UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CR 07 134 T

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| | * | CR No. |
| | * | |
| v. | * | In violation of 42 U.S.C. §6928(d)(2)(A); 42 U.S.C. §11045(b)(4); and 18 U.S.C. §2 |
| | * | |
| | * | |
| | * | |
| | * | |
| SOUTHERN UNION COMPANY | * | |

FILED
OCT 16 2007
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

**INDICTMENT**

**INTRODUCTION**

THE GRAND JURY CHARGES:

1. At all times relevant to this Indictment:

a. Defendant Southern Union Company ("Southern Union") was a Texas-based corporation, incorporated in Delaware, and engaged primarily in a national business of transporting and distributing natural gas.

b. Southern Union owned and operated several natural gas suppliers in Rhode Island and nearby Massachusetts, which collectively were known as the New England Gas Company ("NEGC").

c. As part of its property holdings in Rhode Island, Southern Union owned a facility at the end of Tidewater Street along the Seekonk River in Pawtucket, Rhode Island (the "Tidewater facility"). The property consisted of several vacant buildings and two unused natural gas storage tanks.

**Resource Conservation and Recovery Act (RCRA)**

2. The Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6901 *et seq.*, was enacted by Congress to address the nation's growing hazardous waste disposal problem caused primarily by industrial operations. The intent of RCRA is to protect human health and the environment by requiring the proper safe management of hazardous waste from the time that it is created until the time when it is disposed, and at all points in between.

3. RCRA regulates the generation, treatment, storage, transportation, and disposal of hazardous wastes by establishing a system of management standards, notifications, reports, manifests, and permits. This system of continually tracking hazardous waste is often referred to as "cradle to grave" management.

4. RCRA prohibits the treatment, storage or disposal of hazardous waste without a permit issued under RCRA. RCRA permits are issued by the Environmental Protection Agency ("EPA") or by an authorized state. Authorized state programs may impose more, but not less, stringent regulations than the federal program. At all times relevant to this indictment, the state of Rhode Island, through the Rhode Island Department of Environmental Management ("RIDEM"), was authorized to issue and enforce RCRA permits and regulations in the state of Rhode Island.

5. RCRA requires EPA to identify and list "hazardous

wastes," 42 U.S.C. §6921. Wastes are hazardous either by virtue of their characteristics, for example, toxicity or ignitability, or by virtue of being specifically listed by EPA at 40 C.F.R. §261.20 *et seq.*

6. Mercury wastes are considered "toxic," and therefore hazardous, if they have a concentration of mercury equal to or greater than 0.2 milligrams per liter. 40 C.F.R. §261.24; Rhode Island Hazardous Waste Regulations ("RIHWR") §§ 2.02, 3.00.

7. Mercury that is a discarded commercial chemical product is listed as a hazardous waste at 40 C.F.R. §261.33(f), and is further designated as waste number U151. RIHWR §§ 2.02, 3.00.

**The Mercury Regulator Program at the Tidewater Facility**

8. Prior to the 1960s, many homes were equipped with gas meters using mercury-containing regulators. The regulators controlled the flow of gas to the household. Many older homes in the NEGC service area were outfitted with mercury-containing regulators.

9. From in or about June 2001 to January 2002, Southern Union engaged in a mercury regulator removal and reclamation program. Southern Union identified and removed regulators from its customers' homes, brought the regulators to the Tidewater facility, and contracted with an environmental services company to remove the mercury from the regulators at the Tidewater facility.

10. After removing the mercury from the regulators, Southern Union's contractor placed the mercury in steel flasks designed for its storage and transportation. Southern Union's environmental coordinator for NEGC then shipped the mercury to a facility in Pennsylvania for distillation.

11. In or around January 2002, the contract with the environmental services company that removed the mercury from the regulators ceased.

12. On or about June 24, 2002, Southern Union's environmental coordinator for NEGC drafted a Request for Proposal ("RFP") to restart the mercury regulator removal and reclamation program at the Tidewater facility. The draft was reviewed and revised by Southern Union's environmental director in Texas, but a final version was never sent out to contractors for bids.

**Mercury Storage at the Tidewater Facility**

13. Throughout 2002, 2003 and 2004, Southern Union technicians continued to remove mercury containing regulators from customers' homes and stored them in one of the vacant buildings at the Tidewater facility.

14. On or about August 27, 2003, the Rhode Island-based environmental coordinator for Southern Union drafted a second RFP to solicit bids "for Waste Segregation, Packaging, Transportation and Disposal" of approximately 90 obsolete mercury containing

regulators that were stored in plastic kiddie pools and on the floor of the vacant building, as well as several containers of waste liquid mercury stored in a locked, wooden cabinet in the same building. Southern Union never finalized the second RFP, and it was never sent out to contractors for bids.

15. The waste liquid mercury came from various sources known and unknown to the grand jury. For instance, on or about September 19, 2002, a Southern Union employee transported approximately 10 pounds of loose mercury to the Tidewater facility. On or about September 24, 2002, a Southern Union employee transported a "half full jar of mercury" to the Tidewater facility "in a covered paint bucket." In another instance, on or about March 25, 2003, a plastic gallon-sized container of mercury was discovered in the locker of a deceased employee. Southern Union contracted with an environmental services company to transport the mercury from the locker to the Tidewater facility.

16. By in or about July 2004, Southern Union was storing approximately 165 obsolete mercury containing regulators in the vacant building at the Tidewater facility, along with the waste liquid mercury. The same Rhode Island-based environmental coordinator for Southern Union drafted a third RFP, again "for Waste Segregation, Packaging, Transportation and Disposal" of the mercury waste. As with the previous two draft RFPs, Southern

Union never finalized the third RFP, and it was never sent out to contractors for bids.

17. At no time during the accumulation and storage at the Tidewater facility of the obsolete mercury containing regulators and the waste liquid mercury did Southern Union have a permit to store mercury waste there.

**Lack of Security at the Tidewater Facility**

18. At all times relevant to this indictment, the Tidewater facility was in various states of disrepair, which included gaps in the perimeter fencing, extensive graffiti on the vacant buildings, broken windows and doors, and overgrown vegetation.

19. On or about May 17, 2004, Southern Union's environmental coordinator for NEGC documented in his logbook that there had been evidence of attempted break-ins at the Tidewater facility.

20. After the attempted break-ins at the Tidewater facility, on or about May 20, 2004, at a safety committee meeting, a maintenance employee raised the safety concerns posed by the mercury storage at the Tidewater facility.

21. The same employee raised the issue again at a second safety committee meeting on or about June 17, 2004.

22. After Southern Union again failed to adequately address the safety concerns and after additional attempted break-ins, the

employee raised the issue at a third safety committee meeting on or about September 16, 2004. Again, Southern Union did nothing to address the unsafe conditions at the Tidewater facility.

23. At no time relevant to this indictment were any signs posted at the Tidewater facility indicating that Southern Union was storing hazardous waste at one of the vacant buildings at that facility. There were also no signs within the mercury storage building warning of the presence of mercury containing regulators or the waste liquid mercury.

**September 2004 Mercury Spill**

24. In or about September 2004, three youths entered the Tidewater facility through an opening in the perimeter fence, and broke into the mercury storage building. Once there, the youths removed several containers of waste liquid mercury, some of which they broke and spilled within and outside of the facility grounds. The youths brought some of the mercury back to a nearby apartment complex and into one of the homes there, and spread it around the apartment complex's grounds.

25. For approximately the next three weeks, puddles of mercury remained on the ground at the Tidewater facility and the doors to the mercury storage building remained open. The mercury spilled at the apartment complex also remained on the ground and accessible to the public.

26. On or about October 19, 2004, at approximately 10:30 a.m., a Southern Union construction employee discovered the mercury spill at the Tidewater facility. Shortly thereafter, Southern Union arranged for an environmental services company to remove the mercury spilled on the Tidewater facility grounds.

27. At no time after the mercury spill was discovered did Southern Union notify or attempt to notify the Pawtucket Fire Department or the Rhode Island State Fire Marshall about the mercury spill at the Tidewater facility.

**COUNT ONE**

**(Hazardous Waste Storage Without a Permit - Liquid Mercury)**

28. The Grand Jury realleges Paragraphs 1 through 27 as though fully set forth herein.

29. From on or about September 19, 2002 until on or about October 19, 2004, within the District of Rhode Island,

**Southern Union Company**

defendant herein, did knowingly store, and cause to be stored, hazardous wastes, namely, waste liquid mercury, on the premises of 91 Tidewater Street, Pawtucket, Rhode Island, without a permit issued pursuant to RCRA.

All in violation of 42 U.S.C. §6928(d)(2)(A) and 18 U.S.C. §2.

**COUNT TWO**

**(FAILURE TO PROVIDE EMERGENCY NOTICE OF RELEASE OF A HAZARDOUS SUBSTANCE)**

30. The Grand Jury realleges Paragraphs 1 through 27 as though fully set forth herein.

**The Emergency Planning and Community Right to Know Act (EPCRA)**

31. The Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. §11001 *et seq.*, was enacted by Congress as the national legislation on community safety, designed to assist local and state authorities in protecting the public and the environment from hazardous chemicals. Among other things, EPCRA requires companies to keep inventories of hazardous and toxic chemicals, to plan for emergencies involving such hazardous substances, and to publicize information and provide notice regarding the uses and releases of such hazardous substances.

32. EPCRA also requires owners and operators of facilities that use, produce and store hazardous chemicals to immediately notify the emergency coordinator for the local emergency planning committee and the State emergency planning commission of releases of hazardous substances.

33. The local emergency planning committee for Pawtucket, Rhode Island was the Pawtucket Fire Department. The State emergency planning commission for Rhode Island is the Rhode Island State Fire Marshall.

34. EPCRA requires immediate emergency notification for releases of mercury in amounts equal to or greater than the reportable quantity established pursuant to the Comprehensive

Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9603(b). The reportable quantity for mercury is one pound. 40 C.F.R. § 302.4. One pound of mercury is approximately two tablespoons.

35. From on or about October 19, 2004 up to and including October 20, 2004, in the District of Rhode Island and elsewhere,

**Southern Union Company,**

defendant herein, being owners and operators of a facility, namely, the Tidewater facility, at which a hazardous chemical was produced, used and stored, and from which a hazardous substance, namely, toxic mercury, had been released in a quantity greater than that determined pursuant to 42 U.S.C. §9602, namely, one pound or more, willfully and knowingly failed to immediately make the notification required by 42 U.S.C. §11004, to the community emergency coordinator for the local emergency planning committee, namely the Pawtucket Fire Department, or any of its respective designees, and to the State emergency planning commission, namely the Rhode Island State Fire Marshall, or any of its respective designees.

All in violation of 42 U.S.C. §11045(b)(4) and 18 U.S.C. §2.

**COUNT THREE**
**(Hazardous Waste Storage Without a Permit - Mercury Regulators)**

36. The Grand Jury realleges Paragraphs 1 through 27 as though fully set forth herein.

37. From on or about March 25, 2003 until on or about

October 19, 2004, within the District of Rhode Island,

**Southern Union Company,**

defendant herein, did knowingly store, and cause to be stored, hazardous wastes, namely, mercury-containing gas regulators, on the premises of 91 Tidewater Street, Pawtucket, Rhode Island, without a permit issued pursuant to RCRA.

All in violation of 42 U.S.C. §6928(d)(2)(A) and 18 U.S.C. §2.

A TRUE BILL:

REDACTED

Grand Jury Foreperson

DATED: October 16, 2007

ROBERT CLARK CORRENTE
UNITED STATES ATTORNEY

STEPHEN G. DAMBRUCH
Assistant U.S. Attorney
Criminal Chief

TERRENCE P. DONNELLY
Assistant U.S. Attorney

DIANNE G. CHABOT
Special Assistant U.S. Attorney
U.S. Environmental Protection Agency

KEVIN M. CASSIDY
Trial Attorney, Environmental Crimes Section
U.S. Department of Justice