**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| vs. | : | CR No. 07-134-S |
| | : | |
| SOUTHERN UNION COMPANY | : | |

**DEFENDANT SOUTHERN UNION COMPANY'S**
**MOTION TO DISMISS COUNT I AND COUNT III OF THE INDICTMENT**

Defendant, Southern Union Company ("Southern Union"), pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, respectfully moves to dismiss Count I and Count III of the Indictment. In support of this Motion, Southern Union relies on its accompanying Memorandum of Law, submitted herewith and incorporated herein by reference.

**Statement Pursuant to Local Rule 12(d)**

The filing and disposition of this motion constitutes excludable time as defined by 18 U.S.C. § 3161(h)(1)(f). It is not possible to estimate the amount of excludable time until the disposition of this motion. No motions dealing with the same subject matter have been filed in the past.

**Request for Oral Hearing Under Local Rule 12(e)**

Southern Union requests an oral hearing on this motion under Local Rule 12(e) on the ground that this motion raises issues that can best be clarified in such a hearing. Defendant estimates that thirty (30) minutes will be required for oral argument.

Respectfully submitted,

SOUTHERN UNION COMPANY

By its Attorneys,

/s/ Gerald J. Petros
Gerald J. Petros, No. 2931
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
401-274-2000
401-277-9600 (fax)
gpetros@haslaw.com

John A. Tarantino, No. 2586
Patricia K. Rocha, No. 2793
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
401-274-7200
401-351-4607 (fax)
jtarantino@apslaw.com
procha@apslaw.com

Daniel J. Fetterman
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, NY 10019
212-506-1700
Fax: 212-506-1800

Dated: March 28, 2008

## CERTIFICATION

I hereby certify that on March 28, 2008, a copy of the foregoing Defendant Southern Union Company's Motion to Dismiss Count I and Count III of the Indictment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may accesses this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros
Gerald J. Petros (#2931)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| vs. | : | CR No. 07-134-S |
| | : | |
| SOUTHERN UNION COMPANY | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT SOUTHERN UNION COMPANY'S**
**MOTION TO DISMISS COUNT I AND COUNT III OF THE INDICTMENT**

Defendant Southern Union Company ("Southern Union") respectfully submits the following Memorandum of Law in Support of its Motion to Dismiss Count I and Count III of the Indictment pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure.

## I.

## PRELIMINARY STATEMENT

In Count I of its Indictment, the Government charges that Southern Union's storage of liquid mercury at its Tidewater facility in Pawtucket, Rhode Island violated 42 U.S.C. § 6928(d)(2)(A) of the Resource Conservation and Recovery Act ("RCRA") because Southern Union did not have a hazardous waste storage permit. In Count III of its Indictment, the Government charges that Southern Union's storage of mercury-containing gas regulators at this same facility also violated this RCRA provision because Southern Union did not have a hazardous waste storage permit. The Government is wrong on both Counts.

First, for Count I, accepting the Government's factual allegations as true for the purposes of this motion, the liquid mercury stored at Tidewater was a "commercial chemical product" under the state and federal regulations, and not a solid or hazardous waste that is regulated under

RCRA.[1] EPA specifically excludes commercial chemical products such as liquid mercury from regulation as solid (and therefore hazardous) wastes when stored for eventual recycling. In excluding these products, EPA explained that commercial chemical products are "not wastes when recycled" by being reclaimed. The Indictment alleges that "Southern Union's environmental coordinator for NEGC . . . shipped the mercury to a facility in Pennsylvania for distillation." See Indictment ¶ 10.[2] Because, as the Indictment alleges and as shown *infra*, Southern Union held the liquid mercury as a product for re-sale *(i.e.*, distillation), it is not a solid (or hazardous) waste, and Southern Union did not need a RCRA hazardous waste permit to store the material at Tidewater. Thus, even taking the Government's allegations as true, Count I of the Indictment should be dismissed because RCRA does not apply to the liquid mercury Southern Union stored at Tidewater for re-sale.

Second, for Count III, accepting the Government's allegations as true for the purposes of this motion, the mercury-containing gas regulators are "universal waste" under state and federal regulations.[3] Those Universal Waste regulations provide that handlers of universal waste, including Southern Union, are not subject to the hazardous waste storage permit requirements that form the predicate for criminal charges under 42 U.S.C. § 6928(d)(2)(A). Those regulations

---

[1] For purposes of this motion only, the factual allegations in the Indictment are accepted as true. United States v. J. Tirocchi & Sons, Inc., 187 F. Supp. 778, 778 (D.R.I. 1960). Southern Union restates in this memorandum, but does not admit, the relevant factual allegations set forth in the Indictment.

[2] The facts demonstrate that Southern Union held the liquid mercury at Tidewater as a "product," not a waste, intending to sell the mercury to a facility in Pennsylvania owned by Bethlehem Apparatus, and through distillation the product would be reclaimed. Indeed, as the Government's discovery to Southern Union shows, Southern Union sold 450 pounds of liquid mercury to Bethlehem Apparatus for recycling in December 2001, handling that mercury as a commercial chemical product.

[3] The Government alleges that the mercury-containing gas regulators constitute a hazardous waste. The Government must prove the elements of its case beyond a reasonable doubt. Southern Union's various references in this memorandum to the mercury-containing regulators as universal waste or hazardous waste are solely to address the Government's allegations, but they are not intended to relieve the Government of its burden of proof on any element or to lessen the Government's burden of proof in any way.

specifically provide that Southern Union did not need a hazardous waste storage permit to store the mercury-containing gas regulators at Tidewater. For these reasons, the Court should also dismiss Count III of the Indictment.

## II.

## THE ALLEGATIONS IN THE INDICTMENT

On October 16, 2007, a grand jury returned a three count Indictment against Southern Union. Count I of the Indictment alleges that Southern Union knowingly stored a hazardous waste, liquid mercury, at its Tidewater facility without the required RCRA hazardous waste storage permit, in violation of 42 U.S.C. § 6928(d)(2)(A). See Indictment ¶¶ 28 – 29. Count II alleges that Southern Union knowingly and willfully failed to notify local officials immediately of a release of a hazardous substance in quantities greater than one pound from its facility. See Indictment ¶¶ 31– 35. Count III alleges that Southern Union knowingly stored a hazardous waste, mercury-containing gas regulators, at its Tidewater facility without the required RCRA hazardous waste storage permit, in violation of 42 U.S.C. § 6928(d)(2)(A). See Indictment ¶ 37. In this Motion, Southern Union moves to dismiss Count I and Count III. The allegations in the Indictment are as follows:

**The Tidewater Facility**

Southern Union owned and operated several natural gas suppliers in Rhode Island and nearby Massachusetts, which collectively were known as the New England Gas Company ("NEG"). As part of its property holdings in Rhode Island, Southern Union owned a facility at the end of Tidewater Street along the Seekonk River in Pawtucket, Rhode Island. See Indictment ¶¶ 1(b)-(c).

**The Mercury Seal Regulator Program**

After acquiring NEG in 2000, Southern Union helped NEG to establish a recycling program for its Mercury Seal Regulators (MSRs). Prior to the 1960s, many homes were equipped with mercury-containing regulators. The regulators controlled the flow of gas to the household. Many older homes in the NEG service area were outfitted with mercury-containing regulators. See Indictment ¶ 8.[4]

From in or about June 2001 to January 2002, Southern Union engaged in a mercury regulator removal and reclamation program. Southern Union identified and removed regulators from its customers' homes, brought the regulators to the Tidewater facility, and contracted with an environmental services company to remove the mercury from the regulators at the Tidewater facility. See Indictment ¶ 9.

After removing the mercury from the regulators, Southern Union's contractor placed the mercury in steel flasks designed for its storage and transportation. Southern Union then shipped the mercury to a facility in Pennsylvania for distillation. See Indictment ¶ 10. In or around January 2002, the contract with the environmental services company that removed the mercury from the regulators ceased. See Indictment ¶ 11.

Southern Union technicians continued to remove, occasionally, mercury-containing regulators from customers' homes and stored them in one of the vacant buildings at the Tidewater facility. See Indictment ¶ 13.

In addition, several containers of liquid mercury were stored in a locked, wooden cabinet in this building. See Indictment ¶ 14. The Indictment alleges that the liquid mercury came from

[4] Mercury-containing regulators are cylindrical shaped valves used to reduce the pressure of natural gas as it moves from gas mains into a home. Mercury-containing regulators contain a small amount of mercury in a sealed container.

various sources. For instance, on or about September 19, 2002, a Southern Union employee transported approximately 10 pounds of liquid mercury to the Tidewater facility. On or about September 24, 2002, a Southern Union employee transported a "half full jar of mercury" to the Tidewater facility "in a covered paint bucket." In another instance, on or about March 25, 2003, a plastic gallon-sized container of mercury was discovered in the locker of a deceased employee. Southern Union contracted with an environmental services company to transport the mercury from the locker to the Tidewater facility. See Indictment ¶ 15.

**The Break In**

In or about September 2004, three vandals entered the Tidewater facility through an opening in the perimeter fence, and broke into the mercury storage building. Once there, the vandals removed several containers of liquid mercury, some of which they broke and deliberately released within and eventually outside of the facility grounds. See Indictment ¶ 24.

The vandals did not remove any mercury from the MSRs, and did not damage or otherwise disturb the MSRs, which remained in sealed double bagged plastic bags resting in the hard plastic containment pools.[5]

## III.

## STANDARD OF REVIEW

Dismissal of an indictment is warranted where, as here, construing the facts in the light most favorable to the Government, the Government's theory of prosecution fails as a matter of law. See United States v. Treadwell, 566 F. Supp. 80, 83 (D.C. Cir. 1983) ("it is the government's theory that fails, not the weight of its evidence. For this reason, dismissal of the mail fraud counts is warranted."); see also United States v. Hope, 861 F.2d 1574, 1578 (11th Cir.

[5] Indeed, the Indictment does not allege any consequence whatsoever from Southern Union's storage of the mercury-containing regulators.

1988) (affirming dismissal of count in indictment because allegations in indictment failed to state a violation of the charged offense).

While it is generally true that an indictment is constitutionally adequate if it contains the elements of the offense charged, fairly informs a defendant of the charge against which he must defend, and enables him to plead an acquittal conviction in bar of future prosecutions for the same offense, Hamling v. United States, 418 U.S. 87, 117 (1974) (quotations omitted), it is axiomatic that, "[t]o be legally sufficient, the indictment must assert facts which in law constitute an offense and which, if proved, would establish prima facie of the defendant's commission of that crime." United States v. Superior Growers Supply, Inc., 982 F.2d 173, 177 (6th Cir. 1992); citing Fleisher v. United States, 302 U.S. 218 (1937). Indeed, the Supreme Court has cautioned:

> Undoubtedly the language of the statute may be used in the general description of the offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.

Hamling, 418 U.S. at 117-18 (quotations omitted). If the indictment is legally deficient, the proper result is dismissal of the indictment. United States v. Landham, 251 F.3d 1072, 1080 (6th Cir. 2001); citing Superior Growers, 982 F.2d at 177.

Here, even when viewed in the light most favorable to the Government, the Indictment fails to allege facts which constitute a violation of 42 U.S.C. § 6928(d)(2)(A) of RCRA. The Court should dismiss Count I and Count III.

# IV.

# ARGUMENT

## A. THE COURT SHOULD DISMISS COUNT I OF THE INDICTMENT BECAUSE THE LIQUID MERCURY STORED AT TIDEWATER FOR RECYCLING AS A COMMERCIAL CHEMICAL PRODUCT DID NOT, AS A MATTER OF LAW, REQUIRE A RCRA HAZARDOUS WASTE STORAGE PERMIT.

To prove a violation of 42 U.S.C. § 6928(d)(2)(A), the Government must prove, as a threshold matter, that the liquid mercury stored at Tidewater was a solid (and hazardous) waste. Because the liquid mercury was a commercial chemical product, and not a waste, no hazardous waste storage permit was required, and the Government's claim fails as a matter of law.

In order to prove that the material is a hazardous waste, the government must first prove that it is a "waste" – i.e. that it is a "solid waste" under RCRA. "For a waste to be classified as hazardous, it must first qualify as a 'solid waste' under RCRA." United States v. Self, 2 F.3d 1071, 1076 (10th Cir.)(citing United Technologies Corp v. EPA, 821 F.2d 714, 716 n.1 (D.C.Cir. 1987). See also American Mining Congress v. EPA, 824 F.2d 1177, 1179 (D.C. Cir. 1987) (hazardous waste is defined as a subset of solid waste, and "the scope of EPA's jurisdiction is limited to those materials that constitute solid waste"). As discussed below, the Government's charge fails on this threshold element.

### 1. Commercial Chemical Products Such As Liquid Mercury That Are Recycled By Being Reclaimed Are Not Solid Wastes

a. The Definition of "Solid Waste"

Subtitle C (the Hazardous Waste Management Program) of RCRA grants EPA authority to regulate hazardous wastes. Hazardous wastes are defined in the statute as a subset of "solid wastes." 42 U.S.C. § 6903(4).

RCRA defines solid waste as ". . . any garbage, refuse, sludge from a waste treatment plant, or air pollution control facility and other discarded material . . . resulting from industrial, commercial, mining, and agricultural operations, and from community activities." 42 U.S.C. § 6903(27).

EPA promulgated a regulatory definition of solid waste for purposes of implementing its Subtitle C hazardous waste management regulations. Under its regulations, a solid waste is any material that is "discarded." 40 C.F.R. § 261.2(a)(1).

"Discarded" is defined as any material which is either (a) "abandoned," (b) "recycled," (c) "inherently waste-like," or (d) a "military munition." 40 C.F.R. § 261.2(a)(2)(i)-(iv).

In determining whether "recycled" materials are "discarded" under this regulation, EPA promulgated a regulatory scheme that identified five broad categories of secondary materials (sludges, spent materials, by-products, commercial chemical products, and scrap metal) and then situationally defined whether each such secondary material is a solid waste when it is recycled by means of each of four identified methods (use constituting disposal, burning for energy recovery, speculative accumulation, and reclamation). 50 Fed. Reg. 614, 618 (Jan. 4, 1985). In this way, EPA excluded from regulation as solid wastes certain classes of materials destined for recycling that it did not consider to be "discarded" and therefore were not "solid wastes." EPA explained that, while the statute gave it authority to regulate certain recycling activities as waste management, it did not "believe [its] authority extend[ed] to certain types of recycling activities that are shown to be very similar to normal production operations or to normal uses of commercial products." 50 Fed. Reg. 614, 617 (Jan. 4, 1985).

The regulations set up an objective analysis of the type of recycling activity involved, and the type of material being recycled, to determine whether that material is defined as a solid

waste, or whether the material is excluded from the definition. 40 C.F.R. § 261.2(c)(1)-(4), and Table 1. See American Mining Congress v. EPA, 824 F.2d 1177, 1179 (D.C. Cir. 1987) ("EPA determines whether a material is a RCRA solid waste when it is recycled by examining both the material or substance itself and the recycling activity involved.")

Under this regulatory scheme, the regulations exclude from the definition of solid waste commercial chemical products that are held for reclamation. This is how the regulations create that exclusion:

First, the regulation analyzes the type of material at issue. Here, "commercial chemical products" are defined as those materials listed in 40 C.F.R. § 261.33, and are described as "chemicals manufactured or formulated for commercial or manufacturing use, which consists of the commercially pure grade of the chemical, any technical grades of a chemical that are produced or marketed, and all formulations in which the chemical is the sole active ingredient." See 40 C.F.R. § 261.33 and Comment. It is undisputed that this category of chemicals includes mercury.

Second, the regulations analyze the recycling activity at issue – here, the mercury was "reclaimed." A material is "reclaimed" if it is "processed to recover a usable product, or if it is regenerated. Examples are recovery of lead values from spent batteries and regeneration of spent solvents." 40 C.F.R. § 261.1(c)(4). EPA explained in its preamble promulgating its final rule on solid wastes that "reclaimed metals that are suitable for direct use, or that only have to be refined to be usable, are products, not wastes." 50 FR 614, 635 (Jan. 4, 1985). In addition, EPA has described "recovering mercury from broken thermometers . . . ." as an example of reclamation. U.S. EPA, "Safe Hazardous Waste Recycling" EPA530-E-00-001d (October 2000).

When promulgating its final rule defining solid waste and recycling activities, EPA recognized that commercial chemical products are "not wastes when recycled." 50 Fed. Reg. 614618 (Jan. 4, 1985). EPA therefore excluded these products from its definition of solid waste when they are recycled by being "reclaimed." See 40 C.F.R. § 261.2(c)(3), and Table 1. EPA noted in its preamble that it is a "fairly evident principle" that "reclaimed metals that . . . only have to be refined to be usable are products, not wastes." 50 Fed. Reg. 614, 634 (Jan. 4, 1985). Thus, commercial chemical products are *not* solid wastes, and are *not* regulated under RCRA, when they are recycled by being reclaimed.

b. Storage of Commercial Chemical Products

EPA also excluded from regulation the storage of commercial chemical products being held for recycling. Under 40 C.F.R. § 261.2(c)(1)-(4), and Table 1, certain materials are defined as being "discarded" and are therefore a regulated "solid waste" if the materials are "accumulated speculatively,"[6] even though the materials are destined for recycling and otherwise would not be regulated. However, EPA specifically excluded commercial chemical products from this provision; therefore, EPA did *not* restrict or limit the length of time a party may accumulate and store commercial chemical products prior to their being recycled. 40 C.F.R. § 261.2(c)(4) and Table 1.

Liquid mercury is listed as a commercial chemical product in 40 C.F.R. § 261.33. As a commercial chemical product, liquid mercury is not a solid waste [and by definition not a hazardous waste] when it is accumulated for recycling by reclamation.

[6] A material is "accumulated speculatively," if it is "accumulated before being recycled." 40 C.F.R. § 261.1(c)(8).

### 2. The Liquid Mercury Southern Union Stored At Tidewater Was a Commercial Chemical Product

The elementary mercury Southern Union stored at Tidewater was a commercial chemical product. As set forth above, under 40 C.F.R. § 261.33, a "commercial chemical product" is defined as a product that is "manufactured or formulated for commercial or manufacturing use, which consists of the commercially pure grade of the chemical." The liquid mercury that Southern Union stored at Tidewater was neither changed nor altered from its pure commercial grade. In fact, Bethlehem Apparatus ("Bethlehem") had previously purchased from Southern Union and reclaimed the same type of liquid mercury using its triple distilling process. Thus, the liquid mercury stored at Tidewater was a commercial chemical product under RCRA.

Southern Union collected and stored the liquid mercury at its Tidewater facility as a commercial chemical product that needed only to be refined to be re-used again as mercury. Southern Union sent 450 pounds of liquid mercury for recycling to Bethlehem in December 2001. At Bethlehem, this mercury was refined for direct re-use and re-sale as mercury. Bethlehem's process of refining Southern Union's liquid mercury for re-sale falls directly under this definition of reclamation. Southern Union intended to repeat this process, but the vandals broke into Tidewater and released the liquid mercury.[7]

In sum, under 40 C.F.R. § 261.2(c)(3), Table 1, commercial chemical products "are not solid wastes when reclaimed." Here, Southern Union held the liquid mercury, a commercial

---

[7] Consistent with the Indictment's allegation that the mercury was shipped to a facility (Bethlehem Apparatus) for distillation (*i.e.*, reclamation), EPA has confirmed that mercury sent to Bethlehem to be triple distilled is not a RCRA regulated waste. In a letter to Bruce J. Lawrence, President, Bethlehem Apparatus Company, Inc. dated May 30, 1986, EPA stated that "mercury (which is 99 percent pure) that is received and refined at your facility is not a solid waste." EPA explained – consistent with the regulatory scheme described earlier – that "we have stated that metals that are suitable for direct use, or that only have to be refined to be usable as products, are not wastes." Thus, EPA concluded in its letter to Bethlehem that "the mercury – that is 99 percent free-flowing mercury – that you receive at your facility is not subject to any of the hazardous waste regulations." The liquid mercury at Tidewater falls squarely within this description, and is therefore "not subject to any of the hazardous waste regulations." A copy of this letter is attached as **Exhibit A.**

chemical product, for eventual shipment to Bethlehem for recycling by being reclaimed. Therefore, that liquid mercury – as a matter of law – was not a solid waste, and therefore not a hazardous waste. For these reasons, federal law did not require Southern Union to obtain a RCRA hazardous waste storage permit to store the liquid mercury at Tidewater.

## B. THE COURT SHOULD DISMISS COUNT III OF THE INDICTMENT BECAUSE THE MERCURY-CONTAINING REGULATORS ARE A UNIVERSAL WASTE THAT DOES NOT, AS A MATTER OF LAW, REQUIRE A HAZARDOUS WASTE STORAGE PERMIT

To prove a violation of 42 U.S.C. § 6928(d)(2)(A), the Government must prove, as a threshold matter, that the mercury-containing regulators at Tidewater were a hazardous waste and that storage of those regulators for more than 90 days required a permit under 42 U.S.C. § 6925(a). Because the mercury-containing regulators fall under the category of universal wastes, and universal wastes are a separate category of hazardous wastes that do not require a hazardous waste storage permit under 42 U.S.C. § 6925(a), the Government's charge fails as a matter of law.

### 1. The Mercury-Containing Regulators Are "Universal Waste"

The Environmental Protection Agency promulgated the Universal Waste regulations to ease the regulatory requirements for certain types of common items, including mercury-containing devices such as thermostats and regulators. EPA created this separate and distinct category of hazardous wastes to encourage recycling by lessening the burden on waste handlers of certain materials that are commonly recycled. Handlers of universal wastes are subject to less stringent standards than those standards that would otherwise apply to persons or entities storing, transporting, and collecting such hazardous wastes.

Universal wastes cover devices and materials, which individually contain a small amount of hazardous materials, but which are generated in large volumes each year. In creating this

separate category of hazardous waste, EPA promulgated an entirely separate set of hazardous waste management rules – found at 40 C.F.R. Part 273 – that apply to the handling and storage of universal wastes.

In 1995, EPA initially created three categories of wastes that were covered under its universal waste regulations: hazardous waste batteries, hazardous waste pesticides, and hazardous waste thermostats. Hazardous waste lamps were added in 1999, and in June 2002, EPA issued a proposed rule to add "mercury-containing equipment" to the universal waste category.

However, even before EPA acted on its proposed rule to add "mercury-containing equipment" to the universal waste category, Rhode Island adopted its own regulations doing so. Rhode Island amended its Rules and Regulations for Hazardous Waste Management, effective September 17, 2001, by adopting its own universal waste rule (Rule 13.00) that, in addition to adopting the EPA universal wastes rules and waste categories of pesticides, batteries, thermostats and mercury-containing lamps, added two additional universal waste categories: cathode ray tubes and "mercury-containing devices." "Mercury-containing devices" are defined in Rule 3.00 of the Rhode Island regulations as devices that include

> . . . any electrical product or component which contains elemental mercury that is necessary for its operation and is housed within an outer metal, glass, or plastic casing. These devices include, but are not limited to, thermometers, barometers, electric switches, electric relays, thermocouples, manometers, and sphygmomanometers.

The mercury-containing regulators that Southern Union stored at Tidewater fall squarely within this definition.

What the state of Rhode Island did with respect to its regulations on universal waste was both appropriate and allowed under federal law. That is because a state may include such

additional universal waste categories pursuant to the authority of 40 C.F.R. Part 273 Sub-part G, "Petition process for inclusion of additional universal waste." EPA specifically "authorized" these Rhode Island universal waste regulations that included mercury-containing devices on August 9, 2002,[8] and the agency's approval became effective on October 8, 2002. Thus, under the applicable regulations, at all material times alleged in Count III of the Indictment, the mercury-containing regulators stored at Tidewater, as alleged in the Indictment, were universal wastes.[9]

In 2005, EPA formally adopted its proposed rule that expanded its own categories of universal waste to include mercury-containing devices. EPA issued its Final Rule adding mercury-containing equipment as a universal waste on August 5, 2005. 70 Fed. Reg. 45508 (August 5, 2005): EPA's rule defined this universal waste category as follows:

> Mercury-containing equipment means a device or part of a device (including thermostats, but excluding batteries and lamps) that contains elemental mercury integral to its function.

40 C.F.R. § 273.9.

The Rhode Island rule and the EPA rule are essentially the same, because in 2001 Rhode Island modeled its rule in conformance with EPA's proposed rule. In its statutorily required statement explaining its Final Rule, EPA expressly listed "mercury-containing regulators" as one of the examples of the "kinds of devices" that fall under the definition of mercury-containing equipment:

> Some of the various types of MCE [mercury-containing equipment] are manometers, barometers, flow meters, mercury light switches, *mercury regulators*, pressure relief gauges, water treatment gauges, and gas safety relays.

70 Fed. Reg. 45508, 45512 (August 5, 2005)(emphasis added).

---

[8] 67 Fed. Reg. 51765 (August 9, 2002)

[9] Count III of the Indictment alleges the pertinent dates for the offense as "[f]rom on or about March 25, 2003 until on or about October 19, 2004." See Indictment ¶ 37

In sum, even accepting the Government's allegation in Count III of the Indictment as true, the mercury-containing regulators stored by Southern Union at Tidewater, could only be universal waste.

### 2. Southern Union Did Not Need A Hazardous Waste Storage Permit For The Mercury-Containing Regulators Because Universal Wastes Handlers Are Not Subject To The RCRA Permit Requirements.

Count III of the Indictment alleges only that the mercury-containing regulators stored at Tidewater were a hazardous waste and that Southern Union violated 42 U.S.C. § 6928(d)(2)(A) because it stored these regulators without a hazardous waste storage permit. That allegation is legally wrong.

Section 6928(d)(2)(A) provides, in pertinent part: "Any person who knowingly treats, stores or disposes of any hazardous waste identified or listed under this chapter without a permit under this subchapter . . . shall, upon conviction . . ." be subject to criminal penalties.

The mercury-containing regulators alleged in the Indictment are universal wastes, and universal wastes are not included in the category of hazardous wastes that require a hazardous waste storage permit; therefore, this criminal provision does not (and cannot) apply to Southern Union's alleged storage of mercury-containing regulators. In creating this less stringent, alternate set of management standards for universal wastes, Rhode Island and EPA chose not to subject the storage of these universal wastes to the hazardous waste storage permit requirements that apply to other hazardous wastes. In so doing, EPA chose not to subject handlers of universal waste to criminal prosecution.

Universal waste handlers are subject to the universal waste rules only, and not to the same hazardous waste management rules applicable to those handling or storing all other hazardous wastes. EPA's universal waste regulations specifically provide that the universal

waste standards are "in lieu of regulation under 40 C.F.R. Parts 260 through 272." See 40 C.F.R. § 273.1(b). Those sections of the code of federal regulations impose the requirements for the so-called "cradle to grave" management of hazardous waste and include, in 40 C.F.R. Part 270, the specific requirements for the RCRA hazardous waste storage permit that the Government contends Southern Union needed to store the mercury-containing regulators. 40 C.F.R. § 270.1(c) ("Scope of the RCRA permit requirement") specifically states that "RCRA requires a permit for the 'treatment,' 'storage,' and 'disposal' of any 'hazardous waste' as identified in 40 C.F.R. Part 261." 40 C.F.R. § 270.1(c)(2) then lists, however, under the heading "specific exclusions," "persons . . . who are *not* required to obtain a RCRA permit." These exempt "persons" include:

> [u]niversal waste handlers and universal waste transporters managing the wastes listed below [which include mercury-containing equipment]. These handlers are subject to regulation under 40 C.F.R. Part 273.

40 C.F.R. § 270.1(c)(2).

In its Final Rule adopting mercury-containing equipment as a category of universal waste, EPA explained why it exempts handlers of the universal waste mercury-containing device category from the requirement to obtain a RCRA hazardous waste storage permit:

> Because spent MCE is generated in small quantities in geographically dispersed operations, compliance with full subtitle C requirements is difficult to achieve. Compliance with subtitle C is particularly difficult for electric or gas utility operations which are located on customer's properties. . . .
>
> For example, under the universal waste rule, a fire station, community center, or retail store could participate in MCE collection programs without having to get a RCRA permit, as they would be required to under full subtitle C regulation.

70 Fed. Reg. 45508, 45511 (August 5, 2005). Thus, under EPA's regulations, universal waste handlers are specifically excluded from the requirement to obtain a RCRA hazardous waste storage permit.[10]

Similarly, Rhode Island's regulations, specifically authorized and approved by EPA, provide that universal wastes

> are exempt from regulation under 40 C.F.R. § 262 through 270 . . . and therefore are not fully regulated as hazardous waste. These wastes listed in this rule [which include mercury-containing devices] are subject to regulation under 40 C.F.R. Part 273.

Rule 13.01 of Rhode Island's Rules and Regulations for Hazardous Waste Management.

In addition, these universal waste regulations also specifically state that universal waste handlers "are *not* required to obtain a RCRA permit in order to manage these wastes." See Rule 13.05(C) ("Requirements for Universal Waste Handlers and Transporters")(emphasis added).

Thus, both the federal and state governments, through their respective environmental agencies, exempt handlers of universal wastes from the requirements of 40 C.F.R. Parts 262 through 270 to obtain a hazardous waste storage permit. Consequently, the Government cannot now prosecute criminal charges against Southern Union for allegedly not obtaining a permit that the applicable rules do not require for storage of universal wastes.

In sum, 42 U.S.C § 6928(d)(2)(a) applies only to hazardous wastes that require a storage permit under 40 C.F.R. Parts 262 through 270. Even accepting the Government's allegations as true, Southern Union did not need a hazardous waste storage permit to store the mercury-containing regulators at Tidewater because those mercury-containing regulators were universal

---

[10] Universal waste handlers also are not subject to the hazardous waste generator requirements of 40 C.F.R. Part 262. For example, under 40 C.F.R. § 262.34(b), a generator who accumulates hazardous waste for more than 90 days becomes "an operator of a storage facility" who is required to obtain a RCRA hazardous waste storage permit. That requirement does not apply to universal waste handlers.

waste under the state program, a program duly authorized by EPA. Therefore, the Court should dismiss Count III of the Indictment.

## V.

## CONCLUSION

For these reasons, the Court should dismiss Count I and Count III of the Indictment.

Respectfully submitted,

SOUTHERN UNION COMPANY

By its Attorneys,

/s/ Gerald J. Petros
Gerald J. Petros, No. 2931
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
401-274-2000
401-277-9600 (fax)
gpetros@haslaw.com

John A. Tarantino, No. 2586
Patricia K. Rocha, No. 2793
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
401-274-7200
401-351-4607 (fax)
jtarantino@apslaw.com
procha@apslaw.com

Daniel J. Fetterman
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, NY 10019
212-506-1700
Fax: 212-506-1800

Dated: March 28, 2008

**CERTIFICATION**

I hereby certify that on March 28, 2008, a copy of the foregoing Memorandum of Law in Support of Defendant Southern Union Company's Motion to Dismiss Count I and Count III of the Indictment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may accesses this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros