**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| | * | |
| | * | |
| v. | * | CR No. 07-134S |
| | * | |
| | * | |
| SOUTHERN UNION COMPANY | * | |

**UNITED STATES' OBJECTION TO**
**DEFENDANT'S TO DEFENDANT'S MOTION TO DISMISS**
**COUNTS 1 AND 3 OF THE INDICTMENT**

The defendant has moved to dismiss Counts 1 and 3 of the indictment. For the reasons stated in the attached Memorandum of Law, the government objects to the Motion.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

/s/ TERRENCE P. DONNELLY
TERRENCE P. DONNELLY
Assistant U. S. Attorney
R.I. Bar No. 3506
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
terrence.donnelly@usdoj.gov

KEVIN CASSIDY
Trial Attorney
Department of Justice
Environmental Crimes Section
601 D St. NW
Washington, DC 20530
Tel (202) 305-0333
kevin.cassidy@usdoj.gov

DIANNE CHABOT
Special Assistant U.S. Attorney
Regional Criminal Enforcement Counsel
U.S. Environmental Protection Agency
One Congress Street
Suite 1100, SAA
Boston, MA 02114-2023
Tel (617) 918-1868
Fax (617) 918-0868
chabot.dianne@epa.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CR. No. 07-134-S |
| vs. | ) | |
| | ) | |
| SOUTHERN UNION COMPANY | ) | |

**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION TO DEFENDANT'S MOTION TO DISMISS COUNTS 1 AND 3 OF THE INDICTMENT**

## I. INTRODUCTION

Counts One and Three of the Indictment charge that the Defendant stored hazardous waste at its Tidewater facility in Pawtucket, Rhode Island without a permit issued pursuant to the Resource Conservation and Recovery Act ("RCRA") in violation of 42 U.S.C. § 6928(d)(2)(A). Count One involves hazardous waste liquid mercury and Count Three involves hazardous waste mercury-containing regulators

The Defendant moves to dismiss Count One because it claims, even accepting the Government's factual allegations as true, the liquid mercury stored at the Tidewater facility was a "commercial chemical product" stored for eventual recycling and therefore not a solid waste under RCRA. When one peels back the layers of the Defendant's argument, however, it is apparent that the Defendant really is asking the Court to accept as true *the Defendant's* self-serving factual assertions that (1) the Defendant intended to recycle the mercury stored at Tidewater and (2) the mercury stored at Tidewater was neither changed nor altered from its pure chemical state.

As properly alleged in the Indictment, the conditions at the Tidewater facility were deplorable and not indicative of legitimate recycling. Ind. ¶18. Significantly, the defendant's own never-acted-upon Requests for Proposals refer to the mercury as "waste" and seek its "disposal." ¶¶14, 16. Moreover, as alleged in the Indictment, the mercury at Tidewater was stored in miscellaneous non-commercial chemical product containers, including a plastic jug, glass jars, and an old paint bucket – the type of receptacles in which one might store unwanted, used material. ¶15.

The Defendant also is wrong on the law, citing isolated provisions that do not apply to the Defendant's storage of mercury at the Tidewater facility. First, the Defendant focuses on the provisions within the solid waste definition that apply to facilities that, unlike the Defendant, legitimately recycle secondary materials and store those materials before recycling. It is not the recycling provisions that apply to the Defendant, but the regulation that makes mercury a solid waste if stored in lieu of disposal. The mercury at Tidewater was a solid waste because the Defendant stored that mercury as a form of waste management, and the facts in the Indictment support that conclusion. Second, the mercury stored at Tidewater was not, as the defendant claims, an unused "commercial chemical product," but rather a "spent material" that is a solid waste even if stored for reclamation. The 1986 letter from an EPA employee to Bethlehem Apparatus Company, an EPA permitted and approved mercury recycling facility, and the citations therein, have nothing whatsoever to do with the Defendant's storage of mercury for nearly two years at the dilapidated Tidewater facility. Contrary to the Defendant's assertions, the Bethlehem letter does not authorize the Defendant to store its used, unwanted liquid mercury for as long as it would like, and in whatever deplorable conditions it sees fit. The Indictment

adequately alleges that the used, unwanted liquid mercury was a waste and that the Defendant needed a permit to store that waste at Tidewater.

The Defendant seeks to dismiss Count Three of the Indictment not because the mercury-containing regulators are not waste -- which they and, quite logically, the mercury within them are -- but rather because the Defendant asserts it was a "handler" of universal waste under EPA's universal waste regulations and, as such, was not required to obtain a RCRA storage permit. Once again, there are disputed factual issues buried within the Defendant's argument, and the Defendant misapplies the law.

A handler of universal waste is a temporary collection facility that receives the universal waste, accumulates it for a time, and then sends it to a facility for disposal or recycling. As properly alleged in the Indictment, the Defendant did not send the regulators from Tidewater for proper disposal. A handler is *not* a company that cracks open regulators to remove liquid mercury, or a company that abandons or disposes of universal waste. Companies that engage in these activities are "destination facilities" under the universal waste regulations and destination facilities *are* required to obtain RCRA permits to store universal waste. As alleged in the Indictment, the Defendant, through its contractor, was pouring mercury out of the regulators at the Tidewater facility in 2001, and in 2003 and 2004, the Defendant's environmental coordinator drafted Request for Proposals seeking bids for waste "segregation" and disposal. The Indictment more than sufficiently alleges that the defendant needed a permit to store the regulators

## II. <u>LEGAL STANDARD</u>

Federal Rule 7(c) of Criminal Procedure requires that an indictment be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R.

Crim. P. 7(c)(1). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." United States v. Cianci, 378 F.3d 71 at 81 (1st Cir. 2004), citing Hamling v. United States, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as `those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.'" Id. (citations omitted); see also United States v. McDonough, 959 F.2d 1137, 1140 (1st Cir.1992).

The Court should "view the indictment 'as a whole,' . . . and [] give the words their 'plain and sensible meaning.'" United States v. McLennan, 672 F.2d 239, 243 n.4 (1st Cir. 1982) (quoting United States v. Haas, 583 F.2d 216, 220 (5th Cir. 1978), cert. denied, 440 U.S. 981 (1979)). The Court should "construe the allegations in a practical sense, with all necessary implications." United States v. Barker Steel Co., 985 F.2d 1123, 1125 (1st Cir. 1993).

Where the Indictment tracks the language of the statute, but also goes into considerable detail with respect to the underlying factual allegations, it is more than sufficient. See Cianci, 378 F.3d at 81; see also United States v. Wexler, 621 F.2d 1218, 1222 (2d Cir. 1980) ("A motion to dismiss for failure to charge an offense ... does not lie where as in this case, the indictment tracks the language of the statute and sufficiently sets forth the elements of the crime charged."). The government need not allege its theory of the case or supporting evidence. United States v. Buckley, 689 F.2d 893, 897 (9th Cir. 1982) (citing United States v. Markee, 425 F.2d 1043, 1047-48 (9th Cir. 1970)).

Defendant moves to dismiss Counts One and Three of the Indictment asserting that, even if the government's factual allegations are true, the jars and plastic containers of mercury stored at the Tidewater facility could not be "solid waste" under RCRA, and the storage of mercury-

containing regulators could not have required a RCRA permit. Upon closer examination, however, it becomes apparent that the Defendant's Motion is really asking the Court to accept as true the *Defendant's* disputed factual representations and to misapply RCRA provisions that have little to do with Defendant's conduct. Accordingly, the Defendant's Motion must fail.

When read as a whole, the Indictment more than meets the relatively lenient Rule 7 requirements. Counts One and Three track the language of the statute and charge the Defendant with knowingly storing hazardous waste at the Tidewater Facility without a permit in violation of RCRA. The Indictment goes into considerable detail as to the underlying conduct that, when properly viewed in the light most favorable to the government, is more than sufficient to allege both that the liquid mercury was a waste under RCRA, and that the Defendant required a permit to store the regulators. Accordingly, the United States respectfully request that the Court deny the Defendant's Motion.

## III. OVERVIEW OF RCRA

RCRA is a comprehensive environmental statute that authorizes the United States Environmental Protection Agency ("EPA") to regulate hazardous wastes from cradle to grave, in accordance with the waste management procedures of Subtitle C, 42 U.S.C. §§ 6921-6934. City of Chicago v. Environmental Defense Fund, 511 U.S. 328, 331 (1994).

Under RCRA, it is a felony to knowingly store hazardous waste without a permit. 42 U.S.C. §§ 6928(d)(2)(A).[1] Unless specifically excluded,[2] all facilities that treat, store, or dispose

---

[1] The felony provision of 42 U.S.C. § 6928(d)(2)(A) is not a specific intent crime. The term "knowingly," in the context of "public welfare" statutes such as RCRA, does not require that the defendant act with the specific intent to violation the law, or with the specific knowledge of the particular regulatory program promulgated under RCRA. United States v. Dee, 912 F.2d 741, 745 (4th Cir. 1990); United States v. Kelley Technical Coatings, Inc., 157 F.3d 432, 436 (6th Cir. 1998). Where "dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." Id. at (continued...)

of hazardous waste must have either a permit or interim status. See 42 U.S.C. § 6925(a), (e), 40 C.F.R. § 270.1(c).

The permit requirement is in part " intended to remedy the danger to the public health presented by facilities whose generation of hazardous waste is unknown to authorities charged with monitoring and handling of the wastes, for the protection of the environment." United States v. Dean, 969 F.2d 187, 193 (6th Cir. 1992), citing United States v. Hoflin, 880 F.2d 1033, 1038-9 (9th Cir. 1989). Among other things, permitted hazardous waste storage facilities are required to conduct inspections of the facility for conditions that may cause a release to the environment, 40 C.F.R.§ 264.15; maintain the facilities to prohibit unplanned releases, 40 C.F.R. § 264.31, and make arrangements to familiarize police, fire departments, emergency response teams, and local hospitals with the hazardous waste stored on site, 40 C.F.R. § 264.37. Most significantly, permitted hazardous waste storage facilities must prevent the unknowing entry, and minimize the possibility for unauthorized entry, of persons to that facility. 40 C.F.R. § 264.14(a). Permitted facilities must have a 24-hour surveillance system or a fence in good repair that completely surrounds the facility and a means to control entry at all times, and signs that read "Danger-Unauthorized Personnel Keep Out" posted in sufficient numbers to be seen from any approach. 40 C.F.R. § 264.14 (b) and (c).

Due to the defendant's failure to obtain the required permit, all of the regulatory purposes

---

[1] (...continued)
438, citing United States v. International Minerals & Chemical Corp., 402 U.S. 558 (1971). Courts have uniformly held that the government is not required to prove that the defendant knew that the waste material was a hazardous waste. United States v. Laughlin, 10 F.3d 961, 965 (2d Cir. 1993). The government is required to prove only that the defendant was aware of the general hazardous character of the waste, or in other words, that it was not an innocuous substance like water. United States v. Goldsmith, 978 F.2d 643, 645 (11th Cir. 1992).

[2] Except for the arguments that the loose mercury was not a solid waste, and that its management of the regulators did not require a permit, the Defendant does not argue that it falls within exclusions to the permit requirements.

described above were thwarted. The Pawtucket police and fire departments were unfamiliar with the Defendant's mercury storage location; the youths gained unauthorized and unknowing entry into the facility; and the mercury was released, exposing people to mercury at Tidewater and the nearby apartment complex.

## IV. ARGUMENT

### A. The Indictment Properly Alleges that the Loose Mercury is a Solid Waste

At the heart of Defendant's Motion to Dismiss Count One is the assertion that the mercury in jars, a plastic jug, an old paint can and other containers stored at the graffiti-covered, frequently vandalized Tidewater facility cannot possibly be a solid waste under RCRA. It is sufficient for purposes of defeating the Defendant's motion simply to point out that Defendant's argument requires the Court to accept as true the *Defendant's* self-serving and disputed factual assertions that the mercury at Tidewater "was neither changed nor altered from its pure commercial grade" and that the Defendant "intended" to send the mercury at Tidewater to Bethlehem Apparatus for "recycling." This, of course, is not the proper inquiry at this state of the proceedings, when the Court is required to accept the well-pleaded allegations in the indictment as true. See United States v. Self, 2 F.3d 1071, 1082 (10th Cir. 1993) (where the issue of whether natural gas condensate was a RCRA hazardous waste was dependent upon resolving how the defendant managed that material, the Court affirmed the District Court's denial of defendant's motion to dismiss, stating "a district court may not resolve evidentiary issues on a motion to dismiss."); see also United States v. Dee, 912 F.2d 741, 745 (4th Cir.1990)("Defendant's self-serving argument that materials were not wastes until they declared them wastes is without merit."). Nevertheless, a more complete description of what is meant by "solid waste" under RCRA will serve to underscore the Indictment's validity.

1. The Defendant Stored the Mercury at Tidewater Before or in Lieu of Disposal and the Mercury therefore was a Solid Waste

RCRA, 42 U.S.C. § 6921(a) and (b), directs the EPA Administrator to promulgate criteria for identifying and listing hazardous waste, taking into consideration factors including toxicity, corrosivity and other hazardous constituents. 42 U.S.C. § 6921(a) and (b). Under EPA's regulations, a hazardous waste is a solid waste that is listed in 40 C.F.R. subpart D, or that exhibits one of four characteristics set forth in 40 C.F.R subpart C. Accordingly, to determine whether a material is a hazardous waste, one must first determine whether it is a solid waste under the regulations.

The RCRA statute defines solid waste to include any "discarded material." 42 U.S.C. § 6903(27). The term "discarded material" is defined in 40 C.F.R. section 261.2. And while given almost no mention by Defendant, the solid waste definition provides that discarded materials include materials that are "abandoned," 40 C.F.R. § 261.2(a)(2)(I), and that "abandoned" materials include those that are stored or accumulated before or in lieu of disposal. 40 C.F.R. § 261.2(b)(3). It is *this* portion of the definition of "discarded material" that is most applicable to the loose mercury at Tidewater, rather than the recycling provisions cited by the Defendant. By the terms of this definition, even if the Defendant had been storing unused, commercial grade mercury at Tidewater, which, as detailed below, the government contends it was not, that mercury is a solid waste if discarded – stored before or in lieu of disposal. 40 C.F.R. § 261.33.

The mercury at Tidewater was nothing but a collection of "discarded" mercury from various locations throughout the New England gas facilities, including for example, mercury that had been abandoned in a deceased employee's locker. Indictment ¶ 15. The Defendant argues that all of those discarded quantities of mercury were transformed into products as a matter of law because the Defendant *now* contends that it planned to "recycle" that mercury, despite the

fact that its own Requests for Proposals to get rid of the mercury used the word "disposal." See Indictment ¶ ¶ 14, 16.

Once again, the government's response to the Defendant's Motion to Dismiss the first Count of the Indictment could end here – it is the government's contention that the old, unwanted mercury was stored at various places throughout the Defendant's facilities before or in lieu of disposal; that the Defendant continued to store mercury at Tidewater before or in lieu of disposal; that the mercury was a solid waste and a hazardous waste that required a storage permit; and that the Defendant did not obtain a permit. The Indictment is not required to spell out that theory. It is enough that the indictment tracks the language of the statute and sufficiently sets forth the elements of the crime charged and it does both here. See Indictment ¶ ¶ 28, 29, 36, 37.

All the same, to eliminate any confusion as to how EPA regulates legitimately recycled materials and to further emphasize that the Indictment appropriately charges the Defendant with the storage of hazardous waste mercury without a permit, a reaction to Defendant's misapplication of the solid waste recycling provisions and EPA's letter to Bethlehem Apparatus is warranted.

2. Despite Defendant's Recycling Claims, the Mercury at Tidewater was Discarded

Defendant keys its solid waste argument to both the recycling provisions contained within the definition of solid waste, 40 C.F.R. § 261.2 (c), and the Bethlehem letter. Neither the regulations nor that letter prevent the containers of mercury stored at Tidewater from being a solid waste. Most materials that are recycled are solid wastes. 40 C.F.R. § 261.2(c) The rationale for including most recycled materials within RCRA's cradle to grave management system was expressed by EPA when it promulgated the regulation:

> Wastes in many cases have little independent economic value, but are recycled to avoid disposal costs. Persons storing this type of waste before recycling are very much like persons storing hazardous waste before disposal: there is nothing about the waste that makes it so valuable that safe handling is assured absent regulation.

50 Fed. Reg. 614, 622 (April 4, 1983). Like the mercury here, many wastes have little economic value and, as the Tidewater spill illustrates, will not necessarily be managed to prevent loss.

Central to EPA's approach with regard its regulation of recycled materials was its belief that "the length of time secondary materials are accumulated before being recycled is an important indicator of whether or not they are wastes." 50 Fed. Reg. at 646. Accordingly, under 261.2 (c) most materials are considered solid wastes if they are "speculatively accumulated," or accumulated for too long before recycling. In order to establish that a material has *not* been speculatively accumulated, the person accumulating the material bears the burden of demonstrating that, among other things, during the calendar year (commencing January 1), the amount of material that is recycled, or transferred to a different site for recycling, equals at least 75% of the material accumulated at the beginning of the period. 40 C.F.R. § 261.1 (8). Significantly, even materials that fall within the exemptions listed in 261.2(e) are solid wastes when speculatively accumulated. 40 C.F.R. § 261.2(e)(2)(iii). To state the obvious, mercury that has been stored and left to sit for over two years, as alleged in the indictment, has been speculatively accumulated. The mercury stored by the defendant at Tidewater The defendant

When enacting the recycling/solid waste provisions in 40 C.F.R. § 261.2(c), EPA expressed concern that "sham recyclers" not be allowed to claim that they are recycling when the facts demonstrate that they are really engaging in waste management:

> if secondary materials are stored or handled in a manner that does not guard against significant economic loss . . there is a strong suggestion that the activity is not legitimate recycling.

50 Fed. Reg. 614, 638.

Courts that have examined what is meant by "discarded" under RCRA have conducted a related analysis, finding that a key factor in determining the regulatory status of materials to be recycled is whether those materials have become part of the "waste disposal problem." <u>See</u> <u>American Mining Congress v. EPA</u>, 907 F.2d 1179 (D.C. Cir. 1990)("AMC II")(sludge stored in

surface impoundments was discarded despite AMC's claim that it may be reclaimed at some time in the future; the sludge was capable of posing a hazard to human health or the environment and was part of the waste disposal problem); United States v. Ilco, Inc., 996 F.2d 1126 (11th Cir. 1993)(spent batteries including their lead components become part of the waste disposal problem when original consumer discards the battery, even though potentially recyclable); and Owen Electric Steel v. Browner, 37 F3d. 146 (4th Cir. 1994)(appellant's slag byproduct was discarded even though a third party contractor processed the slag at appellant's plant, cured the slag in holding bays for six months and then sold it to the construction industry for use as a road base: "where a byproduct sits untouched for six months, it cannot be said that the material was '*never* disposed of, abandoned, or thrown away,'" citing American Petroleum Inst., 906 F.2d 729 at 741 (D.C. Cir. 1990).

Accordingly, the legislative and regulatory history as well as the case law support the proposition that when a facility is managing a material that it claims to be holding for recycling, but the facts, as here, demonstrate that it is engaging in waste management, the material is discarded and therefore a solid waste.

3. Even if Not Discarded, the Mercury at Tidewater was Still a Solid Waste Because It was a Spent Material

Although the facts and circumstances surrounding the Defendant's accumulation of loose mercury persuasively demonstrate the mercury was stored before or in lieu of disposal and a solid waste, the Defendant argues that the recycling regulations and the "Bethlehem letter"[3] mandate a dismissal of the Indictment because the mercury stored at Tidewater was, as a matter of law, a "commercial chemical product" that the Defendant intended to recycle. Defendant is mistaken.

---

[3] According to its website, Bethlehem Apparatus Company is the largest EPA-approved and permitted mercury storage and recycling facility in North America and is a global supplier of commodity grade mercury. The Bethlehem letter is EPA's facility-specific response to a request made by that Company in 1986 regarding its management of the mercury that it used to make its mercury product. See www.Bethlehemapparatus.com.

The mercury stored at Tidewater was not a commercial chemical product but a "spent material," and spent materials *are* solid wastes even when legitimately reclaimed or stored for reclamation. 40 C.F.R. § 261.2(c). Thus, even if a jury were to conclude that the Defendant stored the loose mercury at Tidewater for eventual reclamation, the loose mercury was a solid waste. The Bethlehem letter does nothing to change that.

a. The Loose Mercury was a Spent Material

The loose mercury stored at Tidewater was a spent material and a solid waste. Forty C.F.R. § 261.2(c) describes which recycled materials are solid wastes based on the *type of material* it is and the *recycling activity* involved. The Defendant contends that the mercury in various unlabeled, non-commercial product containers at Tidewater was a "commercial chemical product" which can be speculatively accumulated or stored for reclamation without ever becoming solid wastes See Defendant's Memorandum, p. 10. The Defendant's misinformed argument stems from Table 1 in 40 C.F.R. section 261.2(c). As Table 1 describes, commercial chemical products listed in 40 C.F.R. § 261.33 are not solid wastes when *legitimately* reclaimed or speculatively accumulated. Spent materials, on the other hand, *are* solid wastes when discarded, reclaimed or speculatively accumulated. The loose mercury at Tidewater was a spent material.

A spent material is "any material that has been used and, as a result of contamination, can no longer serve the purpose for which is was produced without processing." 40 C.F.R. § 261.1(c)(1). As alleged in the Indictment, during a six month period in 2001 when Defendant's contractor removed mercury from obsolete regulators, that mercury was sent to Bethlehem Apparatus for distillation, or processing. ¶ 10. The Defendant represents that it was going to "repeat that process" with regard to the mercury stored at Tidewater during 2002, 2003, and 2004. See Defendant's Memorandum, p. 11. Bethlehem Apparatus processes waste mercury through four distillation cycles to produce the "quadruple distilled" mercury that it sells to the

consumer. The used mercury was a spent material.

b. The Loose Mercury was Not a Commercial Chemical Product

Although the mercury fits squarely within the definition of spent material, defendant contends that the mercury stored at Tidewater was not a spent material, but rather a commercial chemical product under 40 C.F.R. § 261.33. To get there, first, the Defendant baldly represents that the liquid mercury stored at Tidewater was neither changed nor altered from its pure chemical grade. Second, the Defendant represents that the Bethlehem letter and the Federal Register provision cited therein transform the mercury stored at Tidewater from a spent material into a commercial chemical product.[4] Neither of these arguments has merit.

Forty C.F.R. § 261.33 contains a list of "commercial chemical products or manufacturing chemical intermediates having the [listed] generic name" which, if discarded, are solid wastes. See 40 C.F.R. §261.33(a). The commercial chemical products listed in 40 C.F.R. § 261.33 are pure grade chemicals that are *unused*. See 54 Fed. Reg. (July 28, 1989)(Federal Register notice in which EPA explains that the list of commercial chemical products in 40 C.F.R. § 261.33 "does not apply to chemicals

that have been used for their intended purpose. Thus, CFC [chloroflurocarbon] refrigerants that are removed from a refrigeration system and are reclaimed would not be classified as 'commercial products' but as 'spent materials.'").[5]

---

[4] On this second point, the Defendant essentially argues that while storing this old mercury in miscellaneous jars and plastic containers at the oft-vandalized Tidewater facility, Defendant stands in the same shoes as the EPA- approved and permitted Bethlehem Apparatus mercury recycling facility with its 24-hour security. This is absurd. Indeed, it is interesting to imagine the letter that the Defendant might have written to EPA to seek confirmation that the Bethlehem analysis applied to mercury stored at Tidewater. Had the deplorable conditions and speculative accumulation at Tidewater been disclosed in such a request, it is easy to imagine EPA's response.

[5] It is noteworthy that, with regard to waste CFCs removed from refrigeration equipment,
(continued...)

Whether the mercury "was neither changed nor altered from its pure commercial grade," if relevant at all, would be a question of fact for the jury. Regardless, the mercury was used and therefore spent. The mercury was not stored in labeled, virgin product containers, but rather in the kind of receptacles in which one might collect substances that had already been used for their intended purpose.

c. The Bethlehem Letter Does Not Apply to the Defendant's Mercury Storage

The Defendant argues that the Bethlehem letter and the Federal Register citation quoted therein apply to Defendant's extended storage of mercury at Tidewater. This is incorrect.

The Bethlehem letter cited by the Defendant is a response by one individual at EPA to a conscientious facility's inquiry about its operations.[6] That letter does not have the force of law. When, in support of its arguments in a Clean Air Act appeal, Duke Energy Corporation cited to a letter and memorandum written in 1981 by EPA's then Director of Stationary Source Enforcement Edward R. Reich, the United States Supreme Court recently observed, "...it answers the citation of the Reich letters to realize that an isolated opinion of an agency official does not authorize a court to read a regulation inconsistently with its language." Environmental

---

[5](...continued)
EPA's regulations specifically state that used CFCs removed from certain refrigeration equipment *are* solid wastes but not hazardous wastes provided the refrigerant is reclaimed for further use. 40 C.F.R. § 261.4(b)(12). *EPA could have added a similar exclusion for used mercury but did not.* See 40 C.F.R. § 261.4.

[6] Although the Bethlehem letter, and other site-specific letters, can be found on EPA's website, the website contains the following disclaimer "(t)his database. .. and the documents cited by this database are not intended to serve as statements of EPA policy. The database should not be cited or quoted and cannot be relied upon to create any substantive or procedural rights enforceable by any party in litigation with the United States . . . For the most part, RCRA compliance is a site-specific matter and most appropriately handled by your EPA Regional Office and/or State Authority. You should confirm any compliance determinations with your appropriate EPA Regional or State Environmental Agency in all cases." See www.epa.gov/rcraonline. In addition, when accessing the Bethlehem letter on EPA's website, a cover sheet appears indicating that the document is not an official EPA policy. Id.

Defense et al. v. Duke Energy Corp., 127 S. Ct. 1423, 1436 (2007).

In the Bethlehem letter, EPA responded to Bethlehem Apparatus' February 1986 inquiry as to whether or not the mercury that Bethlehem actually *is* recycling and *is* turning into a commercial product is a waste *as to Bethlehem*. EPA informed Bethlehem that the mercury "that *is received and refined your facility* is not a solid waste . . . the material does not need to be manifested to your facility, you need not comply with the storage requirements, etc." (emphasis added). By its very terms, this letter does not speak to the mercury stored in deplorable conditions at Tidewater for nearly two years, even *assuming arguendo* that the mercury might some day make its way to Bethlehem.[7]

Moreover, neither the Federal Register provision cited in both the Bethlehem letter and the Defendant's Memorandum – 50 Fed. Reg. 614, 634 (Jan 4, 1985) – nor the regulation cited in the Bethlehem letter, 40 C.F.R. § 261.3(c)(2) relate to the Defendant's storage of mercury at Tidewater.

In the Bethlehem letter, EPA relies on these provisions to make its case-specific determination that *as to Bethlehem*, a facility that actually derives its primary commercial product from spent mercury -- and therefore has every incentive to manage it to prevent loss -- the spent mercury is not considered a waste. The letter has absolutely nothing to do with the Defendant's waste management at the Tidewater facility.

4. Conclusion

The government respectfully requests that the Court deny the Defendant's Motion to Dismiss Count One of the Indictment because, accepting the allegations in the Indictment as true,

[7] Bethlehem Apparatus requires that shipments to its facility have prior approval, a signed recovery/recycling agreement and a work authorization number. New customers must fill out a profile of the waste to be shipped, and Bethlehem may require samples for analysis. Bethlehem charges $228.00 for the steel, properly labeled shipping containers (flasks) that meet the requirements of the Department of Transportation. See www.Bethlehemapparatus.com.

the Indictment more than sufficiently alleges that the containers of mercury stored at Tidewater were solid and hazardous waste.

**B. Count Three of the Indictment Properly Alleges that the Defendant's Storage of Mercury-Containing Regulators Required a Permit**

Count Three of the Indictment alleges that the Defendant knowingly stored, and caused to be stored, hazardous wastes, namely, mercury containing regulators, without a permit in violation of 42 U.S.C. §6928(d)(2)(A) and 18 U.S.C. §2. Indictment ¶ ¶ 10, 11. The Defendant seeks to dismiss this count not because the mercury-containing regulators are not waste – which, as described above, they, and the mercury within them clearly are – but rather because, according to the Defendant, "the mercury-containing regulators fall under the category of universal wastes, and universal wastes are a separate category of hazardous waste that do not require a hazardous waste storage permit under 42 U.S.C. § 6925(a)." Defendant's Memorandum, p. 12.

The statement that universal wastes categorically do not require a hazardous waste storage permit is inaccurate. It is only while a facility is acting as either a universal waste "handler" or a universal waste "transporter" that it is excluded from the permit requirements. As described below, there are a number of factual issues for the jury to decide to determine whether the Defendant was a handler, and on that basis alone, the Defendant's Motion to Dismiss Count Three should be denied. The Indictment alleges facts that would permit a jury to find that the Defendant was not a universal waste "handler" or "transporter" as those terms are defined in the regulations, and the Defendant needed a storage permit to store the regulators at the Tidewater.

1. The Permit Exclusion

The RCRA permit regulations require a permit for the treatment, storage, and disposal of hazardous waste. 40 C.F.R. §270.1(c). The permit regulations contain several specific exclusions to the permit requirements. The exclusion that relates to universal waste reads as

follows:

> The following persons are among those who are not required to obtain a RCRA permit:
>
> [exclusions (I)-(vii) omitted]
>
> (viii) Universal waste *handlers and universal waste transporters (as defined in 40 C.F.R. 260.10)* managing the wastes listed below. These handlers are subject to regulation under 40 C.F.R. 273 (emphasis added).

40 C.F.R. § 270.1(c)(2)(viii).

For purposes of this Motion, the Government agrees that the mercury-containing regulators stored at Tidewater were universal waste under Rhode Island's EPA-approved regulations. See 40 C.F.R. Part 273; and Rhode Island Rules and Regulations for Hazardous Waste Management, Rule 13.00.

2. The Defendant was not a Handler

The Universal Waste regulations were designed to streamline the hazardous waste management regulations governing the collection and management of certain widely generated wastes. 60 Fed. Reg. 25492 (May 11, 1995).

The universal waste system involves three types of participants: (1) handlers of universal waste; (2) universal waste transporters; and (3) destination facilities. The regulations contain management requirements that apply to each participant. As described below, based on the way the Defendant managed its mercury-containing regulators, and the regulatory definitions of "handler" and "destination facility," the Defendant was not excluded from RCRA's permit requirements.[8]

The universal waste regulations define "universal waste handler" in two ways. First the

[8] The defendant is not claiming it was exempt from RCRA's permit requirements because it was a transporter.

regulations describe what a universal waste handler is, and then they tell you what it is not. See 40 C.F.R. § 273.9 and Rhode Island Hazardous Waste Regulations, Rule 3.00. Pursuant to the regulations, a universal waste handler is either (1) a generator of universal waste or (2) the owner or operator of a facility, including all contiguous property, that (a) receives universal waste from other universal waste handlers; (b) accumulates universal waste; *and* (c) sends universal waste to another universal waste handler, to a destination facility, or to a foreign destination. 40 C.F.R. § 260.10, Rule 3.00.

The defendant argues that while storing the waste at the Tidewater facility indefinitely, it was a handler of universal waste. The defendant is mistaken. Although the Defendant received the waste at Tidewater; and accumulated it, the important third prong of the handler definition was never met -- the Defendant did not send universal waste from the Tidewater facility to another universal waste handler, to a destination facility, or to a foreign destination. As alleged in paragraph 13 of the Indictment, the Defendant did not send the regulators from the Tidewater facility during 2002, 2003, or 2004. Had EPA intended to exempt from the permit requirements facilities that store universal waste indefinitely, EPA would not have added to the definition of "handler" the requirement that the waste be sent off-site.

Moreover, the universal waste regulations contain several standards that apply to universal waste "handlers." For example, a handler of universal waste must label or mark the universal waste to identify the type of universal waste. 40 C.F.R. § 273.14. A handler may not accumulate universal waste on-site for longer than one year from the date it is received,[9] and the containers of waste must be marked with the accumulation date. 40 C.F.R. §§ 273.15, 273.15. Most significantly, handlers are prohibited from breaking open mercury-containing equipment to remove liquid mercury. 40 C.F.R. §§ 273.11, 260.10, and Rhode Island Hazardous Waste

[9] A handler may store universal waste for longer than a year if it can prove that the accumulation was "solely for the purpose of accumulation of such quantities of universal waste as necessary to facilitate proper recovery, treatment, or disposal."

Regulations, Rules 13.06 (D) and (E)(2). See also 60 Fed. Reg. 25492, 25534 ("the scope of this regulation ...is intended to focus on the collection phase of universal waste management rather than the final treatment, disposal, or recycling phase").

That the Defendant was not a handler as to the Tidewater facility becomes even clearer when one reviews what, under the universal waster regulations, a handler is not. According to the regulations,

> Universal Waste Handler . . .does not mean (1) A person who treats (except under the provisions of 40 C.F.R. 273.13(a) or (c) , or 273.33(a) or (c)), or disposes of, or recycles universal waste; or (2) A person engaged in the off-site transportation of universal waste by air, rail, highway, or water, including a universal waste transfer facility."

40 C.F.R.§ 273.10, Rhode Island Hazardous Waste Regulations, Rule 3.00.

Most significantly, pursuant to the terms of the definition, a handler is not one who treats, disposes of, or recycles universal waste, except for certain specific "treatment" activities allowed by the universal waste management standards. The applicable waste management standards for mercury-containing equipment are found at Rule 13.06(E)(3) of the Rhode Island Hazardous Waste Regulations, which permit only the removal of sealed mercury ampules from the devices in a way that ensures that the ampules do not break. These management standards *do not allow handlers to pour mercury out of the equipment into containers*. Pouring mercury out of regulators is "treatment" under 40 C.F.R. § 260.10, and Rule 3.00,[10] and is *expressly prohibited* by the universal waste "handler" standards. 40 C.F.R. § 273.11 (b), Rule 13.06(D). Those who engage in prohibited treatment of universal waste are not managing universal waste and are subject to the full hazardous waste requirements of parts 262 through 270, including the permit

[10] Treatment among other things is any method, technique or process designed to render a waste amenable for recovery, amenable for storage or reduced in volume. 40 C.F.R. 260.10; Rhode Island Hazardous Waste Management Rule 3.00.

requirements.[11]

Facilities, like the Tidewater facility, that treat, dispose of, or conduct on-site recycling of universal waste are "destination facilities." 40 C.F.R. § 273.9; Rhode Island Hazardous Waste Regulations, Rule 3.00. Pursuant to 40 C.F.R. § 273.60, the owner or operator of a destination facility *is* subject to all applicable hazardous waste management requirements, including the permit requirements contained in 40 C.F.R. Part 270. As described above, pouring mercury from regulators constitutes treatment. 40 C.F.R. § 260.10, Rhode Island Hazardous Waste Regulations, Rule 3.00. In addition,"disposal" includes "abandoning or placing of any hazardous waste in, on, into, or onto any land, other surface, or building." See Rhode Island Hazardous Waste Regulations, Rule 3.00. And while it is true that the definition of destination facility excludes a facility at which a particular category of universal waste is "only accumulated," given the goals of the Universal Waste Rule and the waste management standards described above, it is common sense that what is meant by "only accumulated" is *properly* accumulated for prompt transfer to a destination facility, rather than abandoned in an unlabeled in a graffiti-covered building for more than a year and a half.[12]

The Indictment in this case more than sufficiently alleges that the Defendant needed a permit to store the regulators. The Indictment alleges that the Defendant's mercury regulator program involved removing regulators from customer's homes, bringing them to Tidewater, and removing the liquid mercury from the regulators. ¶ 9. The Indictment alleges that on or about

---

[11] In discussing prohibited treatment of analogous mercury-containing thermostats, EPA stated "(h)andlers not complying with these requirements for ampule removal are not managing universal waste, and are not subject to Part 273. They are subject to the full hazardous waste requirements of parts 262 through 270." See 60 Fed. Reg. 25492, 25525.

[12] Although the Defendant may argue that it was "only accumulating" the regulators at the Tidewater facility as to Count Three, as to Count One, the Defendant asserts that it was going to repeat the process it undertook in 2001. See Defendant's Memorandum, p. 11. This simply underscores that the Defendant's conduct and intent are factual issues that the jury will have to sort out based on all of the evidence presented at trial.

June 24, 2002, the Defendant's environmental coordinator drafted a Request for Proposal ("RFP") to restart the mercury regulator removal and reclamation program. ¶ 12. Throughout 2002, 2003, and 2004, the Defendant continued to remove regulators from customers homes and stored them at Tidewater. ¶ 13. The regulators were stored in plastic kiddie pools and on the floor of the vacant building. ¶ 14. On or about August 27, 2003, Defendant's environmental coordinator drafted a second RFP to solicit bids for "waste segregation" and disposal. ¶ 14. In or about July 2004, the Defendant's environmental coordinator drafted a third RFP for "waste segregation" and disposal. ¶ 16. The Indictment alleges that there were no signs at Tidewater warning of the presence of mercury containing regulators. ¶ 23. The Indictment alleges that the regulators were stored at Tidewater for more than a year and a half. ¶ 37.

What Defendant's environmental coordinator meant by "waste segregation" and whether the facts presented at trial support the Defendant's contention that it was a universal waste "handler" or a "destination facility" ultimately will be questions for the jury. For purposes of this motion, it is clear that the Indictment contains sufficient facts to allege that the Defendant needed a permit under the regulations. The government respectfully requests that the Court deny the Defendant's Motion to Dismiss Count Three of the Indictment.

## IV. CONCLUSION

For these reasons, the Court should deny Defendant's motion.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

/s/ TERRENCE P. DONNELLY
TERRENCE P. DONNELLY
Assistant U. S. Attorney
R.I. Bar No. 3506

U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
terrence.donnelly@usdoj.gov

KEVIN CASSIDY
Trial Attorney
Department of Justice
Environmental Crimes Section
601 D St. NW
Washington, DC 20530
Tel (202) 305-0333
kevin.cassidy@usdoj.gov

DIANNE CHABOT
Special Assistant U.S. Attorney
Regional Criminal Enforcement Counsel
U.S. Environmental Protection Agency
One Congress Street
Suite 1100, SAA
Boston, MA 02114-2023
Tel (617) 918-1868
Fax (617) 918-0868
chabot.dianne@epa.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2008, a copy of the within United States' Objection to Defendant's Motion to Dismiss Counts 1 and 3 of the Indictment, and its accompanying Memorandum of Law, was filed electronically and is available for viewing and downloading from the ECF system.

Electronic notification:

JOHN A. TARANTINO (#2586)
jtarantino@apslaw.com
PATRICIA K. ROCHA (#2793)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, Rhode Island 02903
Tel: 401-274-7200
Fax: 401-351-4607

GERALD J. PETROS
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, RI 02903

/s/ TERRENCE P. DONNELLY
TERRENCE P. DONNELLY
Assistant U. S. Attorney
R.I. Bar No. 3506
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
terrence.donnelly@usdoj.gov