**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| vs. | : | CR No. 07-134-S |
| | : | |
| SOUTHERN UNION COMPANY | : | |

**DEFENDANT SOUTHERN UNION COMPANY'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS COUNTS I AND III OF THE INDICTMENT**

## I. INTRODUCTION

In its Objection to Southern Union's Motion to Dismiss, the Government relies on facts that it has not alleged, contentions it failed to raise, and regulations that do not exist – employing smoke and mirror tactics to preserve a flawed prosecution. In fact, the positions taken by the Government contradict the guidance that EPA continues to give to the regulated community on the specific regulations and material handling questions that are at issue in this case. If the Court applies the regulations, positions, interpretations, and guidance issued by EPA, Counts I and III of the Indictment fail as a matter of law.

The Court should dismiss Count I because the liquid mercury is plainly a commercial chemical product that Southern Union intended to recycle by sending it to Bethlehem Apparatus, as it did three years earlier, for reclamation. As a matter of law, the liquid mercury is not a "spent material" and the Government has not alleged sufficient facts to support the contention that Southern Union "discarded" that material.

The Court should dismiss Count III because the mercury seal regulators are universal waste – as the Government now concedes – and because the Tidewater facility is not a "destination facility" under the applicable regulations.

## II. ARGUMENT

### A. THE LIQUID MERCURY STORED AT TIDEWATER FOR RECYCLING AS A COMMERCIAL CHEMICAL PRODUCT DID NOT, AS A MATTER OF LAW, REQUIRE A RCRA HAZARDOUS WASTE STORAGE PERMIT.

The Government must allege and ultimately prove that the liquid mercury stored at Tidewater was a solid (and hazardous) waste to sustain its contention that the law required Southern Union to obtain a hazardous waste storage permit. The Indictment fails to allege that the liquid mercury stored at Tidewater for recycling is a solid waste.

Under EPA's regulations, commercial chemical products stored for eventual recycling are not solid waste. EPA has no jurisdiction over these products held for recycling. These products can become solid (and hazardous) wastes only "*if and when* they are discarded or intended to be discarded as described in 40 C.F.R. § 261.2(a)(2)(i)." 40 C.F.R. § 261.33.

The Government admits, and indeed alleges, that in 2001 Southern Union collected liquid mercury at the Tidewater site and held it in this same "unoccupied" site before sending it to Bethlehem Apparatus for reclamation. The Government did not indict Southern Union for those actions, acknowledging that storing liquid mercury for eventual recycling without a RCRA permit is not a crime.

The Government contends that at some unknown time between 2002 and 2004 – and in some unidentified manner, Southern Union "discarded" the liquid mercury, thereby converting this commercial chemical product into a solid (and hazardous) waste.[1]

[1] The Government highlighted the flaws in the Indictment when it responded to Southern Union's Motion for a Bill of Particulars on the Indictment. When Southern Union asked for the facts that supported the threshold element of its claim – i.e. "when did Southern Union discard the waste at Tidewater?" – the Government refused to provide any. The Government declared that it did not have to explain "the theory" of its case while also declaring that the moment of discard was a "vague event."

The Government now contends for the first time that the liquid mercury was a "spent material" rather than a commercial chemical product. Nevertheless, the Government's contention contradicts EPA's regulations that exempt from the definition of "solid waste," liquid mercury that is "derived from" mercury containing regulators.

1. The Liquid Mercury Was a Commercial Chemical Product, Not a "Spent Material"

Southern Union previously explained how EPA defines certain secondary materials to be "discarded" – i.e. solid wastes – when recycled in certain ways. See 40 C.F.R. § 261.2(a)(2), and Table 1. EPA determined that "spent materials" that are recycled via reclamation are defined as "discarded" materials and are therefore solid wastes. Further, "spent materials" that are "speculatively accumulated" prior to being recycled are also defined as "discarded" and therefore solid wastes. The Government contends here that because the liquid mercury came from used regulators, these used regulators and the liquid mercury that was removed from them constitutes a spent material. The Government is wrong. EPA exempts from its definition of solid waste certain metals, including liquid mercury, that are "derived from" spent materials. 40 C.F.R. § 261.3(c)(2). Here is what the Government did not tell the Court.

a. EPA's "Derived From" Rule

EPA created the "derived from" rule to close the potential regulatory gap that could otherwise arise from treatment, storage, and disposal processes for hazardous waste that generate residues that may contain high concentrations of hazardous constituents. EPA exempted from regulation certain "materials" that are derived from these spent materials and recycled to make new products or processed to recover usable materials. In 40 C.F.R. § 261.3(c)(2), EPA exempts from the solid waste definition materials "derived from" hazardous wastes if those materials are beneficially re-used. 40 C.F.R. § 261.3(c)(2) states:

> Except as otherwise provided in paragraph (c)(2)(ii), (g) or (h) of this section, any solid waste generated from the treatment, storage, or disposal of a hazardous waste, including any sludge, spill residue, ash emission control dust or leachate (but not including precipitation run-off) is a hazardous waste. (*However, materials that are reclaimed from solid wastes that are used beneficially are not solid wastes and hence are not hazardous wastes* under this provision unless the reclaimed material is burned for energy recovery or used in a manner constituting disposal.).

(emphasis added). Consequently, the liquid mercury "derived from" the regulators is not solid waste.

When EPA proposed its solid waste definition in 1983, it discussed the meaning of "reclamation" and referenced the language it added to this "derived from" rule, to make it clear that "commercial products reclaimed from spent materials, listed sludges and listed by-products – e.g. a reclaimed solvent – are not wastes and are not subject to regulation under RCRA." 48 Fed. Reg. 1447, 14489 (April 4, 1983).[2]

The Government's argument that the liquid mercury removed from used ("obsolete") mercury containing regulators is a "spent material" directly contradicts the plain language of this regulatory exemption and this commentary. It also directly contradicts the consistent position that EPA has expressed in several guidance letters in which it has interpreted that, under the "derived from" rule in 40 C.F.R. § 261.3(c)(2) and the definition of "spent material" in 40 C.F.R. § 261.1(c)(1), the liquid mercury removed from gas regulators is a commercial chemical product, and not a "spent material." These guidance letters should be given due weight, because they present a consistent and reasonable reading and application of the plain language of the Agency's own regulations. See, e.g., Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S. Ct. 161, 164 (1944) (the weight to be given to an administrative interpretation depends upon "the

[2] In promulgating the final rule, EPA described this language as "a clarifying amendment to 40 C.F.R §261.3(c)(2) (the 'derived from' rule)" that "states a fairly evident principle," which was "not challenged by any commenter." 50 Fed. Reg. 614, 634 (Jan. 4, 1985).

thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all of those factors which give it power to persuade, if lacking power to control."); Martin v. Occupational Safety and Health Review Commission, 499 U.S. 144, 157, 111 S. Ct. 1171, 1179 (1991) ("[i]nformal interpretations are entitled to some weight on judicial review," and a reviewing court "may certainly consult them" to determine whether they have been "consistently applied.")

b. EPA's Guidance Letters Confirm That The Liquid Mercury Stored At Tidewater Is A Commercial Chemical Product, And Not A Spent Material

EPA illustrated the distinction between a "spent material" and a "product" derived from a spent material in an April 14, 1989 letter from EPA to Mr. Robert W. Olexzko, Vice President, HazMat Environmental Group, Inc. EPA responded to a query about the "regulatory status" of ignitron tubes containing mercury, when sent for reclamation.[3] (See Olexzko Letter, attached as Exhibit A). In this "official interpretation," EPA stated that "when a material (e.g. an ignitron tube) is being sent for reclamation" it is "classified as spent material and therefore meets the definition of a solid waste as defined in 40 C.F.R. 261.2(c)(3), Table 1." However, EPA explained, "if the mercury is removed from the ignitron tubes *on site* (e.g., material reclaimed from solid waste) and only the mercury from the tubes is sent off site for direct beneficial use or further refining, the mercury is a product, not a solid waste (see 40 C.F.R. 261.3(c)(2) and 50 FR 634 (Jan. 4, 1985))."

EPA explained this distinction further in an August 1, 2002, letter to Mallinckrodt, Inc. in describing why 84 tons of free-flowing mercury that was previously used in mercury cells at the HoltraChem chlor-alkali facility during production processes to manufacture chlorine, and which

[3] Ignitron tubes are similar to mercury containing regulators in that the elemental mercury is contained the way the elemental mercury is contained within the ampule of a regulator.

had been stored for over a year, was not a "spent material" but rather a commercial chemical product. (See Mallinckrodt Letter, attached as Exhibit B). EPA, citing to the Bethlehem letter discussed in Southern Union's opening memorandum, first confirmed that "EPA consistently has stated that 99% pure mercury is of product quality because it is reusable as is, or requires only further refining (e.g. to 99.99% purity), rather than more substantial reclamation, to be reusable." EPA then explained why this mercury did not fall under the definition of "spent material" in 40 C.F.R. § 261.1(c)(1):

> Although HoltraChem mercury was used in an industrial process, we agree that it has retained its status as a commercial chemical product rather than becoming a spent material. . . . . While the HoltraChem mercury has been used, neither contamination with impurities nor any other factor or circumstance has caused the mercury to become unsuitable for commercial purposes or to need reprocessing. Thus the mercury has not become 'spent'.

Thus, contrary to what the Government argues here, even if the regulator taken out of service falls within the definition of a "spent material," the liquid mercury removed from this used regulator and held for recycling is a product, not a spent material.[4]

This is the same circumstance described by EPA in the Bethlehem letter that the Government now wants to disavow. In EPA's May 30, 1986 letter to Bethlehem Apparatus, EPA specifically addressed the regulatory status of "mercury that *is sent* to your facility . . . ." (emphasis added). EPA agreed "that mercury (which is at least 99 percent pure) that *is received* and refined at your facility is not a solid waste." EPA then directly cites to the "derived from" rule and its Federal Register preamble to explain the "fairly evident principle" that "metals that are suitable for direct use, or that only have to be refined to be usable are products, not wastes." Thus, EPA concludes that the free flowing mercury "that you *receive* at your facility is not

[4] Note that the mercury containing regulators themselves fall under the category of universal wastes, and are not subject to the hazardous waste storage permit requirements for the reasons discussed in the Motion to Dismiss, and *infra.*

subject to any of the hazardous waste regulations (i.e. the material does not have to be *manifested to* your facility, you need not comply with the storage requirements, etc.)". (See Bethlehem letter, attached as Exhibit C. ) (Emphasis added).

The letter plainly describes the regulatory status of the liquid mercury that is "sent to" Bethlehem, and that is "received at" Bethlehem. This liquid mercury does not have to be *manifested to* Bethlehem because, as EPA states, it is not solid waste while in the hands of the generator and is not subject to the hazardous waste requirements. If the liquid mercury were "spent material" and thus a solid waste, as the Government now inexplicably claims, then the liquid mercury would have to be manifested, and Bethlehem would have to comply with the hazardous waste requirements because it would be handling a waste, not a product.

Nowhere in this letter does EPA suggest, as the Government's tortured reading does, that the letter is instead referring to an analysis of the regulations that apply to Bethlehem when it is dealing with "spent" liquid mercury. That is because the liquid mercury that is "derived" from "spent materials" such as ignitron tubes, or gas regulators, is not "spent material." The Government cannot now be permitted to disavow its own regulations and its official interpretations of those regulations. To allow the government to retreat and change course would raise substantial "notice" and "due process" concerns particularly in the criminal context. The Government cannot prosecute members of the regulated community for following its guidance.[5]

The Government also suggests that the Bethlehem letter is "case specific" and cannot apply to Southern Union because of the circumstance in which Southern Union stored the liquid

---

[5] The Government also claims this letter does not have "the force of law" under Environmental Defense v. Duke Energy, 127 S. Ct. 1423, 1426 (2007). But there, the Supreme Court only noted that "an isolated opinion of an agency official does not authorize a court to read a regulation inconsistently with its language." Here, the Government is not claiming that EPA was interpreting the "derived from" rule in a way that is inconsistent with the language of that rule. The Government instead is arguing that the letter does not mean what Southern Union has argued it plainly says. The Bethlehem letter stands as a valid, straightforward application of EPA's solid waste regulation, and starkly illustrates how the "derived from" rules exempts Southern Union's liquid mercury from RCRA regulation.

mercury. But EPA wrote another similar letter to a facility that also refines mercury – D.F. Goldsmith Chemical and Metal Corp. – which further underscores that the storage conditions of liquid mercury prior to it being sent for recycling do not determine the regulatory status of the material. (See Goldsmith Letter attached as Exhibit D). In this January 1986 letter, EPA answered Goldsmith's query about the "regulatory status of scrap mercury that is refined at your facility in Chicago" which is "free-flowing" mercury from various sources such as "scrap dealers that accumulate small quantities of mercury; manufacturers or reclaimers of instruments and electric switches; private citizens who have accumulated mercury; and firms who dismantle chlor-alkali facilities."

EPA again cited to the "derived from" rule, 40 C.F.R. 261.3(c)(3), to respond that "[i]n general, I agree with you that the free-flowing mercury that is received and refined at your facility is not a solid waste . . ." because "metals that are suitable for direct use, or that only have to be refined to be usable are products, not wastes." Again, EPA noted that "the material" -- i.e. "scrap" mercury coming from the various sources listed above – "is not subject to the hazardous waste regulations (i.e. it does not have to be manifested to your facility, you need not comply with the storage requirements, etc.)." [6]

Therefore, as these EPA letters make clear, under the "derived from" rule exemption in 40 C.F.R. § 261.3(c)(2), liquid mercury removed from mercury containing regulators for recycling is a product, and not a "spent material."

[6] EPA also crystallized the distinction between liquid mercury and the used "spent" products that contained this liquid mercury, stating that, unlike the liquid mercury, "if you receive electrical switches, instruments, scrap batteries, or other forms of spent material from which you recover/reclaim the mercury, and these spent materials are hazardous, these materials would be solid and hazardous wastes and would be regulated under 40 CFR 261.6(b) and (c)." (The provisions in 40 C.F.R. 261.6(b) and (c) refer to requirements for "owners and operators of facilities that store recyclable materials before they are recycled.")

2. There Are No Disputed Facts Regarding The Liquid Mercury's Status As A Commercial Chemical Product

The Government also contends that whether the "liquid mercury" stored for recycling is a "commercial chemical product" is a factual question for the jury to decide. But here, the Indictment alleges no facts that support its theory that the "liquid mercury" could be anything but a commercial chemical product.

In its preamble to the solid waste rule, EPA defined the "commercial chemical products" listed in 40 C.F.R. § 261.33 to include "commercial chemical products and intermediates, off-specification variants, spill residues, and container residues listed in 40 C.F.R. 261.33."

As Southern Union explained in its Motion to Dismiss, the liquid mercury stored at Tidewater was neither changed nor altered when it was removed from the mercury gas regulators. Bethlehem Apparatus previously purchased and reclaimed 450 pounds of liquid mercury from Southern Union in December 2001. Southern Union broke no laws in 2001. The same circumstances existed in 2004. Southern Union did not refine or use the mercury in a way that would or could change its chemical composition. Mercury containing regulators use elemental mercury – i.e. mercury that is "manufactured or formulated for commercial or manufacturing use." This is the definition of a "commercial chemical product" under 40 C.F.R. § 261.33.

EPA defines "liquid mercury," as another term for "elemental or metallic mercury."[7] And, the Indictment does not allege that the mercury stored at Tidewater was anything but the

[7] EPA says on its website: "When liquid mercury (also known as elemental or metallic mercury) is spilled, it forms droplets that can accumulate in the tiniest of spaces and then emit vapors into the air.") See EPA's Website on Mercury: "Answer to "Frequent Questions" "What should I do and not do if I have a mercury spill?" at www.publicaccess.custhelp.com/cgi-bin/publicaccess.cfg/php/enduser/ste.adp.php.

"liquid mercury" that originated in the mercury containing regulators. Nor does it allege that Southern Union changed or contaminated the liquid mercury.[8]

Further, the Government's own sampling analytical results of the mercury recovered at the Lawn Terrace Apartment Complex confirmed that the mercury was essentially "100 % elemental mercury."[9] The Government cannot credibly claim there is an issue of fact left for the jury to decide. The "liquid mercury" stored at Tidewater was a commercial chemical product.

3. The Indictment Does Not Allege Sufficient Facts To Support The Charge That Southern Union "Discarded" The Liquid Mercury At Tidewater

a. The Indictment Does Not Allege Facts That At Any Point In Time Southern Union Actually Discarded Or Had The Intent To Discard The Liquid Mercury It Stored At Tidewater

The Government is required to allege facts "which in law constitute an offense and which, if proved, would establish prima facie the defendant's commission of that crime." United States v. Superior Growers Supply, Inc., 982 F.2d 173, 177 (6th Cir. 1992); citing Fleisher v. United States, 302 U.S. 218 (1937). The Supreme Court has cautioned:

> Undoubtedly the language of the statute may be used in the general description of the offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.

Hamling v. United States, 418 U.S. 87, 117-18 (1974) (quotations omitted).

Under EPA's regulatory scheme, a commercial chemical product can become a solid waste "if and when" it is discarded. The Government contends that, even if the liquid mercury was a commercial chemical product, Southern Union discarded it by storing it at Tidewater for

---

[8] The Government consistently refers to the mercury stored at Tidewater as "liquid mercury" throughout the Indictment. In its Objection, however, the Government suddenly refers to the mercury at Tidewater as "loose" mercury. The Government is bound by the facts and contentions it chose to set forth in its Indictment.

[9] See E-Mail dated December 16, 2004 from EPA's Dan Granz to EPA's John Fowler, attached as Exhibit E, describing the samples' analytical results as "basically 100% elemental mercury in amber 4 oz. glass sample jars."

eventual disposal. But the Indictment is insufficient, because it alleges no facts that support this allegation.

Under 40 C.F.R. § 261.33, liquid mercury is a listed hazardous waste "if and when [it] is discarded or intended to be discarded as described in § 261.2(a)(2)(i)." When EPA promulgated the commercial chemical product rule in 1980, it answered certain "interpretive questions," in the preamble:

> Are the commercial chemical products and manufacturing intermediates listed in 40 C.F.R. 261.33 subject to regulation if they are used, reused, recycled or reclaimed in lieu of being discarded?
>
> No. A commercial chemical product or manufacturing chemical intermediate listed in 261.33 is a hazardous waste only if discarded or intended to be discarded. If it continues to be used or sold, it is not being discarded and therefore is not a hazardous waste. If it is an off-specification material and is reprocessed, recycled or reclaimed it is not being discarded and therefore is not a hazardous waste.

45 Fed. Reg. 78532, 78540 (November 25, 1980).

EPA went on to note "numerous situations" where the "above interpretation applies." One of these is

> "[w]here there is breakage of containers holding 261.33 chemicals and the supplier takes back the affected chemicals, including recovered spilled chemicals, for repackaging or reprocessing, the chemicals are not discarded and are not hazardous waste. It is only when the spilled chemicals are discarded or intended to be discarded because they cannot be returned (e.g. they are mixed with dirt or other materials), these spilled chemicals and associated spill cleanup residues and debris are hazardous wastes."

Id. EPA described these situations as examples of "common practices" regarding commercial chemical products such as liquid mercury that the EPA "believes should be encouraged because they avoid discarding valuable materials and thereby conserve resources while at the same time avoiding the potential hazards associated with discarding of hazardous chemicals." Id. at 78540-41. These practices "also avoid causing many thousands of wholesalers, retailers, and users from

becoming generators of hazardous wastes because they will be able to return the materials for reuse instead of possibly discarding them." Id. Where a manufacturer or supplier receives a commercial chemical product back that it is "unable to reprocess, repackage, resell or use" then "that portion which is discarded becomes a hazardous waste when it is discarded or when a decision is made [by the manufacturer or supplier] to discard the material." Id.[10]

In its letter to Mallinckrodt, Inc., Exhibit B, EPA emphasized that it is the point in time when a decision is made to discard a commercial chemical product that is determinative of the point when it becomes a regulated hazardous waste. EPA explained that, even though the mercury was previously used in the production process to manufacture chlorine, it was still a commercial chemical product "and will retain its product status under the federal regulations when being stored . . . unless and until a determination is made that the mercury will be 'retired.'" EPA identified that the "key element" that will give the mercury the "continued product status" is that the entity storing the material "has the right, and intends, to sell the mercury for commercial purposes at the end of the storage period . . . " (which, in this case, was to be for a period of up to eight years). EPA noted the agreement here – that the mercury "might be retired if there is a law, regulatory and/or policy change," – "simply means that the mercury may become 'discarded' at a future point; it does not make the mercury a hazardous waste at this point."

The Government divides its contention that the liquid mercury was "discarded" under 40 C.F.R. § 261.2(a)(2)(i) into two general arguments.

[10] See also EPA's RCRA Hotline answer (Feb 1992) ("commercial chemical products that are stored prior to reclamation by definition are not regulated as solid wastes until they are abandoned or intended for discard."); EPA's RCRA Hotline Monthly Report Question (August 1985) ("listed commercial chemical products are not solid wastes when reclaimed" "it remains a commercial chemical product until such time as [it is] discarded or intended to be discarded.").

First, the Government argues that its repeated use of the conclusory term "waste liquid mercury" satisfies its obligation to allege facts in the Indictment. The Government is wrong – it must do more than assert conclusions. The Indictment does not allege any facts that if true could demonstrate that Southern Union discarded the liquid mercury.

The Government also argues that Southern Union "discarded" the liquid mercury at Tidewater pursuant to 40 C.F.R. § 261.2(a)(2)(i), because it was "abandoned," but then provides only a partial cite to, and a partial analysis of, this regulation and how it applies to the storage of liquid mercury at Tidewater.

As discussed in detail in Southern Union's Motion to Dismiss, EPA excludes commercial chemical products from the "discarded" material definition when they are reclaimed, or when they are speculatively accumulated.[11] EPA recognized that RCRA gave it no jurisdiction over such materials.[12] To avoid this result, the Government claims the provision in 40 C.F.R. § 261.2(a)(2)(i), referring to the definition of "abandoned," applies *instead* of 40 C.F.R. § 261.2(a)(2)(ii) that refers to the definition of "recycled" – but the Government does not provide the full text of this definition.

The *full* text of the definition of "abandoned," 40 C.F.R. § 261.2(b), states that "materials are solid wastes if they are abandoned by being:

> (1) disposed of;
> (2) burned or incinerated; or
> (3) accumulated, stored, or treated *(but not recycled)* before or in lieu of being abandoned by being disposed of, burned or incinerated."

(Emphasis added).

---

[11] See 40 C.F.R. § 261.2(c), and Table 1; 50 Fed. Reg. 614, 617 (Jan. 4, 1985).
[12] EPA has recently acknowledged the limits of its RCRA regulatory authority over other classes of secondary materials (including spent materials) that are being recycled. It has proposed changes to its solid waste definition that would significantly expand the exclusions for these materials from the definition of "discarded" materials when they are reclaimed. See 72 Fed. Reg. 14172 (March 26, 2007).

The Government left out the reference in 40 C.F.R. § 261.2(b)(3) to recycling, ignoring that where certain materials are recycled – *or accumulated, stored, or treated before recycling* – the applicable analysis for determining whether the material is "discarded" is pursuant to the section defining which materials are solid wastes when recycled in certain ways.

Further, even under the definition of "abandoned" in 40 C.F.R. § 261.2(b), the Indictment alleges no facts that support the Government's claim that Southern Union "abandoned" the liquid mercury when it stored the material at Tidewater.

In its preamble to its promulgation of its final solid waste rule, EPA explained that

> by saying 'abandoned,' [in its definition of "discarded material"] we do not intend any complicated concept, *but simply mean thrown away*. Materials that are accumulated, stored or treated in lieu of or before such activities also are solid wastes. (We indicate in the final rule that materials that are recycled in lieu of disposal are not covered by this provision – even though recycling constitutes treatment. Rather, they are covered by the provision in the definition saying when recycled materials are wastes.)

50 Fed. Reg. 614, 627 (Jan. 4, 1985) (emphasis added).

And, as explained above, the moment when a party decides to "throw away" a material is determinative of when that material is considered to be "discarded" and therefore a "solid waste." <u>See</u> 45 <u>Fed</u>. <u>Reg</u>. 78532, 78540-41 (Nov. 25, 1980), *infra*.[13] This makes sense because RCRA's definition of solid waste includes only "discarded" material, and so until a material is

[13] <u>See</u> <u>also</u> Letter dated May 13, 1981, from EPA's Office of Solid Waste, to Mr. Steven C. Wittmer, Environmental Facilities Engineer, at Merck, Sharp & Dohme, (attached as <u>Exhibit F</u>), in which EPA responded to a query about commercial chemical products that are generated at branch facilities and then sent to a central point before determining whether the material is to be discarded or saved for potential reuse. EPA stated:

> 40 C.F.R. § 261.33 is the controlling provision: the materials you described, U245 [a listed commercial chemical product], become hazardous wastes "if and <u>when</u> they are discarded or intended to be discarded…. [emphasis added]. We underscore the word "when" because the event of discard, or the time of decision to discard, is determinative. Until a material referenced by section 261.33 is actually discarded, or the decision is made to discard the material, it is not subject to RCRA regulation.

"discarded" – meaning actually discarded, or a decision has been made to discard it – EPA has no authority to regulate it as a "solid waste."

The D.C. Circuit issued several well-reasoned decisions analyzing the extent of EPA's authority over materials that are RCRA "solid wastes" and gives the word "discarded" its ordinary meaning. For example, in American Mining Congress v. EPA ("AMC I") 824 F.2d 1177, 1193 (D.C. Cir. 1987), the Court found the statute unambiguous and Congressional intent clear, holding that:

> [I]n light of the language and structure of RCRA, the problems animating Congress to enact it, and the relevant portions of the legislative history, Congress clearly and unambiguously expressed its intent that "solid waste" (and therefore EPA's regulatory authority) be limited to materials that are "discarded" by virtue of being disposed of, abandoned, or thrown away . . . .

In Association of Battery Recyclers, Inc. v. EPA, 208 F.3d 1047 (D.C. Cir. 2000), petitioners Natural Mining Association and American Iron and Steel Institute challenged a new EPA rule that conditioned a RCRA solid waste exclusion for certain mining wastes on the manner in which the waste was stored. Petitioners challenged "the singling out of these wastes and argued that a secondary material destined for recycling could not be considered solid waste regardless of its method of storage, because a material set aside for recycling has not been discarded." Id. at 1051. The D.C. Circuit stressed that, as it had already held in AMC I, "secondary materials destined for recycling are obviously not discarded materials." Id. "Rather than throwing these materials away, the producer saves them; rather than abandoning them, the producer reuses them." Id. "To say that something is saved is thrown away is an extraordinary distortion of the English language." Id. at 1053.

The Indictment alleges that Southern Union stored the liquid mercury at Tidewater; it does not allege that Southern Union was discarding, abandoning, or throwing the liquid mercury

away. The Government argues that the Indictment is sufficient based on conclusory allegations – i.e. that the liquid mercury is "nothing more than a collection of 'discarded' materials," and that the liquid mercury was "discovered" in a deceased employee's locker. But the Indictment actually alleges facts that support the opposite conclusion. For example, in 2001 Southern Union stored liquid mercury at the Tidewater facility and then sent it to Bethlehem Apparatus for reclamation. See Indictment ¶¶ 9 -10. And in 2002, Southern Union hired an environmental contractor – not to "dispose" of the liquid mercury found in the deceased employee's locker – but to take the liquid mercury to Tidewater, where it was stored. See Indictment ¶ 15.

Alleging and proving a material is a solid waste requires as a threshold element that the material was actually thrown away. The Government refused to allege when this happened – and refused to respond to a Bill of Particulars on this point – because it cannot. Why? Because it never happened. Southern Union stored the liquid mercury for eventual recycling at Bethlehem. There are no facts in the Indictment that support the allegation that Southern Union "discarded" the liquid mercury at Tidewater, and the Indictment is insufficient as a matter of law.

b. The Storage Conditions At Tidewater Do Not Determine Whether Southern Union "Discarded" the Liquid Mercury

The second prong of the Government's argument reveals its true intention. The Government seeks to nullify the law by arguing that the jury should find that Southern Union discarded the liquid mercury because the security at Tidewater was allegedly inadequate. That argument is equivalent to a defense argument of jury nullification. The law and the regulations do not provide that a commercial chemical product held for recycling becomes a solid waste if the security is inadequate. To the contrary, EPA does not regulate security at such facilities and does not include security considerations in defining whether a commercial chemical product has been discarded.

The security conditions at Tidewater cannot determine the status of the liquid mercury under EPA's regulation. A party storing liquid mercury at a facility with security conditions identical to Tidewater with the intent to recycle the material is not subject to prosecution. Another party storing liquid mercury at a facility with security conditions identical to Tidewater with the intent to discard the material is subject to prosecution. Yet, under the Government's theory of prosecution, both parties could be prosecuted, one wrongfully, under the same facts. The point is that the security conditions do not inform the question of whether the owner intended to recycle or discard the liquid mercury. And it would be error to permit a jury to decide this issue as ambiguities affecting a criminal statute's scope must be resolved in the defendant's favor under the rule of lenity. United States v. Lanier, 520 U.S. 259, 266 (1997); Liparota v. United States, 471 U.S. 419, 427 (1985); United States v. Nippon Paper Indus. Co. 109 F.3d 1, 7-8 (1st Cir. 1997) (collecting cases).

The Government attempts to conjure up storage regulations based on inapplicable citations to "legislative and regulatory history and case law" that it claims somehow "support the

proposition that when a facility is managing a material that it claims to be holding for recycling but the facts, as here, demonstrate that is engaging in waste management, the material is discarded, and therefore a solid waste." Nevertheless, EPA determined which materials it considers to be "discarded" when it promulgated its solid waste definition. EPA applied this proposition and noted in the preamble to the final solid waste rule, that it did not "believe [its] authority extend[ed] to certain types of recycling activities that are shown to be very similar to normal production operations or to normal uses of commercial products." 50 Fed. Reg. 614, 617 (Jan. 4, 1985). That is why EPA did not define as "discarded" commercial chemical products such as liquid mercury when held for recycling. EPA determined by rule that its authority does not extend to commercial chemical products destined for recycling, and no analysis of the facts relating to storage of the commercial chemical product can somehow turn that product into a "discarded" material under EPA's regulation. Thus, the factors the Government cites to, such as the economic value of liquid mercury, how the liquid mercury was managed, or the "length of time" the liquid mercury was accumulated, are not applicable, or relevant, to determine whether Southern Union "discarded" the liquid mercury at Tidewater.

In fact, when EPA excluded commercial chemical products that are recycled from regulation, it decided not to place any conditions on the storage time, or the management, of the commercial chemical product while held for recycling. In proposing the solid waste rule, EPA considered "whether some type of maximum accumulation period should be imposed by rule" for commercial chemical products that "accumulate over time without being used."

> EPA indicated in the proposed rule that commercial chemical products that are hazardous wastes when discarded were not subject to either the speculative accumulation or over accumulation provisions of the proposed rule. 48 FR 14489. We also asked for comments as to whether some type of maximum accumulation period should be imposed by rule. Virtually all commenters opposed this idea, due to the large recordkeeping requirements

> involved, and the difficult practical problems involved in observing and enforcing such a standard. The Agency shares these concerns. *We therefore are not adopting any time limit on when a commercial chemical product held for recycling becomes a waste*. The May 18, 1980 standard remains in place; these materials are wastes when discarded or intended for discard (by means of abandonment), and are not wastes when stored for recycling.

50 Fed. Reg. 614, 636 (Jan. 4, 1985) (emphasis added).[14]

EPA put *no* other requirements or conditions for how a commercial chemical product was to be stored while it was being accumulated for eventual recycling. There is no regulation that the Government can cite to that states graffiti on the mercury storage building makes the liquid mercury a "discarded" material. There are no requirements that warning signs be posted, records be kept, or certain labels be used which, if not met, transform the liquid mercury into a "discarded" material.

c. Southern Union Stored The Liquid Mercury For Legitimate Recycling At Bethlehem.

In another attempt to evade the regulatory exclusion for commercial chemical products that are destined for recycling, the Government implies that materials that are not "legitimately" recycled can be defined as "discarded" and thus subject to RCRA jurisdiction. There is no merit to the Government's suggestion.

First, there is no existing EPA regulation that defines or sets out the criteria for what is considered to be "legitimate" recycling. In fact, EPA has only recently *proposed* such criteria as a regulation – first in October of 2003 and then again, after receiving numerous comments on this proposal, in March of 2007. In its 2003 proposal, EPA proposed four criteria that would apply to determine whether "legitimate" recycling is occurring. After receiving numerous comments on the proposal, EPA re-evaluated the relative importance of the four criteria. In its

---

[14] See also Mallinckrodt Letter, Exhibit B, where EPA also agreed that the mercury stored for future recycling is not subject to the storage time limits set forth in 40 C.F.R. § 261.2.

re-proposed rule, EPA restructured its approach, and deemed that only two of the previously four criteria (now called "factors") would be "mandatory," because these were the "core considerations for determining whether a recycling operation is legitimate . . . ." 72 Fed. Reg. 14172, 14194 (March 26, 2007). The other two factors could be "considered," but did not have to be "necessarily met." The two "mandatory" "core" factors for determining whether the recycling is legitimate are: (1) that the secondary material provide a useful contribution to the recycling process or to a product of the recycling process, and (2) that the recycling process produces a valuable product or intermediate. As Bethlehem Apparatus purchased liquid mercury from Southern Union for recycling in the past, the two "mandatory" "core" criteria are easily met, and the Government does not contend otherwise. (In fact, the Government neglects to mention these criteria, or their status as proposed rules.) In any event, these legitimacy factors have still not been promulgated in a final regulation, and the Government cannot apply them against Southern Union in a criminal enforcement case.[15]

In sum, Southern Union never discarded the liquid mercury by storing it at Tidewater for eventual recycling. And the mercury did not become a "discarded" material at some "vague" point in time because of the manner in which it was stored, or the length of time it was stored. EPA specifically decided *not* to place any conditions, or any time limit, on the storage of a commercial chemical product held for recycling. The Government cannot now prosecute

[15] The Government attempts to build its entire prosecution on an excerpt from EPA's 1985 preamble to the solid waste rule, stating that "secondary materials stored or handled in a manner that does not guard against significant economic loss…" are not legitimately being recycled. This is similar to one of the two "discretionary" factors in EPA's proposed rule for determining legitimate recycling: "how the secondary material is managed (as compared to analogous raw materials, to the extent they exist)." 72 Fed. Reg. 14172, 14198. But this factor is concerned with whether the material is managed in a way so that the material is "contained" such that it does not spill or leak into the environment. Storing liquid mercury in containers in a locked cabinet, in a locked building, clearly meets this factor.

Southern Union for violating non-existent standards that EPA chose not to impose on the regulated community.[16]

### B. THE MERCURY-CONTAINING REGULATORS ARE A UNIVERSAL WASTE THAT DO NOT, AS A MATTER OF LAW, REQUIRE A HAZARDOUS WASTE STORAGE PERMIT

The Government "agrees that the mercury-containing regulators stored at Tidewater were universal wastes under Rhode Island's EPA-approved regulations," but disagrees that Southern Union was a "handler" of these mercury-containing regulators. Handlers of universal waste are not required to obtain a hazardous waste storage permit.

The Government contends instead that Southern Union was the "owner or operator" of a "destination facility." But the Indictment alleges no facts that support this new allegation, because the Indictment does not claim that Southern Union "treated" or "disposed of" the mercury containing regulators during the time period that the Government alleges a violation. The Indictment alleges only that Southern Union stored mercury containing regulators at Tidewater during this period. Thus, the Government has not properly alleged that Tidewater was a "destination facility" that required a hazardous waste storage permit. Southern Union was a "handler" of universal waste, and is not subject to the hazardous waste storage permit requirements, or the criminal enforcement provisions of RCRA.

---

[16] Note that where EPA has determined that a secondary material being recycled should be excluded from the definition of "discarded material," but only where certain specific storage conditions are met, it has included those conditions in the promulgated rule that excludes the material. See., e.g., Safe Food and Fertilizer v. EPA, 350 F.3d 1263 (D.C. Cir. 2003), where the Court upheld an EPA rule that excludes from the definition of solid waste hazardous secondary materials used to make zinc fertilizers, and the fertilizers themselves, *so long as* the recycled fertilizers meet certain handling, storage and reporting conditions. EPA determined in promulgating the rule that, if these conditions are met, the recycled materials "have not been discarded." There are no similar conditions placed on the rule excluding commercial chemical products that are recycled.

1. The Indictment Does Not Allege That Southern Union Was A "Destination Facility," Or Allege Any Facts That Support Such An Allegation

EPA promulgated the universal wastes regulations to ease the regulatory and management burden for certain specifically identified wastes (i.e. batteries, pesticides, mercury-containing devices, thermostats) by streamlining requirements to make these wastes easier to handle, and to facilitate recycling. EPA's stated goal of the universal waste program is "to promote the collection and recycling of these widely generated hazardous wastes."

In creating this new category of universal wastes, EPA promulgated an entirely separate section of the hazardous waste regulations, 40 C.F.R. § 273, that applies to the categories of hazardous wastes that EPA has identified as "universal waste." These regulations apply to all aspects of universal waste management, from cradle to grave.

"Handlers" of universal wastes are exempt from the cradle to grave requirements found in 40 C.F.R. Parts 262 through 270 [which include the hazardous waste storage permit requirement], and are instead subject only to the universal waste requirements in 40 C.F.R. Part 273. A universal waste handler is defined under 40 C.F.R. § 260.10 as a "generator" of universal waste, or "the owner or operator" of a facility that "receives universal waste from other universal waste handlers, accumulates universal wastes, and sends universal waste to another universal waste handler, to a destination facility, or to a foreign destination." "Handlers" of universal waste are not subject to the requirements applicable to hazardous waste treatment, storage and disposal facilities, or the requirement that these facilities obtain a hazardous waste storage permit.

As explained in Southern Union's Motion to Dismiss, the mercury-containing regulators are "universal wastes" under both state and federal regulations – a fact that the Government now

acknowledges in its Objection. Southern Union was a "handler" of these universal wastes because it was a "generator" of these universal wastes, and because it accumulated these universal wastes at Tidewater.

Here, the Government relies on the one provision under the universal waste regulations that applies the hazardous waste permit requirements to universal wastes. 40 C.F.R. § 273.60 ("Standards for Destination Facilities") states that the "owner or operator of a destination facility (as defined in § 273.9) is subject to all the applicable requirements" of the hazardous waste treatment, storage and disposal facilities" ("TSDFs") (including 40 C.F.R. Parts 264, 265, 266, 268, 270 and 124).

40 C.F.R. § 273.9 defines a "destination facility" as "a facility that treats, disposes of, or recycles a particular category of universal waste . . . ." Significantly, the definition also makes explicit that "a facility at which a particular category of universal waste is *only accumulated*, is *not a destination* facility for purposes of managing that category of universal waste." (emphasis added). As EPA stated in promulgating the final universal waste rule for mercury containing equipment, facilities "that only consolidate a particular category of [universal] waste should be subject to the small or large quantity handler of universal waste requirements." 60 Fed. Reg. 25492, 25518 (May 11, 1995).

The Indictment charges that "from on or about March 25, 2003, until on or about October 19, 2004" Southern Union "did knowingly store, and cause to be stored, hazardous wastes, namely, mercury-containing gas regulators on the premises of 91 Tidewater Street . . . without a permit issued pursuant to RCRA." Indictment ¶ 37. This charge does not allege that Southern Union "treated" the mercury-containing regulators without a permit, or that it "disposed of" the mercury containing regulators without a permit. Rather, it alleges only that Southern Union

stored these universal wastes without a permit. The Indictment alleges no facts that would support a "treatment" allegation.

Although the Indictment alleges that Southern Union "removed" mercury from regulators (what the Government contends is "treatment") "from June 2001 to January 2002," (Indictment ¶ 9), it also alleges that the "contract with the environmental services company that removed the mercury from the regulator ceased . . . in or around January 2002." (Indictment ¶ 11). Thereafter, the Indictment alleges only that Southern Union "continued to remove mercury containing regulators from customers' homes and *store* them" at Tidewater." (Indictment ¶ 13). (Emphasis added). The Indictment never alleges that, during the alleged time period of violation from March 25, 2003 onward, Southern Union "treated" or "disposed" of the mercury containing regulators "stored" at Tidewater. Thus, the Indictment does not sufficiently allege any elements that would make Southern Union an owner or operator of a "destination facility" and, therefore, the Indictment is insufficient as a matter of law.[17]

2. <u>As A "Handler" Of Universal Waste, Southern Union Was Not Required To Have A Hazardous Waste Permit</u>

The Government also argues that Southern Union is not a "handler" under the universal waste regulations because the definition of "handler" includes someone who receives universal waste, accumulates universal wastes, and sends universal waste to another handler or destination facility. The Government claims that Southern Union cannot meet this definition because it did not "send" the regulators off-site, and thus claims the consequence of this failure is that Southern Union is automatically subject to all of the requirements applicable to hazardous waste treatment, storage, and disposal facilities. The Government cites to no regulation or case law to support this *ipse dixit* logic. The Government's argument also fails because there is no provision anywhere

[17] For these reasons, the Government's argument that Southern Union did not meet the definition of "handler" – because a "handler" does not mean a person who "treats" or "disposes" of universal waste – similarly fails.

in EPA's RCRA regulations that subjects universal waste handlers who allegedly violate a universal waste regulation – i.e. surpassing the allowable accumulation time limit – to the provisions of the hazardous waste storage permit requirements.

One of the significant regulatory differences between universal waste requirements and hazardous waste requirements is the length of the allowable accumulation time limit that a generator of the waste has for keeping the waste on site before it must send the waste off for ultimate disposition. Under 40 C.F.R. § 273.15 of the universal waste regulations, a small quantity handler of universal waste:

> may accumulate universal waste for no longer than one year from the date the universal waste is generated, or received from another handler, unless the requirements of paragraph (b) of this Section are met.

And 40 C.F.R. § 273.15(b) states:

> a small quantity handler of universal waste may accumulate universal waste for longer than one year from the date the universal waste is generated, or received from another handler, if such activity is solely for the purpose of accumulation of such quantities of universal waste as necessary to facilitate proper recovery, treatment, or disposal.[18]

There are similar provisions for the accumulation time limits for large quantity handlers of universal waste. (See 40 C.F.R. § 273.35.)

By contrast, the allowable accumulation time for generators of hazardous waste, found at 40 C.F.R. § 262.34, is much shorter. This regulation provides that generators "may accumulate hazardous wastes on-site for ninety (90) days or less *without a permit* or without having interim status" (emphasis added) provided that the generator meets various specific requirements regarding placement of waste, documentation of waste, and labeling requirements. For hazardous waste generators who exceed the 90 day storage limit, the regulatory consequence is explicitly written into the regulation: 40 C.F.R. § 262.34(b) states that "a generator who

[18] The regulations do not provide any limit on the length of this allowable extra time for accumulation.

accumulates hazardous waste for more than ninety days *is an operator of a storage facility* and is subject to the requirements of 40 C.F.R. §§ 264 and 265 and the permit requirements of 40 C.F.R. § 270, unless he has been granted an extension to the ninety (90) day period." (Emphasis added)

The universal waste requirements do not make a "handler" of universal waste "subject to the requirements of 40 C.F.R. §§ 264 and 265 and the permit requirements of 40 C.F.R. § 270" if it accumulates universal waste beyond the prescribed period. In fact, there are no provisions in the universal waste regulations that ever impose as a sanction for a violation either the requirement to comply with the requirements of 40 C.F.R. §§ 264, 264, and 270, or criminal sanctions or prosecution. The universal waste requirements state nothing about the consequence for exceeding the accumulation time limit.

As described above, the definition of "destination facilities" includes a provision explicitly stating that "a facility at which a particular category of universal waste is *only accumulated*, is not a destination facility for purposes of managing that category of universal waste." (Emphasis added). The regulations do not provide that a universal waste handler facility that accumulates universal waste over the accumulation time limit becomes a destination facility, or is subject to the requirements applicable to destination facilities.

In addition, there is no EPA guidance or policy in which the Agency has announced that it interprets the universal waste regulations to mean that handlers who exceed the accumulation time period "become storage facilities" subject to all applicable TSDF and permitting requirements – and EPA has no authority to impose criminal sanctions by regulation or interpretation. EPA's RCRA Orientation Manual 2006 is an EPA guidance document in which EPA provides detailed explanations and descriptions of the Agency's RCRA program and

requirements.[19] In this Manual, under the hazardous waste generator requirements section, EPA explains that, "if [generators] exceed their [ ] accumulation time limit, the facility *becomes a storage facility* subject to all applicable requirements for TSDF (including permitting) unless they have received an accumulation time limit extension from EPA." RCRA Orientation Manual 2006, at page III-45. (Emphasis added). However, under the universal waste handler requirements section, the Manual merely states what the accumulation time for universal waste is – the Manual provides no further explanation or comment, as it does for the hazardous waste generator, that the more onerous storage and permitting requirements would apply for the handler who exceeds the accumulated time limit. RCRA Orientation Manual 2006, at page III-36.

The Rhode Island Department of Environmental Management ("RIDEM") regulations add further support that a universal waste handler who exceeds the accumulation time limit is *not* subject to the storage and permitting requirements that are applicable to the hazardous waste generator who exceeds the accumulation time limit. The Rhode Island Rules and Regulations for Hazardous Waste Management, Universal Waste (Rule 13.00) states in Rule 13.01 that "the wastes listed in this Rule are *exempt* from regulations under 40 C.F.R. § 262 through 270 except as specified in the Universal Waste Rule itself (40 C.F.R. § 273) and therefore *are not fully regulated as hazardous waste*." (Emphasis added).[20]

The Government's allegation that Southern Union accumulated the mercury containing regulators past the time limit under the universal regulations cannot support a criminal prosecution because the law does not provide for that sanction. In promulgating RCRA, Congress decided not to subject universal waste handlers to criminal enforcement actions; the

---

[19] EPA's RCRA Orientation Manual 2006 can be found at: http://www.epa.gov/epaoswer/general/orientat/.
[20] 40 C.F.R. §§ 262-270 are the cradle to grave requirements for hazardous waste as cited above.

universal waste regulations do not fall under RCRA's criminal penalties for violations listed in 42 U.S.C. § 6928. Handlers who violate the universal waste regulations can only be subject to civil or administrative penalties. The Government has no authority to enforce criminally these regulations against Southern Union, and the Company cannot be criminally liable for its storage of mercury containing regulators at Tidewater.

### C. THE GOVERNMENT'S INDICTMENT VIOLATES DUE PROCESS

Finally, if the Government's arguments are accepted, such a result would raise serious due process and "fair notice" concerns as it would transform into felonies conduct commonly and reasonably understood to be lawful. United States v. Lanier, 520 U.S. 259, 266 (1997).

The Due Process Clause requires that regulated entities receive "fair notice" of the conduct that a government agency, such as the EPA, expects them to adhere to prior to imposing penalties. In this regard, as noted by the D.C. Circuit, the Due Process Clause "prevents . . . deference from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires." Gates & Fox Co. v. OSHRC, 790 F.2d 154, 156 (D.C. Cir. 1986). In the absence of this "fair notice," the agency may not "deprive a party of property by imposing civil or criminal liability." General Electric Co. v. EPA, 53 F.3d 1324, 1328 (D.C. Cir. 1995). Here, that is exactly what the Government is attempting to do.

## III. CONCLUSION

For these reasons, the Court should dismiss Count I and Count III of the Indictment.

Respectfully submitted,

SOUTHERN UNION COMPANY

By its Attorneys,

/s/ Gerald J. Petros
Gerald J. Petros, No. 2931
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
401-274-2000
401-277-9600 (fax)
gpetros@haslaw.com

John A. Tarantino, No. 2586
Patricia K. Rocha, No. 2793
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
401-274-7200
401-351-4607 (fax)
jtarantino@apslaw.com
procha@apslaw.com

Daniel J. Fetterman
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, NY 10019
212-506-1700
Fax: 212-506-1800

Dated: June 2, 2008

**CERTIFICATION**

Terrence P. Donnelly
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Kevin Cassidy
Trial Attorney
Department of Justice
Environmental Crimes Section
601 D St. NW
Washington, DC 20530

Dianne Chabot
Special Assistant U.S. Attorney
Regional Criminal Enforcement Counsel
U.S. Environmental Protection Agency
One Congress Street
Suite 1100, SAA
Boston, MA 02114-2023

I hereby certify that on June 2, 2008, a copy of the foregoing Reply to United States' Objection to Defendant Southern Union Company's Motion to Dismiss Count I and Count III of the Indictment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may accesses this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros

*903044*