# EXHIBIT A

U.S. ENVIRONMENTAL PROTECTION AGENCY

# RCRA Online

Contact Us | Print Version

EPA Home > Wastes > Information Sources > RCRA Online > Document Record Detail

Welcome What's New Topics Search Full Text Search Advanced Search How To

# Document Record Detail

| | |
|---|---|
| **Full Document:** | PDF |
| **Title:** | REGULATORY STATUS OF SPENT IGNITION TUBES AFTER SENT FOR RECLAMATION |
| **RCRA Online Number:** | 11419 |
| **Date:** | 04/14/1989 |
| **To:** | Oleszko |
| **From:** | Cochran |
| **Organization of Recipient:** | HazMat Environmental Group, Inc. |
| **Description:** | Used ignitron tubes sent off-site for mercury reclamation are spent materials and solid wastes, not commercial chemical products (CCPs). The purity of the mercury within the tube is not a consideration when determining whether the ignitron tube itself meets the definition of spent material (the tube is what becomes spent). If mercury is removed from the tube on-site and only mercury is sent for direct reuse or further refining, mercury is product and not solid waste. |
| **Regulatory Citation(s) :** | 261.1(c), 261.2(c)(3), 261.2(e) EXIT Disclaimer |
| **Statutory Citation(s):** | NA Read US Code 42, Chapter 82 EXIT Disclaimer |
| **Topic(s):** | Characteristic Wastes; Hazardous Waste; Hazardous Waste Recycling; Mercury Wastes |
| **Approximate Number of Hardcopy Pages:** | 2 |
| **EPA Publication Number:** | NA |
| **RPPC Number (if applicable):** | NA |
| **Official OSW Policy:** | No |

EPA Home | Privacy and Security Notice | Contact Us

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

APRIL 14, 1989

Mr. Robert W. Oleszko
Vice President, HazMat Environmental Group, Inc.
P. O. Box 676
Buffalo, New York 14217

Dear Mr. Oleszko:

This letter is in response to your letter of January 6, 1989, in which you request an official interpretation of the regulatory status of ignitron tubes containing mercury, when sent for reclamation.

I understand that your inquiry is a follow-up to a previous official interpretation made by the Environmental Protection Agency (EPA) to Mr. Philip E. Gerwert, Manager, Industrial Waste and Toxic Substances, General Motors Corporation, concerning Resource Recovery and Conservation Act (RCRA) regulations as they relate to various aspects of recycling mercury (copy attached). Our interpretation regarding the regulatory status of ignitron tubes has not changed.

As was indicated in the letter to Mr. Gerwert, when a material (e.g., an ignitron tube) is being sent for reclamation, it is necessary to determine what type of secondary material it is in order to define the material as a solid waste under Subtitle C of RCRA. In the above referenced letter, the Agency determined that ignitron tubes sent off site for mercury reclamation are classified as spent material and therefore meet the definition of a solid waste as defined in 40 CFR Section 261.2(c)(3), Table 1. If the mercury is removed from the ignitron tubes on site (e.g., material reclaimed from solid waste) and only the mercury from the tubes is sent off site for direct beneficial use or further refining, the mercury is a product, not a solid waste (see 40 CFR Section 261.3(c)(2) and 50 FR 634, January 4, 1985).

As I understand your letter, you disagree with this interpretation. It is your position that the ignitron tubes do not meet the definition of a spent material under 40 CFR Section 261.l(c)(1). You believe the ignitron tubes should be defined as a commercial chemical product and therefore, would not be a solid waste when sent off site for reclamation under 40 CFR Section 261.2(c)(3), Table 1. Your rationale is that neither the tube, or any component of the tube, has been contaminated. Therefore, the ignitron tube cannot be defined as a spent material.

In deciding the status of material being sent for reclamation, you have to look at what is actually physically being sent off site. In this case, it is the entire ignitron tube that is being sent off site. The purity of the mercury within the tube is not a consideration when determining whether the ignitron tube itself meets the definition of a spent material.

You further argue that even though the ignitron tube is burned out and can no longer serve its intended use, the tube's failure is not due to contamination of the mercury or any other part of the tube. Again, the condition of the mercury or the mercury itself has nothing to do with determining whether the ignitron tube is a solid waste by being a spent material. If the ignitron tube is considered a solid waste under 40 CFR Section 261.2(c), the unit would likely be a hazardous waste because the mercury component may exhibit the hazardous waste characteristic of EP toxicity.

In summary, the ignitron tube is the material that becomes spent and thus, would be considered a spent material. The presence of mercury in the ignitron tube is not a consideration when defining the tube as a solid waste. There is nothing in the RCRA regulations that would support defining an ignitron tube as a commercial chemical product. The non-functional ignitron tubes from the welding equipment meet the definition of spent material and are solid waste under Subtitle C of RCRA when sent for reclamation (mercury recovery). The tubes could be further defined as a hazardous waste if they exhibit a characteristic of hazardous waste (e.g., EP toxicity--D009).

If you have any additional questions, please feel free to call me a (202) 475-9715.

Sincerely

Stephen L. Cochran
Environmental Protection Specialist
Waste Characterization Branch

Attachment

# EXHIBIT B

EPA New England Topics



# Hazardous Waste Policy Compendium

Below you will find copies of EPA Region I RCRA regulatory interpretation made in response to questions from the New England states and the public concerning different hazardous waste issues. The compendium will be updated periodically to reflect new information. If you should have any questions regarding the Hazardous Waste Policy Compendium, you may contact Lynda Boriskin (Boriskin.Lynda@epa.gov):

Environmental Protection Agency
Office of Ecosystem Protection
One Congress Street, Suite 1100
Boston, MA 02114-2023

Telephone #: (617) 918-1640
Fax #: (617) 918-1505
E-fax #: (617) 918-0640

You will need Adobe Acrobat to view some of the files on this page. See EPA's PDF page to learn more about PDFs, and for a link to the free Acrobat Reader.

Hide All | Show All

**2008 Compendium Letters**

**2007 Compendium Letters**

**2006 Compendium Letters**

**2005 Compendium Letters**

**2004 Compendium Letters**

**2003 Compendium Letters**

**2002 Compendium Letters**

**2001 Compendium Letters**

**2000 Compendium Letters**

**1999 Compendium Letters**

**1998 Compendium Letters**

**1997 Compendium Letters**

**1996 Compendium Letters**

**1995 Compendium Letters**

**1994 Compendium Letters**

**1993 Compendium Letters**

**1992 Compendium Letters**

**1991 Compendium Letters**

**1990 Compendium Letters**

**1988 Compendium Letters**

**1985 Compendium Letters**

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
Region 1
1 Congress Street, Suite 1100
BOSTON, MA 02114-2023

August 1, 2002

Patricia H. Duft
Staff Vice President, Legal Dept.
Mallinckrodt, Inc.
675 McDonnell Blvd.
St. Louis, MO 63134

Re: Regulatory Interpretation Regarding Mercury From the HoltraChem Manufacturing Company Facility in Orrington, Maine

Dear Ms. Duft:

This is in response to your request for a regulatory interpretation dated May 10, 2002 regarding mercury from the HoltraChem Manufacturing Company facility in Orrington, Maine.

**SUMMARY OF REQUEST**

You report that there is approximately 84 tons of free-flowing elemental mercury currently being stored in Orrington. The mercury previously was used in mercury cells at the HoltraChem chlor-alkali facility during the production process to manufacture chlorine. For economic reasons, the HoltraChem Manufacturing Company ceased operations at the Orrington facility in September 2000, and the mercury has been stored on site since that time.

According to your letter and a materials Profile submitted with your letter, the mercury is more than 99% pure. Subsequent to your letter, this purity level has been confirmed by having a sample of the mercury analyzed by an independent laboratory, showing a purity level of 99.994%. You note that in the chlor-akali facility process, the mercury did not chemically react with any of the other materials. It thus did not become contaminated with other materials, and also was not used up or depleted. But for the closure of the plant, it could have continued to be used, as is, in the manufacturing process.

As a prior site owner, Mallinckrodt, Inc. currently is carrying out certain RCRA corrective action remediation activities at the HoltraChem facility. The continued storage of the mercury on site is impeding Mallinckrodt's ability to continue these activities.

The mercury has been offered for sale to Mercury Waste Solutions, Inc. ("MWS"). MWS is in the business of reselling mercury in commerce. You report, however, that pursuant to

Agreements planned to be signed by MWS and the Natural Resources Council of Maine ("NRCM"), the mercury temporarily will be stored at MWS's facility in Union Grove, Wisconsin rather than immediately being resold as a product. According to drafts of the Agreements submitted to the EPA on August 1, 2002, the mercury will be stored for at least four years. At the end of the four-year period, MWS and NRCM may continue the storage on an annual basis, not to exceed a total storage period of eight years. At the request of the NRCM, MWS has agreed that if during the period of storage, there is a change in current law, regulations and/or policy, and a mercury retirement policy is established, MWS will sell the mercury to the United States government or another entity in accordance with the retirement policy. However, MWS has reserved the right to sell the mercury in commerce at the end of the first four year storage period, if MWS determines that it could be adversely impacted by major changes in cost structure or regulations by continuing to store the mercury. In any event, unless there is a change in law, regulations and/or policy, MWS has the right, and intends, to sell the mercury in commerce by no later than the end of the eight year storage period. The mercury does not need to be reclaimed by MWS prior to reselling it as a product since it is already greater than 99% purity. MWS has no plans to refine the mercury to further increase the purity, at this time.

You request a regulatory interpretation as to whether the mercury may be handled as a product, rather than as a hazardous waste under the federal regulations promulgated pursuant to the Resource Conservation and Recovery Act ("RCRA"). Although you believe that the mercury is a product, you note that MWS is a licensed hazardous waste storage facility, and has agreed to store the mercury in accordance with safe handling requirements. According to the draft Agreements submitted to the EPA, the mercury will be stored in containers which will be inspected daily to ensure their integrity, inspected weekly with full documentation, and monitored by mercury vapor analyzers to ensure proper containment. You further note that the mercury will be transported from Maine to Wisconsin by a licensed hazardous waste transporter.

**RESPONSE**

Maine and Wisconsin both have been authorized by the EPA to administer State hazardous waste programs. Thus whether the mercury is a product or hazardous waste must be determined in accordance with Maine law which applies until the mercury leaves Maine and in accordance with Wisconsin law which will apply once the mercury reaches Wisconsin. However, the EPA is responding to your regulatory interpretation request in order to provide you with guidance regarding the federal hazardous waste regulations, since the federal regulations set the requirements which all States must follow at a minimum.

EPA Region I is responding to your request because whether a material is a hazardous waste must initially be determined by the generator where the material is generated, and the mercury has been generated in this Region. However, since the plan is to ship the mercury to a facility within EPA Region V, we have consulted with that EPA Region and with the Office of Solid Waste at EPA Headquarters prior to sending you this response.

In response to your request, we agree, first, that mercury which is at least 99% pure is of product quality. The EPA consistently has stated that 99% pure mercury is of product quality because

it is reusable as is, or requires only further refining (e.g., to 99.99% purity), rather than more substantial reclamation, to be reusable. See Letter from Matthew A. Straus, EPA Office of Solid Waste, to D.F. Goldsmith Chemical and Metal Corp. dated January 21, 1986; Letter from Matthew A. Straus, EPA Office of Solid Waste, to Bethlehem Apparatus Company, Inc., dated May 30, 1986; Letter from David Bussard, EPA Office of Solid Waste, to Appropriate Technologies, II, Inc., dated March 19, 1991. Thus the HoltraChem mercury appears to be of product quality.

Although the HoltraChem mercury was used in an industrial process, we agree that it has retained its status as a commercial chemical product rather than becoming a spent material. Under the federal regulations, a spent material is "any material that has been used and as a result of contamination can no longer serve the purpose for which it was produced without processing." 40 C.F.R. § 261.1(c)(1). While the HoltraChem mercury has been used, neither contamination with impurities nor any other factor or circumstance has caused this mercury to become unsuitable for commercial purposes or to need reprocessing. Thus the mercury has not become "spent."

As a commercial chemical product, the HoltraChem mercury is not subject to regulation as a hazardous waste under the federal regulations so long as it is not "discarded." Commercial chemical products being stored for the purpose of disposal are considered to have been "discarded" and thus are subject to regulation. See 40 C.F.R. § 261.2(b)(3). However, commercial chemical products being stored in order to be recycled as products are not considered to have been "discarded," unless they are burned for energy recovery or used in a manner constituting disposal. See id. § 261.2(c). See also 40 C.F.R. § 261.33.

Whether the HoltraChem mercury when shipped to MWS will become "discarded" depends upon the particular arrangement made with MWS. Based on your representations regarding the terms of agreement, and our review of the draft Agreements, it appears that the mercury will retain its product status under the federal regulations when being stored by MWS, unless and until a determination is made that the mercury will be "retired."

The key element of the arrangement (as represented by you and reflected in the draft Agreements), that will give this mercury continued product status, is that MWS has the right, and intends, to sell the mercury for commercial purposes at the end of the storage period, unless there is a law, regulatory and/or policy change. That the mercury might be retired if there is a law, regulatory and/or policy change simply means that the mercury may become "discarded" at a future point; it does not make the mercury a hazardous waste at this point. That the mercury may be stored for as long as eight years prior to being resold also does not remove its product status, in the particular circumstances of this case. In other circumstances, the EPA might question the legitimacy of a claim that commercial chemical products being stored long term without being sold are products. In this case, however, there is a commercial market for mercury such that the HoltraChem mercury could be immediately resold. It will be stored only in response to the concerns of environmental organizations, in order to help promote an environmental purpose. We do not think that RCRA should be interpreted to impose greater regulation on a company which plans to sell a product (absent a law, regulatory and/or policy change) after promoting an

environmental purpose than would be imposed in the absence of carrying out the environmental purpose.

In answering your inquiry, we have assumed that the HoltraChem mercury is a secondary "material" potentially subject to regulation under RCRA, since the mercury was used in an industrial process. However, so long as it is recycled back into commerce or stored in order to be recycled back into commerce, the mercury (even if a secondary material) will remain classified under the federal regulations as a non-regulated product. See 40 C.F.R. § 261.2(c). So long as the mercury retains its product status, it will not be subject to any RCRA regulatory requirements under the federal regulations. In particular, the limitations on storage time set by RCRA section 3004(j), 42 U.S.C. § 6924(j), and 40 C.F.R. § 268.50 will not apply. The speculative accumulation provisions in 40 C.F.R. § 261.2 also will not apply, since commercial chemical products are not subject to these speculative accumulation requirements. See id., Table 1.

We recognize that the Maine Department of Environmental Protection has determined that the HoltraChem mercury is a hazardous waste under Maine State law. The State acted pursuant to its authority under RCRA to impose requirements which go beyond the minimum federal hazardous waste requirements. However, Maine's interpretation does not set a precedent for interpreting the federal RCRA regulations. The federal and Maine RCRA regulations are worded quite differently. Maine generally regulates as a waste any substance or material which is "unwanted" by the generator of the material "whether or not such substance or material has any other or future use." Maine Hazardous Waste Management Rules, Chapter 850, section 3A. In contrast, as noted above, under the federal regulations, when a commercial chemical product is unwanted by the generator, it may nevertheless be handled as a product, providing that it is being recycled for another or future commercial use. There thus is no inconsistency between classifying the mercury as a hazardous waste under Maine law and classifying it as a product under the federal regulations.

As a result of the Maine classification, the HoltraChem mercury will need to be handled as a State-only hazardous waste until it leaves the State of Maine. It will need to be shipped to the State of Wisconsin under a hazardous waste manifest using a licensed hazardous waste carrier. As a licensed hazardous waste storage facility, MWS will need to sign on the manifest that it has received this hazardous waste. However, once MWS has received and signed for the mercury, it will then be able, according to the federal regulations, to convert the mercury back to product status.

Our determination that the HoltraChem mercury may be handled as a product is subject to the following important qualifications. First, it is of course based on all of the representations contained in your letter being accurate. Second, as indicated above, the actual determination of whether the mercury will be a product or a hazardous waste when stored in the State of Wisconsin needs to be made in accordance with Wisconsin law. We suggest that Wisconsin State authorities be contacted in advance of any shipment to that State, to obtain their interpretation. As noted above, a State has the right to impose requirements which go beyond the minimum federal hazardous waste requirements. Third, even if State hazardous waste regulatory requirements are determined not to apply to the storage of this mercury in Wisconsin, it is

imperative that the mercury be safely stored. Among other things, poor management of the mercury could suggest that the mercury was not being carefully handled as a valuable product and thus could call into question its classification as a product. For this reason as well as safety reasons, we support the plan to include, in the Agreements with MWS, specifications regarding how the mercury will be stored.

Finally, if and when a decision is made to retire the mercury (including if there is storage for the purpose of retirement), further guidance from the EPA and the relevant State authorities should be sought. As indicated above, under current federal RCRA regulations, mercury being retired or stored for the purpose of retirement would need to be handled as a hazardous waste.

I hope that this answers your questions and that the important task of removing this mercury from the HoltraChem facility now moves forward. Should you have any further questions or concerns, please feel free to contact me at tel: 617-918-1631 or Jeffry Fowley in our Office of Regional Counsel at tel: 617-918-1094.

Sincerely,

Marvin Rosenstein, Chief
Chemical Management Branch

cc: Robert Dellinger, EPA Office of Solid Waste
Robert Springer, EPA Region V
Michael Ellenbecker, Wisconsin DNR
Scott Whittier, Maine DEP

# EXHIBIT C

U.S. ENVIRONMENTAL PROTECTION AGENCY

# RCRA Online

Contact Us | Print Version

EPA Home > Wastes > Information Sources > RCRA Online > Document Record Detail

Welcome What's New Topics Search Full Text Search Advanced Search How To

# Document Record Detail

| | |
|---|---|
| **Full Document:** | PDF Adobe |
| **Title:** | MERCURY SUITABLE FOR DIRECT USE (99% PURE) NOT SOLID WASTE |
| **RCRA Online Number:** | 11159 |
| **Date:** | 05/30/1986 |
| **To:** | Lawrence |
| **From:** | Straus |
| **Organization of Recipient:** | Bethlehem Apparatus Company, Inc. |
| **Description:** | Used mercury that is 99% pure and is destined for refining is not a solid waste. Used metals that are suitable for direct use or reuse, or that only need to be refined before use, are a product and not a solid waste. |
| **Regulatory Citation(s) :** | 261.2(e), 261.2(c)(3) EXIT Disclaimer |
| **Statutory Citation(s):** | NA Read US Code 42, Chapter 82 EXIT Disclaimer |
| **Topic(s):** | Hazardous Waste; Hazardous Waste Recycling; Mercury Wastes |
| **Approximate Number of Hardcopy Pages:** | 1 |
| **EPA Publication Number:** | NA |
| **RPPC Number (if applicable):** | 9441.1986(43) |
| **Official OSW Policy:** | No |

Mr. Bruce J. Lawrence
President
Bethlehem Apparatus Company, Inc.
Hellertown, Pennsylvania 18055

MAY 30 1986

Dear Mr. Lawrence:

This is in response to your February 26, 1986, letter in which you request confirmation that the mercury that is sent to your facility to be triple distilled is not a waste. First, I would like to apologize for taking so long in responding to your request; I hope this delay has not caused you any problems. With respect to your specific request, I agree with you that mercury (which is at least 99 percent pure) that is received and refined at your facility is not a solid waste.1/ In particular, we have stated that metals that are suitable for direct use, or that only have to be refined to be usable are products, not wastes. See 40 CFR 261.3(c)(2); see also preamble discussion at 50 FR 634, January 4, 1985. Thus, the mercury--that is 99 percent free-flowing mercury--that you receive at your facility is not subject to any of the hazardous waste regulations (i.e., the material does not have to be manifested to your facility, you need not comply with the storage requirements, etc.).

Please feel free to give me a call if I can be of any further assistance; my telephone number is (202) 475-8551.

Sincerely,

Matthew A. Straus
Chief
Waste Identification

---

1/ It should be noted that this regulatory interpretation reflects the Federal hazardous waste rules. The State of Pennsylvania may take a different interpretation; you, therefore, need to contact the state for further information on the status of this material.

MS860133

240

# EXHIBIT D

U.S. ENVIRONMENTAL PROTECTION AGENCY

# RCRA Online

Contact Us | Print Version

EPA Home > Wastes > Information Sources > RCRA Online > Document Record Detail

Welcome | What's New | Topics Search | Full Text Search | Advanced Search | How To

## Document Record Detail

| | |
|---|---|
| **Full Document:** | |
| **Title:** | MERCURY, REFINING/REUSE OF SCRAP |
| **RCRA Online Number:** | 11123 |
| **Date:** | 01/21/1986 |
| **To:** | Goldsmith |
| **From:** | Straus |
| **Organization of Recipient:** | D.F. Goldsmith Chemical and Metal Corp. |
| **Description:** | Free-flowing, 99% pure mercury is not a solid waste (SW). Metals suitable for direct use, or that only need to be refined to be usable are products, are not wastes. Any electrical switches, instruments, scrap batteries (battery), or other spent materials from which such pure mercury will be reclaimed are SW. |
| **Regulatory Citation(s) :** | 261.1(c), 261.2(c)(3) EXIT Disclaimer |
| **Statutory Citation(s):** | NA Read US Code 42, Chapter 82 EXIT Disclaimer |
| **Topic(s):** | Batteries; Hazardous Waste; Hazardous Waste Recycling; Mercury Wastes |
| **Approximate Number of Hardcopy Pages:** | 2 |
| **EPA Publication Number:** | NA |
| **RPPC Number (if applicable):** | 9441.1986(06) |
| **Official OSW Policy:** | No |

EPA Home | Privacy and Security Notice | Contact Us

9441.1986(06)

MERCURY, REFINING/REUSE OF SCRAP

JAN 21 1986

Mr. D. F. Goldsmith
D. F. Goldsmith Chemical
and Metal Corp.
909 Pitner Avenue
Evanston, Illinois 6020

Dear Mr. Goldsmith:

This letter is in response to your request of August 2, 1985, concerning the regulatory status of the scrap mercury that is refined at your facility in Chicago. First, I would like to apologize for taking so long in responding to your request; I hope this delay has not caused you any problems. With regard to your specific request, you indicate that scrap mercury, in the form of free-flowing mercury, is shipped to your facility in 76 pound flasks for refining. The scrap mercury purchased by your facility comes from a variety of sources, including the following: scrap dealers that accumulate small quantities of mercury; manufacturers or reclaimers of instruments and electric switches; private citizens who have accumulated mercury; and firms who dismantle chlor-alkali facilities. The mercury, as received, is at least 99 percent pure mercury; this material is distilled to instrument quality (over 99.99 percent pure mercury). Based on your reading of the January 4, 1985 recycle/reuse regulations, the scrap mercury that is refined at your facility is not a solid waste and, thus, would not be subject to the RCRA hazardous waste rules.

In general, I agree with you that the free-flowing mercury that is received and refined at your facility is not a solid waste (although I do not necessarily agree with all the arguments you present in your letter).1/ In particular, we have stated (which you note in your letter) that metals that are suitable for direct use, or that only have to be refined to be usable are products, not wastes. See 40 CFR 261.3(c)(2);

1/ It should be noted that this regulatory interpretation reflects the federal hazardous waste rules. The State of Illinois may take a different interpretation.

see also preamble discussion at 50 FR 634, January 4, 1985. Thus, the scrap mercury--that is the 99 percent free-flowing mercury--that you receive is not subject to any of the hazardous waste regulations (i.e., the material does not have to be manifested to your facility, you need not comply with the storage requirements, etc.).2/

Please feel free to give me a call if I can be of any further assistance; my telephone number is (202) 475-8551.

Sincerely yours,

Matthew A. Straus, Chief
Waste Identification Branch

2/ It should be noted that if you receive electrical switches, instruments, scrap batteries, or other forms of spent materials from which you recover/reclaim the mercury and these spent materials are hazardous (i.e., they exhibit one or more of the hazardous waste characteristics), these materials would be solid and hazardous wastes and would be regulated under 40 CFR 261.6(b) and (c).

# EXHIBIT E

Dan Granz/R1/USEPA/US
12/16/2004 11:55 AM

To John Fowler/NEIC/USEPA/US@EPA
cc
bcc
Subject CID Case RP1084 Mercury Analyses

John,

The 4 samples should have arrived by now from yesterday's sampling (Dave Dugan & I). All 4 samples are basically 100% elemental mercury in amber 4 oz glass sample jars.

We had no access to a copier before shipping the samples so could you be sure to send a copy of the C-O-C to me for the case file.

Thanks,

Dan Granz
USEPA OEME-EIA
11 Technology Drive
N. Chelmsford, MA 01863

C-O-C copy sent on 12/17/04. JWF

NEIC000033

# EXHIBIT F

U.S. ENVIRONMENTAL PROTECTION AGENCY

# RCRA Online

Contact Us | Print Version

EPA Home > Wastes > Information Sources > RCRA Online > Document Record Detail

Welcome | What's New | Topics Search | Full Text Search | Advanced Search | How To

# Document Record Detail

| | |
|---|---|
| **Full Document:** | |
| **Title:** | APPLICABILITY OF 261.33 TO DISCARDED PRODUCTS |
| **RCRA Online Number:** | 11012 |
| **Date:** | 05/13/1981 |
| **To:** | Wittmer |
| **From:** | Corson |
| **Organization of Recipient:** | Merck, Sharp and Dohme |
| **Description:** | CCPs are not solid wastes until the decision is made to discard them. Pharmaceutical chemical (U245) becomes a hazardous waste at the point the decision is made to discard (after returned to manufacturer) (reverse distribution system). |
| **Regulatory Citation(s) :** | 261.2(a), 261.2(b), 261.33, 261.33(f) EXIT Disclaimer |
| **Statutory Citation(s):** | NA Read US Code 42, Chapter 82 EXIT Disclaimer |
| **Topic(s):** | Chemicals (RCRA); Hazardous Waste; P-wastes; U-wastes |
| **Approximate Number of Hardcopy Pages:** | 4 |
| **EPA Publication Number:** | NA |
| **RPPC Number (if applicable):** | NA |
| **Official OSW Policy:** | No |

EPA Home | Privacy and Security Notice | Contact Us

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460
OFFICE OF SOLID WASTE

MAY 13, 1981

OFFICE OF WATER
AND WASTE MANAGEMENT

Mr. Steven C. Wittmer
Environmental Facilities Engineer
MERCK SHARP & DOHME
West Point, Pennsylvania 19486

Dear Mr. Wittmer:

Your letter of March 26, 1981 requests our interpretation of the RCRA hazardous waste regulations as applied to products eventually discarded at your West Point plant.

40 CFR §261.33 is the controlling provision: the materials you describe, including U245, become hazardous wastes "if and <u>when</u> they are discarded or intended to be discarded...". [Emphasis added]. We underscore the word "when" because the event of discard, or the time of decision to discard, is determinative. Until a material referenced by section 261.33 is actually discarded, or the decision is made to discard the material, it is not subject to RCRA regulation.

As we understand, the decision by Merck Sharp & Dohme whether to discard a given product is not made until after the product has been returned to the West Point plant, following a check by your Security Department. Moreover, as we understand, your procedures for segregating returned goods for reclamation or disposal via either incineration or landfill take place only at the West Point plant. Given these facts, and assuming that your branch operations have no role in the decision to discard a particular material, we conclude, as to materials in the form of commercial chemical products on the P or U lists of 40 CFR §261.33, that the materials are not yet within the RCRA regulatory system when shipped to West Point from the branch operations. We agree with your reasoning that West Point is "the place where the goods become a waste."

I trust this interpretation will be helpful. If I can be of further assistance, please let me know.

Sincerely yours,

Alan S. Corson
Chief
Waste Characterization Branch
Hazardous and Industrial Waste Division (WH-565)

FaxBack# 11012

MSD
MERCK
SHARP
DOHME

DIVISION OF MERCK & CO., INC., WEST POINT, PENNSLYVANIA 19486

March 26, 1981

Mr. Alan Corson,
Chief-Waste Characteristics Branch
Hazardous Waste Management Division (AW-465)
Office of Solid Waste
U.S. Environmental Protection Agency
401 M Street, S.W.
Washington, D.C. 20460

Dear Mr. Corson:

I recently had the opportunity to meet with Ms. Claire Welty from your office, at our plant on March 6, 1981. During her visit, I briefly summarized a matter concerning hazardous waste management that has been of concern to our Company. Ms. Welty recommended that we submit this matter in writing to your office for consideration.

Merck Sharp & Dohme, Division of Merck & Co., Inc., is located in West Point, Pennsylvania where we manufacture ethical pharmaceutical and biological products. Finished goods are shipped to sixteen branch operation facilities located throughout the country. The finished goods are then distributed to customers from the branch operation facilities. A small percentage of the finished goods are returned to the branch operation facilities on a regular basis. Usually returns occur when a pharmacist has kept a product beyond the expiration date. Occasionally, a pharmacist may return a product for some other reason, such as lack of sales. Also, a product may be returned if we initiate a recall for any one of numerous reasons. These return goods are shipped from all sixteen branches to our West Point plant.

Most return goods shipped to West Point are discarded either for business reasons or because Food and Drug Administration regulations prevent us from recovering them. Once they reach the plant, return goods are disposed, but only after they have been checked at our plant under the supervision of our Security Department. They are either incinerated or transferred to a solid waste crusher for destruction prior to being landfilled. In this manner, we can account for and control the disposal of all return goods in a uniform manner at a central location. The centralized control of our return goods has been practiced effectively for over 30 years. It is essential to our standards of practice to assure uniformity in handling products, even when discarded.

After careful review of the Part 261 regulations, Identification and Listing of Hazardous Waste, we have determined that some of our return goods should be ultimately disposed of as a

hazardous waste. Accordingly, we have established procedures to segregate the return goods so that proper disposal can be assured.

One of our products was listed as an acutely hazardous waste (P025) on May 9, 1980 but was reclassified as a toxic waste (U245) on November 25, 1980. Since it was unknown at the time the regulations went into effect whether or not the return goods shipment to West Point contained more than 1 kilogram of that product each month, it was determined that each of our branch operations facilities should register as a generator and a treatment, storage, disposal facility (TSDF). This included notification of all ten EPA Regional Administrators. The TSDF portion of the notification has since been withdrawn based on an evaluation of our standard operating procedures. We have not withdrawn the generator notification because we are not sure if the branch operation facility is a generator of hazardous waste or if the West Point plant is the generator of hazardous waste for that fraction of return goods ultimately disposed as hazardous waste.

In the comments preceding the regulations, the EPA stated that "any material which is intended to be or is in fact thrown away, abandoned or destroyed is a "waste". (emphasis added). Because most return goods are discarded, it remains unclear to us whether or not the "intent to discard" language in the preamble to the regulations means that the branches' return shipments to West Point, in the absence of the small quantity provisions, would be subject to the requirements of Parts 263 and 264. If branches are generators we face the probability that we will have to establish different return goods procedures for branches located in states whose regulations vary from the federal ones. The resulting loss in uniformity would present increased potential of security and administrative problems.

However, since branches have authority only to return the goods to West Point and only the West Point site has authority to actually discard the goods, we believe that it is reasonable to regard West Point as the place where the goods become a waste. This interpretation is consistent with the regulations' purpose of assuring proper disposal of wastes, since all return goods are tracked under our internal system and the disposal of goods would be managed in compliance with hazardous waste regulations where applicable. Following this approach, we would not have to establish different compliance procedures in different states according to their generator standards, and we could maintain a uniform procedure. Uniformity in procedures results in better security and control, which, in turn, helps to assure compliance with the hazardous waste regulations.

U.S. Environmental Protection Agency

March 25, 1981

As it is our objective to comply with the hazardous waste regulations, we would appreciate your review of our situation to determine whether our interpretation is correct that insofar as returned goods are concerned, our branch operation facilities are not subject to the hazardous waste generator standards of the regulations. Thank you for your cooperation in this matter.

Very truly yours,

Steven C. Wittmer, Environmental Facilities
Engineer, Facilities Engineering

SCW:cg