IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | CRIMINAL ACTION |
| USA | 07-134S |
| VS. | JUNE 11, 2008 |
| SOUTHERN UNION COMPANY | PROVIDENCE, RI |
| * * * * * * * * * * * * | |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(MOTIONS)

APPEARANCES:

FOR THE GOVERNMENT:

TERRENCE P. DONNELLY, ESQ.
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DIANNE CHABOT, ATTY.
U.S.E.P.A.
One Congress Street
Suite 1100, SAA
Boston, MA
(617) 918-1868

KEVIN CASSIDY, ESQ.
Department of Justice
601 D Street, NW
Washington, DC 20530
(202) 305-0333

Proceeding reported and produced by computer-aided stenography

APPEARANCES: (Continued)

FOR THE DEFENDANT:

GERALD J. PETROS, ESQ.
Hinckley, Allen & Snyder
50 Kenney Plaza
Suite 1500
Providence, RI 02903
(401) 274-2000

JOHN A. TARANTINO, ESQ.
Adler Pollock & Sheehan, P.C.
One Citizens Plaza
8th Floor
Providence, RI 02903
(401) 274-7200

Court Reporter:

Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

# I N D E X


| DEFENDANT'S EXHIBITS | | PAGE |
|---|---|---|
| A, B & C | - | 13 |


___________________________

THE COURT: Good morning, everyone. We have quite a crowd this morning. There's nothing like an argument on RCRA to bring out the fans.

All right. We're here this morning in a number of motions in the matter of the United States versus the Southern Union Company.

Let's have all counsel identify themselves for the record.

MR. DONNELLY: Good morning, your Honor. Terrence Donnelly for the United States. I'm accompanied by Special Assistant United States Attorney Dianne Chabot of the U.S. Environmental Protection Agency, as well as trial attorney Kevin Cassidy from the Department of Justice, Environmental Crimes Section.

MR. PETROS: Your Honor, Jerry Petros on behalf of Southern Union Company. Good morning.

MR. TARANTINO: Good morning, your Honor. John Tarantino for the Southern Union Company.

MR. FETTERMAN: Daniel Fetterman.

THE COURT: Good morning to all of you. And welcome to the summer clerks who are here from Edwards and Angell. The rest of you, I'm sure you'll get a lot out of this argument. You're going to see some of the best advocates that we have arguing today so I think

this is a good classroom for you.

So why don't we start with the motion to dismiss Counts I and III of the indictment. And who's going to be arguing?

MR. PETROS: I will, your Honor.

THE COURT: All right. Mr. Petros.

MR. PETROS: Your Honor, the Court should dismiss Counts I and III of the indictment because they are legally -- they are not legally sufficient to establish a prima facie case against Southern Union with respect to those charges. Even accepting the allegations in the indictment, as we must do in this motion, those allegations simply do not support the charges. Essential facts are missing.

In Counts I and III, your Honor, the Government charges Southern Union with the failure to obtain a hazardous waste permit with respect to elemental mercury and mercury sealed regulators that were stored at the Tidewater facility.

The only question presented, I think, today on those elements is was a RCRA permit required. We are not charged in those counts with failure to comply with any storage requirements. The question is was a permit necessary.

We think the Court should dismiss the indictment

because it fails to assert facts, which, if proved, would establish a prima facie case against Southern Union.

Now, your Honor, the principal issue in Count I, and I'll address Count I first and Count III second, is whether the elemental mercury -- Count I deals with only elemental mercury. Count III deals with mercury sealed regulators. The principal issue in Count I was whether the elemental mercury at Tidewater was a commercial chemical product, as we contend, or it was waste as the Government contends. It's a fairly narrow issue.

The Government agrees that you do not need, you do not need a RCRA permit to store a commercial chemical product. And that storage, I should add, your Honor, is unregulated by EPA; it does not regulate the storage of commercial chemical products. A commercial chemical product is not a hazardous waste or a solid waste. And mercury, the Government concedes, is a commercial chemical product and does not become a waste until and unless you discard it.

Now, the Government contends --

THE COURT: How much does the purity of the mercury matter?

MR. PETROS: It has to be commercial grade or

technical grade, your Honor, and in the papers that's been referred to, it's essentially free-flowing mercury, 99 percent pure.

THE COURT: It can be waste even if it's pure, right? If there's a decision made to discard it?

MR. PETROS: That's correct, your Honor. If you decide to discard mercury, it becomes a waste at that point in time.

THE COURT: So how do we tell whether there's an intention to discard the mercury other than by the conduct of the company with respect to how it dealt with the mercury?

MR. PETROS: Well, I think, the conduct of the company is a critical part of that inquiry, obviously. At this proceeding, at this juncture, in order to make that determination we have to look at what the indictment says.

We're here on a motion to dismiss. I might like to show the Court additional facts, but the Government correctly points out that we're limited to the indictment here. Of course, there are two sides to that sword, your Honor. We're limited, and so is the Government, and that's the point I want to make this morning.

What does the indictment -- and, your Honor,

does the Court have a copy of the indictment handy?

THE COURT: I do.

MR. PETROS: I have a copy if it doesn't.

THE COURT: I have it right here.

MR. PETROS: Your Honor, what does the indictment tell us about how Southern Union handled elemental mercury at Tidewater? First of all, it tells us that in 2001 and 2002, Southern Union implemented a reclamation program. In that program, it went out and collected mercury sealed regulators from many of its customers' homes. It brought those sealed regulators to the Tidewater facility. At a certain period of time toward the end of 2000 and 2001, it removed mercury from the mercury sealed regulators, and it sent that mercury for reclamation to a facility in Pennsylvania that's called Bethlehem Apparatus.

We shipped about 450 pounds, your Honor, either at the end of 2000 or the early part -- end of 2001, early part of 2002.

In short, your Honor, the indictment lays out a mercury reclamation program that Southern Union successfully implemented in those early years.

THE COURT: That's the key, it successfully implemented the program in 2000, 2001 and then didn't. And the company wasn't indicted with respect to that

mercury, right?

MR. PETROS: That's very important, your Honor. You're absolutely right. Southern Union was not indicted with respect to those actions. That's correct.

THE COURT: So you've got this additional mercury that accumulates during 2002 and 2003 and so forth, 450 pounds of it, I think, right?

MR. PETROS: No, your Honor. The 450 pounds was what was shipped out to the facility in Pennsylvania.

THE COURT: How much was there?

MR. PETROS: Your Honor, I don't think the Government alleges in the indictment a specific quantity with respect to the elemental mercury.

THE COURT: Is that because after the spill was discovered, it was all gathered up and sent out and reclaimed, right?

MR. PETROS: I'm not sure that's the reason, your Honor. I think there was information about what was at the facility before the vandals broke in and stole the mercury.

But let's look at what the indictment says about that later period. The Court is correct. These events that happened in 2001, the Government brings no charges. Their charges relate to the sort of second

step of this process.

Now, what goes on in 2002, 2003, 2004, according to the indictment, is essentially a copy of what happened earlier except the process was interrupted when the vandals broke in.

THE COURT: Well, let me ask you a few questions about that.

MR. PETROS: Sure.

THE COURT: Because the indictment alleges that there was an RFP to restart the mercury reclamation program and then that was not followed through with; is that right? It's paragraph 12.

MR. PETROS: That's correct, your Honor.

THE COURT: And then another RFP was drafted and but not sent out. I think that's paragraph 14.

MR. PETROS: That's correct, your Honor.

THE COURT: And then another RFP, paragraph 16, describes the third RFP.

So couldn't the allegation of the three additional RFPs be evidence that could cut either direction, it seems to me. It could be evidence, as you suggest, that this was really mercury that was being reclaimed and destined for recycling, or it could be evidence of that not being the case because of the failure to follow through with that program.

MR. PETROS: No, your Honor. I don't believe that the RFPs in any way support the Government's contention that the company intended to discard the elemental mercury, and here's why. First of all, the Government, the rules, the RCRA statute and the EPA regulations do not regulate how long you can store a commercial chemical product.

THE COURT: So I think that's an important point, and I'm curious about that. Are you suggesting that as long as someone has the intent to eventually get around to recycling the mercury, they could leave it there for a hundred years?

MR. PETROS: Or reuse it, your Honor. I'm suggesting that in corporations across this country, thousands of them, there are right now commercial chemical products are on the shelf that have been used or that or going to likely may be reused, and those products can stay there for a hundred years, for two months or for a thousand years. There is no regulation on how long those products can stay there.

When the company, any of these thousands of companies in industry decide that that oil paint they're not going to use to paint the back barn, they're going to get rid of it, when they make that decision, then the status of that material changes from

a product to a solid waste.

And your Honor, we have cited innumerable references from EPA confirming that proposition, that they consider, they actually consider putting storage requirements on commercial chemical products that were held for recycling. And after getting comments and considering it, they opted not to do that. I think it is undisputed there is no time limit on how long you can keep a commercial chemical product on the shelf, and there are no storage requirements that attach to that from EPA. They don't say you have to keep it in a plastic container, in a sealed container, in a locked vault or Fort Knox or anything like that.

They have chosen, after discussion, not to regulate that area, and I think that is a terribly important point.

Your Honor, let me talk about the RFPs first, because you raised it. The Government points to these RFPs and characterizes them in their indictment, your Honor, but I would ask the Court to look at those documents. I would like to offer them to the Court because the Government has seen fit to refer to them. And, Judge, let me tell you what they say. The second of the two RFPs, this is a quote, (Reading:) Hazardous material -- this is in the attachment to the RFP -- any

elemental mercury recovered from the remediation or decommissioning processes will be sent to an approved reclamation recycling facility. This material will be refined and resold as a recycled material.

Right underneath it, (Reading:) Hazardous material will be shipped via common carrier as a hazardous material to an approved recycling facility.

I would like to offer to the Court copies of those three RFPs because I think they, far from proving the Government's case, they are -- each one of these, your Honor, confirms that the company retained its intent to recycle the elemental mercury.

THE COURT: Any objection, Mr. Donnelly?

MR. DONNELLY: Your Honor, only in the sense that the legal analysis I'll outline when I address the defendant's argument should be limited to the face of the indictment. There's just no reason to accept evidence at this point. They are what they are.

THE COURT: Well, I'm going to take them in and then I'll allow you both to argue to what degree I can consider the contents of them. So we'll make them Defense Exhibits A, B and C.

(Defendant's Exhibits A, B and C admitted full.)

MR. PETROS: Thank you, your Honor.

Your Honor, I want to continue to talk about

what's in the indictment recognizing we're here on a motion to dismiss and what the standard is.

We've talked about to some extent what's in the indictment with respect to the early activities, but let me just finish up with a few points about what's in the indictment with respect to the later activities.

If you look at paragraphs 14, 16, 17, 23 and 29 of the indictment, what the Government alleges and what the grand jury voted out of the indictment is that Southern Union stored, and I put that in quotes, in bold and underlined, your Honor, Southern Union stored this elemental mercury in a locked cabinet, in a locked cabinet at Tidewater.

If you look at paragraphs 23, 24 and 5 of the indictment, the Government again alleges, and the grand jury voted out an indictment, that says Southern Union accumulated and stored the elemental mercury in the, quote, mercury storage building, close quote.

That's what the grand jury concluded. That's what is in the indictment.

Now, Southern Union contends, and explains in its papers, why the activities outlined in the indictment demonstrate that the elemental mercury was a commercial chemical product held for recycling and not a solid waste as defined by the EPA.

Now, rather than repeat all those arguments, your Honor, I would like to address the contentions the Government raises as to why that's not true and take them one at a time.

The Government complains, your Honor, that Southern Union is really asking the Court to accept our version of the truth and they point to two contentions on page one of their memo in particular. One, that Southern Union intended to recycle rather than discard the elemental mercury; and two, that the mercury was neither changed nor altered nor contaminated from its pure form. That's on page one. They say, you know, we assert those things and we can't do that on a motion to dismiss.

Well, the Government is right that we do assert them, and the Government is also right that those are the two critical areas of inquiry as to whether Count I stands or falls. But the Government is wrong on one very critical aspect of that, your Honor. Southern Union has no burden here this morning, or ever in this case, to prove to the Court that it intended to recycle, or to prove to the Court that the mercury was not contaminated. That's the Government's burden. It's their burden this morning; it will be their burden if we get to trial on those counts.

So they have to come forward in the indictment with evidence to sustain those two charges, and, in fact, they haven't done that, your Honor.

THE COURT: But only probable cause that there's reason to believe that there was an intention not to recycle.

MR. PETROS: Probable cause, and if you look at the Fleisher case in the Supreme Court that we cite in our opening memo, your Honor, they have an obligation, I think, and the cases make it fairly clear, to lay out a prima facie case that if those facts were accepted as true, were believed by the jury, they made out a prima facie case that a crime has been committed. That's the language the Supreme Court used, and I think that's the standard we have here this morning.

We concede, your Honor, they don't have to lay out every element of their proof. They don't have to say what every witness is going to say or identify every fact, but they've got to lay out the basic facts. That's the requirement, I think, on a motion to dismiss, the requirement of Rule 7, which refers to the essential facts.

THE COURT: It seems like this really comes around to a question within the regulations of whether this material was really abandoned and that, in turn, I

think the Government alleges, is evidenced by the way in which it was stored.

So you're saying that they talk about the storage at the Tidewater facility, but that's really the evidence of its abandonment, I think they're suggesting. And given the relatively low burden that they have for meeting your motion to dismiss and getting the matter to trial, why isn't all of this evidence of how the mercury was stored, the kiddie pools, the paint bucket, you know, the lack of sufficient locking, the disrepair of the fence and so forth and so on, and there's a lot of it, why isn't all of that put together enough to give you probable cause that there really wasn't a serious intent to store this for reclamation but rather it was just, you know, out of sight, out of mind, and they've moved on to other things?

MR. PETROS: For several reasons, your Honor, and if I get the chance I'd like to unpack the Government's contentions and take them seriatim and explain to the Court why they're insufficient.

But, again, your Honor, it goes back to the legal standard. The question here is not whether Southern Union adequately stored the material. The question is very clear under the law and the

regulations and the case law, did Southern Union at some point change its intent from an intent to recycle to an intent to discard.

THE COURT: My question is can't the storage, the method of storage be evidence of the intention or lack of intention to recycle or the intention to abandon or discard?

MR. PETROS: No.

THE COURT: Why not?

MR. PETROS: I don't think it can, your Honor.

THE COURT: Why not?

MR. PETROS: For several reasons. First of all, going back to the earlier point, EPA considered this issue. It was an obvious issue, and that's why I think the Court is addressing it. You know, how does that play into this analysis? EPA considered whether it was going to regulate specifically commercial chemical products being held for recycling.

In fact, your Honor, commercial chemical product are one of five secondary materials under the regulations, and EPA has chosen with respect to other secondary materials to regulate how they're stored and how long they're stored.

We discuss all this in our papers. I won't trouble the Court with all the citations now, but that

issue has been front and center since the 1980's. EPA considered this issue. They elected publicly, in their guidances and their comments, not to regulate the storage of commercial chemical products, and they explain why. We've set that forth in our reply memo as to why they made that decision.

But, Judge, they thought about that issue, they recognized the problems with it, they recognize that it's a jurisdictional issue. Remember RCRA gives EPA jurisdiction only over solid waste. They don't have jurisdiction over products no matter how hazardous those products may be. And EPA recognized there was a jurisdictional issue as to whether they could even regulate, if they wanted to, commercial chemical products that are held for recycling, that are not being discarded. So, Judge, they opted not to under those circumstances.

Now they want to come in and say to the Court, well, you know, we elected not to regulate that. We elected not to tell the regulated community how they needed to store these products, but now we want to prosecute them criminally because we don't like the way they stored the products. We think that's wrong, and we want to come in and prosecute them on that basis.

So number one, Judge, fundamentally, I think

they can't have it both ways there. If they want to lay out standards and tell the community, the regulated community you face prosecution unless you store those products in this fashion, they needed to do that.

Having elected not to, they can't now come in and say we didn't tell you what the standards were, but we don't think this met those unarticulated standards and now you're subject to criminal prosecution. Point number one.

Point number two, your Honor, look at the indictment. It does have language about the security conditions, but it also talks about this mercury, the elemental mercury. And what does it say? It says the elemental mercury was being stored. The elemental mercury was being stored in a locked cabinet in the building. There's no allegation that any of that mercury was ever released before the three vandals came in, broke through a locked door, broke into a locked cabinet and took it back to the Lawn Terrace Apartments.

This isn't like other cases where material was being disposed of, being released into the environment. It was in a locked building in a locked cabinet.

So the idea that somehow the facts in the indictment demonstrate that this material had somehow

been discarded conflicts with the actual facts that are set forth in the indictment. It was being stored, your Honor.

So the regulations don't address storage or they choose not to address storage. And having elected to take that path legally, the Court should not allow the Government to come in and say we didn't tell you what the rules are, but you broke them and you're going to get prosecuted for that.

Now, Judge, storage is one of the issues. Security is one of the issues the Government talks about. They also talk about whether or not -- their central theme in their memo is that Southern Union intended to discard this material. I would like to direct the Court's attention to the indictment. The only place, the only place that the word "discard" is used in the indictment, I believe, your Honor, is paragraph 7, where it says, (Reading:) Mercury that is discarded, that is a discarded commercial chemical product is listed as a hazardous waste.

So if you discard a commercial chemical product and it's mercury, it's a hazardous waste. Look at the rest of the indictment. Nowhere in that indictment will you find a statement that the company intended to discard the elemental mercury. That's the indictment

the grand jury considered and voted on after considering all of the evidence. Now, in fact, Judge, in this case, we actually filed a Bill of Particulars. And we said to the Government, tell us, if you contend it was discarded, tell us when it was discarded, tell us how it was discarded, tell us basic information about who made the decision to discard. The Government objected. They provide none of that information in the indictment, those essential facts in this inquiry, and they say in their papers in opposition to the Bill of Particulars that's a vague event.

Judge, criminal prosecution should not be based on vague events. The Government either doesn't have the information because the evidence doesn't support it, which is our contention, or they chose not to include it in the indictment. But either way it is amazing, given the particular narrow factual issue here, that the indictment fails to even allege that we intended to discard. It goes beyond that. Abandonment. The Court mentioned abandonment. The Government does say, in their memo they say Southern Union abandoned this material.

Judge, you won't find the word "abandoned" or an allegation of abandoned anywhere in the indictment. It's not there. First of all, their definition in

their memo is wrong, and we point out that on page 14 of our reply memo, but the indictment doesn't allege abandonment. That's not an accident, we contend. The grand jury in this case sat, I think, for almost three years. They heard an untold number of witnesses and saw a lot of documents. After all of that information, they couldn't vote on an indictment that alleged that we intended to discard or that we had abandoned.

Let's look at what else the Government says. The Government also alleges that on page eight of their memo -- and I urge the Court to compare the allegations in the memo with the allegations in the indictment. They don't match. The same thing the Government accuses us of --

THE COURT: Wait a second. You just said, and I want to be clear on what you're actually saying, you just said that after sitting for three years, the grand jury could not vote on an indictment that included the words "abandonment" or "intention to discard."

MR. PETROS: I'm saying that after sitting for three years, the indictment that I assume that was voted on by the grand jury, the one before the Court right now, does not contain an allegation, a contention that we intended to discard --

THE COURT: But you don't have any evidence that

there was a suggested indictment that included those words.

MR. PETROS: Of course not. Those proceedings are not known to me or anybody on my side, as the Court knows. We have to deal with what came out of the grand jury, your Honor.

And my point is that with a legal issue so narrowly focused with the critical fact, the essential fact as Rule 7 says, so obviously flagged by the law, it is remarkable that we have an indictment that doesn't talk about those essential facts.

The memo on pages -- I think it's on page 7, your Honor, page 8 and 9 of the Government's memo, they talk about the elemental mercury being, quote, nothing but a collection of discarded mercury from various locations, including mercury that had been abandoned in a deceased employee's locker. They go on, on page 9, to call it old, unwanted material stored in lieu of disposal.

Same problem, your Honor. The grand jury didn't vote on the Government's memo. They looked at the indictment. You won't find anything in the indictment that says that the elemental mercury had previously been discarded by the company or by anybody else.

You won't find any contention in the indictment

that the elemental mercury was being stored in lieu of disposal or that it was old or that it was unwanted or that it was abandoned. The Government is right. We're bound by the indictment but so are they, and their memo is now inserting essential facts because they need to put those facts in to make out a prima facie case.

But your Honor, those facts, those allegations are absent from the indictment with respect to Count I. They aren't there. And all we know is the grand jury sat for three years, heard a lot of evidence, voted on an indictment, and that indictment is missing essential facts that are required under Rule 7(c).

THE COURT: Now, do you believe that the Government is contending that the spillage of the mercury by the vandals constitutes a discarding of the mercury by the company in any way?

MR. PETROS: Your Honor, I don't think they're alleging that, and I don't see how they possibly could allege that. I don't read that in their papers. They make many other contentions, but I don't believe that's one of them.

THE COURT: I don't think so either. I just want to be clear that you don't think they're doing that either.

MR. PETROS: Now, Judge, you asked me earlier on

about another contention the Government makes, and this falls under the same rule I've been talking about. You asked me earlier on, what do we know about the content of the mercury, the purity of it, the grade of it.

Now, the Government, as I mentioned earlier, they say that we've asked the Court to accept two fundamental contentions: One, that we intended to recycle; and two, that the mercury was still of commercial grade. As I've tried to point out this morning, it's not our burden to prove those things. It's the Government's burden with respect to the indictment to at least have alleged essential facts to show that we intended to discard or that it was not, or that the mercury was contaminated. That's really the standard.

Judge, look at the indictment again. There is no contention, no allegation whatsoever in the indictment that the elemental mercury was contaminated or had otherwise fallen out of the definition of commercial chemical product. A basic fact. The Government says, well, that's an issue of fact. That can't be decided on a motion to dismiss.

Your Honor, we submit that's not an issue of fact unless the Government makes it one in their indictment. We're entitled to fair notice. They're

obligated to put in essential facts. If they were basing this prosecution, if they're basing Count I on a claim that that mercury had been contaminated and no longer qualified as a commercial chemical product, they had an obligation to put it in the indictment. In fact, we contend that these omissions, your Honor, are not mistakes. They are a reflection of the evidence that was actually presented to the grand jury. They haven't made these contentions because there's not evidence to support these contentions.

THE COURT: Can the manner of storage be enough to get you to the contamination? For example, isn't it alleged that some of the mercury was stored in an old paint bucket?

MR. PETROS: It was actually stored in a jar inside an old paint bucket, I think is the contention in the indictment, your Honor, inside a locked cabinet.

I think that suffers from the same problem we talked about earlier. EPA -- we're not being prosecuted for having improper storage containers. We're not being prosecuted for storing it for too long. We're not being prosecuted for not having labels on it. The reason is, your Honor, that EPA has chosen not to impose those requirements on industry.

This is a very large issue in the context of the

regulated community, your Honor. Think about it. All the companies, manufacturers, industrial companies throughout the country use commercial chemical products every day. And they reuse them, and they put them on the shelf in a number of ways.

EPA has decided that they're not going to regulate that activity; they're not going to put time limits on it; they're not going to tell them how to store it or how to label it, and I don't think they can base a prosecution in this case on those areas they've chose not to regulate. It's fundamentally unfair.

Now, Judge, apart from the factual problems with Count I, the Government makes two legal arguments with respect to Count I that I want to address just briefly. First, the Government argues that -- they try to save Count I by arguing on cumulative speculation; and second, they argue that the elemental mercury was a spent material. Let me address each one of those separately.

Speculative accumulation is a concept that is, in fact, embedded in EPA's regulations. No question about it. And speculative accumulation is a concept that applies and, Judge, in simple terms, it relates to how long you can accumulate certain secondary materials under the Rules and still stay outside the definition

of solid waste before the Government says if you store it any longer, we're going to consider it to be waste and not going to be recycled, for example.

That concept applies expressly with respect to a number of secondary materials. What the Government doesn't tell you is it expressly does not apply to commercial chemical products. This isn't an interpretation issue, Judge. This is right in the regulations. It's 40 CFR 261.2(c).

And there's a chart, if the Court goes and looks at that regulation, there's a chart, I have a version of it, your Honor, I'd like to show the Court if I could.

THE COURT: Go ahead. I have the regulation right here. Go ahead. I see the chart.

MR. PETROS: If you see the chart, it has stars on it, your Honor, and if you look at that column, I think it's the accumulated column, you see that with respect to many of the other secondary materials, the speculative accumulated rules apply but they don't apply to commercial chemical products. So the Government is wrong in this motion when it tries to argue accumulated speculative rules apply to commercial chemical products. So that means, Judge, when they say you stored it for too long, you didn't have containers,

you didn't follow those rules. Those rules don't apply here. And the same goes with the time limit that you can store this material. That's what this accumulation goes to.

THE COURT: That works as long as this is a commercial chemical product and not a spent material, right?

MR. PETROS: That's correct, your Honor.

THE COURT: You're going to get to that issue.

MR. PETROS: Spent materials. The Government throws out the concept of spent materials.

Judge, again, I'll deal with this as a legal issue, but if you look through the indictment, you won't find any reference to spent materials. It isn't in there. They don't contend, factually, that this was a spent material. All of a sudden it comes in in the memo.

Let's address it on the facts. First point, there is no factual information in the indictment to support the contention that it, indeed, is a spent material. What is a spent material, Judge? It's a pretty simple definition. Any material that has been used and as a result of contamination can no longer serve the purpose for which it was produced without processing. That's the rule.

Judge, there's no support in this indictment for the conclusion that this product was a spent material. As I discussed a few moments ago, the Government makes no contentions and allegations in the indictment about the quality of the mercury. They don't contend that the mercury had been contaminated, that it had been altered, that it had been adulterated. That's an essential fact.

If they want to make the claim, make the criminal charge in this case that the elemental mercury was a spent material, they have an obligation to put that in the indictment. Again, after sitting for three years, we have an indictment considered by the grand jury that does not make that claim. So as a matter of law and as a matter of fact, this material at this stage of the proceedings cannot be considered to be spent material.

Judge, unless the Court has more questions on Count I, you've be generous with your time, I'd like to move to Count III.

THE COURT: Right. Yes. I'd like you to do that.

MR. PETROS: Count III deals with the MSRs. We've been talking so far about elemental mercury. Count III deals with the mercury sealed regulators, and

with the Court's permission I'll refer to those as MSRs.

There's no dispute, your Honor, that universal wastes are common wastes that are treated differently under the regulations because EPA wanted to encourage, among other things, recycling of universal waste and because universal wastes are handled by so many members of the regulated community. So we have a whole different set of regulations, I think it's in part 273, that deal with universal waste.

Section 6928(d)(2)(A) applies to -- that's the RCRA statute, your Honor, that we're charged with in Count III, charges that we stored waste without a permit. That section does not apply to handlers of universal waste. There's no dispute about that.

The Government contends that notwithstanding that admission and notwithstanding that law, which couldn't be more clear, your Honor, we don't get a by here. We had to have a permit for two reasons. One, they contend that Southern Union, in fact, was not a handler of universal waste because Tidewater was a destination facility; and two, they argue that even if we were only a handler of universal waste and not a destination facility, we stored it for too long.

Let me take each one of those separately, your

Honor. First of all, it is clear that Tidewater was not a destination facility on the face of this indictment. And again, your Honor, turning to the language of the indictment itself, and the charge in the indictment, soon as I can locate my copy of it, paragraph 37, I think it's the last paragraph in the indictment, is, I think, the only paragraph under Count III. There's 36, which repeats and realleges and 37, which is the paragraph.

Let's take a look at that, your Honor, because I really think that eliminates this count. It really undermines the Government's claim with respect to Count III.

First of all, 37 starts off by saying that from on or about March 25th, 2003, until on or about October 19, 2004, that's the relevant period the Government talks about in the indictment, the relevant period the Government talks about in its memo of law.

Now, what happened during that relevant period? The Government makes some noise here about, well -- and it's very subtle in their memo, your Honor, but they make noise about, well, in 2001, you poured out some mercury in this reclamation program. And pouring out mercury, that's what you do when you treat as opposed to handle universal waste. So that makes you a

different kind of facility.

But, Judge, there's no contention in the indictment that any time in the relevant period that is the subject of Count III any of those activities occurred. None whatsoever. In fact, the contention is just the opposite. The contention by the Government is that we just stored it there, and we left it there.

Now, it's even more subtle than that because if you read through pages 18 and 19 of the Government's memo, they imply that because we intended to recycle the mercury, because we intended, your Honor, to take the mercury out of the MSRs and recycle it, then we had the intent to become a destination facility and, therefore, we should be considered a destination facility.

Let's just step back and unpack that contention for a moment. First of all, it's undisputed that the MSRs brought to the facility during the relevant period were placed in a plastic containment pool, the so-called kiddie pools, double-bagged, and they stayed there until EPA came in, until the cleanup. No releases ever from those. None are alleged; none happened, Judge. Those things came in, and they sat there; no mercury moved. So factually, it's wrong. But there's something a little bit more pernicious than

that. The Government on Count I is saying you didn't intend to recycle this. You were going to discard it, so we should call the elemental mercury a waste, not a product.

Now on Count III they're saying, well, you hadn't drained out the mercury, but you intended to recycle it so you were going to become a destination facility, therefore, Count III survives. Well, which is it, your Honor? Were we going to discard it, or were we going to recycle it? I don't think there's any question in terms of what the documents say, including the RFPs and including the allegations in the indictment, that we were going to recycle it, but it's also undisputed that there is no evidence that any mercury was removed from those MSRs during the relevant period.

And, Judge, if you read further on paragraph 37, look at the charge. They don't charge us with treatment, which is one of the charges available under 6928(d)(2). They don't make that claim. They charge us with did knowingly store and cause to be stored hazardous waste. There's no contention and there's no charge of treating, or pouring, or doing any of the other activities that the Government suggests would make us a destination facility. So I think that

paragraph 37 in Count III effectively eliminates the Government's contention here that we were a destination facility. And if that doesn't do it, the indictment clearly does, because there are no facts within the relevant period to support that charge. Simply isn't there as a matter of law, your Honor.

Now, the second thing the Government goes to is that, well, even if you're a handler -- and I should have said this earlier, Judge, you're a handler -- a handler can take in universal waste, store universal waste, and then ship universal waste to some other place and they can remain a handler during that entire period of time. They can't treat it. That's what separates a destination facility from a handler.

The Government says, well, conceding even if you are a handler, Southern Union, and even if we agree, and they do agree, Judge, that the permit requirements expressly, the RCRA permit requirements do not apply to universal waste handlers. You don't need a permit, a RCRA permit if you're a handler of universal waste. The Government says, well, even if all that is true and even if you are a handler, you know what, you stored it for too long, you didn't label it; so, therefore, you should need a permit.

Well, that may have some superficial appeal,

your Honor, but I urge the Court to look carefully at the law because the law absolutely does not support that argument. EPA regulations make it clear that if a handler of universal waste stores the waste too long, doesn't label it properly, doesn't put it in the appropriate containers, doesn't maintain the paperwork it should maintain, there are penalties. And those penalties are in the same statute we're talking about, but they're civil penalties and they're administrative penalties. There is no provision in RCRA and no provision in EPA's regulations that say, oh, by the way, regulated community, if you store that waste for too long, you're not just subject to civil penalties, you're subject to criminal penalties.

And even more specifically, Judge, there's no provision that says if you store the waste too long or if you don't label it properly, then you need to get a RCRA permit. Because that's really the contention advanced by the Government, not very clearly but that's their contention to the Court this morning. Judge, they stored it for too long, they didn't label it, so they should have to have a permit like everybody else.

The regulations do not support that argument. In fact, they flatly contradict it.

Let me give the Court a clear example of the

fact that EPA knows how to impose that requirement when they want to. When you're dealing with hazardous waste, Judge, there's something that's pretty well known called the 90-day rule. We cite to it in our papers.

If you're a generator of hazardous waste, you can store that waste for up to 90 days without a RCRA permit. You don't need a permit as long as you move the waste within 90 days.

Now, with respect to that set of regulations, not the 273, I think it's 270, EPA also says, and by the way, if you store it for longer than 90 days, we're going to consider you to be a TSDF facility, treatment storage and disposal facility. So on day 91, by regulation, you become a TSDF facility. And if you don't have a RCRA permit, you're subject to criminal liability.

So EPA knows exactly how to say to the regulated community, you store it too long under this program, your status changes, you become a TSDF facility.

With respect to universal waste, that provision is absent. There is no criminal liability provided for a handler of universal waste who stores it for too long or who doesn't label it or doesn't file the right paperwork. There are penalties, your Honor. It's

under the same statute, but they're civil, administrative penalties, not criminal penalties.

So the Government cannot now come in and ask this Court essentially to rewrite the statute and say, Judge, we want you to find that because they stored it for more than a year their status changed and they became a TSDF facility that required a hazardous waste permit. There is no support for that proposition, your Honor.

So your Honor, for those reasons, we think that Count I and Count III are legally insufficient. They do not state a prima facie claim that shows that, even if the allegations of the indictment are believed, that Southern Union committed a crime. And for those reasons, we ask the Court to dismiss both of those counts.

THE COURT: Okay. Thank you, Mr. Petros.

MR. PETROS: Thank you, your Honor.

THE COURT: Okay. Mr. Donnelly?

MR. DONNELLY: Good morning, your Honor.

THE COURT: Good morning.

MR. DONNELLY: Your Honor, I think this issue can be resolved, this motion can and should be resolved very quickly, very briefly, and very easily for the Court at least at this juncture. And I want to address

the standards -- really the big question that we're here facing today, which is, is the face of the indictment sufficient, not by what the defendant wishes it should be, but by the standards of Rule 7(c) and the standards of the due process clause of the United States Constitution.

That's the only law we need to be talking about this morning. We're not here today arguing to a jury whether the defendant is guilty or not guilty, which is about half of what I just heard. We're not arguing a Rule 29 motion, and all of these arguments would be very proper at that stage of the proceedings. A lot of the argument or certainly a lot of the defendant's memoranda sound more like we're arguing a motion for summary judgment, and, obviously, we're not doing that in this criminal case. What we're simply trying to figure out is, is the indictment sufficient, as Mr. Petros referred to several times, under the standard but he didn't want to go into what that standard is.

I'd like to address that, your Honor. If the Court when I'm done continues to have substantive legal questions about environmental law, with the Court's permission, I'd like to defer the Court's questions to Ms. Chabot of our team. Thank you.

Your Honor, so the starting point, of course, is what is the standard. The standard was addressed recently by the First Circuit in a case out of this district, United States versus Cianci. And in Cianci, the First Circuit was elucidating on the case of United States versus Hamling. And what does Hamling tell us? Does it tell us that we need to have regulatory language in an indictment? Does it tell us that we have to put the Government's theory of the case in an indictment? Does it tell us that we have to put the names of witnesses in an indictment? Does it tell us that we have to lay out all the minutia that Mr. Petros and Southern Union wishes were in this indictment? Absolutely not. What Hamling stands for is that as long as the indictment lays out the elements of the offense and alleges enough facts so the defendant knows what crime he's charged with, end of story. I should say the third prong being that it has to be specific enough so that at some future date, should he be acquitted here, he can plead an acquittal at bar. And that's the standard. And does this indictment meet this standard? It's a ground ball, Judge. It obviously does.

What are the elements of Counts I and III, the RCRA charges? Simply, the Government will be obligated

to prove beyond a reasonable doubt that a person, one, knowingly; two, stored; three, a hazardous waste; four, without a permit. All of those elements are alleged. Are just the elements alleged? Is it just the language of the statute as in "Did possess a controlled substance," period? No. There's 11 pages and 37 paragraphs here providing tons of factual detail above and beyond the Hamling standard. The defendant is informed of the date, the time, the place, some of the manner in which the company committed this offense, and so the indictment is more than sufficient and they do not want to address this standard because they want to dive into the substantive questions of law that they have, but those are more appropriate to be addressed -- they're making those argument in good faith, your Honor, but they're to be made at a Rule 29. They're to be made, perhaps, to the jury at the end of this case, not now.

We did not lay out every piece of evidence. We did not lay out the theory of our case. Each and every allegation of insufficiency that Mr. Petros just made, that the word "discard" is not used, that the word "spent material" is not used, and all those other allegations, he says the law requires that those be put in there. Well, I just talked about the standard, your

Honor, and the law does not require that those things be in there.

They don't cite any cases that support the proposition that all of this minutia and evidentiary and case theory details should be in there.

We cited United States versus Self, a 1993 decision out of the 10th Circuit. And despite the defendant's approximately 50 pages of memoranda, our 20 pages, your Honor, in United States versus Self, the 10th Circuit had before it almost an exact same question as we have here, whether under a storage without a permit charge under RCRA the indictment was sufficient. And the 10th Circuit dispatched with that argument in one small paragraph, and I'll read it in its full to your Honor.

(Reading:) Defendant claims that because natural gas condensate burned for energy recovery is not a RCRA hazardous waste, Counts III, IV and VII were, quote, fatally defective as a matter of law --

THE COURT: You forgot Count II. It says Count II, III, IV and VII.

MR. DONNELLY: I apologize, your Honor -- (Reading:) And should be dismissed before trial.

The same type of claim that the defendant is

making here today.

The 10th Circuit says, (Reading:) We disagree. Each of these counts allege that the natural gas condensate was a hazardous waste.

And that's what's alleged in our indictment.

The 10th Circuit goes on, (Reading:) Whether the natural gas condensate was a RCRA hazardous waste was dependent on the factual question of whether the natural gas condensate was burned for energy recovery. A district court may not resolve evidentiary issues on a motion to dismiss.

And I would submit, your Honor, that that's exactly what the defendants want you to do here today, which is to resolve really the big factual question here.

Your Honor, I'm not going to pretend to have a fluid and comprehensive understanding of all the environmental law that's at question in this case, but one question that I think I can speak with some authority on is that we have a factual dispute here.

Since the beginning of this investigation, I've been in conversation with Mr. Petros and Mr. Tarantino.

From the beginning, their primary defense, they may have others, has been, Mr. Donnelly, this is not a waste. And the question then becomes is it a waste or

isn't it under the facts as applied to the law.

Now, on page 11 of their memorandum, they tell us that Southern Union intended to repeat the 2001 process, namely, the recycling process where mercury was emptied from regulators and shipped off to Bethlehem Apparatus. They say Southern Union intended to repeat this process, but the vandals broke into the building and stole the mercury.

In their reply memo at page one, they say the Court should dismiss Count I because the liquid mercury is plainly, plainly a commercially chemical product that Southern Union intended to recycle by sending it to Bethlehem Apparatus.

How do we know that Southern Union intended to send this stuff that they threw in a delipidated, graffiti strewn, frequently vandalized building over in Pawtucket where there was virtually no security, there was no labeling, how do we know that they intended -- that that was a valuable commercial chemical product to them and that they intended to recycle that? How do we know that, your Honor? The only way we know it today is because they say it. Because they say it's so.

THE COURT: How do we know that they intended to discard it or abandon it? That's the whole point of their motion.

MR. DONNELLY: That's going to be the point at trial, your Honor.

THE COURT: I agree it all comes down to a question of intent. But doesn't the Government have an obligation to allege sufficiently that intent, that intent to discard as opposed to store? I think when you boil it all down, that's, essentially, what Mr. Petros is saying.

MR. DONNELLY: The elements of the statute are that they stored it, that they knowingly stored it, a hazardous waste without a permit. All of those elements are alleged in the indictment, and that's all that's required. These questions are going to come up, the legal questions, no doubt. This is just not where they should be addressed, on a motion to dismiss for facial insufficiency. They simply can't under the standard of Hamling as applied in Cianci and a host of other cases, they just simply cannot make out a case that this indictment is insufficient. We've got a factual argument with them about what they intended to do with this mercury.

I just laid out some facts in a string. They will dispute that. Mr. Petros says, well, the cabinet was locked. I don't think Mr. Petros mentioned, but I'll tell the Court, I think the building was locked,

too. So those are facts that could weigh in their favor, that maybe they were taking better care of this. But these are all factual disputes, your Honor. They don't belong here, now. Is the indictment sufficient? Are the elements laid out? Do they know what they're charged with?

As the Court pointed out, they know exactly what they're charged with. They know they're not charged with the 2001 mercury. And so there's no question, they're not tricked, they're not surprised, they know what charges they're facing. They simply disagree as to the application of the facts as they see them to the law. The only way to resolve this, your Honor, is by trying the case, and that's what we want to do.

THE COURT: You have to allege, don't you, enough to suggest that this is a hazardous waste?

MR. DONNELLY: Yes, your Honor.

THE COURT: So how do you get to it being a hazardous waste?

MR. DONNELLY: We allege, your Honor, in paragraph 7 of the indictment that mercury that is discarded -- a discarded commercial chemical product is a hazardous waste. We allege the conditions over at --

THE COURT: There's the "discarded" point. So it has to be discarded to be a hazardous waste, right,

or abandoned?

MR. DONNELLY: Under one theory of the case, yes, or it could be a spent material as well.

THE COURT: Okay. So just a commercial chemical product in and of itself is not a hazardous waste? That's Mr. Petros' point, right?

MR. DONNELLY: Correct.

THE COURT: So you have to allege enough to establish, don't you, that it is a hazardous waste, or do you just have to say it's a hazardous waste because you say it's a hazardous waste?

MR. DONNELLY: That's exactly right, the latter, your Honor. And that's what the 10th Circuit said in Self. That's what Hamling stands for.

In Hamling, the defendant was indicted for obscenity. And in that case, the defendant said, you know, you didn't put enough specifics in there. And that's why the Supreme Court said you don't have to lay out the specifics of why it's obscene. Tracking the language of the statute, you know, giving him enough facts so he knows what particular images or whatever are the obscene images he's being charged with transporting through the mails I believe was the charge. And Hamling is kind of instructive for this case, because that's all that was required. There's a

host of other theories in Hamling as to why that material could have been obscene. I guess the legal point I'm making, your Honor, is the Government is not obligated to plead its theory of the case.

In fact, I'm a little surprised the defendants keep making sort of in their reply memo and now in oral argument this morning, making sort of a big deal about the fact that we didn't want to answer their Bill of Particulars. Their Bill of Particulars was seeking, among other things, to lock us into a theory of the case. And what they didn't mention is that in January Judge Almond denied their motion for a Bill of Particulars. He issued a written decision saying that the indictment was sufficient in all aspects, that the Government is not obligated to plead the theory of its case. That's black letter law when it comes to indictments, that, you know, there's a lot of theories by which the defendant here can be found guilty. They've got a lot of theories under which they can be found not guilty. We've got to try the case. This indictment is sufficient, your Honor.

As to the defendant's legal arguments, your Honor, I would only state this, and I think the Court picked up on it from the beginning, is that if you take their legal arguments to its logical conclusion, you

end up with either a result that is so extreme that it's absurd, which is mainly that their legal position that anybody, no matter what the conditions are, can have mercury and store it forever and a day as long as at some point they say we do intend some time down the road to recycle this material. And that's their legal position.

They did not, of course, in this case, as -- they've shown you letters that folks write, that companies write to EPA to get legal opinions from EPA that apply only to them, by the way. They've shown you those kinds of letters, but they didn't take any of that action.

Do you have any question in your mind, Judge, that if they laid out how they were storing this mercury and those regulators at that building over there, do you have any question in your mind about what EPA's response would be? Do you think it would have been the same as it was to Mallinckrodt Company in their Exhibit B? I found that letter very instructive. Obviously, they cite it as support for their legal positions, but I think it's kind of a two-edged sword for the defendants.

You see at page two of the Mallinckrodt letter that according to the draft agreement submitted to the

EPA, the mercury will be stored in containers which will be inspected daily to ensure their integrity, inspected weekly with full documentation and monitored by mercury vapor analyzers to ensure proper containment.

One of the great dangers of what makes mercury so deadly, your Honor, are the vapors that escape from it.

At the end of the letter, and probably most critical to this case, which shows, again, just highlights the factual dispute that the parties have is from page four over to page five, the EPA tells Mallinckrodt: (Reading:) Third, even if state hazardous waste regulatory requirements are determined not to apply to the storage of this mercury in Wisconsin, it is imperative that the mercury be safely stored. Among other things, poor management of the mercury could suggest that the mercury was not being carefully handled as a valuable product, and, thus, could call into question its classification as a product.

And that's why later on we'll be arguing on their motion in limine about the security and conditions at Tidewater. The letter that they submit tells us, part of their own memorandum tells us how

relevant that evidence is, because poor management over at Tidewater shows, from our point of view, that there's just no way this mercury can be classified under the law as a product.

THE COURT: Isn't the Mallinckrodt Company, wasn't it the defendant in the matter with the EPA over the pollution of the Penobscot River from the mercury at the HoltraChem plant?

I thought I sat on an appeal involving just that very issue when I sat with the Court of Appeals, and I think Judge Selya wrote the opinion, the long-term pollution of the Penobscot River, I believe.

So I was curious when I saw this letter. I know it's beside the point.

All right. Do you want to address the Count III argument? Or is there anything additional even to say?

MR. DONNELLY: I don't have anything.

I have one additional thing I want to address. Mr. Petros did not address it. I don't want to leave the record empty of it.

In their reply memorandum, the defendant for the first time raises a brand new issue. They raise it in three sentences, I think, a due process argument regarding the fair notice doctrine as illustrated in cases such as the Lanier case out of the Supreme Court.

I'm not quite sure how to respond, your Honor, to their argument because it's not developed at all. The Government certainly objects to it. It's a new ground that was not raised in their initial memo.

They state that the indictment violates due process. It's difficult -- because the argument is not developed, it's difficult to follow. I don't know if they're pressing it today or waiving it, but the fair warning doctrine is meant to address attacks on the vagueness of statutes. Here they don't allege the statute is vague in any sense. They don't cite any criminal cases that address the supposed vagueness of the RCRA statute. But if anything's clear, your Honor, that the law itself is not vague as applied to these defendants. We simply have a factual dispute about what their intentions were with the mercury, with the regulators and that factual dispute at this point can only be resolved by trial.

And for those reasons, your Honor, I think the defendants motion to dismiss should be denied.

Your Honor, did you have any substantive questions that you'd like Ms. Chabot to address?

THE COURT: No, because I think I understand your arguments, and I think it really comes down to the points that you were arguing.

MR. DONNELLY: Thank you.

THE COURT: Mr. Petros, do you want to say anything in response with respect to the standard?

MR. PETROS: Very briefly, your Honor. Your Honor, point number one with respect to the standard, I do disagree with my learned colleague on what the standard is of this motion. I would point the Court to page six of our opening memorandum where we cited the United States versus Superior Growers case, which was citing the Fleisher case of the United States Supreme Court, which says, (Reading:) That to be legally sufficient, the indictment must assert facts which in law constitute an offense and which, if proved, would establish prima facie of the defendant's commission of that crime.

I disagree with the Government. I do not think it is sufficient to assert four boilerplate elements of the statute and say, you know, we allege hazardous waste, we allege storage, we allege no permit, that's enough. I don't think the law supports that, your Honor.

Now, I do agree with Mr. Donnelly that they're not required, and I said this in my argument, your Honor, they're not required to give us all of the minutia. And Mr. Donnelly correctly points out that

they gave us 11 pages, 37 paragraphs and what I think he called tons of information.

I urge the Court to consider why in that tons of information the Government doesn't allege an intent to discard, an intent to abandon, or an adulterated product or contaminated product. Nowhere in there are those essential facts missing, and essential facts is a requirement under Rule 7(c).

Now, Judge, I think the standard becomes particularly important in this area. Let me explain why, briefly.

We're dealing with what commentators have called one of the most complex areas of regulatory law anywhere in the United States. And as I think you've probably seen from the papers and our arguments this morning, there are different ways to get to a conclusion here, different regulations that have different impacts. And instead of the Government coming forward and saying here's why it's a waste, it's a spent material, it's an adulterated material, it's something else, you get the elements and then a lot of information, but not the critical information, the essential information that tells us what the charge is based upon.

So I think, in this context, in this regulatory

context, where it's not the kind of offense, a drug offense that the Court deals with commonly where the element are pretty clear and you know what the Government has to prove and will prove to get a conviction. When you're dealing with a regulatory scheme that is as complex as this, it's even more important, I think, to require the Government to set forth those essential facts.

THE COURT: Well, you know, that's a good policy argument, and this isn't your run-of-the-mill case, certainly. It's not a drug case. And it's a corporate defendant and a prosecution under these statutes is not something you see every day by any means.

On the other hand, there isn't a separate standard for this type of criminal indictment from other types of criminal indictments. So you make a good policy argument. Maybe there should be, but it really is the same standard.

MR. PETROS: Judge, it's not meant to be a policy argument. It's meant to say this. When Rule 7(c) and the Supreme Court says you have to set forth essential facts, those essential facts are pretty cut and dry on a possession case, but they are not cut and dry, we submit, your Honor, on a case of this complexity involving these regulations and the

Government has an obligation in all of the tons of the information they set forth in this indictment as they describe it to set forth the essential facts or face dismissal.

Judge, one final point, particularly with respect to Count III, your Honor, there's no issue of fact on Count III.

The Government flat out doesn't contend in the indictment that Tidewater is a destination facility. They flat out do not contend that during the relevant period we treated the MSRs or the universal waste at that facility. They flat out do not charge us with treatment, which is the charge that would be there if they really believed that when this indictment was voted out.

So, Judge, particularly with respect to Count III, we don't believe there can be, even under the Government's theory, any factual issue and we urge the Court to dismiss that count, and both counts. Thank you, your Honor.

THE COURT: Thank you. All right. I'm going to take the motion under advisement, and I will give you a ruling in fairly short order.

I will say that I think the burden here to get the indictment dismissed upon the defendant is a very

difficult burden. And I think Mr. Donnelly's point that these arguments really appear to be arguments that would be more appropriately made at Rule 29 stage of the proceedings I think is probably correct. And in saying that, I think the defendant makes some very good arguments about the application of the law, but I'm not convinced, although I want to take a hard look at it, I'm not convinced that's it's appropriate to deal with those arguments at the motion to dismiss stage, but I do want to take a short time just to review a few more things before I make my final decision. So I'm going to take it under advisement, and I'll give you a ruling shortly.

Now, we have a number of motions in limine that are pending. And I think that -- do either of you wish to argue those, or do you want to rest on your papers?

MR. TARANTINO: I would like to be heard on the security issue, your Honor, and reference to the additional litigation.

THE COURT: All right. Let's address those.

MR. TARANTINO: Would you like me to argue that now, your Honor?

THE COURT: Yes. Take the security question first.

MR. TARANTINO: Your Honor, I believe

Mr. Fetterman may want to be heard on the issue of what happened at the Lawn Terrace apartment.

THE COURT: Okay. Hopefully, we can do this fairly quickly. I'm not sure we need to spend a lot of time on this.

MR. TARANTINO: Your Honor, I'd like to address the conditions about the alleged lack of security. I know Mr. Petros touched on them, but there's a different standard, I think we would all agree, in terms of what is alleged in an indictment and the admission of evidence at the trial.

Mr. Petros, Mr. Donnelly and your Honor have already cited what the standard is on a motion to dismiss the indictment and what the indictment may say about the security or physical conditions at Tidewater, but here we're really dealing with two Rules of Evidence; Rule 401, and that is what evidence is relevant and only relevant evidence is admissible in a trial and particularly in a criminal case; and 403, that even if the evidence were to be deemed relevant in some manner, the Court has its discretion under Rule 403 to determine that the relevancy of that evidence is outweighed by other factors including prejudice and confusion and waste of time and the like.

And I understand from your questioning of

Mr. Petros to sort of characterize the Court's question, and you said, well, aren't the security issues potentially relevant to the defendant's state of mind or whether it intended to recycle or reclaim this mercury or not. And that's what I would like to address, not for purposes of a motion to dismiss but for purposes of does this evidence come in or should this evidence come in.

First, is it relevant; second, even if it is relevant, is whatever relevance that it might have outweighed by its potential for prejudice, inflaming the jury, confusing the issues and the like.

I'd actually like to use one of the Government's cases that it cites to make my point. The Government cites a case called United States versus Dee, D-E-E, and it uses Dee to argue that the conditions at Tidewater are, in fact, relevant evidence to the storage charge; and also, because they're relevant on this issue, they're not -- it's not unfair prejudice. There's always prejudice, all evidence if it's good evidence is going to be prejudicial, but is it unfair prejudice.

And I think it's important to actually look at what the Fourth Circuit said about Dee because we believe Dee actually supports Southern Union's position

and not the Government's.

The case involved federal employees who were civil engineers who were charged criminally for a variety of RCRA-related charges. Not only storage, not only unpermitted storage, but other kinds of charges including disposal, actually charged in the indictment disposal of the various hazardous wastes. And the Government relies on this language from Dee.

Th defendants assert that there was insufficient evidence that the management of chemicals was an environmental crime because, quote, sloppy storage procedures is not a crime.

Then the Court goes on to say, (Reading:) The defendants are wrong. Negligent and inept storage of hazardous materials is one of the evils RCRA was designed to prevent, and 6928(d) make such egregious conduct a crime.

The defendants were charged with that and the Court makes clear in Dee that Count II charged the defendant with that conduct and with disposal of hazardous wastes. And as the Dee's court says, the defendant charged conceded that the chemicals were hazardous, and there was no use for them, meaning they weren't intended to be reclaimed. They weren't in any way intended to be recycled. There was no use for

them.

Now, there's a concession, and the defendant conceded that there had been warnings about the hazardous conditions, other chemicals had been improperly stored, he undertook no actions to comply with RCRA and the like. So in that particular case and in that particular factual circumstance where how the storage took place and what the storage conditions were was relevant.

In this case, the only crime charged under 6928 is storage without a permit. Whether we stored under absolutely ideal conditions or the worse conditions imaginable, under the Government's theory, it is storage without a permit. It makes no difference what the physical conditions were in terms of relevancy to the charge. And as Mr. Petros said, think about this for a second, your Honor, if the EPA says we are not going to tell you or regulate you in any way, shape, manner or form of how you store this material, we could, but we choose not to, you can be charged with a crime if you improperly store, but we're not going to tell you how to store. You should have a permit. You don't have a permit. You get charged with a crime, but we're not going to tell you how to store.

Now the Government wants to say it's relevant,

relevant first, it's relevant how you store it. It's relevant that there was graffiti on the building. It's relevant that there was alleged holes in perimeter fencing and the like.

THE COURT: Aren't you really arguing the opposite of what Mr. Petros was arguing in the sense he wanted me to look past the indictment and dig far into what needs to be proven in order to prove the case in terms of whether this was discarded, whether there was an intent to discard, whether it was abandoned. And now you're arguing that I should not look at all of those questions in terms of determining the relevancy and only look at the indictment, which alleges storage.

And it seems to me the Government's argument is, and I think it has merit, that the way in which the product was stored could tend to prove a fact that the jury must decide. And that's the standard. Does it tend to make a fact more likely or less likely? And the fact here is the intent to either discard or reclaim the mercury.

Now, the Government is going to get up and say, listen, the fact that they didn't have any security, they let the fence deteriorate and the locks and so forth and so on, shows that they didn't put any value in this product. If they really thought it was

valuable for reclamation, they would have made a better effort to take care of it. Doesn't it tend to prove that?

MR. TARANTINO: I don't believe it tends to prove it because the Government puts a word in that's nowhere in the statute, "valuable." And what the Government wants, and they've done this in their memos, they want to say, well, look, if this stuff was valuable, you would have taken greater security issues. Meaning, somehow, that if you could sell it for a lot of money on reclamation that was valuable. The word is nowhere in existence. It's commercial chemical product. Whether we made zero on the reclamation, whether we lost money on the reclamation, or whether we made a million dollars on the reclamation, it's irrelevant. It's are you reclaiming the product. This could be an absolute loss leader, make zero dollars on it. So it doesn't have to be a valuable product.

The Government wants the Court to assume that this is like diamonds, and if you had diamonds and you were going to protect these diamonds, you were going to have lots of security to protect the diamonds. All this has to be is a commercial chemical product. Its value is meaningless for purposes of the law or for purposes of the regulation.

So for the Government to say how you secured that site where there's no regulations that tell you how you must secure it, but how you secure that site can be used against you in a criminal case to suggest that you really intended to discard this product. Even if that were relevant, even if that somehow can be tangentially relevant, you're going to have not only prejudice but think about how the case will be changed in terms of the trial. It's going to take a lot longer, and it's going to be a lot more confusing because the trial is going to be about not was this or was this not a commercial chemical product, but what were the security issues in the case.

The Government couldn't have charged us -- they could have tried to charge us with security problems. They could have tried to do what they did in Dee. They didn't charge us with that crime. They charged us only with storing without a permit, and now they want to get all of this evidence in the back way. We weren't charged with that offense. We were charged with storing without a permit.

So now we have to bring in evidence, this is on cumulative issues and waste of time and confusion to talk about we insured that property. We had locks on the door. We had locks on the cabinet. We had people

come to maintain. We had all of those things. It has nothing to do, all of that evidence has nothing to do with whether we had a permit or not. Nothing to do with it. And we're going to be spending all of that time because the Government wants to say somehow if it was valuable, we would have stored it differently. But the valuable aspect isn't a relevant issue in the first place.

So I think the Government's argument here is circular. They're saying if it was valuable, it goes to your state of mind and how you store it. It's not a charge in the case, and it's not something that's required. It simply means what the product is. Is the product a commercial chemical product. That simply means commercial, can it be sold for reclamation, not how much is it worth. It can be worth virtually nothing, but is there a process by which it can be reclaimed.

So in our view, your Honor, if there is any relevance -- and I would suggest there's no relevance to a storage charge. And I would just suggest, I will give this to the Court if the Court would find it helpful, I understand in no way are you bound by what another judge said about this case, but if you would find it helpful, before he recused himself, Judge

Torres addressed the issue of his doubts of how a security issue in a case like this could have anything to do with the storage charge.

And it came about, your Honor, because Judge Torres initially had the Arriaga case, which is the subject of the second motion and said he originally thought these two cases were interrelated, but as he thought about it, Arriaga was a negligent security case and this is a storage case; and therefore, they really aren't interrelated.

And I will provide you with the transcript of that conference, if you would find it helpful.

Additionally, just very recently in the Arriaga case, Judge Torres again, now he has the Arriaga case and he wasn't deciding a motion in limine, I'm not in any way suggesting that, but the issue before him at that point in time was should the discovery in the Arriaga case be stayed pending this criminal case.

And once again, there was argument about the relationship between these two cases. And again, the focus on, well, one was a storage charge. And it's pretty simple, either you had a permit or you didn't have a permit, and you either needed one or you didn't need one. And in the Arriaga civil case, it's, okay, how you maintained that site, whether you had adequate

security. That's a civil charge that will be pending in this Court and a jury someday, assuming the case is not resolved prior to trial, will determine those security issues, but they are relevant in the civil context. They are not relevant in the criminal context. And even if they are relevant in some manner, the relevance is clearly outweighed under Rule 403.

THE COURT: Okay. Let me hear from Mr. Donnelly.

MR. DONNELLY: Your Honor, Mr. Cassidy will be arguing this motion.

THE COURT: Okay. Mr. Cassidy?

MR. CASSIDY: Good morning, your Honor. Kevin Cassidy for the United States.

We couldn't disagree more with Mr. Tarantino's characterization of this evidence. We think it's highly relevant, the conditions of the facility, the lack of security there. We think, as your Honor has suggested with your questions, it tends to make facts at issue in this case more or less likely.

Mr. Tarantino suggested that if they stored it in an ideal situation, our theory would be exactly the same. Well, that may be. That doesn't mean it's not relevant. It means it might make it less likely --

THE COURT: Let me ask you this question.

MR. CASSIDY: Sure.

THE COURT: How long was this Tidewater facility in this disrepair?

MR. CASSIDY: The evidence that we have, your Honor, is that it went back a number of years. Certainly during the alleged conduct in this case.

THE COURT: But how many years?

MR. CASSIDY: I'd have to go back and look at some of the testimony of the witnesses, but probably back until at least 2001, 2002. As we say, it's in various states of disrepair.

THE COURT: That's the point of my question. If the facility was in disrepair in 2000 and 2001, and yet the company reclaimed and recycled the mercury and they were not indicted for the 2000, 2001 mercury, how does that disrepair then prove of a state of mind to discard or abandon the mercury in 2003, 2004? I don't get it.

MR. CASSIDY: Well, there are a couple of issues, your Honor. The relevance of the evidence, number one, is it's relevant to other aspects of the case other than just the defendant's state of mind.

THE COURT: Which ones?

MR. CASSIDY: It's relevant particularly to the issue of whether or not this was a waste. Okay? So the defendants have made a lot of arguments this

morning about the fact that they believe or their defense is this is a commercial chemical product. We have to prove it is a waste, that the conditions of the Tidewater facility make it more likely that this is a waste.

Now, your Honor, you asked a question about going back, you know, to 2001, 2002, prior when they were recycling the material, reclaiming the material. That was a short period of time. They had -- our understanding is they had security there almost 24 hours or at least they were rotating through. The security situation changed after that. We understand as a result of that, perhaps, the graffiti increased.

It certainly went into a further state of disrepair after that time period. One of the reasons it's important for the Court to know this, that we didn't go back and charge the time period during the reclamation, was that we didn't have evidence that it was actually being stored there for a long period of time. The evidence that we saw was that the mercury regulators came in. They had a contractor there who was breaking them open and pouring out the mercury into steel flasks, and they were sending them off to Bethlehem Apparatus.

There are exemptions. As has been mentioned

before this morning, you can store, you can have hazardous waste and store it for a certain amount of time. I believe Mr. Petros mentioned a 90-day rule without having to go get a permit.

So the evidence just wasn't there for us during that time period to charge a storage case because the evidence was that the mercury came in and went out.

After that, they were storing it there for a longer period of time. And we have to show that it's waste, and we believe their defense is going to be and always has been that it's a commercial chemical product. If you treat something like waste, if you leave it in a delipidated facility for a long period of time, it's more likely that that is waste; therefore, the evidence is relevant. It's indicia of not treating something like a product that is being manufactured in commerce.

The Mallinckrodt letter that Mr. Donnelly mentioned earlier is very instructive on this issue. They required for that facility that the mercury being stored there be safely stored.

The defendants are also making a recycling claim. It's another reason this evidence is relevant. Judge, your Honor knows the standard for relevance. It's a very low standard in the First Circuit. We cite

the case in our brief for that standard, threshold is very low under 401, United States versus Tutiven in the First Circuit. Evidence can be relevant. It doesn't have to prove or disproved a certain element of the crime. That's another First Circuit case. And there are various ways this evidence is relevant.

On their recycling claim, the conditions in the facility make it more likely that this wasn't a legitimate recycling operation during the time period alleged in the indictment. This is not a Government theory that we're coming out of the blue with. EPA thought about this 23 years ago, and we say that on page three of our response where, in the Federal Register, EPA talks about the conditions of a facility showing whether or not something is going to be a sham recycling operation.

THE COURT: Okay. All right. I think I've heard enough on this one. I'm going to deny the motion in limine, but I'm going to do two things. One is, in general, I'm going to caution the Government that we're not going to try the issue of the security arrangements. They're not indicted for that. And if you attempt to put that on trial as sort of a substitute for proving up the actual counts of the indictment, I'm going to stop you. In other words, if

you attempt to highlight it too much or make that the issue in the case, I'm going to take steps to mitigate that.

Secondly, I think this will be an appropriate area for a jury instruction, cautionary jury instruction with respect to what that evidence is permissible for, that is, that it is permissible for consideration of the questions that are before the jury, such as whether the product was a hazardous waste or whether it was a commercial product. And so I think that is the way to deal with it, with a carefully worded jury instruction, so I will entertain that.

All right?

MR. CASSIDY: Thank you, your Honor.

THE COURT: The next issue then is the prior lawsuits. I know you want to argue it, but after reading the Government's papers, it struck me that really the question of whether this material will be relevant at all will depend on how the trial unfolds.

For example, there could be standard impeachment evidence that relates to prior proceedings. We won't know that until trial.

MR. TARANTINO: Judge, there's a difference -- maybe I misread the Government's papers. If something were said by a Southern Union official or employee in

one of the other pieces of litigation, the Corvello case or the Arriaga case, we're not suggesting that person can't be impeached by that testimony, but the way that it's normally handled is you say did you not give testimony in a prior proceeding.

THE COURT: I agree.

MR. TARANTINO: That's not what we're talking about. We're talking about reference to other litigation against Southern Union so the jury -- we don't want the jury to know that Southern Union is a defendant in two other cases pending in this Court that are civil cases.

THE COURT: I understand that. I read the Government as saying that they don't intend to attempt to introduce it for that purpose. Now, maybe you don't believe them, but that's how I read their papers.

MR. TARANTINO: Well, I certainly don't believe the Government is attempting to mislead me or anyone else, but I read it somewhat more narrowly. They're saying we want to be able to use this, meaning other lawsuits, as impeachment. The other lawsuits, the existence of the other lawsuits isn't impeachment. What they can use as impeachment --

THE COURT: Let me get Mr. Donnelly up. Let's find out what he does intend to do. All right?

MR. DONNELLY: I suppose the very short answer, your Honor, is what I intend to do is not introduce any such evidence without prior permission of the Court and without alerting the Court and the parties beforehand. That's the bottom line for the Government today, your Honor.

We outlined that there might be some ways in which this evidence might become relevant at trial. I think what Mr. Tarantino was trying to express is the thought that I expressed in our memo that it could be, depending on how the testimony comes in -- and just to back up a half a step, sorry, Judge, many, if not most, the majority of the witnesses you will hear from are either present or former Southern Union employees. They're not necessarily friendly to the Government. Their employer, or former employer, is currently being prosecuted by the United States.

So there may be an interest there, a motive for testifying because of this case, the various lawsuits that are going on where the financial stakes for Southern Union are very high. So my concern --

THE COURT: I'm just not getting how the other cases relate to the bias issue that you're referring to.

MR. DONNELLY: It's hard for me to speculate.

As a threshold matter, I think I stated in our memorandum, as a threshold matter, I don't think it is relevant. And if there's any circumstance under which we change our position and state, you know, your Honor, he just said X, I'd like to inquire as to the litigation that's going on, can we stop and talk about it.

THE COURT: All right. Well, that's enough for me. At this stage then, I'm going to take the Government's representations, take Mr. Donnelly at his word that he doesn't see any real relevance to this evidence. I'm fully sympathetic to the defendant's position on this. I think Mr. Donnelly recognizes it by saying he will give advanced notice, that this is not proper to go into unless there's a very good reason to do so. So for now, I'm just going to reserve on the motion, and if it comes up, we'll deal with it when it comes up.

If there is impeachment, standard sort of impeachment evidence, I expect the Government to handle it the way it handles it in all other trials, in another proceeding didn't you state as follows. No reference to the other proceeding or that sort of thing.

All right. The next motion -- there's two more.

Maybe this can be dealt with fairly quickly, that is the motion in limine to exclude the evidence of the mercury spill at the apartments and the subsequent evacuation of the apartments.

MR. FETTERMAN: May I be heard on that, Judge?

THE COURT: Yes. Why don't you come on up. Again, I'd like to focus on what the Government has sort of said in response to your motion, and I think that they said that there really -- they don't intend to get into the -- they don't intend to put on evidence of the evacuation of the apartment building and that sort of thing.

MR. FETTERMAN: The evacuation of the residents and the subsequent remediation. They agree, essentially, with our motion, that that's unfairly prejudicial. I would suggest, your Honor, this is a particularly sensitive notion, and this ties into the next motion, the surplusage motion, and what Mr. Tarantino said, I believe the Government is trying to try a negligence security case, and so these are particularly prejudicial, and they've agreed. So as long as your Honor enters the same order, and we'll rely on the Government's representation they said they're not going to offer it, and if they're not permitted to offer it unless they, obviously, have

further order of the Court, we're fine with that, but that's only a portion of the evidence that we've moved to exclude.

So if I might be able to address the last piece, which is they've asked and argued that they be allowed to offer at trial that the mercury spread off of Southern Union's facility to the Lawn Terrace Apartments, that Government agents were able to obtain samples of the mercury at the Lawn Terrace Apartments and that the Lawn Terrace mercury came from Tidewater. And they offer two theories to the Court as to why that evidence would be relevant at this trial. And I would submit to you, your Honor, that both of those theories are wrong and that your Honor should add to the order that you're going to enter all evidence related to any mercury.

The first theory that the Government offers is that, essentially, because it failed to obtain and test mercury at the Tidewater facility, it should be allowed to introduce samples of mercury that it obtained at the Lawn Terrace Apartments. In essence, what the Government is asking your Honor --

THE COURT: Wait a second. You're saying because they couldn't get to the mercury that was in the facility, they had to use the mercury that was at

the apartment complex in order to determine the content?

MR. FETTERMAN: That's what they're telling you, your Honor. First of all, we strongly disagree that they couldn't get to it. They didn't test it. They failed to test it. They failed to get samples.

THE COURT: Don't they say that that's because you, the company, failed to notify the police department, the fire department of the spill and you contacted the reclamation or cleanup company and got it all out of there before anybody was able to get in?

MR. FETTERMAN: The Clean Harbors was the contractor that picked up that mercury, Judge. Clean Harbors was a contractor that the Government is fully aware of. In fact, Clean Harbors is a contractor for the Government themselves, and they never contacted Clean Harbors. My understands is they never contacted Clean Harbors and said we want to get a sample. And at some point, that mercury was disposed of and they had samples from Lawn Terrace, and now they're asking your Honor, because they don't have the samples from the facility, to allow them to put in samples that they took from Lawn Terrace, samples that were gone from our facility for more than three weeks. Who knows what kind of contamination and other things happened to

that. There's no chain of custody. It was stolen from us, and they want to offer it in place of that evidence. Judge, I submit it's just not relevant.

Let's say for argument sake they're able to show that mercury is not pure and that mercury is contaminated. What relevance does that have, because after it's been stolen, taken to an apartment complex and God knows what has happened to it. So I don't think -- I submit, Judge, you shouldn't allow them to fill that hole in their proof.

And second, they argue it's relevant to their EPCRA claim, the notification claim, because they say they have to prove that there was a release into the environment, and they cite the Court to the elements of that claim in the indictment. But what they're doing, Judge, I submit, is they're being misleading about what that evidence is relevant to, because that claim requires them to show that Southern Union knowingly and willfully failed to immediately report a release of a reportable quantity of mercury in the environment. And the facts are that the mercury that they want to put in evidence of wasn't discovered at Lawn Terrace until three days after it was discovered at the Tidewater site. And so it's going to be very confusing for the jury.

There's no evidence that on the day, October 19th, when the Southern Union officials showed up at Tidewater, that they knew that this mercury had gotten off-site and that they knowingly and willfully failed to report that more than a pound had gotten to Lawn Terrace because that Lawn Terrace mercury wasn't discovered for three more days. It would be terribly confusing. And that's what that evidence is relevant to, and I submit, your Honor, there's no evidence that on the day, October 19th, that the Southern Union officials showed up, that they had any knowledge; and so, therefore, what they're going to do is they're going to confuse the jury and try to argue from that, in essence, scienter. I would ask your Honor to keep that out because it's going to be much, much more confusing and it's, frankly, not relevant.

THE COURT: Okay. Let me hear from Mr. Donnelly.

MR. DONNELLY: Well, let me assure you and Mr. Fetterman that nobody is trying to mislead the Court here, your Honor. This evidence is incredibly relevant to Counts I and II of the indictment. As I outlined the elements of the RCRA charge found in Count I, the Government is going to have to prove that the defendant stored hazardous waste at its facility.

Due to the defendant's criminal conduct as charged in Count II, the Government was unable to obtain samples from the site, the Tidewater site on October 19th and 20th; and therefore, your Honor -- but the Government was able to obtain samples from the Lawn Terrace Apartments.

The Government is going to have to prove, your Honor, that the mercury that was being stored at Tidewater was hazardous. As we outlined in our memorandum on the motion to dismiss under RCRA, a material can be hazardous if it's either a listed hazardous material or if it meets -- if it fails to meet various criteria, including in this case, toxicity. That's how we intend to prove that the mercury was hazardous. To prove the toxicity, we have to introduce the sampling of the mercury or at least the testing of the sample.

THE COURT: I hear the defendant's concern as being one of contamination of the product, so it goes to the commercial --

MR. DONNELLY: That's going to go to the weight of the evidence, I think, your Honor, and we're confident that -- I don't think that contamination is going to have anything to do with the admissibility of the evidence.

THE COURT: Maybe I'm misunderstanding the issue, but I thought what they were saying is that because it was off-site, because it was stolen and it was off-site and they didn't have any control over it, the sample may reveal that the product is somehow contaminated or adulterated in some way and, therefore, it becomes hazardous waste as opposed to non-hazardous waste or commercial product. Okay?

And because you, the Government, didn't go and test the product that was actually taken out of the Tidewater facility, you're now going to be introducing this adulterated product. Now, are you not going to be using the sample to prove its adulterated content in order to prove it's hazardous?

MR. DONNELLY: No. Again, I'm not a scientist, your Honor, but the fact that there might be, for example, the vandals took -- they were playing with the mercury will be the evidence that came before you, at least in part. It was being spilled in a parking lot at the Lawn Terrace Apartments. I believe that's where some of the samples were taken from. The scientists that will testify will, I believe, say there was some gravel in there and that sort of thing. But those kinds of contaminants in there will have no effect on whether or not under RCRA law the mercury that was

found at Lawn Terrace was hazardous under the law, which is one of the elements we have to prove.

So it's directly relevant, your Honor. Also, as another matter, although the defense might wish it, the Government should not have its case gutted by the criminal conduct by the defendant; namely, the storage without the permit, the storage in this lousy place they kept it. They knew ahead of time, you're going to hear evidence, they knew about break-ins at this place. It was eminently foreseeable.

Now, that all just goes against the issue of whether this was a waste or not. We're not trying to try a negligence case. We have the elements of the offense. We're going to try and prove all of the elements of the offense.

The evidence, your Honor, is also relevant to several factual issues that are charged in Count II. We have to prove a release from the facility so --

THE COURT: I've heard enough. I understand. I am going to deny the motion. I will say this. The Government has conceded in its papers that it will not put the evidence on of evacuation or cleanup, and I will hold them to that.

Secondly, I understand Mr. Donnelly's comments just now to be that he does not intend to argue that

because of any contamination of the mercury sample during the time that it was played with by the vandals, or in the complex, the Government will not be using that contamination to somehow prove the hazardous nature of the waste. So I think that issue, that concern is resolved by his representations.

Then the question becomes is it relevant. And I think it clearly is relevant to both Count I and particularly to Count II and, again, I think an appropriately worded instruction along the lines of what I described earlier with respect to the conditions of the property, and part and parcel of that can ameliorate any concerns over any undue prejudice resulting from that evidence. So with those limitations in mind, I'm going to deny the motion.

That leaves, lastly, the motion to strike the surplusage in the indictment. Now, given the rulings that I've made with respect to the other motions, I don't think I need to hear any further argument on it. I'm going to deny the motion to strike the surplusage issue.

I give very strong instructions during every criminal trial about what an indictment is and that it doesn't prove anything. And I think that, combined with the instructions that we've referred to with

respect to these issues you're concerned about, that, I think, should alleviate any concerns about that excess wording.

Mr. Tarantino, you look like you might want to say something.

MR. TARANTINO: If I may just make one point on that, your Honor.

THE COURT: Sure.

MR. TARANTINO: The only concern that I have about this is, as I understand it, you put limitations or you will put limitations on the Government as to how it can use the negligence security type evidence and that's to go to state of mind, potentially go to state of mind issues.

Again, I would just ask the Court before it decides the motion to strike the surplusage, I don't believe that's the way the indictment reads. So the jury will be looking at an indictment that talks about negligent conditions and security that's different than what the Court's instruction will be in terms of it only goes to issues of state of mind. It says a lot more than that in the indictment. And my concern would be the jury is going to get the indictment; I understand the Court's instructions about the indictment, but it, again, it could create some

confusion because if it's going to the issues of state of mind, then it doesn't have to be in the indictment. It's an evidentiary issue. What's in the indictment are the charging offenses. And if you were just telling the jury this is not a negligence security case, it's not an element of the offense, it only goes to issues of state of mind, if they see in the indictment itself, the charging instrument, the very same negligent security issues that the Court has ruled out, I think that would be confusing.

THE COURT: Mr. Donnelly, do you think, especially in light of the lack of Bill of Particulars and your arguments about you didn't need to do all this, do you think some redaction of the indictment would be appropriate in light of the rulings I've made?

MR. DONNELLY: I don't think so, your Honor. The rulings the Court has made is that the evidence is relevant. My understanding of how the Court ruled particularly on the security and conditions motion was that the Court didn't want the Government going hog-wild with it and spending all kinds of time. You know, the lack of security is one factor among many that the Government believes and will assert to prove the element that this was a waste. Some of that evidence goes to state of mind; some of it goes to the

acts by the defendant.

So I'd be very uncomfortable, your Honor, where the Court has ruled that the evidence is relevant, and I don't see how their failing to protect this so-called commercial chemical product and to protect the public in any way should be stricken from an indictment that was validly issued by the grand jury.

THE COURT: Okay. Well, for the time being, my ruling will stand, that I'm not going to strike the language in the indictment. But you may renew that motion at the close of trial. We'll see how the evidence actually comes in, and we'll see how the instructions actually come out. And if there's reason for me to modify that position once we know better what really transpires, then I'll reconsider that ruling at that time. I think, for now, the better course is to deny the motion.

So lastly, yesterday I signed a subpoena for the witness that you wished to subpoena.

MR. DONNELLY: That motion has been granted, your Honor?

THE COURT: I granted that.

MR. DONNELLY: Thank you.

THE COURT: So you should be getting that or you can get that right now maybe from the clerk.

MR. DONNELLY: Thank you.

THE COURT: Is there any more to report on what's going on with that witness, just very briefly. I don't want to spend a lot of time on this. In fact, we can go off the record on this. This doesn't have to be on the record.

(Discussion off the record.)

(Court concluded at 12:35 p.m.)

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

_____________________________________

Anne M. Clayton, RPR

June 18, 2008

_______________________________________

Date