UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| United States of America, Plaintiff, | : | |
| | : | |
| v. | : | CR No. 07-134 S |
| | : | |
| Southern Union Company, Defendant. | : | |

**DECISION AND ORDER**

William E. Smith, United States District Judge.

Defendant Southern Union Company ("Defendant") is charged in a three-count Indictment with: (1) storing hazardous waste (liquid mercury) without a permit, (2) failing to provide emergency notice of a release of a hazardous substance, and (3) storing hazardous waste (mercury regulators) without a permit. Currently before the Court is Defendant's motion to dismiss counts one and three of the Indictment on the following grounds: (1) the liquid mercury stored at Defendant's facility was a commercial chemical product intended for recycling and, as such, did not require a permit, and (2) the mercury-containing regulators stored at Defendant's facility were universal wastes not requiring a permit.[1] For the following reasons, Defendant's motion is denied.

---

[1] Counts one and three of the Indictment were brought pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 _et seq._

I. Background

The facts alleged in the indictment and relevant to this decision are as follows. Defendant owned and operated several natural gas purveyors in Rhode Island and Massachusetts, which companies were collectively known as the New England Gas Company ("NEGC"). Indictment ¶ 1(b). Defendant owned a facility in Pawtucket, Rhode Island (the "Tidewater facility") that consisted of several vacant buildings and two unused natural gas storage tanks. Id. ¶ 1(c). From June 2001 to January 2002, Defendant engaged in a mercury regulator removal and reclamation program.[2] Id. ¶ 9. Pursuant to the program, Defendant retrieved mercury regulators from its customers' homes, brought the regulators to the Tidewater facility, and contracted with an environmental services company to remove the mercury from the regulators. Id. The removal took place at the Tidewater facility. Id. After removing the mercury from the regulators, Defendant's contractor placed the mercury in steel flasks designed for its storage and transportation. Id. ¶ 10. Defendant's environmental coordinator for its NEGC operation then arranged to ship the mercury to a facility in Pennsylvania for distillation. Id.

In January 2002, Defendant's contract with the environmental services company ceased. Id. ¶ 11. In June 2002, the NEGC

---

[2] A mercury regulator is a device found in some older gas meters that regulates the flow of natural gas through the meter. Indictment ¶ 8.

environmental coordinator drafted a Request for Proposal ("RFP") to restart the mercury regulator removal program at the Tidewater facility. Id. ¶ 12. The draft RFP was reviewed and revised by Defendant's environmental director, but a final version was never sent out for bids. Id.

Throughout 2002, 2003, and 2004, Defendant continued to retrieve mercury regulators from its customers' homes and store them at the Tidewater facility. Id. ¶ 13. In August 2003, Defendant's Rhode Island-based environmental coordinator[3] drafted a second RFP "for Waste Segregation, Packaging, Transportation and Disposal" of approximately 90 obsolete mercury regulators that were stored in plastic "kiddie" pools and on the floor of the Tidewater facility, as well as several containers of liquid mercury stored in a locked, wooden cabinet in the same building.[4] Id. ¶ 14. This second RFP was never finalized or sent out for bids. Id.

By July 2004, Defendant had stored at the Tidewater facility approximately 165 mercury regulators and the liquid mercury in the

---

[3] It is not clear from the Indictment whether this refers to the NEGC environmental coordinator.

[4] The mercury in the wooden cabinet came from various sources known and unknown. In September 2002, one of Defendant's employees transported approximately 10 pounds of loose mercury to the Tidewater facility. Indictment ¶ 15. Also that month, another of Defendant's employees transported a "half full jar of mercury" to the Tidewater facility "in a covered paint bucket." Id. In March 2003, a plastic gallon-sized container of mercury was discovered in the locker of a deceased employee. Id. Defendant contracted with an environmental services company to transport the mercury from the employee's locker to the Tidewater facility. Id.

wooden cabinet. Id. ¶ 16. Defendant's Rhode Island-based environmental coordinator drafted a third RFP "for Waste Segregation, Packaging, Transportation and Disposal" of the mercury. Id. The third RFP was never finalized or sent out for bids. Id.

At no time during these events did Defendant have a permit to store mercury waste at the Tidewater facility. Id. ¶ 17.

II. Standard of Review

An indictment is sufficient if: (1) it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend; and (2) it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. See United States v. Cianci, 378 F.3d 71, 81 (1st Cir. 2004); Hamling v. United States, 418 U.S. 87, 117 (1974). "When reviewed for sufficiency an indictment must be read in its entirety, construed according to common sense, and read to include facts which are necessarily implied." United States v. Grace, 429 F. Supp. 2d 1207, 1237 (D. Mont. 2006) (citing United States v. Anderson, 532 F.2d 1218, 1222 (9th Cir. 1976)); see also United States v. Barker Steel Co., 985 F.2d 1123, 1125 (1st Cir. 1993) ("[W]e construe the allegations in a practical sense, with all necessary implications."); United States v. McLennan, 672 F.2d 239, 243 n.4 (1st Cir. 1982) ("[W]e are entitled to view the indictment 'as a whole,' however, and to give the words their 'plain and

sensible meaning.'" (citation omitted)); United States v. Barbato, 471 F.2d 918, 921 (1st Cir. 1973) ("Indictments 'must be read to include facts which are necessarily implied by the specific allegations made.'" (citation omitted)).[5]

III. Discussion

A. Count One: Storing Hazardous Waste (Liquid Mercury) Without A Permit

The Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 et seq., defines "hazardous waste," in relevant part, as "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may . . . pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5)(B). Defendant contends that the Government cannot

---

[5] By referring the Court to United States v. Superior Growers Supply, Inc., 982 F.2d 173 (6th Cir. 1992), Defendant attempts to put a favorable gloss on the standard elucidated by Hamling v. United States, 418 U.S. 87 (1974). In Superior Growers, the Sixth Circuit wrote: "To be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime." 982 F.2d at 177. However, this statement does not depart from Hamling in any way favorable to Defendant's motion. Moreover, the indictment in Superior Growers was held defective not because it fell short on the facts but because it omitted an element of the offense. Defendant here is not arguing that the Government omitted one of the elements of the charged offense; rather, it is arguing that the Government has not met its burden of pleading facts sufficient, if proved, to constitute a violation of the statute.

prove that the liquid mercury at the Tidewater facility was a waste without first proving that it was a "solid waste" under RCRA. See United States v. Self, 2 F.3d 1071, 1076 (10th Cir. 1993) ("[F]or a waste to be classified as hazardous, it must first qualify as a solid waste under RCRA." (Citation omitted)).

Defendant argues that the liquid mercury could not have been a RCRA solid waste because it was a "commercial chemical product" exempt from the hazardous waste storage permit requirements. Def.'s Mem. Supp. Mot. Dismiss at 7. Putting aside all the considerations that may go into determining whether a commercial chemical product is a RCRA solid waste, and accepting Defendant's premise that if the liquid mercury was a commercial chemical product it would be exempt from the permit requirement, the Court cannot conclude as a matter of law that the liquid mercury was, indeed, a commercial chemical product. As acknowledged by Defendant in its motion, the RCRA regulations define "commercial chemical product" as "a chemical substance which is manufactured or formulated for commercial or manufacturing use which consists of the commercially pure grade of the chemical, any technical grades of the chemical that are produced or marketed, and all formulations in which the chemical is the sole active ingredient." 40 C.F.R. § 261.33(d), Comment.

Thus, Defendant's argument that the liquid mercury at the Tidewater facility was a commercial chemical product is premised on

the Court accepting that the mercury "consist[ed] of the commercially pure grade of the chemical, any technical grades of the chemical that are produced or marketed, and all formulations in which the chemical is the sole active ingredient."[6] Id. Such a factual leap would be improper at this stage, where the Court's duty is to accept as true the well-pleaded allegations in the Indictment.[7] See Self, 2 F.3d at 1082 ("A district court may not resolve evidentiary issues on a motion to dismiss.") (citing United States v. Knox, 396 U.S. 77, 83 n.7 (1969)). The Court therefore

---

[6] In fact, the inquiry is even narrower. Defendant contends that the liquid mercury was a commercial chemical product specifically because it was "neither changed nor altered from its pure commercial grade." Def.'s Mem. Supp. Mot. Dismiss at 11. Defendant does not contend that the mercury was a "technical grade[] of the chemical that [was] produced or marketed," or a "formulation[] in which the chemical [was] the sole active ingredient." See 40 C.F.R. § 261.33(d), Comment.

[7] For example, Defendant provided an internal U.S. EPA email, in which it is said:

> The 4 samples should have arrived by now from yesterday's sampling (Dave Dugan & I). All 4 samples are basically 100% elemental mercury in amber 4 oz glass sample jars.

Def.'s Reply, Ex. E. Defendant argues, based on this email, that "[t]he Government cannot credibly claim that there is an issue of fact left for the jury to decide," as to whether the liquid mercury at the Tidewater facility was a commercial chemical product. Def.'s Reply at 10. However, this snippet of electronic conversation is not sufficient to resolve this factual issue. There is no discussion of the sampling procedure, or of the results of other sampling. There is no explanation of what the writer means by "basically." The Court cannot spin any certain conclusion out of such threadbare evidence; the issue is best reserved for the jury.

must deny Defendant's motion to dismiss count one of the Indictment.[8]

B. Count Three: Storing Hazardous Waste (Mercury Regulators) Without A Permit

Defendant argues that count three of the Indictment must be dismissed because the mercury regulators stored at the Tidewater facility are "universal wastes," that, under RCRA, do not require a hazardous waste storage permit.[9] Def.'s Mem. Supp. Mot. Dismiss at 12. As even Defendant implicitly concedes, however, Def.'s Mem. Supp. Mot. Dismiss at 16-17, Hrg. Trn. 32:15-25, the exclusion carved out for universal wastes does not categorically apply to all such wastes. Rather, RCRA provides that "handlers" and "transporters" of universal wastes are not required to obtain a hazardous waste permit:

---

[8] Defendant makes the additional argument that "commercial chemical products are 'not wastes when recycled.'" Def.'s Mem. Supp. Mot. Dismiss at 10 (quoting 50 Fed. Reg. 614, 618 (Jan. 4, 1985)). Given that the Court cannot even resolve the question of whether the liquid mercury stored at the Tidewater facility was a commercial chemical product, the Court finds it unnecessary to analyze whether the mercury was in the process of being recycled. The Court notes, however, that Defendant's argument appears to presume that the Court will accept at face value the contention that Defendant "intended" to reclaim or recycle the mercury stored at the Tidewater facility. Def.'s Mem. Supp. Mot. Dismiss at 11. This should not be presumed, but rather left to the jury to determine.

[9] For the purposes of Defendant's motion to dismiss, the Government agrees that the mercury regulators stored at the Tidewater facility were universal waste under RCRA and Rhode Island's EPA-approved hazardous waste regulations. Govt. Opp. Mot. Dismiss at 17 (citing 40 C.F.R. Part 273 and R.I. Rules and Regulations for Hazardous Waste Management, Rule 13.00).

> The following persons are among those who are not required to obtain a RCRA permit:
>
> [exclusions (i)- (vii) omitted]
>
> (viii) Universal waste handlers and universal waste transporters (as defined in 40 CFR 260.10) managing the wastes listed below.

40 C.F.R. § 270.1(c)(2)(viii). Defendant does not contend that it was a universal waste transporter, but does argue that it was a universal waste handler as defined in 40 C.F.R. § 260.10. Under RCRA, a universal waste handler is: "(i) A generator . . . of universal waste; or [¶] (ii) The owner or operator of a facility, including all contiguous property, that receives universal waste from other universal waste handlers, accumulates universal waste, and sends universal waste to another universal waste handler, to a destination facility, or to a foreign destination." 40 C.F.R. § 260.10; <u>see also</u> 40 C.F.R. § 273.9. A universal waste handler <u>is not</u>: "(i) A person who treats . . ., disposes of, or recycles universal waste; or [¶] (ii) A person engaged in the off-site transportation of universal waste by air, rail, highway, or water, including a universal waste transfer facility." 40 C.F.R. § 260.10.

Taking as true the allegations in the Indictment, Defendant does not meet the prerequisites of being a universal waste handler. The Indictment alleges that "[t]hroughout 2002, 2003, and 2004, Southern Union technicians continued to remove mercury containing regulators from customers' homes and stored them in one of the

vacant buildings at the Tidewater facility." Indictment ¶ 13. These facts fall short of meeting RCRA's requirement that a would-be universal waste handler "send[] universal waste to another universal waste handler, to a destination facility, or to a foreign destination." 40 C.F.R. § 260.10.

Although Defendant spent much time arguing that it was a universal waste handler because the Tidewater facility was not a "destination facility," see, e.g., Hrg. Trn. 33:20-36:7, this, too, misses the mark. As explained by Defendant at oral argument, in order for the Tidewater facility to be a destination facility for purposes of count three, the Indictment would need to allege that Defendant treated, disposed of, or conducted on-site recycling of a universal waste during the time period relevant to count three, which was March 2003 to October 2004. See Hrg. Trn. 33:11-36:7; see also 40 C.F.R. § 273.9 ("Destination facility means a facility that treats, disposes of, or recycles a particular category of universal waste . . . . A facility at which a particular category of universal waste is only accumulated, is not a destination facility for purposes of managing that category of universal waste."). While the Indictment does not go so far as to allege that Defendant "treated" the mercury regulators from March 2003 to October 2004, it does allege that Defendant "did knowingly store, and cause to be stored, hazardous wastes" at the Tidewater facility. Indictment ¶ 37. Under the Rhode Island Hazardous Waste

Regulations, "disposal" can include the "abandoning or placing of any hazardous waste in, on, into, or onto any land, other surface, or building." R.I. Rules and Regulations for Hazardous Waste Management, Rule 3.00. Indeed, as already explained, the Indictment alleges that "[t]hroughout 2002, 2003, and 2004, Southern Union technicians continued to remove mercury containing regulators from customers' homes and stored them in one of the vacant buildings at the Tidewater facility."[10] Indictment ¶ 13.

The Court recognizes that this skirmishing presages future debates over the merits of the Government's claims and regarding jury instructions. The tangled arguments advanced by both the Government and Defendant evidence the complexity of hazardous waste regulation, and highlights the number of factual issues that the jury will have to resolve at trial. But it is not for the Court to attempt to resolve these issues at this stage. See Self, 2 F.3d at

---

[10] As with the issue of whether Defendant intended to recycle the liquid mercury stored at the Tidewater facility, the Court finds it unnecessary to determine whether the length of time that Defendant is alleged to have stored the mercury regulators effectively precludes it from being a universal waste handler, as argued by the Government. Govt. Opp. Mot. Dismiss at 18 (citing 40 C.F.R. § 273.15). Given that the Indictment's allegations, if true, support the conclusion that Defendant was not a universal waste handler at all, it appears to be irrelevant for how long the waste was stored at the Tidewater facility. The bottom line is this: the alleged crime is the "storage" of hazardous waste without a permit. Defendant may be able to refute the Government's claim that the alleged waste was stored by showing that it was in the process of being moved or recycled. Conversely, the Government may be able to show that Defendant abandoned the waste by storing it. These are all issues the jury will need to sort out at trial.

1082. The question before the Court is whether the Indictment is legally sufficient to allow the Government to move forward with its prosecution. For the reasons stated above, the Court concludes that it is sufficient.

C. Due Process Considerations

For the first time in its reply brief, Defendant specifically argues that "if the Government's arguments are accepted, such a result would raise serious due process and 'fair notice' concerns as it would transform into felonies conduct commonly and reasonably understood to be lawful." Def.'s Reply at 28. To the extent Defendant presents this as an independent theory as to why the Indictment is insufficient as a matter of law, the Court declines to give it consideration. See United States v. Eirby, 515 F.3d 31, 36 n.4 (1st Cir. 2008) (issues "advanced for the first time in an appellant's reply brief are deemed to have been waived"); see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 894-95 (1990) (court has discretion to disregard late-filed factual matters); Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007) ("district court need not consider arguments raised for the first time in a reply brief").

IV. Conclusion

For the foregoing reasons, Defendant's motion to dismiss counts one and three of the Indictment is DENIED.

It is so Ordered.

WESmith

William E. Smith
United States District Judge
Date: 8/5/08