UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CR. No. 07-134S |
| | : | |
| SOUTHERN UNION COMPANY | : | |

## UNITED STATES' TRIAL MEMORANDUM

## I. INTRODUCTION - STATUS OF THE CASE

On October 29, 2007, the defendant was arraigned on a three count indictment. The indictment charges Southern Union Company (SUC) in counts 1 and 3 with violating the Resource Conservation and Recovery Act ("RCRA"), in violation of 42 U.S.C. § 6928(d)(2)(A), and in count 2 with violating the Emergency Planning and Community Right to Know Act ("EPCRA"), 42 U.S.C. §11045(b)(4). In its essence, the indictment charges Southern Union with the unlawful storage of a hazardous waste - mercury - without a permit (the RCRA counts), and then failing to immediately notify local emergency response authorities when Southern Union discovered that liquid mercury had been released from its facility in Pawtucket, Rhode Island (the EPCRA count).

The case is scheduled for trial on September 22, 2008. The government expects that its case-in-chief will last between two and three weeks.

## II. SUMMARY OF THE GOVERNMENT'S EVIDENCE

This case involves Southern Union Company's storage of mercury-containing regulators and containers of loose mercury in a vacant facility in Pawtucket, Rhode Island (the "Tidewater

facility”), the subsequent release of mercury by vandals, and SUC’s failure to immediately notify authorities of the release.

**A. The Defendant**

Defendant Southern Union Company (SUC) is an Austin, Texas-based company engaged primarily in a national business of transporting and distributing natural gas. In 2000, SUC purchased several natural gas suppliers in Rhode Island and nearby Massachusetts, and reconstituted them as an unincorporated division known as the New England Gas Company (NEGC).

As part of its property holdings in Rhode Island, SUC possessed a facility at the end of Tidewater Street, along the Seekonk River in Pawtucket, Rhode Island (the "Tidewater Facility"). The property consisted of several buildings and natural gas storage tanks. The mercury which was eventually released was stored in one of the smaller buildings on the property.

The individuals who played significant roles in environmental management issues for SUC were:

- Marc Viera, former environmental services manager for SUC;
- Robert Young, former Director of Engineering (which oversaw Viera and the environmental section); and
- Alan Fish, Director of Environmental Services for SUC in Austin.

**B. Overview of the Facts**

SUC was a local natural gas utility for the Rhode Island and Southeastern Massachusetts area. This case involves the storage of approximately 165 mercury-containing regulators, and a

number of containers containing a total of approximately 100 pounds of loose mercury at a vacant, frequently vandalized SUC facility in a residential area of Pawtucket Rhode Island (the Tidewater facility).

**1. Mercury at Tidewater before 2002**

Prior to the 1960s, many homes were equipped with gas meters using mercury-containing regulators. The regulator allowed an appropriate flow of gas to the household. Thus, many older homes in the SUC service area were outfitted with mercury-containing regulators. From approximately June 2001 to December 2001, SUC engaged in a mercury sealed regulator removal program (the MSR program). SUC identified and removed regulators from homes, brought the regulators to Tidewater, and contracted with the International Environmental Trading Company (IETC) to remove the mercury from the regulators at the Tidewater facility. IETC removed the mercury from the regulators at the Tidewater location, placed the mercury in steel flasks designed for its storage and transportation, and sent the mercury to a reclamation facility in Pennsylvania for further treatment. The regulator casing was recycled as scrap metal. In or around December 2001, the IETC contract ceased.

**2. Mercury at Tidewater after 2002**

Regulators. Throughout 2002, 2003, and 2004, SUC's effort to systematically remove regulators from customers homes was overtaken by other corporate priorities. Southern Union was going through a period of rapid expansion, and the so-called "regulator program" was shelved.

SUC technicians continued to remove mercury-containing regulators when they failed, or when it seemed to make sense during routine service calls. Although there was no reclamation

contractor at the Tidewater facility, the technicians were instructed to continue to take the old regulators to Tidewater for storage. The regulators were stored at the facility in plastic bags. Some of the bags were placed within plastic wading pools ("kiddie pools").

Liquid Mercury. In addition to the regulators, SUC stored at the Tidewater location approximately 100 pounds of mercury[1] in glass and plastic jug containers in a small wooden cabinet with a padlock. SUC collected the containers of mercury from its employees and transported them to the Tidewater facility. In March 2003, a plastic, gallon-size container of mercury was discovered in the locker of a deceased employee and transported to the Tidewater facility by Clean Harbors, a contractor for SUC. None of these containers were properly labeled with the words "hazardous waste."

**3. The RFPs to Dispose of the Mercury**

Throughout 2002, 2003 and 2004, the mercury stored at the Tidewater facility began to pile up. The SUC environmental manager expressed concern to SUC management. In 2002, 2003 and 2004, the SUC environmental manager, Marc Viera, drafted Requests for Proposals (RFPs) for the removal of the regulators and mercury from the Tidewater facility.

The 2002 RFP sought bids to remove regulators from customer locations, and "assistance with the proper handling, storage and recycling/disposal of the MSR [regulators] and associated wastes." The RFP was reviewed by Viera's boss in Rhode Island, Robert Young, who forwarded it to the Director of Environmental in Texas, Alan Fish, for review and revision. The RFP was never issued. According to Viera, despite making several attempts, he could not get

[1] Given mercury's extraordinary density, two tablespoons of mercury weigh approximately one pound.

Young, an engineer who reports that he had no environmental experience or expertise, to focus on it. According to Young, SUC didn't have the people necessary to resume the systematic identification and removal of regulators.

The 2003 RFP sought bids for the removal of liquid mercury from 90 obsolete natural gas regulators stock-piled at the Tidewater facility and the removal of liquid mercury from several small containers in a locker containing "one plastic jug with approximately one quart of mercury, five manometers each with approximately one cup of mercury, four glass jars each with approximately one pint of mercury, two steel vials each with approximately one cup of mercury, and one glass jar with approximately one cup of mercury." The proposal sought a bid to "(t)ransport and dispose (or recycle) of all waste generated." Viera forwarded the RFP to Young. Nothing happened.

In 2004, Viera tried again. The 2004 RFP sought the removal of liquid mercury from 165 obsolete regulators and contained the same list of containers described above. Again the RFP sought bids to "transport and dispose (or recycle)" all wastes generated. The RFP stated "the waste described above [the regulators and the mercury] is currently located in a single room garage." The RFP was not issued. When Viera repeatedly approached Young seeking action on the RFP, Young got angry.

Also, in this same time period, an SUC maintenance employee raised safety concerns posed by the continuing storage of mercury at the Tidewater facility. This concern was raised on several occasions before the SUC Safety Committee, a joint employee-management group which raised and dealt with miscellaneous safety issues.

**4. The Conditions at Tidewater**

Employees of the Company report that from at least 2002 through 2004, vandals and homeless people frequented the Tidewater property on a regular basis. The buildings on the site, including the building containing the mercury, were covered with constantly-changing graffiti, and doors and windows were broken. There were brush fires on the property, and homeless people occupied some of the buildings on site including a building referred to as the "tin shed" and the large brick building next to the mercury storage building. The door to the mercury storage area had been broken by vandals in the past.

SUC knew of the conditions at Tidewater. At some point prior to 2001, there had been a security guard on site at the Tidewater facility, and teenagers and homeless people were routinely chased from the facility at night.

Marc Viera's notes of May 17, 2004 reference "evidence of break in attempts," and on May 18, 2004 his notes refer to discussions among Viera, Young and SUC maintenance supervisor Gary Sunday regarding security at Tidewater. On May 27, 2004 Viera's notes reference Tidewater and Gary Sunday stating "nothing done yet." On June 4, 2004, nearly three weeks after the May 17th notation, Viera noted that he checked the repair to the door at Tidewater. Finally, notes from a September 16, 2004 – approximately one week before the vandals accessed the mercury – SUC Safety Committee meeting list the following as "old business":

> Safeness of mercury storage – Rob Steere again reported having to repair the doors at Tidewater due to possible break-ins by homeless people camping out on the premises. Since there are no longer security people stationed at the location, he suggested boarding up the mechanical building [where the mercury was stored].

Photos of the site at the time the release was discovered show that the door to the mercury storage area had been patched with a piece of wood, and at least one of the windows was broken.

### 5. The Mercury is Released

During September 2004, three young individuals pried open the door to the mercury storage area at Tidewater, apparently pried the door off the small wooden cabinet and removed several containers of mercury. They broke the containers within and outside the facility and in a residential parking lot near the individuals' homes, tracking mercury into some of the homes.

For approximately three weeks, the puddles of mercury remained on the ground at the Tidewater facility, and the doors remained open. Additional containers of mercury remained accessible. During that three week time frame, the Company took no steps to patrol its mercury storage area to ensure that it was secure.

On October 19, 2004, SUC employee Dave Gendron, unable to perform his usual duties due to the weather, decided on his own initiative to do some maintenance of the overgrowth of vegetation around the vacant facility where he discovered the mercury spill at approximately 10:30 a.m. Gendron reports seeing three or four "pancake sized" puddles of mercury on the ground. He immediately contacted SUC managers to report the spill.

### 6. The Release of Mercury is Not Immediately Reported to Emergency Authorities

On the morning of October 19, 2004, SUC immediately called Clean Harbors Environmental Services ("Clean Harbors") to respond to the incident for clean-up. Approximately two hours later at approximately 1:00 p.m., after receiving clearance to do so from the corporate office in Texas, Viera telephoned the desk number of Jim Ball of the Rhode Island Department of Environmental Management and left a voice mail message that there had

been a release of mercury. Jim Ball did not return the call or show up at the site, as was his usual practice. SUC did not try to reach anyone else within DEM that day. More importantly, SUC made no efforts to contact either the Pawtucket Fire Department or the Rhode Island State Fire Marshall. Despite the obvious fact that a crime had been committed by the persons who broke into the facility, SUC did not notify the Pawtucket Police Department.

As Clean Harbors continued with the clean up, Clean Harbors personnel became increasingly uncomfortable that DEM had never arrived at the site. Late in the day, Clean Harbors informed SUC's environmental consultant, Vanesse Hangen Brustlin Inc. ("VHB"), that it was going to contact DEM. Clean Harbors supervisor Peter Joseph reached Jim Ball on his Nextel pager at approximately 6:00 p.m. Jim Ball had been in field training all day and had not received the voice mail message – he had been unaware of the spill.

As described below, the reportable quantity for mercury is one pound, which is approximately two tablespoons. SUC's clean-up contractor, Clean Harbors, confirmed Gendron's account of "puddles" of mercury outside the building. One Clean Harbors employee estimated that there was the equivalent of at least two twelve-ounce soda cans on the ground outside the double doors at the entrance to the mercury storage area, and that the puddle was about one quarter inch deep. Notes prepared by employees of SUC environmental contractor, VHB, diagram puddles of mercury outside the facility, and state "1400 2nd crew has started vacuuming up outside of Hg storage room spoke to Marc V. it was estimated that as much as 24 [oz?] may have been released."

Although more than two tablespoons of mercury had been released to the environment, and although SUC knew of the requirement under EPCRA to notify the local authorities, and

discussed doing so on the day of the spill, SUC did not notify the Pawtucket Fire Department of the release. On the morning of October 20, 2004, after learning of the spill from DEM, the Pawtucket Fire Department arrived at the Tidewater Facility to investigate the incident.

SUC also did not immediately notify the police. According to an officer from the Fire Department, fire fighters decided to notify the police department after they learned that SUC employees were unable to identify the amount of mercury that had been stored at the site, or inform the authorities how much mercury was missing. By the time the DEM, the Fire Department, and the Police Department arrived at the scene, most of the mercury had been cleaned up.[2] The Police Department conducted an investigation which ultimately revealed that some of the mercury had been released at the housing complex, exposing its residents to mercury. Because SUC did not have a complete inventory of what was stored at the site, there is no way to be sure even to this day that all the mercury has been recovered.

## III. STATUTES AND ELEMENTS OF THE OFFENSES

The indictment charges two crimes. First, under the Resource Conservation and Recovery Act (RCRA), it is a felony carrying a $50,000 fine per day to knowingly treat, store or dispose of hazardous waste without a permit. 42 U.S.C. §§ 6928(d)(2)(A). Under the Emergency Planning and Community Right to Know Act (EPCRA), it is a felony to fail to immediately notify specified local emergency

[2] Although the Comprehensive Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. 9603(b) also required SUC to report the mercury release immediately, SUC did not report the incident to the National Response Center until 5:08 on October 19, 2004, did not identify the precise location of the facility, and reported the spilled quantity as "unknown."

authorities that there has been a release of a reportable quantity of a hazardous substance.[3] 42 U.S.C. §11045(b)(4).

**A. Storage of Hazardous Waste Without a Permit in Violation of the Resource Conservation and Recovery Act -- 42 U.S.C. §§ 6928(d)(2)**

Section 3008(d)(2) of RCRA reads:

> Any person who knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subchapter without a permit under this subchapter . . . shall, upon conviction, be subject to a fine of not more than $50,000 for each day of violation, or imprisonment not to exceed five years, or both.

42 U.S.C. § 6928(d)(2). The elements are:

1. A person
2. knowingly
3. stores
4. a hazardous waste
5. without a permit.

Each of these elements is discussed below.

**1. Person**

The term "person" is defined in §1004(15) of RCRA, 42 U.S.C. §6903(15) to include companies and corporation. See also Rhode Island Hazardous Waste Regulations ("RIHWR"), § 3.62.[4]

---

[3] Mercury is a hazardous substance, and the threshold quantity triggering the reporting requirement is one pound (or, as stated previously, approximately two tablespoons).

[4] Because Rhode Island is authorized under 42 U.S.C. § 6926 to administer its hazardous waste program in lieu of the federal program, citations to the authorized Rhode Island hazardous waste regulations have been included.

The definition of "person" encompasses Southern Union Company. A corporation is held criminally liable for the acts of its employees as long as the acts were performed within the scope of employment. Conduct falls within the scope of one's employment if it is done on behalf of and at least partially for the benefit of the corporation, even though it may be contrary to general corporate policy or express instructions to the employee. United States v. McDonald & Watson Waste Oil, 933 F.2d 35, 42 (1st Cir. 1991); United States v. Cincotta, 689 F.2d 238, 241-42 (1st Cir.), cert. denied, 459 U.S. 991 (1982); United States v. Gold, 743 F.2d 800, 822-23 (11th Cir. 1984), cert. denied, 469 U.S. 1217 (1985).

Furthermore, the traditional notion of respondeat superior which holds the corporation criminally liable when at least one employee satisfies all of the elements of the offense has been expanded by cases supporting the principle of "collective knowledge." This theory holds that even though one employee may not satisfy all of the elements of the offense, a corporation can be held criminally accountable for the collective acts of all of its employees. See United States v. Illinois Central Railroad, Inc., 303 U.S. 239 (1938), United States v. Bank of New England, N.A., 821 F.2d 844 (1st Cir. 1987) cert. denied 108 S. Ct. 328.[5]

---

[5] In United States v. Bank of New England, N.A., 821 F. 2d 844 (1st Cir. 1987) cert. denied 108 S. Ct. 328, the First Circuit upheld a collective knowledge instruction, stating:

> Corporations compartmentalize knowledge, subdividing the elements of specific duties and operations into smaller components. The aggregate of those components constitutes the corporation's knowledge of a particular operation. It is irrelevant whether employees administering one component of an operation know the specific activities of employees administering another aspect of the operation....[T]he court's collective knowledge instruction was not only proper but necessary.

821 F. 2d at 856.

**2. Knowingly**

The felony provision of 42 U.S.C. section 6928(d)(2)(A) is not a specific intent crime. The government must prove that the defendant acted "knowingly." That term, in the context of "public welfare" statutes such as RCRA, however, does not require that the defendant act with the specific intent to violate the law or with specific knowledge of the particular regulatory program promulgated under RCRA. See United States v. Kelley Technical Coatings, Inc., 157 F.3d 432, 436-38 (6th Cir. 1998); United States v. Laughlin, 10 F.3d 961, 965-67 (2d Cir. 1993); United States v. Dee, 912 F.2d 741 (4th Cir. 1990). The government must show that the defendant had a general awareness that she was performing acts proscribed by statute or that she knew factually what she was doing. See United States v. International Minerals & Chemical Corp., 402 U.S. 558, 565 (1971) ("where . . . dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation"); United States v. Laughlin, 10 F.2d 961 (2d Cir. 1993, cert. denied 114 S. Ct. 1649 (1994); United States v. Baytank, 934 F. 2d 599 (5th Cir. 1991). Thus, knowledge of the facility's permit status is not an element of the offense in cases involving the knowing treatment, storage or disposal of hazardous waste under 42 U.S.C. § 6928(d)(2).[6] United States v. Hoflin, 880 F. 2d 1033, 1038, cert. denied, 493 U.S. 1083 (1990) (9th Cir. 1989); United States v. Laughlin, 10 F.3d 961, 966 (2d Cir. 1993), United States v. Dean, 969 F. 2d 197, 191 (6th Cir.

[6] There is a split in the Circuits as to whether knowledge of the facility's permit status is required in cases involving the *transportation* of hazardous waste without a permit under 42 U.S.C. 6928(d)(1). See United States v. Hayes Int'l Corp. 786 F.2d 1499 (11th Cir. 1986); United States v. Speach, 968 F.2d 795 (9th Cir. 1992). That disagreement between the Circuits is not implicated in this case.

1992, cert denied, 113 S. Ct. 1852 (1993); United States v. Wagner 29 F.3d 264, 265066 (7th Cir. 1994); United States v Sellers, 926 F.2d 410(5th Cir. 1991); United States v. Dee, 912 F.2d 741 (4th Cir. 1990), *cert. denied*, 499 U.S. 919(1991); Kelley Technical Coatings, 157 F.3d 432 (6th Cir. 1998).[7] In United States v. Laughlin, the Second Circuit stated that "[w]ith respect to the mens rea required by section 6928(d)(2)(A), the Government need prove only that a defendant was aware of his act of disposing of a substance he knew was hazardous. Proof that a defendant was aware of the lack of a permit is not required." 10 F.3d at 966.

With respect to whether the government must prove that the defendant knew that the waste material was a regulated hazardous waste under RCRA, courts uniformly have held that it does not. The government must prove only that the defendant was aware of the general hazardous character of the waste, or that the waste had the potential to be harmful to others or the environment or, in other words, was not a harmless substance like uncontaminated water. United States v. Greer, 850 F.2d 1447, 1450, 1452 (11th Cir. 1988); United States v. Hoflin, 880 F.2d 1033, 1039 (9th Cir. 1989), cert. denied, 493 U.S. 1083 (1990); United States v. Dee, 912 F.2d 741, 745 (4th Cir. 19909), cert. denied, 499 U.S. 919 (1991); United States v. Sellers, No. 90-1216 (5th Cir. Mar. 1, 1991); United States v. Goldsmith, 972 F.2d 643 (11th Cir. 1992); United States v. Self, 2 F.3d 1071 (11th Cir. 1993); United States v. Laughlin, 10 F. 3d 961, 965-67 (2nd Cir. 1993), cert. denied, 114 S. Ct. 1649 (1994).

Some courts have held that the Government needs to prove that the defendant knew that

[7] The Hoflin and Laughlin courts found that Section 6928(d)(2)(A) did not require proof that the defendant knew that the facility lacked a permit. The Wagner and Dean courts held that knowledge of RCRA's permit requirement was not an element of an offense under Section 6928(d)(2)(A).

it was storing a "waste." See United States v. Heuer, 4 F.3d 723, 732 (9th Cir. 1993); U.S. v. Kelley Technical Coatings, 157 F.3d 432 (6th Cir. 1998). However, consistent with how the courts have handled the "hazardous" element described above, the Government need prove only that the defendant knew the *facts* that made the mercury a waste under the regulations, rather than that the defendant knew its conduct was illegal or had a correct understanding of the solid waste law. In other words, while a true mistake of fact would be a defense (i.e. SUC thought the regulators contained water), SUC's purported belief that RCRA deems unwanted spent mercury a "product" because it might some day be sent to a reclamation facility is not. Rather, that is just the kind of mistake of law argument rejected in case after case cited above, and in the factually analogous case of United States v. Hayes Int'l Corp. 786 F.2d 1499, 1505 (11th Cir. 1986) (rejecting defense argument that a good faith belief that any waste sent to a recycler was exempt from RCRA regulations: "The discussion set forth above indicates that ignorance of the regulatory status is no excuse. There is no dispute that the appellees knew that the waste was a combination of paints and solvents; nor is there any dispute that the mixture was a hazardous waste.")

**3. Stores**

The term "storage" is defined in section 1004(33) of RCRA, 42 U.S.C. § 6903(33) to mean "the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste." See also RIHWR, § 3.74.

**4. Hazardous waste**

A hazardous waste under RCRA must be both a solid waste and a hazardous waste as those terms are defined in 40 C.F.R. Part 261. See also RIHWR, Sections §§ 3.32 and 3.67.

**a. *Solid Waste***

A solid waste is any "discarded material" that has not been excluded under the regulations. 40 C.F.R. § 261.2(a)(1).[8] Under 40 C.F.R. § 261.2(a)(2) a "discarded material" is any material that is **"abandoned"** as described in 40 C.F.R. § 261.2 (b), or "inherently waste-like," as described in 40 C.F.R. § 261.2(d).[9] A material is a solid waste if it is abandoned by being (1) disposed of; (2) burned or incinerated; or (3) accumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned or incinerated. 40 C.F.R. § 261.2(b). The mercury at Tidewater was abandoned because it was stored in lieu of disposal.

Under 40 C.F.R. § 261.2(a)(2), "discarded materials" are not only materials that are abandoned, as described above, but also *most* materials that are recycled, or accumulated, stored, or treated before recycling. Forty C.F.R. § 261.2(c) describes, in table form, which recycled materials are solid wastes based the *type of material* it is and the *recycling activity* involved. Among the materials listed are "spent materials" and "commercial chemical products listed in 40 C.F.R. 261.33."

"Commercial chemical products listed in 40 C.F.R. § 261.33" are "commercial chemical

---

[8] Because Rhode Island's regulations essentially incorporate by reference the federal definition of solid waste, only federal regulations are cited.

[9] Mercury is not contained in the list of "inherently waste like" materials set forth at 40 C.F.R. § 261.2(d).

products or manufacturing chemical intermediates having the [listed] generic name" *which, if discarded or intended to be discarded, are hazardous wastes*. See 40 C.F.R. §261.33(a). Mercury is a listed hazardous waste. Id. Thus, if commercial chemical product mercury is discarded or intended for discarded, it is a solid waste and a hazardous waste.[10] But the commercial chemical products listed in 40 C.F.R. § 261.33 are pure grade chemicals that are *unused*. See 54 Fed. Reg. (July 28, 1989)(Federal Register notice in which EPA explains that the list of commercial chemical products in 40 C.F.R. § 261.33 "does not apply to chemicals that have been used for their intended purpose. Thus, CFC [chlorofluorocarbon] refrigerants that are removed from a refrigeration system and are reclaimed would not be classified as 'commercial products' but as 'spent materials.'").

A "spent material" is "any material that has been used and, as a result of contamination, can no longer serve the purpose for which is was produced without processing." 40 C.F.R. § 261.1(c)(1). According to the table found at 40 C.F.R. § 261.2 (c), spent materials are considered solid waste when they are reclaimed, or speculatively accumulated. A material is "reclaimed" if it is "processed to recover a usable product, or if it regenerated." 40 C.F.R. § 261.1(4). The mercury stored at Tidewater was not a commercial chemical product but a spent material – the mercury had served its purpose in the hands of SUC, was put into miscellaneous containers, and, at best, might some day have been sent to a recycling facility for processing. As such, it was a solid waste.

A material is speculatively accumulated if it is accumulated before recycling. 40 C.F.R.

---

[10] According to the table at 40 C.F.R.§ 261.2, a listed commercial chemical product is not a solid waste if it is reclaimed or speculatively accumulated, as those terms are defined below.

§ 261.1(8). In order to establish that a material has *not* been speculatively accumulated, the person accumulating the material bears the burden of demonstrating that, among other things, during the calendar year (commencing January 1), the amount of material that is recycled, or transferred to a different site for recycling, equals at least 75% of the material accumulated at the beginning of the period. 40 C.F.R. § 261.1 (8). SUC cannot meet that burden. Accordingly, the spent mercury at Tidewater was a solid waste.

**b. *Hazardous Waste***

Hazardous wastes are identified in two ways: a waste may be specifically listed as hazardous or it may exhibit a characteristic that makes it hazardous. A listed hazardous waste appears by name on one of four lists of hazardous wastes in the regulations. See 40 C.F.R. § 261.30. Rhode Island incorporates by reference the federal hazardous waste list. RIHWR, Section 3.32. Mercury that is a discarded commercial chemical product is listed at 40 C.F.R. § 261.33(f) as waste number U151.

Characteristic hazardous wastes are identified as hazardous wastes by virtue of the characteristics they exhibit. Specifically, wastes are hazardous wastes if they exhibit the characteristics of ignitability, corrosivity, reactivity or toxicity. 40 C.F.R. § 261.20 - 261.24, RIHWR § 3.32. Wastes exhibit the characteristic of toxicity if, using the Toxicity Characteristic Leaching Procedure ("TCLP") tests, the extract from a representative sample of the waste contains more than a specified level of any of the contaminants listed in the relevant regulations.

Circumstantial evidence also can be used to prove that a waste is a characteristic waste. See United States v. Self, 2 F.3d 1071, 1086-87 (10th Cir. 1993) and United States v. Dee, 912 F.2d 741, 746-47 (4th Cir. 1990) (jury can infer that wastes exhibited the characteristic of

"ignitability" from flash points reported in Material Safety Data Sheets ("MSDSs") and other records); see also United States v. Baytank (Houston), Inc., 934 F.2d 599, 614 (5th Cir. 1991) and United States v. Greer, 850 F.2d 1447, 1452 (11th Cir. 1988) (jury can infer that waste contained listed spent solvents based on company records and drum labels).

**5. Without a permit**

Unless specifically excluded, all facilities that treat, store, or dispose of hazardous waste must have either a permit or interim status. See 42 U.S.C. § 6925(a), (e), 40 C.F.R. § 270.1(c). The permit and interim status requirements are set out at 40 C.F.R. § 270. See also RIHWR § 7.00.

In general, in order to satisfy the permit requirement, the facility must have applied for and received a permit from EPA or an authorized state like Rhodes Island. To satisfy the interim status requirement, a facility existing at the time of the passage of RCRA and the promulgation of the regulations must have submitted a notification of hazardous waste activity and Part A of a permit application. 40 C.F.R. § 270.70.

The permit requirement is in part " intended to remedy the danger to the public health presented by facilities whose generation of hazardous waste is unknown to authorities charged with monitoring and handling of the wastes, for the protection of the environment." United States v. Dean, 969 F.2d 187, 193 (6th Cir. 1992), citing United States v. Hoflin, 880 F.2d 1033, 1038-9 (9th Cir. 1989). Among other things, permitted hazardous waste storage facilities are required to conduct inspections of the facility for conditions that may cause a release to the environment, 40 C.F.R.§ 264.15; maintain the facilities to prohibit unplanned releases, 40 C.F.R. § 264.31, and make arrangements to familiarize police, fire departments, emergency response

teams, and local hospitals with the hazardous waste stored on site, 40 C.F.R. § 264.37. Most significantly, permitted hazardous waste storage facilities must prevent the unknowing entry, and minimize the possibility for unauthorized entry, of persons to that facility. 40 C.F.R. § 264.14(a). Permitted facilities must have a 24-hour surveillance system or a fence in good repair that completely surrounds the facility and a means to control entry at all times, and signs that read "Danger-Unauthorized Personnel Keep Out" posted in sufficient numbers to be seen from any approach. 40 C.F.R. § 264.14 (b) and (c).

The permit regulations contain several specific exclusions to the permit requirements. Two exclusions that could potentially apply in this case are the universal waste handler exclusion, and the so-called small quantity generator exclusion. Neither applies to the facts of this case.

As to the universal waste handler exclusion, the regulations read as follows:

> The following persons are among those who are not required to obtain a RCRA permit:
>
> [exclusions (I)-(vii) omitted]
>
> (viii) Universal waste *handlers and universal waste transporters (as defined in 40 C.F.R. 260.10)* managing the wastes listed below. These handlers are subject to regulation under 40 C.F.R. 273 (emphasis added).

40 C.F.R. § 270.1(c)(2)(viii).

Pursuant to the regulations, a universal waste handler is either (1) a generator of universal waste or (2) the owner or operator of a facility, including all contiguous property, that (a) receives universal waste from other universal waste handlers; (b) accumulates universal waste; *and* (c) sends universal waste to another universal waste handler, to a destination facility, or to a

foreign destination. 40 C.F.R. § 260.10, Rule 3.00. Southern Union is not a handler of universal waste because it did not send the MSRs to another universal waste handler, to a destination facility, or to a foreign destination, and accordingly is not exempt from the permit requirement.

Pursuant to 40 C.F.R. § 262.34(a) and RIHWR § 5.0, generators may store hazardous waste on site for up to 90 days without a permit, provided they meet the requirements described in section 264.34(a)(1)-(4). A generator that accumulates hazardous waste on site for more than 90 days is operating a storage facility and must obtain a permit. 40 C.F.R. § 262.34(b); RIHWR § 5.0.[11]

In order to take advantage of this period of permissible on-site storage without a permit, generators must, among other things:1) label or mark each container of waste with the words "hazardous waste" and other words that identify the container's contents, 2) mark each container with the date that the storage began, and 3) comply with regulations regarding the use and management of containers. See 40 C.F.R. § 262.34, RIHWR § 5.02.

SUC's long-term storage and mismanagement of the waste disqualify it for this permit exclusion.

**B. Failure to Report the Release of a Hazardous Substance -- ("EPCRA"), 42 U.S.C. §11045(b)(4)**

It is a felony under the Emergency Planning and Community Right to Know Act

---

[11] Under federal regulations, generators of different quantities of waste are granted different periods of unpermitted storage. For example, small quantity generators (generating more than 100 kilograms but less than 1000 kilograms - between 220 and 2,200 lbs) may store hazardous waste on site for up to 180 days without a permit, provided they meet the requirements described in section 264.34(d)(1)-(5); larger quantities generators may store for 90 days. In Rhode Island, however, the 90 day storage period applies to all generators of hazardous waste, regardless of the quantity of waste generated. RIHWR § 5.00.

(EPCRA) to fail to immediately notify the community emergency coordinator for the local emergency planning committee and the state emergency planning commission about a release of a reportable quantity of a hazardous substance. 42 U.S.C. § 11045(b)(4).

The statute reads in relevant part:

> Any person who knowingly and willfully fails to provide notice in accordance with section 11004 of this title shall, upon conviction, be fined not more than $25,000 or imprisoned for not more than two years, or both....

42 U.S.C. § 11045(b)(4). Section 11004, in turn, requires that notice be given to the local community emergency coordinator for any area likely to be affected and to the state emergency planning commission of any state likely to be affected by the release. That notice must be given immediately, in order to assist local and state authorities in protecting the public and the environment from hazardous chemicals. 42 U.S.C. §11004(b)(1).

The elements of a criminal EPCRA violation are:

(1) A release of a reportable quantity of a hazardous substance requiring notice;

(2) From a facility at which the hazardous chemical is produced, used or stored;

(3) The defendant was the owner or operator of the facility; and

(4) The defendant knowingly and willfully failed to immediately provide notice as required by §11004(b).

1. <u>Release of a Reportable Quantity Requiring Notice</u>

EPCRA incorporates CERCLA for purposes of determining the quantities of released hazardous substances that trigger the notification requirements under EPCRA. *See* 42 U.S.C. § 11004(a). Under CERCLA, the reportable quantities for various hazardous substances are

provided in 40 C.F.R. § 302.4 (table). The reportable quantity for mercury is one pound. One pound of mercury is approximately two tablespoons.

"Release" is defined as any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching dumping or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles) of any hazardous chemical, extremely hazardous substance, or toxic chemical. 42 U.S.C. 11049(8).

2. From a Facility Where Hazardous Chemical Is Stored

The mercury was stored at the Tidewater facility.

3. Defendant was Owner/Operator

Southern Union was both the owner and operator of the Tidewater facility.

4. Defendant knowingly and willfully failed to immediately provide notice as required by §11004(b)

EPCRA is one of the few environmental statutes that requires a heightened mental state of willfulness. However, under Bryan v. United States, 524 U.S. 184 (1998), the Supreme Court clarified that the willful standard only requires a general understanding of the illegality of one's conduct, not specific knowledge of the law making the conduct illegal. Id. at 193-96 ("the willfulness requirement of [the firearms statute] does not carve out an exception to the traditional rule that ignorance of the law is no excuse; knowledge that the conduct is unlawful is all that is required"). The court pointed out that only in the limited circumstance of tax and currency transaction violations, "involv[ing] highly technical statutes that present[] the danger of ensnaring individuals engaged in apparently innocent conduct", would knowledge of the specific provisions of the law be required. Id. at 194-195.

Section 11004(b) requires that "notice shall be given immediately after the release." In United States v. Fredericks, 38 F. Supp 2d 396, 400 (D. Virgin Islands, 1999), *aff'd,* 254 F.3d 1079 (3rd Cir. 2001), the court referenced the dictionary in finding that the term "immediately" for purposes of the oil spill notice requirements of the Federal Water Pollution Control Act, 33 U.S.C. § 1321(b)(5), meant "without interval of time, without delay, straightaway, or without lapse of time. The term implies prompt vigorous action without any delay."

Section 11004(b) also requires notification be given to the community emergency coordinator for the local emergency planning committee (in this case, the Pawtucket Fire Department) and the State emergency planning commission (in this case, the Rhode Island State Fire Marshall). 42 U.S.C. § 11004. The evidence will show that defendant Southern Union knew of this notification requirement and yet failed to notify either the local or state authorities about the mercury spill. Defendant Southern Union's voicemail left with one individual at DEM two to three hours after SUC discovered the release fails as a matter of law to satisfy EPCRA's notification requirement because RIDEM did not serve as either the local or State emergency planning commission, and notice to RIDEM, such as it was, could not be imputed to the Pawtucket Fire Department or the Rhode Island State Fire Marshall.

## IV. ANTICIPATED TRIAL ISSUES

The parties have already raised several issues that will arise in the trial of this case, including:

- evidentiary issues relating to the conditions and security at Tidewater;
- evidentiary issues relating to the spread of the mercury to the Lawn Terrace apartments;

- evidentiary issues relating to other related litigation involving SUC;
- legal/evidentiary issues relating to the waste/product issue; and
- legal/evidentiary issues relating to the admissibility of testimony about the law, and in particular the proposed testimony of proposed defense expert Marcia Williams.

In addition to these issues, the government believes that the following issues can be anticipated during the trial of this case:

**1. Leading Questions of Witnesses Aligned with the Defense**

The Prosecution may call as witnesses present and former SUC employees with a potential bias against the Government. The manner of questioning witnesses remains within the discretion of the trial judge, who will rarely be overturned. Fed R. Evid. 611 advisory committee's note; see also United States v. Phelps, 733 F.2d 1464, 1471-72 (11th Cir. 1984). Federal Rule of Evidence 611 provides, "leading questions should not be used on the direct examination of a witness." However, Rule 611(c) permits leading questions if the witness is hostile, an adverse party, or a witness identified with an adverse party. Suarez Matos v. Ashford Presbyterian Community Hosp., Inc., 4 F.3d 47, 50 (1st Cir. 1993) (employee of party is sufficiently connected to employer to allow opponent to ask leading questions) (citing Perkins v. Volkswagen of America, Inc., 596 F.2d 681, 682 (5th Cir.1979)). In addition, Federal Rule of Evidence 607 provides that the credibility of a witness may be attacked by any party, including the party calling the witness.

Rule 611(c) broadened the ability of a party to call a witness on direct examination and treat them as a hostile witness. Haney v. Mizell Memorial Hospital, 744 F.2d 1467, 1477-78 (11th Cir. 1984); Stahl v. Sun Microsystems, Inc., 775 F. Supp. 1397, 1398 (D. Colo. 1991). In

Stahl, the court permitted the use of leading questions when the plaintiff called a witness on direct examination because the witness was a former employee of the defendant and had an ongoing relationship with a key witness for the defendant. Stahl, 775 F. Supp. at 1398. Similarly, in Haney, the court allowed the plaintiff to use leading questions of a witness on direct examination because the witness was a former employee of the defendant, and was an employee at the time in question. Haney, 744 F.2d at 1477-78.

The rule removes the prior requirements that the proponent show that the witness was "actually hostile or was an adverse party, officer, director, or managing agent of such adverse party." Id. Certain categories of witness are deemed automatically adverse. See id. (finding a former employee of the defendant hospital, who was an employee at the time in question, identifiable with the adverse party because of the employment status); see also Ellis v. City of Chicago, 667 F.2d 606, 612-613 (7th Cir. 1981) (holding that police officers employed by the defendant were adverse to the plaintiff for purposes of Rule 611(c)); National Railroad Passenger Corporation v. Certain Temporary Easements Above the Railroad Right of Way in Providence, Rhode Island, 357 F.3d 36, 42 (1st Cir. 2004) (holding that the defendants could call an expert appraiser in its case-in-chief, retained by the plaintiffs, as a hostile witness).

Further, a corporation can only act through its employees. United States v. Brothers Construction, 219 F.3d 300, 310-311 (4th Cir. 2000). Therefore, if the United States calls current employees to the stand, it is simply calling the human embodiment of the defendant, Southern Union Company.

Here, the United States intends to call witnesses that are aligned with SUC, due to their past or current employment relationship with SUC, or their past, present, or future business

relationship as contractors for SUC. For example, Marc Viera is a past SUC employee who, after the criminal investigation was commenced, signed an affidavit adopting SUC's factual and legal position on the waste/product issue. In the event that such witnesses are called, the United States is entitled to use leading questions on direct examination.

**2. Mistake of Law Defense**

SUC will seek to introduce evidence and argue that the New England Gas division's environmental managers did not believe they were violating RCRA – that they believed that the mercury was a "product" not a "waste," and that they could store it at the Tidewater facility without a permit.

Case law in the environmental area is very clear that mistake of law is no defense. United States v. Kelley Technical Coatings, 157 F.3d 432 (6th Cir. 1998); United States v. Laughlin, 10 F.3d 961, 965-67 (2d Cir. 1993). In fact, Courts have excluded that evidence as irrelevant. See United States v. Snook, 366 F3d. 439 (7th Cir. 2004) (defendant's belief that selective sampling was legal as irrelevant); United States v. Hill, 141 F.3d F.3d 1181 (9th Cir. 1998) (unpublished table decision) (defendant's belief that facility was a lawful "transfer facility" immaterial).

**3. The Admissibility or Effect of EPA Letters**

The Defendant may seek to introduce letters written by EPA employees to facilities other than SUC in response to site-specific inquiries that have nothing whatsoever to do with SUC's storage of mercury at the Tidewater facility. One example of such a letter is EPA's 1986 letter to Bethlehem Apparatus Company, which was attached to the Defendant's Motion to Dismiss. These letters should be excluded under Federal Rules of Evidence 401 and 403. The letters do not make any fact of consequence more or less probable, and their admission is likely to confuse

and mislead the jury

In the Bethlehem letter, for example, EPA responded to Bethlehem Apparatus' February 1986 inquiry as to whether or not the mercury that Bethlehem actually *is* recycling and *is* turning into a commercial product is a waste *as to Bethlehem*. EPA informed Bethlehem that the mercury "that *is received and refined your facility* is not a solid waste . . . the material does not need to be manifested to your facility, you need not comply with the storage requirements, etc." (emphasis added). By its very terms, this letter does not speak to the mercury stored in deplorable conditions at Tidewater for nearly two years, even *assuming arguendo* that the mercury might some day make its way to Bethlehem.[12] The letter does not make any fact of consequence more or less probable. While the Defendant may argue that the letters are relevant to its mental state – what it believed to be the law at the time it stored the mercury – the Defendant's understanding of the law is not an issue in this case. It is well-settled that RCRA does not require that the defendant act with the specific intent to violate the law or with specific knowledge of the particular regulatory program promulgated under RCRA. See United States v. Kelley Technical Coatings, Inc., 157 F.3d 432, 436-38 (6th Cir. 1998); United States v. Laughlin, 10 F.3d 961, 965-67 (2d Cir. 1993); United States v. Dee, 912 F.2d 741 (4th Cir. 1990); United States v. Hayes Int'l Corp, 786 F.2d 1499 (11th Cir. 1986).

Finally, even if the EPA letters were somehow relevant, any potential relevance is substantially outweighed by the likelihood that the letters will confuse and mislead the jury. It

[12] Bethlehem Apparatus requires that shipments to its facility have prior approval, a signed recovery/recycling agreement and a work authorization number. New customers must fill out a profile of the waste to be shipped, and Bethlehem may require samples for analysis. Bethlehem charges $228.00 for properly labeled shipping containers - steel flasks - that meet the requirements of the Department of Transportation. See www.Bethlehemapparatus.com.

will be very confusing for the jury to be presented with letters by miscellaneous EPA employees that have nothing to do with the Defendant's operations, and that purport to interpret the law in a case in which mistake-of-law is not a defense. Accordingly, the letters should be excluded under Federal Rule of Evidence 403.

**4. The Admissibility of Documentary Evidence**

The United States will offer into evidence a substantial number of documents to prove the allegations in the Indictment. These documents generally fall into two categories: documents produced to the grand jury by defendant SUC and its agent-contractors pursuant to grand jury subpoenas, and documents produced or maintained by the Rhode Island DEM. All of these documents are admissible under various Federal Rules of Evidence.

a.. Documents Produced by Defendant SUC

Pursuant to a lawfully issued grand jury subpoena, defendant SUC, through its agent-document custodian, produced certain business records to the grand jury. The United States intends to offer a select number of these documents into evidence at trial. These documents fall generally into the following categories, *inter alia*: internal memoranda, electronic mail, letters, logbooks, material safety data sheets, compliance plans, invoices, requests for proposals, and internal policy documents. Each of these types of documents are properly admissible.

*i. The Documents are Authentic*

Federal Rule of Evidence 901(a) states that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." See also United States v. Barrow, 448 F.3d 37, 42 (1st Cir. 2006). The standard for authentication is relatively

low—the proponent need only establish a "prima facie case that the proffered evidence is what it purports to be." United States v. Caldwell, 776 F.2d 989, 1002 (11th Cir. 1985); United States v. Harvey, 117 F.3d 1044, 1049 (7th Cir. 1997) ("Federal Rule of Evidence 901(a) states that the authentication requirement 'is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.'") Once the proponent establishes a prima facie case that the proffered evidence should be admitted, the trier of fact appraises the evidence to decide whether the evidence is in fact what it purports to be. Id.; Harvey, 117 F.3d at 1049 ("Rule 901 requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence."), citing United States v. McGlory, 968 F.2d 309, 328-29 (3d Cir.1992); United States v. Dombrowski, 877 F.2d 520, 525 (7th Cir.1989); United States v. Johnson, 637 F.2d 1224, 1247 (9th Cir.1980).

There is implied authenticity as to documents produced to the grand jury. Braswell v. United States, 487 U.S. 99, 118 (1988) (the jury may "draw from the corporation's act of production the conclusion that the records in question are authentic corporate records, which the corporation possessed, and which it produced in response to the subpoena"); In re Grand Jury 83-8 (MIA) Subpoena Duces Tecum, 611 F. Supp. 16, 25 (D.C. Fla.,1985) (authentication implicit in the act of company's production); In re Grand Jury Subpoenas Duces Tecum Served, 633 F. Supp. 419 (S.D. Fla.,1986). In addition to the documents' implied authenticity, many SUC employees will testify that they recognize the documents as company documents. Accordingly, the government will be able to meet its prima facie burden to establish that SUC's documents are what they are purported to be.

*ii. SUC's Documents are Statements by the Defendant*

SUC's documents are statements by the defendant and thus are not hearsay. Rule 801(d)(2)(A) provides that a party's own statement, offered against it, is not hearsay. See United States v. Clemons, 676 F.2d 122 (5th Cir. 1982) ("A statement is not inadmissible hearsay if it is the statement of a party against whom it is offered."). "[A]ny and every statement of an accused person . . . is usable against him as an admission." United States v. Rouse, 452 F.2d 311, 313-14 (5th Cir. 1971), citing 6 Wigmore, Evidence, § 1732, p. 99 (3d Ed. 1940); see also Asher v. United States, 394 F.2d 424, 429 (9th Cir. 1968). Because the statements are not hearsay, they are "properly admitted for substantive purposes." United States v. Lynn, 608 F.2d 132, 135 (5th Cir. 1979); United States v. Cline, 570 F.2d 731, 735-36 (8th Cir. 1978) (testimony was admissible as substantive evidence because it qualified as an admission by the defendant.).

In this case, the documents that the government intends to offer into evidence, which SUC produced to the grand jury, are statements of defendant SUC because they were made by employees and agents of the company.

(a). Statements by SUC Employees and Agents are Admissible

Rule 801(d)(2) expressly provides for the admission of statements made by a defendant "in either his individual or a representative capacity" and "by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(A) and (D); Noviello v. City of Boston, 398 F.3d 76, 85 (1st Cir. 2005) (statements made by supervisors are admissible as non-hearsay statements of the defendant's agents made within the scope of their employment); Brookover v. Mary Hitchcock Memorial Hosp., 893 F.2d 411, 417-18 (1st Cir.1990) (holding that nurses' statements that bed restraints should have been used on patient were made within scope of nurses' employment) see

also United States v. Pena, 527 F.2d 1356, 1360 (5th Cir.1976) (statement of an agent of a party admissible as a vicarious or representative admission of his principal). In order to admit out-of-court statements made by a defendant's agent, the United States must show the existence of the agency relationship, that the statement was made within the course of the relationship, and that the statement relates to matters within the scope of the relationship. Fed. R. Evid. 801(d)(2)(D); see also United States v. Brothers Construction, 219 F.3d 300, 310-11 (4th Cir. 2000) ("Because a corporation can act only through its employees, a statement by a corporate official . . . can certainly be considered an admission by a corporate defendant"); United States v. Shunk, 881 F.2d 917, 921 (10th Cir. 1989) (statements made by a party's agent are non-hearsay admissions).

The agent need not have specific authority to make a statement on a subject for the statement to relate to the scope of the relationship. See McDonough v. City of Quincy, 452 F.3d 8, 21 (1st Cir. 2006) ("employee's station within the organization is not relevant to the Rule 801(d)(2) analysis"); City of Tuscaloosa v. Hacros Chemicals, Inc., 158 F.3d 548, 558 n.10 (11th Cir. 1998) (the agent does not need to have "speaking authority" tested by the usual standards of agency law); Wilkinson v. Carnival Cruise Lines, Inc., 920 F.2d 1560 (11th Cir. 1991) (same); Nekolny v. Painter, 653 F.2d 1164, 1171 (7th Cir. 1981) (as long as the agency relationship is established, 801(d)(2)(D) does not require the person to have the authority to make a particular statement); see also United States v. Pacelli, 491 F.2d 1108, 1117 (2d Cir. 1974) (an agency relationship can be inferred from surrounding circumstances).

"Nothing in Rule 801(d)(2)(D) prevents the out-of-court statements of low-level employees from coming into evidence as non-hearsay admissions of a party-opponent in appropriate factual scenarios." Wilkinson, 920 F.2d at 1565, citing Zenith Radio Corp. v.

Matsushita Elec. Ind. Co., 505 F. Supp. 1190, 1247 (E.D. Pa.1980). Rather, "the appropriate focus is instead upon whether the [speaker's] statement concerned a 'matter within the scope of [his] agency or employment.'" Id. Specifically, "the inquiry is whether [the speaker] was authorized to *act* for his principal . . . concerning the matter about which he allegedly spoke." Id. at 1566. Here, statements and testimony will be offered by employees on matters for which the employee was specifically authorized by SUC to act, and thus are matters within the scope of their employment under Rule 801(d)(2)(D). See Woodman v. Haemonetics Corp., 51 F.3d 1087, 1094 (1st Cir. 1995) ("Rule 801(d)(2)(D) does not contemplate ... that the statement be shown to have been made by the employee at the instance of her employer ... but only that the declarant's statement *concern* matters within the scope of her agency or employment.")

Rule 801(d)(2)(D) has been broadly interpreted in admitting employee statements as admissions against a company. For example, there is no requirement that an employee or agent have managerial responsibilities for an out-of-court statement to be admitted. Zenith Radio Corp., 505 F. Supp. at 1247. Indeed, even if the employee's name is not known, it is sufficient if the evidence establishes that the speaker was in fact an agent of the defendant for purposes of Rule 801(d)(2)(D). See Davis v. Mobil Oil Exploration, 864 F.2d 1171, 1174 (5th Cir. 1989) (fact that speaker wore a "Mobil" hat was sufficient to establish agency); O'Neal v. Morgan, 637 F.2d 846, 851 (2d Cir.1980) (identity of declarant party not required in order to introduce admission).

Here, the government will offer statements made and documents prepared by employees and agents of SUC within the course of their employment and relating to matters within the scope of their employment. SUC employees will testify, for example, that they recognize these

documents as belonging to SUC and that certain documents were used to record information about mercury program and mercury storage and the company's environmental operations, or to provide information to or from employees. They will testify that during the course of their employment, they either relied upon or created these documents. Additionally, SUC employed several contractors that acted as SUC's agents during the course of the cleanup (e.g., Clean Harbors, VHB). Documents such as notes, log books, company policy statements, letters, notebooks, internal memoranda, were prepared by employees and agents of SUC in the course of their employment, on matters related to their employment, and will be offered against the company. Thus, they are not hearsay and are wholly admissible under Rule 801(d)(2)(A).

b. Rhode Island DEM's Records are Admissible

Some of the documents which the United States will offer into evidence include records received, maintained or created by the Rhode Island DEM. These records are admissible under the business record exception to hearsay.

In relevant part, Fed. R. Evid. 803 provides that "[r]ecords of regularly conducted activity" are not excluded by the hearsay rule. Fed. R. Evid. 803(6). Documents included within the scope of this exception include "[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses." To be admissible under this rule, (1) the document must be made at or near the time of the event recorded or communicated by or from information transmitted by a person with knowledge; (2) the document must be kept in the course of a regularly conducted business activity; and (3) it must have been the regular practice of that business activity to make the business record. Fed.R.Evid. 803(6). The custodian or some other qualified witness may establish this foundation. Fed.R.Evid. 803(6). Many of the Rhode

Island DEM documents the government will seek to introduce will meet the business record exception to hearsay, and therefore will be admissible. Further, in some instances, the government will seek to introduce into evidence the *absence* of an entry into the records of DEM (or other public or business entity) pursuant to FRE 803(7) or 803(10).

**5. Summaries and Charts**

The government anticipates seeking, pursuant to Fed. R. Evid. 1006, the admission of several summaries and charts which address different aspects of this case, including:

(1) Summaries of a voluminous diary kept by Marc Viera;

(2) Timelines of significant events.

These summaries are still being prepared.

Federal Rule of Evidence 1006 provides, in pertinent part:

> The contents of voluminous writings ... which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals or duplicates shall be made available for examination or copying, or both, by [the other party].

As long as summary or charts meet the following requirements, they are admissible:

(1) the underlying documents must be admissible, even if they are never admitted;

(2) the underlying documents must be too voluminous for convenient in-court review;

(3) the charts must accurately summarize the underlying documents;

(4) the summary charts and the underlying documents must have been made available at a reasonable time and place for inspection by the opposing side; and

(5) the person who prepared the charts must have been made

> available for cross examination.

United States v. Bertoli, 854 F.Supp. 975, 1051 (D.N.J. 1994). The completeness of summaries is a matter that goes to the weight of the evidence, rather than its admissibility:

> [s]o long as the government, exercising due diligence, collects whatever records are reasonably available and succeeds in introducing them, it may be permitted (subject, of course, to relevancy and perscrutation under Fed.R.Evid. 403) to summarize the data it has managed to obtain. If defendants possessed exculpatory records not in the government's files, they could have offered them at trial or prepared their own summary. By the same token, if there were gaps in the charts, the defense ... had every opportunity to exploit them. In the last analysis, completeness of the underlying records was for the jury.

United States v. Sawyer, 85 F.3d 713, 740 (1st Cir. 1996). As the language of Rule 1006 indicates, although the underlying documents may be admitted, there is no requirement that they be admitted prior to the admission of the summary. Air Safety, Inc. v. Roman Catholic Archbishop of Boston, 94 F.3d 1, 7 & n.14 (1st Cir. 1996).

Summaries, of course should not be admitted if they are mere argumentative devices.

> Before submitting summaries or charts for a jury's inspection, the court must find there is sufficient factual basis for admitting them and that possible prejudice or confusion does not outweigh their usefulness in clarifying the evidence. Charts and summaries are, for instance, inadmissible if they contain information not present in the original or duplicate materials on which they are based. Care must be taken to insure that summaries accurately reflect the contents of the underlying documents and do not function as pedagogical devices that unfairly emphasize part of the proponent's proof or create the impression that disputed facts have been conclusively established or that inferences have been directly proved.

United States v. Drougas, 748 F.2d 8, 25 (1st Cir. 1984).

**V. JURY INSTRUCTIONS**

Proposed jury instructions are being forwarded under separate cover, due September 8, 2008 as directed by the Court.

**VI. VOIR DIRE INQUIRY**

In addition to follow-up questions to answers to the questionnaire, the government requests that the Court inquire of the jury in the following areas:

1. Corporate Liability. The government requests that the Court inquire as to whether prospective jurors can accept the proposition of law that a corporation is criminally liable when the acts and knowledge of its employees satisfies all of the elements of the offense. Further, can the jury accept even though one employee's acts and knowledge may not satisfy all of the elements of the offense, a corporation can be held criminally accountable for the collective acts and knowledge of all of its employees.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

/s/ TERRENCE P. DONNELLY
TERRENCE P. DONNELLY
Assistant U. S. Attorney
R.I. Bar No. 3506
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
terrence.donnelly@usdoj.gov

KEVIN CASSIDY
Trial Attorney
Department of Justice
Environmental Crimes Section
601 D St. NW
Washington, DC 20530
Tel (202) 305-0333
kevin.cassidy@usdoj.gov

DIANNE CHABOT
Special Assistant U.S. Attorney
Regional Criminal Enforcement Counsel
U.S. Environmental Protection Agency
One Congress Street
Suite 1100, SAA
Boston, MA 02114-2023
Tel (617) 918-1868
Fax (617) 918-0868
chabot.dianne@epa.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on August 27, 2008, a copy of the within United States' Trial Memorandum, was filed electronically and is available for viewing and downloading from the ECF system.

Electronic notification:

JOHN A. TARANTINO (#2586)
jtarantino@apslaw.com
PATRICIA K. ROCHA (#2793)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, Rhode Island 02903
Tel: 401-274-7200
Fax: 401-351-4607

GERALD J. PETROS
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, RI 02903

/s/ TERRENCE P. DONNELLY
TERRENCE P. DONNELLY
Assistant U. S. Attorney
R.I. Bar No. 3506
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
terrence.donnelly@usdoj.gov