UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| vs. | : | CR No. 07-134-S |
| | : | |
| SOUTHERN UNION COMPANY | : | |

**DEFENDANT SOUTHERN UNION COMPANY'S PRETRIAL MEMORANDUM**

Pursuant to paragraph 3 of the Pretrial Scheduling Order, Defendant Southern Union Company ("Defendant" or "Southern Union") files this Pretrial Memorandum.

## I. LEGAL ANALYSIS

The following is a legal analysis of the applicable law, organized by the Counts in the Government's Indictment.

### A. Count I of the Indictment Fails Because the Liquid Mercury Was Not Waste, Tidewater Was a Conditionally Exempt Facility, and Southern Union Did Not Knowingly Store a Hazardous Waste.

Count I of the Government's Indictment alleges that from September 19, 2002 until October 19, 2004, Southern Union stored liquid mercury at Tidewater. The Government contends that Southern Union's storage of this liquid mercury without a hazardous waste permit violated 42 U.S.C. § 6928(d)(2)(A) of the Resource Conservation and Recovery Act ("RCRA") because the liquid mercury was a hazardous waste.

For the Government to prevail on Count I, it must prove beyond a reasonable doubt each of the following elements: (1) the liquid mercury stored at the Tidewater facility was a solid waste; (2) the liquid mercury stored at the Tidewater facility was a hazardous waste; (3) Southern Union did not have a hazardous waste storage permit required by RCRA; and (4) Southern Union knowingly stored hazardous waste without the requisite permit.

The Government's charge founders on the first element because the liquid mercury was not a solid waste. RCRA regulates wastes, not products. Southern Union did not require a permit to store liquid mercury that it used in its business – as it did for years. The mercury that Southern Union used in the business, and eventually stored at Tidewater, was elemental mercury. The Government's own statements and analyses confirm that conclusion. The status of the mercury – as a product – did not change when Southern Union stored some of this liquid mercury at Tidewater for eventual recycling. The United States Environmental Protection Agency ("EPA") regulations plainly state that commercial chemical products, held for recycling, are not waste and are not subject to regulation under RCRA. Moreover, EPA has issued numerous guidances to the regulated community confirming that liquid mercury and other commercial chemical products held for recycling are not waste.

The Government charges that at some unknown time, as a result of some "vague event," the liquid mercury became waste at Tidewater because Southern Union no longer intended to recycle the mercury. The Government cannot demonstrate beyond a reasonable doubt that Southern Union intended to discard the liquid mercury by abandoning it, because that contention is not true. Southern Union intended to recycle the liquid mercury at Tidewater by sending it to Bethlehem Apparatus, as it did in 2001. RCRA did not require Southern Union to complete that recycling program within any particular time period – Southern Union was free to store the liquid mercury for four days or for four years. RCRA also did not require Southern Union to maintain any particular level of security at Tidewater. RCRA does not regulate the conditions or length of storage of commercial chemical products held for recycling. The critical question is whether Southern Union continued to intend to recycle the liquid mercury. It did. Count I should fail.

Count I fails for a second reason: the Government cannot prove beyond a reasonable doubt that Southern Union knowingly stored a hazardous waste. The law plainly provides that a person who believed he was storing a material or product, rather than a waste, did not violate 42 U.S.C. § 6928(d)(2)(A).

Count I also fails for a third reason: even if the liquid mercury was a waste, the federal regulations exempted the Tidewater facility from the hazardous waste permit requirements because Tidewater was a conditionally exempt small quantity generator ("CESQG"). RCRA does not require a CESQG to obtain a hazardous waste storage permit. A CESQG is an entity that generates no more than 100 kilograms (220 pounds) of hazardous waste in a calendar month, or a total of 1,100 kilograms (2,200 pounds) of hazardous waste at any one time. Here, the Government alleges that Southern Union stored approximately 100 pounds of liquid mercury, an amount well below even the monthly limit. Tidewater was a CESQG and therefore did not require a hazardous waste permit.

1. The Government cannot meet its burden to prove that the liquid mercury was a solid waste.

The Government must first prove that the liquid mercury was a solid waste. 42 U.S.C. § 6903(4). See also United States v. Self, 2 F.3d 1071, 1076 (10th Cir. 1993) (citing United Techs. Corp. v. Envtl. Prot. Agency, 821 F.2d 714, 716 n.1 (D.C. Cir. 1987) ("For a waste to be classified as hazardous, it must first qualify as a 'solid waste' under RCRA")).

a. The definition of solid waste.

EPA defines solid waste as "any discarded material." 40 C.F.R. § 261.2(a)(1). "Discarded" is defined as any material which is either (a) "abandoned," (b) "recycled," (c) "inherently waste-like," or (d) a "military munition." 40 C.F.R. § 261.2(a)(2)(i)-(iv).

Under this definition of "discarded," materials can be solid wastes if they are "abandoned" by being: (1) disposed of; (2) burned or incinerated; or (3) accumulated, stored, or treated *(but not recycled)* before or in lieu of being abandoned by being disposed of, burned or incinerated." (Emphasis added.) In its preamble discussing the meaning of the term "abandoned," EPA explained that "by saying 'abandoned,' [in its definition of "discarded material"] we do not intend any complicated concept, *but simply mean thrown away*." 50 Fed. Reg. 614, 627 (Jan. 4, 1985) (emphasis added).

Under this definition of "discarded," certain materials can also be solid wastes if they are "recycled" in certain ways. EPA set up a regulatory scheme that identified five broad categories of secondary materials (sludges, spent materials, by-products, commercial chemical products, and scrap metal) and then situationally defined whether each such secondary material is a solid waste when it is recycled by means of each of four identified methods (use constituting disposal, burning for energy recovery, speculative accumulation, and reclamation). 50 Fed. Reg. 614, 618 (Jan. 4, 1985). In this way, EPA decided not to define as "discarded," and not to regulate as solid wastes certain classes of materials destined for recycling. See 40 C.F.R. § 261.2(c) and Table 1. These materials include commercial chemical products that are recycled by being reclaimed.

b. Commercial chemical products.

RCRA regulates wastes, not products. It does not matter whether the product is hazardous or toxic – if it is a product it is not regulated under RCRA. EPA has identified certain hazardous materials, including mercury, as "commercial chemical products." These commercial chemical products become hazardous wastes only "if and when they are discarded or intended to be discarded as described in 40 C.F.R. § 261.2(a)(1)." See 40 C.F.R. § 261.33. For example, a

company storing a solvent that it intends to use in its manufacturing business is storing a product, not a waste.

EPA defines these "commercial chemical products" as "any commercial chemical product, or manufacturing chemical intermediate having the generic name listed in paragraph . . . (f)" of 40 C.F.R. § 261.33. "Mercury" is listed under this section. "The phrase commercial chemical product or manufacturing chemical intermediate having the generic name listed in [40 C.F.R. § 261.33(f)] refers to a chemical substance which is manufactured or formulated for commercial or manufacturing use which consists of the commercially pure grade of the chemical, any technical grades of a chemical that are produced or marketed, and all formulations in which the chemical is the sole active ingredient." 40 C.F.R. § 261.33 and Comment. The term "technical grade" in this definition means "a commercial chemical product that is not 100 percent pure, but is of a grade of purity that is either marketed or recognized in general usage by the chemical industry." See Glossary, RCRA Orientation Manual (2006).

RCRA does not regulate commercial chemical products unless a decision is made to discard them. See 45 Fed. Reg. 78532, 78540-41 (Nov. 25, 1980) (where a manufacturer or supplier receives a commercial chemical product back that it is "unable to reprocess, repackage, resell or use" then "that portion which is discarded becomes a hazardous waste when it is discarded or when a decision is made [by the manufacturer or supplier] to discard the material."); May 13, 1981 Letter from EPA to Steven C. Wittmer, attached as Exhibit A ("we underscore the word 'when' because the event of discard, or the time of decision to discard, is determinative. Until a material referenced by section 261.33 is actually discarded, or the decision is made to discard the material, it is not subject to RCRA regulation."); Aug. 1, 2002 Letter from EPA to Mallinckrodt, Inc., attached as Exhibit B (even though the mercury was previously used in the

production process to manufacture chlorine, it was still a commercial chemical product "and will retain its product status under the federal regulations when being stored . . . unless and until a determination is made that the mercury will be 'retired'" because the entity storing the material "has the right, and intends, to sell the mercury for commercial purposes at the end of the storage period . . . .").

A decision to recycle rather than reuse a commercial chemical product does not change its status as a product rather than a waste. The EPA's regulations provide that commercial chemical products that are recycled by being reclaimed are products, not solid wastes. 40 C.F.R. § 261.2(c) and Table 1. Commercial chemical products held for recycling are not considered "discarded."

Sometimes commercial chemical products are derived from spent materials, such as a discarded battery or a broken thermometer. These reclaimed commercial chemical products are not wastes, and are not regulated by RCRA, even when they are reclaimed from a waste. Commercial chemical products that are derived from a waste or a "spent" material, or are recovered from a manufacturing process, retain their status as a product or material rather than a waste so long as they continue to meet the requirements regarding commercial or technical grades and are not discarded.

This principle is spelled out under 40 C.F.R. § 261.3(c)(2), which provides that materials such as liquid mercury that are "derived from" hazardous wastes are not included in the definition of solid wastes where those materials are reclaimed. 40 C.F.R. § 261.3(c)(2) states:

> Except as otherwise provided in paragraph (c)(2)(ii), (g) or (h) of this section, any solid waste generated from the treatment, storage, or disposal of a hazardous waste, including any sludge, spill residue, ash emission control dust or leachate (but not including precipitation run-off) is a hazardous waste. (*However, materials that are reclaimed from solid wastes that are used beneficially are not solid wastes and hence are not hazardous*

> *wastes* under this provision unless the reclaimed material is burned for energy recovery or used in a manner constituting disposal.).

(Emphasis added.) Thus, liquid mercury stored at Tidewater that was recovered from the regulators or other "spent" equipment was not a solid waste unless it was discarded. EPA noted that in promulgating this rule that it is a "fairly evident principle" that "reclaimed metals that . . . only have to be refined to be usable are products, not wastes." 50 Fed. Reg. 614, 634 (Jan. 4, 1985). In short, commercial chemical products recovered from spent materials are *not* solid wastes and are *not* regulated under RCRA.

EPA has issued numerous guidance letters confirming its interpretation of this rule.[1] See, e.g., April 14, 1989 Letter from EPA to Robert W. Olexzko, Vice President, HazMat Environmental Group, Inc., attached as Exhibit C ("if the mercury is removed from the ignitron tubes *on site* (e.g., material reclaimed from solid waste) and only the mercury from the tubes is sent off site for direct beneficial use or further refining, the mercury is a product, not a solid waste); Aug. 1, 2002 Letter from EPA to Mallinckrodt, Inc., attached as Exhibit B (84 tons of free-flowing mercury that was previously used in mercury cells at the HoltraChem chlor-alkali facility during production processes to manufacture chlorine, and which had been stored for over a year, was not a "spent material" but rather a commercial chemical product, where neither contamination with impurities nor any other factor or circumstance has caused the mercury to become unsuitable for commercial purposes or to need reprocessing); May 30, 1986 Letter from

---

[1] These guidance letters should be given due weight, because they present a consistent and reasonable reading and application of the plain language of EPA's own regulations. See, e.g., Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) (the weight to be given to an administrative interpretation depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all of those factors which give it power to persuade, if lacking power to control."); see also Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 157 (1991) ("[i]nformal interpretations are entitled to some weight on judicial review," and a reviewing court "may certainly consult them" to determine whether they have been "consistently applied.").

EPA to Bethlehem Apparatus, attached as Exhibit D ("mercury that is received and refined at your facility is not a solid waste and is not subject to any of the hazardous waste regulations because metals that are suitable for direct use, or that only have to be refined to be usable are products, not wastes."); Jan. 1986 Letter from EPA to D.F. Goldsmith Chemical and Metal Corp., attached as Exhibit E ("scrap" mercury coming from the various sources such as scrap dealers that accumulate small quantities of mercury; manufacturers or reclaimers of instruments and electric switches; private citizens who have accumulated mercury; and firms who dismantle chlor-alkali facilities are "not subject to the hazardous waste regulations (i.e. it does not have to be manifested to your facility, you need not comply with the storage requirements, etc.)").

c. Storage of commercial chemical products.

EPA did not include in its definition of "discarded" material the storage of commercial chemical products being held for recycling. Under 40 C.F.R. § 261.2(c)(1)-(4), and Table 1, certain secondary materials are defined as being "discarded" and are therefore a regulated "solid waste" if the materials are "accumulated speculatively,"[2] even though the materials are destined for recycling and otherwise would not be regulated. However, EPA specifically excluded commercial chemical products from this provision. EPA *did not* restrict or limit the length of time a party may accumulate and store commercial chemical products prior to their being recycled. 40 C.F.R. § 261.2(c)(4) and Table 1.

Further, EPA decided not to place any restrictions or conditions on the management of commercial chemical products held for recycling; there is no regulation that either requires certain storage or management practices to be followed in order to maintain the status of a material as a

[2] A material is "accumulated speculatively," if it is "accumulated before being recycled." 40 C.F.R. § 261.1(c)(8).

product, or transforms a product into a solid waste when those conditions or practices are not followed. RCRA regulates only "discarded" materials, not products.

The Government contends that the liquid mercury stored at Tidewater does not meet the definition of a commercial chemical product but rather was a used, "spent" material under 40 C.F.R. § 261.2(c) and Table 1. However, under EPA's definition of a "spent" material, the Government must prove that the liquid mercury was "used and as a result of contamination [could] no longer serve the purpose for which it was produced without processing." See 40 C.F.R. § 261.1(c)(1). The Government's allegations do not allege in any way that the liquid mercury stored at Tidewater was previously used, or that its use in equipment resulted in contamination such that the liquid mercury could no longer serve its purpose and be used as liquid mercury.

Similarly, there is no basis for the Government's claim that Southern Union discarded the liquid mercury. The Government admits that the liquid mercury was stored in a locked cabinet located inside a locked building. The Government also concedes that liquid mercury stored at Tidewater in 2001 was in fact recycled at Bethlehem Apparatus. RCRA did not require Southern Union to send the liquid mercury to Bethlehem Apparatus within any particular time frame, nor did it require Southern Union to implement any particular security measures to prevent the theft of the mercury.

2. Even if the liquid mercury was a waste, the federal regulations exempted Southern Union from the RCRA permit requirements.

Even if the liquid mercury Southern Union stored at Tidewater was a solid and hazardous waste, Southern Union did not need a permit for Tidewater because of the small quantities of liquid mercury stored at Tidewater. The Subchapter C requirements of RCRA do not require a "conditionally exempt small quantity generator" ("CESQG") to obtain a hazardous waste storage

permit. A CESQG is an entity that generates no more than 100 kilograms (220 pounds) of hazardous waste in a calendar month, or a total of 1,100 kilograms (2,200 pounds) of hazardous waste at any one time. See 40 C.F.R. § 261.5. The Government contends that in total Southern Union generated and stored less than 100 pounds of liquid mercury during the time period alleged in the Indictment (from September 19, 2002 until October 19, 2004).[3] The mercury gas regulators are not included in determining the quantity of hazardous waste for CESQG purposes, because they are universal wastes. See 40 CFR § 261.5(c)(6) (when making the quantity determinations of this part . . . the generator must include all hazardous wastes that it generates, except hazardous waste that . . . is universal waste managed under 40 CFR 261.9 and 40 CFR Part 273). Therefore, Southern Union's Tidewater facility fell well within the maximum generator amounts and was a CESQG. CESQGs are not subject to the hazardous waste permit requirements.

3. The Government cannot meet its burden to prove that Southern Union knowingly stored a hazardous waste without the required RCRA hazardous waste storage permit.

The Government must prove beyond a reasonable doubt that Southern Union knew the liquid mercury stored at Tidewater was a waste. United States v. Heuer, 4 F.3d 723, 731 (9th Cir. 1993) (under RCRA, the "*mens rea* requirement of knowledge extends to each element of the offense"); United States v. Kelley Tech. Coatings, Inc., 157 F.3d 432, 435 (6th Cir. 1998) (upholding jury instructions that required the Government to prove the defendants knowledge that the material being stored was waste); United States v. Hayes Int'l Corp., 786 F.2d 1499 (11th Cir. 1986) (citing to United States v. Int'l Minerals, 402 U.S. 558, 563-64 (1972) (no

---

[3] In its April 8, 2008 "Objection to Southern Union's Motion in Limine to Exclude Evidence at Trial of Discovery of Mercury and Related Evidence at the Lawn Terrace Apartment Complex," the Government stated: "… over the course of at least two years, this is where Southern Union chose to store nearly 100 pounds of liquid mercury, as well as dozens of mercury bearing gas regulators."

violation of RCRA where there was "good faith belief" that the materials were being recycled and therefore they were not a waste)).

In Kelley, the district court had included a jury instruction "that the defendant knew that the material was waste and that it had the potential to be harmful to others or to the environment." Kelley Tech. Coatings, Inc., 157 F.3d at 435. The defendants argued at trial that they thought the materials were raw materials, finished products, or off-specification materials awaiting reformulation, or other such materials, and thus lacked sufficient knowledge of the materials to have the requisite intent. On appeal, the Sixth Circuit held that "[t]he jury was properly instructed that the Defendants had to know the materials were waste" before RCRA criminal liability could attach. Id. at 440; see also United States v. Elias, Cr. No. 98-00070-E-BLW (D. Idaho 1999) (unpublished) (RCRA case explaining that "[t]he Government must show that the Defendant knew he was storing and disposing of waste materials, and that he knew that the waste material was potentially harmful to others or the environment.").

In Heuer, 4 F.3d 723, the defendant contended that he could not be liable because the hazardous propellant at issue was a sample not intended for disposal – not a "waste," and thus not a "hazardous waste." The court stated that the defendant "correctly asserts that knowledge that the material is a waste is also a requirement for conviction under Sec. 6928(d)(2)(A)" but found that there was sufficient evidence for the jury to find that (1) the hazardous propellant was intended for disposal (and thus was a RCRA hazardous waste), and (2) defendant was aware of that fact. Id. at 732. See also United States v. Ahmad, 101 F.3d 386, 390 (5th Cir. 1996) (striking down jury instruction in Clean Water Act prosecution that failed to require that the defendant know that the substance he discharged was a pollutant).[4]

[4] Some courts also describe this as a mistake of fact theory.

**B. <u>Count II Fails Because Southern Union Did Not Knowingly and Willfully Fail to Provide a Required Notice</u>.**

The Government charges that Southern Union failed to comply with the release notification requirements of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11045(b)(4). The Government must prove beyond a reasonable doubt that between October 19, 2004 and October 20, 2004 Southern Union Company knowingly and willfully failed to provide a required notice to the state emergency planning commission ("SEPC") and to the local emergency planning committee ("LEPC") immediately after the Tidewater release.

The Government's charge fails because the release discovered at Tidewater did not require notification under EPCRA because EPCRA does not require notification when the release does not result in off-site exposures. The Tidewater release was contained within the facility boundaries. That release did not migrate off-site, or result in off-site exposures.

The Government contends that off-site exposures resulted from the Tidewater release because the vandals took mercury back to the Lawn Terrace apartments and released mercury at that site. This contention is fundamentally flawed. EPCRA imposes obligations on owners and operators of facilities to provide certain notifications of releases at those facilities. Here the release of mercury at Southern Union's facility, Tidewater, did not require notification because that release did not result in off-site exposure. The release at Lawn Terrace is a second release that did not occur on a facility owned or operated by Southern Union. That second release resulted from the criminal conduct of the vandals who stole mercury and then released it into the environment at Lawn Terrace.

Count II also fails because Southern Union did not know on October 19 or 20, 2004, that the vandals had released mercury at Lawn Terrace. 42 U.S.C. § 11045(b)(4) is a specific intent

crime. Southern Union could not knowingly and willfully fail to report a release at Lawn Terrace before it knew that a release occurred at Lawn Terrace.

1. The Tidewater release did not migrate beyond the Tidewater facility boundaries.

The EPCRA notification requirement "does not apply to any release which results in exposure solely to persons within the site or sites on which a facility is located." 42 U.S.C. § 11004(a)(4). The Government must prove that the mercury release that Southern Union discovered on October 19, 2004, at the Tidewater facility extended off the Tidewater property boundaries. See Conference Report 99-962, Superfund Amendments and Reauthorization Act of 1986, 132 Cong. Rec. H9113-14 (Oct. 3, 1986) ("for a release to be reportable under this section, it must extend beyond the site on which the facility is located. On-site releases that do not extend off-site are exempt from the requirements."); see also In re: Genicom Corp., 1992 WL 204414 (E.P.A. July 16, 1992) ("if the release does not extend off-site, and thus the only persons potentially exposed were on-site, the reporting requirement does not apply."). Under the regulations the term "facility" includes "all buildings, equipment, structures, and other stationary items which are located on a single site or on contiguous or adjacent sites which are owned or operated by the same person." 42 U.S.C. § 11049(4).

The Government's Indictment alleges that on October 19 Southern Union discovered the Tidewater release but failed to report it on either October 19 or 20. But the Indictment does not allege that the Tidewater release – the only release that it alleges Southern Union did not report – extended off the Tidewater facility boundaries. There is no evidence that the Tidewater release migrated off-site through the soil, groundwater or air.

The Lawn Terrace release constitutes a separate release, at a separate site, owned by a separate owner/operator. In the Indictment, the Government alleges that Southern Union failed

to report the Tidewater release, not the Lawn Terrace release. The Government's apparent contention that Southern Union was obligated under EPCRA to report the Lawn Terrace release on October 19 and 20 reflects a fundamental misunderstanding of the law.

First, EPCRA's notification requirement applies to the "owner or operator" of the facility "at which a hazardous chemical is produced, used or stored" when a release occurs at that facility. 42 U.S.C. § 11004(a)(3). Southern Union did not own or operate Lawn Terrace, or store materials there. Second, EPCRA does not require an owner to report a release that results when vandals steal a material from an owner's facility, carry it to a remote location, and then release it at that location. Even a cursory review of the statute demonstrates that it is intended to require notifications where an owner/operator discovers a reportable release from his facility, not a release at some other facility. Finally, as a matter of common sense, the law cannot obligate an owner to report a release of a chemical stolen and released at some unknown location. The Government is improperly trying to merge two separate releases to create a reporting obligation on the part of Southern Union that does not exist under EPCRA with respect to either individual release.

2. <u>The Government cannot meet its burden to prove that Southern Union should have notified local officials of a release before it even learned of that release</u>.

The Government also must prove that Southern Union did not notify the appropriate officials "immediately" after the release. "Immediately" has been interpreted to mean reasonably promptly after the defendant could reasonably determine the facts that made the release one that required notification. In <u>Genicom</u>, 1992 WL 204414, EPA stated:

> What is at issue is when did … [the person in charge] have enough information that it could reasonably be said that it knew that the releases were at or above reportable quantities even though it did not know the exact quantities released. A company should be given some latitude about how it interprets the information it has.

See also United States v. Messer Oil Co., 391 F. Supp. 557, 562 (W.D. Penn. 1975) (interpreting a similar provision in the Clean Water Act and observing that "[o]bviously the word 'immediate' must be interpreted in the light of the circumstances of each particular case."); In re B.F. Goodrich Co., 1998 WL 220026 (E.P.A. Mar. 31, 1998) ("'immediate' notification must in this and many other cases be determined by reference to the circumstances").

Here, the Government does not allege that the Tidewater release extended outside the Tidewater facility boundaries. Southern Union did not learn of the Lawn Terrace release until October 22, after the State and local authorities learned of the release. Thus, even if the Lawn Terrace release somehow gave rise to a notification obligation on the part of Southern Union – which it did not – Southern Union could not have provided that notification on October 19 or 20 as the Government charges.

3. The Government cannot meet its burden to prove that Southern Union "knowingly and willfully" failed to notify.

The Government also must prove beyond a reasonable doubt that Southern Union "knowingly and willfully" failed to notify local officials immediately after the Tidewater release. Courts have held that, for purposes of the notification required to the National Response Center under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), "knowingly" requires that defendant have actual or constructive knowledge of a release of the reportable quantity that creates a duty to report. See Sierra Club, Inc. v. Tyson Foods, Inc., 299 F. Supp. 2d 693, 707 (W.D. Ky. 2003) ("[K]nowledge that a release is of a reportable quantity is necessary to impose a requirement to file a report."); In the Matter of Thoro Prods. Co., 1992 WL 143993 (EPA) (holding that where CERCLA duty to notify triggers EPCRA duty to notify, CERCLA's knowledge requirement becomes condition precedent to

EPCRA duty to notify). Since EPCRA, unlike CERCLA, requires reporting of releases that (1) meet the reportable quantity amount *and* (2) create exposure outside the facility, "knowingly" in the EPCRA context must also require that Southern Union have actual or constructive knowledge that the release extended off the Tidewater site.

"Willfully" means to act intentionally and purposefully and with intent to do something the law forbids, that is, with bad purpose either to disobey or to disregard the law. United States v. Andrade, 135 F.3d 104, 105 (1st Cir. 1998); United States v. Overholt & Attaluri, 307 F.3d 1231 (10th Cir. 2002) (interpreting "willful" violation of the Safe Water Drinking Act). See also United States v. Murdock, 290 U.S. 389, 394 (1933) ("[w]illful" when used in a criminal statute generally means "an act done with a bad purpose" or with an "evil motive."); United States v. Aitken, 755 F.2d 188, 191-92 (1st Cir. 1985) (holding that criminal statute requires subjective standard of assessing willfulness defined as an "intentional violation of a known legal duty").

Thus, in addition to proving that Southern Union "knowingly" failed to make the required notifications, the Government must also prove beyond a reasonable doubt that Southern Union (1) knew that there was a release of more than one pound of mercury at its facility that extended off the Tidewater facility boundaries; (2) deliberately chose not to report the release, and (3) in doing so, knew that it was unlawful.

The Government's charge again fails for several reasons. First, as explained above, the Tidewater release did not create an obligation to notify under EPCRA. Second, there is no evidence that Southern Union knowingly and willfully failed to meet this phantom notification requirement. To the contrary, Southern Union asked its environmental consultant to identify the necessary notifications, and the consultant identified a notification to the National Response Center ("NRC") under CERCLA, but not notification under EPCRA. Southern Union notified

the NRC the day it discovered the Tidewater release. Third, even under the Government's theory, Southern Union did not learn of the Lawn Terrace release until October 22, after state and local authorities notified Southern Union. Southern Union could not provide notice of the Lawn Terrace release before it knew about that release.[5]

### C. **Count III of the Indictment Fails Because the Mercury Containing Regulators Are a Universal Waste That Did Not Require a Hazardous Waste Storage Permit.**

Count III of the Indictment alleges that from March 25, 2003 to October 19, 2004, Southern Union stored mercury containing regulators at Tidewater without a hazardous waste storage permit, in violation of 42 U.S.C. § 6928(d)(2)(A) of RCRA.

EPA promulgated the universal waste regulations to ease the regulatory requirements for certain types of common items, including mercury-containing devices such as thermostats and regulators. EPA created this separate and distinct category of hazardous wastes to encourage recycling by lessening the burden on waste handlers of certain materials that are commonly recycled. Handlers of universal wastes are subject to less stringent standards than those standards that would otherwise apply to persons or entities generating, storing, transporting, and accumulating such hazardous wastes.

The universal wastes regulations set forth separate standards that apply to the cradle to grave management of universal wastes. Under the universal waste regulations, Southern Union was a "generator" of universal waste. Generators of universal waste are subject to the universal waste regulations applicable to "handlers," and handlers of universal wastes are not required to obtain a hazardous waste storage permit.

---

[5] The critical function of the notification is to tell the local authorities where the release occurred so they can respond appropriately. No proper notification of a potential release of mercury stolen from Tidewater was possible before Southern Union learned that the mercury was released, and learned where it was released.

The universal waste requirements applicable to handlers are enforced through civil sanctions – the law does not provide for criminal sanctions for violations of these requirements. There is no regulatory provision that states or even suggests that a handler who violates a universal waste regulation becomes subject to the requirement to obtain a hazardous waste storage permit.

The Government conceded for purposes of Southern Union's Motion to Dismiss Count III that the mercury containing regulators stored at Tidewater were a universal waste, but claimed for the first time that Southern Union was not a generator (handler) of this waste. The Government instead contends that Southern Union was an operator of a "destination facility" for universal waste because it had previously "treated" and "disposed of" the mercury containing regulators at Tidewater. This argument fails for several reasons.

First, the Indictment does not even allege that Tidewater was a "disposal facility" that did not have a "hazardous waste disposal permit," or that Tidewater was a "treatment facility" that did not have a "hazardous waste treatment" permit. The contention is beyond the scope of the Indictment and beyond the fair notice of the charge set forth in the Indictment.

Second, the Indictment alleges no facts that, if proven, show that Southern Union "treated" or "disposed of" regulators at Tidewater from March 25, 2003 to October 19, 2004. To the contrary, the Government contends that Southern Union did nothing to or with the mercury containing regulators during this time period apart from storing them in the Blacksmith Shop in plastic pools. The Government maintains that no treatment occurred during the relevant period alleged in the Indictment.

Finally, the allegations that Southern Union "disposed of" the mercury containing regulators because it "abandoned" them at Tidewater is both wrong and beside the point. It is

wrong because Southern Union did not abandon the mercury containing regulators. It is beside the point because it has no bearing on whether Tidewater required a hazardous waste permit to *store* the mercury containing regulators.

1. The mercury containing regulators are "universal waste".

EPA promulgated the universal waste regulations to ease the regulatory requirements for certain types of common items, including mercury containing devices such as thermostats and regulators. Universal wastes cover devices and materials, which individually contain a small amount of hazardous materials, but which are generated in large volumes each year. In creating this separate category of hazardous waste, EPA promulgated an entirely separate set of hazardous waste management rules – found at 40 C.F.R. Part 273 – that apply to the handling and storage of universal wastes.

In 1995, EPA initially created three categories of wastes that were covered under its universal waste regulations: hazardous waste batteries, hazardous waste pesticides, and hazardous waste thermostats. Hazardous waste lamps were added in 1999, and in June 2002, EPA issued a proposed rule to add "mercury containing equipment" to the universal waste category.

However, even before EPA acted on its proposed rule to add "mercury-containing equipment" to the universal waste category, Rhode Island adopted its own regulations doing so. Rhode Island amended its Rules and Regulations for Hazardous Waste Management, effective September 17, 2001, by adopting its own universal waste rule (Rule 13.00) that, in addition to adopting the EPA universal wastes rules and waste categories of pesticides, batteries, thermostats and mercury-containing lamps, added two additional universal waste categories: cathode ray

tubes and "mercury containing devices." "Mercury containing devices" are defined in Rule 3.00 of the Rhode Island regulations as devices that include

> . . . any electrical product or component which contains elemental mercury that is necessary for its operation and is housed within an outer metal, glass, or plastic casing. These devices include, but are not limited to, thermometers, barometers, electric switches, electric relays, thermocouples, manometers, and sphygmomanometers.

The mercury containing regulators that Southern Union stored at Tidewater fall squarely within this definition. EPA specifically "authorized" these Rhode Island universal waste regulations that included mercury containing devices on August 9, 2002,[6] and the agency's approval became effective on October 8, 2002.

2. <u>The Government cannot meet its burden to prove that Southern Union needed a hazardous waste storage permit for the mercury containing regulators</u>.

Count III of the Indictment alleges only that the mercury containing regulators stored at Tidewater were a hazardous waste and that Southern Union violated 42 U.S.C. § 6928(d)(2)(A) because it stored these regulators without a hazardous waste storage permit. That allegation is legally defective because persons storing universal wastes do not require a hazardous waste storage permit. In creating this less stringent, alternate set of management standards for universal wastes, Rhode Island and EPA chose not to subject the storage of universal wastes to the hazardous waste storage permit requirements that apply to other hazardous wastes, and therefore not to subject handlers of universal waste to criminal prosecution.

Universal waste handlers are subject to the universal waste rules only, and are not subject to the general hazardous waste management rules applicable to those handling or storing all other hazardous wastes. EPA's universal waste regulations specifically provide that the universal

---

[6] 67 Fed. Reg. 51765 (Aug. 9, 2002).

waste standards are "in lieu of regulation under 40 C.F.R. Parts 260 through 272." See 40 C.F.R. § 273.1(b). Those sections of the code of federal regulations impose the requirements for the so-called "cradle to grave" management of hazardous waste and include, in 40 C.F.R. Part 270, the specific requirements for the RCRA hazardous waste storage permit that the Government contends Southern Union needed to store the mercury containing regulators. 40 C.F.R. § 270.1(c) ("Scope of the RCRA permit requirement") specifically states that "RCRA requires a permit for the 'treatment,' 'storage,' and 'disposal' of any 'hazardous waste' as identified in 40 C.F.R. Part 261." 40 C.F.R. § 270.1(c)(2) then lists, however, under the heading "specific exclusions," "persons . . . who are *not* required to obtain a RCRA permit." These exempt "persons" include:

> [u]niversal waste handlers and universal waste transporters managing the wastes listed below [which include mercury containing equipment]. These handlers are subject to regulation under 40 C.F.R. Part 273.

In its Final Rule adopting mercury containing equipment as a category of universal waste, EPA explained why it exempts handlers of the universal waste mercury containing device category from the requirement to obtain a RCRA hazardous waste storage permit:

> Because spent MCE is generated in small quantities in geographically dispersed operations, compliance with full subtitle C requirements is difficult to achieve. Compliance with subtitle C is particularly difficult for electric or gas utility operations which are located on customer's properties. . . .
>
> For example, under the universal waste rule, a fire station, community center, or retail store could participate in MCE collection programs without having to get a RCRA permit, as they would be required to under full subtitle C regulation.

70 Fed. Reg. 45508, 45511 (Aug. 5, 2005). Thus, under EPA's regulations, universal waste handlers are specifically excluded from the requirement to obtain a RCRA hazardous waste

storage permit.[7] The Government cannot prosecute criminal charges against Southern Union for allegedly not obtaining a permit that the applicable rules do not require for storage of universal wastes.

Faced with this plain result, the Government has contrived two arguments that have no basis in its Indictment, or under any provision in RCRA. The Government contends alternatively that Southern Union was not a "handler" of universal waste, because (1) it did not meet the universal waste "requirements" to be a "handler," or (2) it was instead the "owner or operator" of a "destination facility" for universal waste, and thus was required to have a hazardous waste permit. The Government's Indictment alleges no legal claim, or facts, that could support these contentions.

a. As a "handler" of universal waste, Southern Union was not required to have a hazardous waste permit.

A "universal waste handler" is defined as: (i) a generator of universal waste; *or* (ii) the owner or operator of a facility, including all contiguous property, that receives universal waste from other universal waste handlers, accumulates the universal waste, and sends universal waste to another waste handler, or to a destination facility, or to a foreign destination." 40 C.F.R.§ 260.10. Southern Union became a universal waste handler because it was a "generator" of universal wastes when it took the mercury containing regulators out of service and stored them at Tidewater.

The Government's claim that Southern Union is not subject to the universal waste regulations because it did not meet the "requirements" to be a handler makes no sense under the

[7] Universal waste handlers also are not subject to the hazardous waste generator requirements of 40 C.F.R. Part 262. For example, under 40 C.F.R. § 262.34(b), a generator who accumulates hazardous waste for more than 90 days becomes "an operator of a storage facility" who is required to obtain a RCRA hazardous waste storage permit. That requirement does not apply to universal waste handlers.

universal waste regulatory scheme. 40 C.F.R. Part 273 applies to entities who have universal waste – that is the only "requirement" that must be met to fall under the jurisdiction of 40 C.F.R. Part 273. Once the waste at issue is a universal waste, the management of that waste is subject only to the universal waste regulations. The precise sections of the universal waste regulations that apply depend on the "status" of the entity managing the universal waste. Thus, the universal waste standards under 40 C.F.R. Part 273, Subpart B apply to "small quantity handlers," the standards under Subpart C apply to "large quantity handlers," the standards under Subpart D apply to "transporters," and the standards under Subpart E apply to "destination facilities."

The Government argues that Southern Union cannot be a universal waste "handler" because it did not meet the "requirement" that it send off the universal waste from its facility to its ultimate destination. Again, the Government misunderstands the regulations. Anyone who generates universal waste is a handler. Under the express definition cited earlier – there is no further "requirement." Since Southern Union generated universal waste, it was a 'handler" subject to the universal waste requirements. Further, for the reasons already explained, a handler who may violate one of the requirements of the universal waste regulations is not subject to criminal penalties, and does not "forfeit" its status as a handler of universal waste. In other words, even if a generator stores universal waste too long, the generator remains a handler, and the waste remains universal waste.

b. The Indictment alleges no legal claim or facts that support the Government's contention that Southern Union was a destination facility.

The Indictment alleges only that Southern Union "stored" the mercury regulators for greater than 90 days, and violated 42 U.S.C. § 6928(d)(2)(A) because it "did knowingly store, and cause to be stored, hazardous wastes, namely mercury containing regulators . . . without a

permit issued pursuant to RCRA . . . ." Indictment, ¶ 37. This claim fails as a matter of law because the material stored was a universal waste, as the Government appears to concede.

In an attempt to salvage the charge, the Government now pretends that the Indictment also alleges that Southern Union "treated" and "disposed of" the mercury gas regulators from March 25, 2003 to October 19, 2004, because that could subject Southern Union to the only provision under the universal waste regulations that applies the hazardous waste permit requirements to universal wastes.[8] But the Government cannot prosecute a case that it did not indict.

Further, Tidewater was not a "destination facility." A "destination facility" is "a facility that treats, disposes of, or recycles a particular category of universal waste . . . ." 40 C.F.R. § 273.9. Significantly, the definition also makes explicit that "a facility at which a particular category of universal waste is *only accumulated*, is *not a destination* facility for purposes of managing that category of universal waste." (Emphasis added.)

The Indictment does not allege that Southern Union "treated" or "disposed of" the mercury containing regulators without a permit from March 25, 2003 onward, the relevant period specifically identified in the Indictment. To the contrary, the Government contends that Southern Union simply stored mercury gas regulators in the Blacksmith Shop during this period and left them there. In other words, it "accumulated" universal waste – an activity excluded from the qualifying activities of a destination facility. Tidewater was not a destination facility.

---

[8] 40 C.F.R. § 273.60 ("Standards for Destination Facilities") states that the "owner or operator of a destination facility (as defined in § 273.9) is subject to all the applicable requirements" of the hazardous waste treatment, storage and disposal facilities ("TSDFs") (including 40 C.F.R. Parts 264, 265, 266, 268, 270 and 124).

3. The Government cannot meet its burden to prove that Southern Union knowingly stored a hazardous waste without the required RCRA hazardous waste storage permit.

Finally, even if the mercury containing regulators stored at Tidewater were wastes that required a permit, the Government must prove beyond a reasonable doubt that Southern Union knew the mercury containing regulators stored at Tidewater were a waste. (See cases cited under Count I, pp. 10–11.) There is no evidence that Southern Union knew it was storing a waste.

## II. EVIDENTIARY ISSUES

Pursuant to section 3(a) of the Pretrial Scheduling Order, the following is a brief analysis of the applicable law relating to evidentiary issues that Southern Union believes should be considered by the Court before trial.

### A. Relevance and Unfair Prejudice.

It is black-letter law that "[e]vidence which is not relevant is not admissible," and that "relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401, 402. "The consequential facts in [a] litigation are those concerning the liability, if any, of the defendant [ ]." Dudley v. Bus. Express, Inc., Civ. No. 93-581-SD, 1995 U.S. Dist. LEXIS 17725, at *2 (D.N.H. Nov. 28, 1995) (excluding evidence of plaintiff's gambling habits in tort action); McNitt v. BIC Corp., 846 F. Supp. 1049, 1054-55 (D.N.H. 1994) (excluding as irrelevant evidence unrelated to causation where defendant acknowledged all other elements of claim related to defective design of lighter).

FRE 403 works in tandem with FRE 402 and provides that even relevant evidence should be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of

time, or needless presentation of cumulative evidence." Fed. R. Evid. 403; United States v. Currier, 836 F.2d 11, 18 (1st Cir. 1987) ("Unfairly prejudicial evidence . . . is evidence that triggers the mainsprings of human action in such a way as to cause a jury to base its decision on something other than the established proposition in the case.") (internal quotation marks and brackets omitted). In applying FRE 403, the Court must employ "a balancing test . . . weighing the probative worth of the evidence against its potentially confusing inflammatory and prejudicial effects. Thus, even when the evidence may shed light on the disputed issues, the court can find the untoward effects of the proffered evidence to be so weighty that the evidence should be excluded." Galarneau v. Merrill Lynch, 504 F.3d 189, 205 (1st Cir. 2007) (internal citations and quotations omitted). Under FRE 403's balancing test, unfair prejudice must be avoided. United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000). "Usually, courts use the term 'unfair prejudice' for evidence that invites the jury to render a verdict on an improper emotional basis." Id.; United States v. Rodriguez Cortes, 949 F.2d 532, 541 (1st Cir. 1991), quoting Fed. R. Evid. 403 Advisory Committee's note (Federal Rule of Evidence 403 precludes evidence that induces a "decision on a purely emotional basis").

Although it is impossible to know all of the evidence that the Government intends to introduce at trial, discovery, the grand jury process, and the Government's own statements before this Court demonstrate that the Government intends to introduce evidence that is either irrelevant or whose relevance is far outweighed by its risk of unfair prejudice and jury confusion. Southern Union identifies the following evidence which may be offered by the Government that should be raised with the Court before being mentioned, offered or published in the presence of the jury:

(a) evidence concerning Southern Union's purported delay in reporting the break-in at Tidewater (the "Break-in") to the local police;

(b) evidence concerning the remediation of the Tidewater facility following the release of mercury there;

(c) evidence concerning any schools near Tidewater; and

(d) evidence concerning the forseeability of the Break-in or the Tidewater or Lawn Terrace releases.

**B. Vicarious Admissions.**

The Government has produced a substantial volume of materials from individuals who were not employees of Southern Union, and the Government has advised Southern Union that it may contend these persons or entities are agents of Southern Union. Specifically, the Government has produced out-of-court statements of over a dozen different individuals and sixteen separate organizations. Many of these persons or entities are ones with whom Southern Union had only the most tenuous relationship. The Government has not disclosed to what extent it will argue that these statements are admissible as vicarious admissions of Southern Union pursuant to Federal Rules of Evidence 801(d)(2)(C) or (D). These are evidentiary issues that the Court needs to address before the Government is allowed to argue that any of these out of court statements are admissions made by Southern Union. As the law regarding agency makes clear, determining both the existence and scope of the principal-agent relationship is a multi-factored, fact-intensive exercise. Gottlieb v. Isenman, 215 F.2d 184, 188 (1st Cir. 1954). For each statement it intends to introduce as vicarious admissions by Southern Union under Federal Rule of Evidence 801(d)(2)(C) or (D), the Government, as the proponent of the statement, will be required to prove by a preponderance of the evidence "(1) that an agency relationship existed; (2) that the statements were made during the course of the relationship; and (3) that the statements

relate to matters within the scope of the agency." Gomez v. Rivera Rodriguez, 344 F.3d 103, 116 (1st Cir. 2003).

These determinations, particularly given the facts and relationships at issue in this case, cannot be made on a wholesale basis, or even by individual or organization. Consequently, for each statement that the Government contends is a vicarious admission by one of Southern Union's independent contractors, the Court will have to engage in an individualized, fact-specific analysis.

## III. THE RCRA CHARGES AS APPLIED TO SOUTHERN UNION ARE UNCONSTITUTIONALLY VAGUE

In the circumstances of this case, the Government has violated the fair notice requirements of the Due Process clause of the United States Constitution. Although it remains to be seen on which theories the Government will ultimately rely at trial, it appears based on its Response to the Defendant's Motion to Dismiss that it intends to invoke theories that involve both vague and novel interpretations of the regulations promulgated under RCRA. For example, and without limitation, the Government is using Southern Union's storage of a commercial chemical product (liquid mercury) as evidence of criminal conduct, despite EPA's explicit choice not to regulate such storage. Where, as here, the Government deliberately chooses not to elaborate the standards according to which it will deem a stored commercial chemical product as discarded, it violates the fundamental principle of fair notice to later criminally charge a company with alleged illegal storage of that commercial chemical product. Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926) (It is a "first essential of due process of law" that a criminal statute "must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.").

A criminal statute will be unconstitutionally vague as applied to the facts of a particular case where it is inconsistent with either of the two core values animating the vagueness principle. Kolender v. Lawson, 461 U.S. 352, 358 (1983); see also City of Chicago v. Morales, 527 U.S. 41, 56-64 (1999). First, a criminal statute must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). Second, "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." Id. Here, the Government's prosecution violates both core values underlying the vagueness doctrine and should be rejected.[9]

## IV. PROPOSED QUESTIONS FOR VOIR DIRE

The Court has granted Southern Union's motion to use a juror questionnaire and the proposed questionnaire was sent to the Court for review and approval on August 26, 2008. Southern Union is presently awaiting further direction from the Court. Southern Union reserves the right to request that the Court ask follow up and additional voir dire questions at the empanelment, depending in part on the questionnaire responses received from prospective jurors, including but not limited to questions that follow up on the questionnaire responses. In addition, Southern Union requests that the following questions be asked of prospective jurors during voir dire:

1. As the Court will instruct you, a corporation is entitled to the same presumption of innocence as a person. This means that Southern Union is presumed to be innocent of the crimes charged here. Does anyone believe that corporations should not be presumed innocent if they are charged with crimes, including environmental crimes?

---

[9] The Government's theory may also violate the rule against the novel construction of a criminal statute, which is a subset of the fair notice doctrine.

2. Does anyone believe that he or she would have difficulty following the Court's instruction that Southern Union is presumed innocent of the crimes charged here?

Respectfully submitted,

SOUTHERN UNION COMPANY

By its Attorneys,

/s/ Gerald J. Petros

Gerald J. Petros, No. 2931
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
401-274-2000
401-277-9600 (fax)
gpetros@haslaw.com

John A. Tarantino, No. 2586
Patricia K. Rocha, No. 2793
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
401-274-7200
401-351-4607 (fax)
jtarantino@apslaw.com
procha@apslaw.com

Daniel J. Fetterman (*pro hac vice*)
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, NY 10019
212-506-1700
212-506-1800 (fax)
dfetterman@kasowitz.com

Dated: August 27, 2008

**CERTIFICATION**

Terrence P. Donnelly
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Kevin Cassidy
Trial Attorney
Department of Justice
Environmental Crimes Section
601 D St. NW
Washington, DC 20530

Dianne Chabot
Special Assistant U.S. Attorney
Regional Criminal Enforcement Counsel
U.S. Environmental Protection Agency
One Congress Street
Suite 1100, SAA
Boston, MA 02114-2023

I hereby certify that on August 27, 2008, a copy of the foregoing Pre-Trial Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may accesses this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros

919367