# EXHIBIT B

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

MAR 15 1982

MEMORANDUM

SUBJECT: EPA Enforcement of RCRA-Authorized State Hazardous Waste Laws and Regulations

FROM: William A. Sullivan, Jr.
Enforcement Counsel (EN-329)

TO: Regional Administrators, Regions I - X
Regional Counsels, Regions I - X

In the administration of the hazardous waste program, a state with an authorized RCRA program may, for various reasons, be unable or unwilling to take enforcement action that EPA may deem critical. Several legal and administrative questions which may be presented in such cases include the following:

1. Can EPA take enforcement action in states which have been granted authorization to administer and enforce the RCRA program? What about states with which EPA has Cooperative Arrangements?

2. Assuming EPA can take enforcement action, does it enforce the state laws and regulations, or the Federal RCRA law and regulations?

3. If an enforcement action is necessary, in what court should EPA file the action?

4. If the enforcement action involves administrative proceedings, does EPA follow federal or state procedures?

5. Since the taking of an enforcement action by EPA in an authorized state might, in some cases, endanger or irritate federal-state relationships, what procedures should be developed to insure, to the greatest possible extent, that any federal enforcement actions taken in a RCRA-authorized state are done at such times and in such a manner as to eliminate or minimize any possible impact upon that federal-state relationship?

6. What is the effect, if any, of state authorization upon EPA's ability to take action under Sections 7003 and/or 3013 of RCRA?

This memorandum will attempt to suggest some answers to these questions and procedures which might be employed to avoid confusion between EPA and the state agency or agencies should it become necessary for EPA to take enforcement action. The questions will be addressed in the order set forth above. The Office of Enforcement Counsel has consulted with the Office of General Counsel in the preparation of this memorandum.

1.

CAN EPA TAKE ENFORCEMENT ACTION IN A RCRA-AUTHORIZED STATE?
WHAT ABOUT STATES WITH WHICH EPA HAS COOPERATIVE ARRANGEMENTS?

A. Authorized states:

When a state is authorized to administer the RCRA program in lieu of EPA, EPA has made a determination that the state's program is equivalent (in the case of final authorization), or substantially equivalent (in the case of interim authorization), to the federal program, and that the state hazardous waste program can thereafter be administered by the state under state law, in lieu of the Federal program. (See RCRA, Section 3006(b) and (c)). After authorization, can EPA take enforcement action in such a state, and if so, would it enforce state or federal law and regulations?

The provisions of RCRA Section 3008(a)(1) and (2) are most helpful in answering these questions. These provisions state:

> "Section 3008(a) Compliance Orders.- (1) Except as provided in paragraph (2), whenever on the basis of any information the Administrator determines that any person is in violation of any requirement of this subtitle, the Administrator may issue an order requiring compliance immediately or within a specified time period or the Administrator may commence a civil action in the United States district court in the district in which the violation

> occurred for appropriate relief, including a temporary or permanent injunction."
>
> "(2) In the case of the violation of any requirement of this subtitle where such violation occurs in a State which is authorized to carry out a hazardous waste program under Section 3006, the Administrator shall give notice to the State in which such violation has occurred prior to issuing an order or commencing a civil action under this section." (emphasis supplied)

Subsection (2) clearly indicates that even though' a state has an authorized hazardous waste program, EPA retains the right of federal enforcement, subject to the giving of notice to the state in which the violation occurred prior to taking enforcement action.

The legislative history of Section 3008 supports this interpretation. That history, contained in House Committee on Interstate and Foreign Commerce Report No. 94-1461 (September 9, 1976), at page 31, states:

> "This legislation permits the states to take the lead in the enforcement of the hazardous waste laws. However, there is enough flexibility in the act to permit the Administrator, in situations where a state is not implementing a hazardous waste program, to actually implement and enforce the hazardous waste program against violators in a state that does not meet the federal minimum requirements. Although the Administrator is required to give notice of violations of this title to the states with authorized hazardous waste programs, the Administrator is not prohibited from acting in those cases where the states fail to act, or from withdrawing approval of the state hazardous waste plan and implementing the federal hazardous waste program pursuant to Title III 1/ of this act."

The preamble to 40 CFR §123.128(f) and (g) at 45 Fed. Reg. 33394 (May 19, 1980), also briefly sets forth this position regarding

EPA's enforcement of hazardous waste laws and regulations in an authorized state.

We can also look to the Clean Water Act (CWA), which is highly analogous to RCRA in this regard, and from which Section 3008 was drawn 2/. Cases involving similar provisions of the CWA (e.g., Sections 309 and 402) support the proposition that while Congress intended that the states have primary authority to administer the the program subject to national guidelines provided by the Act and by the EPA regulations, EPA retained the authority to achieve the purposes and goals of the Act, including the right to take

-------------

1/ The House Bill (H.R. 14496) was amended subsequent to the submission of this report, which changed the references of Title III to Subtitle C of the final Act.

2/ See Report of Senate Committee on Public Works, No. 94-988, p. 17, dated June 25, 1976; which states with reference to what is now Section 3008:

> "In any regulatory program involving Federal and State participation, the allocation or division of enforcement responsibilities is difficult. The Committee drew on the similar provisions of the Clean Air Act of 1970 and the Federal Water Pollution Control Act of 1972."

enforcement action in appropriate cases, even after a state program has been approved. See Cleveland Electric Illuminating Co. v. EPA, 603 F. 2d 1 (6th Cir., 1979); U.S. v. City of Colorado Springs, 455 F. Supp. 1364, (D.C., Colo., 1978); Chesapeake Bay Foundation, Inc. v. Virginia State Water Control Board, 453 F. Supp. 122 (D.C. Wa., 1978); U.S. V. Cargill, Inc., Civ. Docket #80-135, (D.C. Del. Feb. 12, 1981); and Shell Oil V. Train, 415 F. Supp. 70, (D.C. Cal. 1976), where the Court, after quoting from legislative history of the CWA, stated:

> "The language suggest that Congress did not intend the environmental effort to be subject to a massive federal bureaucracy; rather, the states were vested with primary responsibility for water quality, triggering the federal

> enforcement mechanism only where the state defaulted.... The overall structure is designed to give the states the first opportunity to insure its proper implementation. In the event that a state fails to act, federal intervention is a certainty".

3. States With Which EPA Has Cooperative Arrangements:

Regarding states which have entered into Cooperative Arrangements, the federal-state relationship is different from that of interim or final authorization. A Cooperative Arrangement is a device to assist states whose hazardous waste programs are not yet sufficiently developed to qualify for authorization, and to provide financial assistance to those states. (See guidance memorandum on Cooperative Arrangements dated August 5, 1980). There is no authorization by EPA of the state to administer the hazardous waste program in lieu of the federal program. In fact, the model Cooperative Arrangement specifically provides that:

> "EPA retains full and ultimate responsibility for the administration and enforcement of the Federal hazardous waste management program in the state."

The right and obligation of EPA to take enforcement action in a state with which the Agency has a Cooperative Arrangement is, therefore, the same as in a state which has neither interim or final authorization.

Although notice to such states of impending enforcement action is not required by RCRA, for purposes of maintaining harmonious EPA-state relationships, appropriate consultations should precede EPA action, and written notice should be given by EPA to the appropriate agency and the governor of the affected state.

2.

DOES EPA ENFORCE STATE LAW AND REGULATIONS OR FEDERAL LAW AND REGULATIONS IN AN AUTHORIZED STATE?

Having concluded that EPA can enforce hazardous waste laws and regulations in a state with an EPA-approved program,t he question then becomes: does EPA enforce RCRA and federal regulations,

or the state's statute and regulations? If the latter, can EPA enforce a portion of the state program that goes beyond the scope of coverage of the basic federal program, or state laws and regulations which were adopted after EPA approval of the state program? On the other had, may EPA enforce a portion of the federal program that is not included in the state program?

These issues may initially seem more academic than real since, in order to gain interim authorization to administer the RCRA program, a state must have a program which is "substantially equivalent" to the Federal program (see RCRA, Section 3006(c)), and a program which is "equivalent" to the federal program in order to gain final authorization (Section 3006(b)). As a result, many authorized states will have provisions which are similar, if not identical, to the federal regulations. However, there will undoubtedly be differences in the federal and state laws and regulations, particularly during interim authorization, and many states will have programs which are, in part, more stringent or broader in scope of coverage than the federal program. Therefore, it is very likely that these issues will be encountered frequently.

As discussed in Part 1 of this memorandum, Section 3008 (a)(2) RCRA authorizes EPA to take enforcement action in an authorized state, after notice to the state, in the case of "a violation of any requirement of this subtitle." When EPA authorizes a hazardous waste management program under section 3006, the state program becomes the RCRA program in that state, and is a part of the requirements of Subtitle C referred to in Section 3008(a)(2), which EPA is mandated to enforce. Upon development of the state's program and acceptance of that program by EPA, "such state is authorized to carry out such program in lieu of the federal program under this subtitle in such state...." (RCRA Section 3006(b) and (c)). In other words, the only hazardous waste program in effect in that state is the state program, and the state laws and regulations are those which must be enforced by EPA should federal enforcement action be necessary. This, of course, does not limit EPA's right to take action under Sections 7003 or 3013 of RCRA (see Section 6 of this memorandum).

This result is undoubtedly in keeping with the intent of Congress. If the federal hazardous waste regulations were to apply to handlers of hazardous waste in authorized states, those persons would be continously subjected to a dual set of laws and regulations, a situation which presently exists in those states

which have not yet received interim authorization. Such dual regulations is presumably what Congress intended to phase out in an orderly manner when it adopted the provisions of Section 3006 (b) and (c).

Again, an analogy can be drawn to the provisions of the Clean Water Act and the cases decided under it to reinforce this opinion. See United States v. Cargill, Inc., (D.C., Del.) Civil No. 80-135, Slip Op. February 12, 1981; Shell Oil v. Train, supra; United States v. I.T.T. Rayonier, Inc., 627 F. 2d 996 (9th Cir., 1980). The problem becomes more complex, however, when the following questions are considered:

(A) If an authorized state program includes regulations or statutory provisions which are greater in scope of coverage than the federal program, can EPA also enforce those additional state requirements?

(B) If the federal regulations contain provisions which are not included in the state program (e.g., by reason of promulgation by EPA subsequent to authorization of the state program by EPA), can EPA enforce the federal regulations which are not a part of the state program? and,

(C) If the states make modifications in its program after authorization, does EPA enforce the state program as originally approved, or the state program as modified after approval by EPA?

These questions will be of particular significance during interim authorization, when the states are required only to have programs which are "substantially equivalent" to the federal program, and while EPA and the states continue to "fine-tune" their programs.

A. If an authorized state program includes regulations or statutory provisions which are greater in scope of coverage or more stringent than the federal program, can EPA also enforce those additional state requirements?

Individual states will, in addressing industrial, agricultural, geographic, hydrological and other factors which exist within their borders, undoubtedly develop portions of their hazardous waste programs which are greater in scope of coverage than the federal] program. Examples of such additional coverage could include the listing of wastes which are not included in the federal universe

of hazardous waste; the permitting of generators or transporters; recordkeeping or reporting requirements not included in the federal regulations; and requirements for physical examination of employees and their families. State requirements which are greater in scope of coverage than the federal regulations are generally those for which no counterpart can be found in the federal requirements.

State program requirements that are greater in scope of coverage than the federal program are not a part of the federally-approved program (40 CFR §§123.1(k) and 123.121(g)). Since that portion of the state program does not have a counterpart in the federal program, it does not become a requirement of Subtitle C, the violation of which EPA is entitled to enforce pursuant to Section 3008(a)(1) and (2). Therefore, EPA may not enforce that portion of a state program which is broader in scope of coverage than the federal program.

In should be made clear, however, that there is a distinction between portions of a state program which are broader in scope of coverage, and those which are "more stringent" than the federal program. Section 3009 of RCRA and 40 CFR §§123.1(k) and 123.121(g) provide that nothing shall prohibit a state from imposing any requirements which are more stringent than those imposed by the federal regulations.

While state provisions which are broader in scope of coverage generally do not have a counterpart in the federal program, the subject matter of the more stringent state provisions is usually covered in similar provisions of the federal program. Examples of more stringent state provisions would include: a requirement that not only a fence be erected and maintained around a facility, but that it be a fence of specific height and of specific material (e.g., a ten-foot, chain-link fence); a requirement that containers for storage of waste be of a specific material and/or color-coded; a lesser amount of waste exempted from regulation under the small quantity generator exemption (40 CFR §261.5); and a requirement that final cover of a land disposal facility be of a particular material or thickness.

Provisions in state program which are more stringent than their federal counterparts are, nevertheless, a part of the approved state program, and are enforceable by EPA. Congress apparently intended that result when, in Section 3009, it authorized states to develop more stringent programs, and, at the same time, authorized

EPA to enforce those programs under Section 3008(a)(2). In addition, more stringent state provisions in an approved program are, unlike those which have no counterparts in the federal program, a part of the requirements of Subtitle C, which EPA is required to enforce.

B. If the state modifies its program after authorization, can EPA enforce the state program as modified, or th state program as approved before the modification?

This issue assumes that, after either interim or final authorization of a state program, the state makes modifications in that program. Such modifications could make the program more stringent, less stringent or enlarge or restrict the scope of the program. In such event, must EPA enforce the program as modified, or the program in existence at the time of authorization?

With regard to modifications made by the states in their programs after final authorization, 40 CFR §123.13 sets forth specific procedures for such revisions by the states and approval thereof by EPA. A state program revision after final authorization must be submitted to EPA for approval, public notice given, and a public hearing held if there is sufficient public interest. The revision to the state ?????????????????????? upon approval by the Administrator (40 CFR §123.13(b)(4)). It is, therefore, clear that under present EPA regulations, modifications made to a state program after final authorization require EPA approval for such modifications to be effective, and that the state program which EPA may enforce is that which existed as of the latest EPA approval.3/

However, the federal regulations relating to Phase I authorization contained in 40 CFR §123.121 through 123.137 do not contain specific provisions comparable to §123.13 with respect to how modifications may be made by a state in its program after interim authorization, or how approval of any such modifications could be made by EPA, short of Phase II or final authorization. This is a significant omission, since it is apparent that many, if not all, states will be making modifications in their programs between the approval for interim authorization and the filing of their applications for final authorization.4/

In the absence of requirements in RCRA or EPA's regulations for submission of program modifications by a state with interim authorization to EPA for approval, it is presently our opinion that EPA may enforce such modifications made by a state with

interim authorization, notwithstanding that EPA may not have approved those modifications.5/

------------------

3/Discussions with representatives of the Office of General Counsel and the Office of Solid Waste indicate that 40 CFR §123.13 is under review, and may be amended to eliminate the requirement that EPA approve modifications made after final authorization of state programs before the modifications may be effective. The consequences on enforcement of such an amendment to §123.13 are addressed in the following discussion.

4/There are, however, stages during interim authorization in which state program changes may be approved by EPA. For example, when the states, having received Phase I authorization, apply to EPA for Phase II interim authorization,t hey must demonstrate that their programs have been modified, if necessary, since Phase I authorization so as to contain the elements necessary to meet the requirements of one or more of the components of Phase II. Likewise, changes in the state program during interim authorization are submitted to EPA for approval as part of the process for final authorization. There is also a provision in the model memorandum of Agreement between EPA and the state which requires the state to inform EPA of any program changes which would affect the state's ability to implement the authorized program. Nevertheless, there is no requirement, as in 40 CFR §123.13, which delays the effective date of modifications in a state program during interim authorization until after EPA approval of such modifications.

5/In the event EPA should eliminate the requirements of 40 CFR §123.13 (see footnote 3), then by much the same reasoning contained herein, EPA could also enforce modifications made in the state program after final authorization, notwithstanding whether EPA had approved the modifications.

We have come to this conclusion for the following reasons:

1. Congress provided in Section 3006 for two types of authorization: interim authorization to be granted upon a showing by the states of "substantial equivalence" with the federal program; and final authorization, upon a showing by the state of "equivalence" with the federal program. Obviously, in the journey from substantial equivalence to equivalance, some

changes must be made, and were undoubtedly contemplated by Congress. Yet, Congress also authorized EPA to enforce the hazardous-waste program during this interim period, including the programs in effect in those states to which interim authorization had been granted. It therefore appears that Congress intended the EPA enforce such laws and regulations as were in effect at the time of violation in a state with interim authorization, notwithstanding whether EPA had formally approved each and every one of those laws or regulations.

2. To conclude that EPA could not enforce state laws and regulations adopted after granting of interim authorization, but was, instead, restricted to enforcement of only those which were in existence at time of approval of the state program by EPA, would potentially subject the regulated community to the dilemma of being required to comply with two sets of laws or regulations on the same subject: those which were a part of the EPA-approved state program at the time of granting of interim authorization; and those which the state promulgated after the granting of interim authorization. Such dual regulation defeats the whole purpose of state authorization.6/

We therefore conclude that changes made by a state in its hazardous waste programs after granting of interim authorization, and before granting of final authorization, may be enforced by EPA regardless of whether the changes have been formally approved by EPA. In so doing, we recognize that there are several forceful arguments which can be made on the other side of the issue.7/ Notwithstanding these, we believe the weight of the arguments tilts in favor of the conclusion which we reached herein.

---------------

6/This reasoning would not apply with equal force to modifications made in a state program during final authorization because the States presumably will be making many fewer modifications of their programs after final authorization.

7/For example, if a state, after receipt of interim authorization, makes changes in its program which are less stringent, is EPA required to enforce the portions of the state program which are less stringent? The answer must be "yes", and if the states makes any such changes in its program, EPA's only resort may be to revoke the State's authorization.

C. If the federal regulations contain provisions which are not included in an approved state program, can EPA enforce those federal regulations in that state?

The situation presented by this question will most likely occur when EPA modifies its regulations or adopts new regulations, such as the addition of a waste to the universe of federally-regulated waste, after the approval of a state program. This issue is significant because, with approximately one-half of the states having received interim authorization, it is important to know whether changes made in the federal program subsequent to a state having been granted authorization can be enforced in that state.

Under the procedure established by Section 3006 and 40 CFR Parts 123, a state, in order to gain interim or final authorization, must submit to EPA its program consisting of, among other things, the state laws and regulations which constitute its program. These are compared to the analogous provisions of the federal program to determine whether the state program meets the necessary standards for interim or final authorization. Approval is granted for the specific state program as submitted, which then becomes the hazardous waste program in effect in that state in lieu of the federal program.8/ The federal program, in effect, ceases to exist in that state, except for the potential of federal enforcement of the state program or the possibility of action under sections 7003 or 3013.

Since the state hazardous waste laws and regulations are effective in lieu of the federal program after authorization, any changes in the federal program made after the granting of interim authorization to a state do not become a part of the state program unless and until the state adopts such changes.9/ Inasmuch as the state laws and regulations are those which EPA is required to

----------------

8/As noted earlier, where the state program has a greater scope of coverage than required under the federal program, that part of the state program is not a part of the federally-approved program. 40 C.R §§123.1(k)(2) and 123.121(g)(2). Also as noted earlier during interim authorization, EPA enforces modifications in a state program, notwithstanding that EPA may not have approved those modifications.

9/For a discussion of the adoption of modifications by a state in its program, and when those modifications become a part of the EPA-authorized program, see Subsection B of this Section, supra.

enforce, EPA is, conversely, not entitled to enforce federal requirements which are not a part of the state program.10/

With regard to states which have been granted final authorization, there are provisions in the federal regulations which govern the state adoption of modifications in the federal program. Section 123.13 or 40 CFR requires the states, after final authorization, to adopt amendments which are made to the Federal program within one year of the promulgation of the federal regulation, unless the state must adopt or amend a statute, in which case the revision of the state program must take place within two years. However, until the state adopts the Federal amendments, the state program does not include them, and EPA cannot enforce them in that state.

We recognize that this could create a situation in which regulations promulgated by EPA subsequent to authorization of a substantial number of states would not be effective in those states until such time as the states adopted them,11/ while being in effect as part of the federal program in those states which do not yet have interim authorization, and in those states which receive authorization after promulgation of the regulations and have included a counterpart of the regulations as part of their state program.

3.

IF AN ENFORCEMENT ACTION IS NECESSARY,
IN WHAT COURT SHOULD EPA FILE THE ACTION?

Section 3008(a)(1) of RCRA provides that whenever the Administrator determines that any person is in violation of any requirement of Subtitle C, "... the Administrator may commence a

--------------

10/It should be noted here that there are components of the federal program which are not included in Phase I interim authorization or in some phases of Phase II authorization to the states. For example, the granting of Phase I interim authorization to the

states does not include the authority to issue RCRA permits to hazardous waste management facilities. Likewise, the granting of Phase II, Component A authorization (covering permitting of storage facilities) does not include authority to issue RCRA permits to hazardous waste land disposal facilities, which will be covered by Component C of Phase II. The portion or portions of the federal program not covered by an authorization to the state continues as a part of the federal program in effect in that state until it is covered by a subsequent authorization.

In the meantime, EPA is entitled to enforce those portions of the federal program which the state has not yet been authorized to administer.

11/For a discussion of the adoption of modifications by a state in its program, see Subsection B of this Section, supra.

civil action in the United States District Court in the district in which the violation occurred...."

This statute vests jurisdiction of suits involving violations of the hazardous waste program under Subtitle C in the U.S. District Courts, and the venue of such actions in the U.S. judicial district in which the violation occurred. Therefore, in a suit brought by EPA to enforce a portion of the hazardous waste program of a state which has received interim or final authorization, the suit should be brought in the appropriate U.S. District Court, but the substantive law to be applied to the facts of the case should be the state hazardous waste statutes and regulations which were applicable to those facts.

The state may, of course, file its enforcement actions in the state courts. In this regard, EPA should be aware of the potential which may exist for a final decision in a state court action to act as collateral estoppel to a subsequent action which EPA may bring against the same offender over the same violation. See U.S. v. ITT Rayioner, Inc., 627 f.2d 996 (9th Cir, 1980), for a discussion of state court judgments acting as collateral estoppel against EPA.

4.

IF EPA ENFORCEMENT OF STATE LAWS, REGULATIONS OR PERMITS INVOLVES ADMINISTRATIVE PROCEEDINGS, SHOULD EPA FOLLOW FEDERAL OR STATE PROCEDURES?

Since the bulk of the RCRA enforcement activity of EPA will involve administrative proceedings, particularly with the authority to issue administrative orders under Sections 3008, 3013 and 7003, the question of whether federal or state administrative procedures will be followed in enforcement actions is an important one.

There can be little question that Congress provided EPA with the necessary authority to use federal procedures for enforcement of all applicable hazardous waste laws, and that it intended that those procedures be used in the event of federal enforcement of a state's hazardous waste laws or regulations.12/ For example, Section 3003(a)(1) of RCRA authorizes the Administrator, in the event of a violation of any requirement of Subtitle C, to issue an order requiring compliance immediately or within a specified time.

Section 3008(a)(2) makes it clear that such orders may be issued in states which are authorized to carry out the hazardous waste program under Section 3006 (after notice to the affected state); and Section 3008(a)(3) provides for a penalty for non-compliance, as well as the authority of the administrator to revoke

-------------

12/We interpret RCRA as limiting the use of the administrative orders mentioned herein to EPA, and that they are not available, as such, to the states. The states statutes may, of course, contain authority for state administrative orders.

any permit issued to the violator, whether by EPA or the State. Provisions for public hearings on any order issued under this Section, and authority for the Administrator to issue subpoenas are also included in Section 3008(b). Section 3008(c) specifies the scope and content of the compliance orders which may be issued under this Section.

Congress provided a specific mechanism for federal administrative enforcement proceedings, to be used in cases of federal enforcement of state programs in lieu of any administrative procedures contained in the laws and regulations of the state in which the violation occurred. Furthermore, it would seem inconceivable as a practical matter that EPA would consider using state administrative procedures even should it legally be possible to do so, since that would, in most cases, necessitate submitting the violation to the state

agency whose inability or failure to take enforcement action would have been responsible for bringing about EPA's involvement in the matter.

5.

IN EVENT OF EPA ENFORCEMENT IN AN AUTHORIZED STATE, WHAT STEPS SHOULD BE TAKEN TO MINIMIZE ADVERSE IMPACT UPON FEDERAL-STATE RELATIONSHIPS?

There are several circumstances under which EPA may be required to take enforcement action in a state with an authorized RCRA program, most primarily because of the state's lack of resources to take adequate or timely action. Whatever the reason, EPA should carefully avoid the appearance of being "overbearing" or disregarding the states' role as the primary agency for administration and enforcement of the hazardous waste program.

In some cases, the state will request EPA to take enforcement action. In such cases, few problems are encountered in EPA-state relations. However, a letter confirming the State's request, and the notice provided for in Section 3008(a)(2) should be issued to the state before the action is commenced. On the other hand, when the state is passive or unwilling to initiate a timely, appropriate enforcement action, EPA should take care to handle that matter with diplomacy.

Since it is clear, as outlined above, that Congress intended the states to have the primary enforcement authority of the RCRA program, if it appears that federal enforcement intervention may be required, a letter should be written from EPA to the appropriate state agency administering the program containing the following:

1. A description of the violation, including the name and address of the violator; the date of violation and location of the facility or site at which it occurred; references to the provisions of the state program which are being violated; and any other pertinent details which will aid in the identification and the nature of the violation. Additional information, such as names of witnesses, laboratory reports, inspection reports, and other evidence in EPA's possession should be offered upon request of the state should the state decide to take enforcement action.

2. A statement that under RCRA and the Memorandum of

Agreement between EPA and the state, it is the primary obligation of the state to take necessary and timely actions to enforce the provisions of the state hazardous waste laws and regulations, and that EPA believes it is appropriate that the state take such action. In some cases, it would be appropriate to suggest the type of action to be taken, such as issuance of a compliance order, other administrative orders, revocation of a permit, or filing of an injunctive action.

3. A statement that should the state agency fail to take appropriate and timely action by a date certain stated in the letter, EPA may thereafter exercise its right to initiate enforcement action under Section 3008(a)(2).

The question of what is a "timely" action by the state agency will depend upon a variety of circumstances. If an uncorrected violation could constitute a threat to human health or the environment, a relatively short period of time may be required for either the state or EPA to act. If, through telephone conversations, or other communications between EPA and state agency officials, there is already an indication before the letter is mailed to the state that it will probably not take action regardless of the request, then a relatively short period of time (e.g., 10 days) for state response may be allowed before EPA initiates the action. In such case, the letter should also refer to the previous communication with the state which indicated the liklihood of inaction on its part.

On the other had, if there is an indication that the state will or may act, but has failed to do so because of scarce resources or for other clear and understandable reasons, a longer period of time may be allowed to give the state ample opportunity to fulfill its role as the primary enforcement authority.

At the end of the time period stated in the letter, if the state agency has not initiated an enforcement action or indicated its willingness and intent to do so, EPA may proceed to commence action as the enforcing authority without further notification.

6.

EFFECT OF STATE AUTHORIZATION ON SECTION 7003 AND 3013 ACTIONS

Section 7003 of RCRA states, in pertinent part:

> "Notwithstanding any other provision of this Act, upon receipt of evidence that the handling... of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment, the Administrator may bring suit ... to immediately restrain any person contributing to such handling..., or so take such other action as may be necessary. The Administrator shall provide notice to the affected State of any such suit. the Administrator may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and the environment." (emphasis supplied)

The first clause of the section indicates that it was the intent of Congress to allow EPA to take emergency actions to protect human health and the environment in cases of imminent hazard, without regard to any other provisions of the Act. It is not within the scope of this memorandum to review the purposes and uses of Section 7003, but it is clear that EPA is not bound by any of the provisions of an authorized state's laws or regulations which may appear to restrict or limit the use of this Section. Again, however, notice must be given to the state prior to the commencement of such an action.

It is also clear from the express wording of the section that only the Administrator of EPA, or other Agency personnel to whom he has delegated authority, may take the actions authorized by Section 7003, and that therefore a state which as been authorized to administer the hazardous waste program may not employ Section 7003 as a state enforcement mechanism. States are authorized by EPA to administer and enforce the hazardous waste program only under Subtitle C of RCRA, which does not include Section 7003. Use of Section 7003 is within the exclusive province of EPA. This does not, however, prohibit the states from adoption and use of their own form of imminent hazard authority in the state courts.

The ability of EPA to take action under Section 3013 is likewise unaffected by authorization of a state program. By such authorization, EPA does not relinquish the enforcement options which it possesses, but merely agrees to hold them in abeyance to be used in the event the state fails to take appropriate and timely

enforcement action.13/ Before issuing a 3013 order to a person in an authorized state, however, notice should be given to the appropriate agency in the affected state in the manner suggested herein, and reference should be made to the guidance on issuance of 3013 orders contained in the Memorandum from Douglas MacMillan, Acting Director of the Office of Waste Programs Enforcement to the Regional Enforcement Directors dated September 11, 1981, entitled, "Issuance of Administrative Orders under Section 3013 of the Resource Conservation and Recovery Act."

----------------

13/The model Memorandum of Agreement between EPA and the states contained in the RCRA State Interim Guidance Manual, provides:

> "Nothing in this Agreement shall be construed to restrict in any way EPA's authority to fulfill its oversight and enforcement responsibilities under RCRA."

If you have any questions or problems relating to the matters contained in this memorandum, please contact Richard H. Mays of my office at FTS 382-3108.

cc: Christopher J. Capper
Acting Assistant Administrator
Office of Solid Waste and Emergency Response

Robert M. Perry
General Counsel
Office of General Counsel

Mr. C. Raymond Marvin
General Counsel
National Association of Attorneys General
444 N. Capitol Street - Room 1777
Washington, D.C. 2000