IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>SOUTHERN UNION COMPANY ) | Cr. No. 07-134 S |

**DECISION AND ORDER
ON MOTION FOR JUDGMENT OF ACQUITTAL
AND MOTION FOR NEW TRIAL**

William E. Smith, United States District Judge.

After having been found guilty by a jury of knowingly storing hazardous waste without a permit in violation of 42 U.S.C. § 6928(d)(2), the Defendant, Southern Union Company, now moves for judgment of acquittal under Fed. R. Crim. P. 29 on the sole ground that the Court erred by allowing the United States to enforce Rhode Island's regulation of conditionally exempt small quantity generators. The Defendant alternatively requests a new trial pursuant to Fed. R. Crim. P. 33 because it claims: (1) it was deprived of a critical defense under the applicable regulations; (2) the evidence weighed heavily against the verdict on the issues of whether the liquid mercury was a waste and whether the company knowingly stored it; and (3) the Court improperly allowed evidence about the conditions at Tidewater and Southern Union's failure to contact police following the spill. For the reasons set forth below, both motions are denied.

I.   Background

The Defendant, Southern Union Company, is a Delaware corporation based in Texas and primarily engaged in the business of transporting and distributing natural gas.  In 2000, the Defendant acquired several separate gas companies in Rhode Island and Massachusetts, consolidated those companies, and formed the New England Gas Company ("NEGC").  Through NEGC, the Defendant supplied natural gas to Rhode Island and parts of Southeastern Massachusetts.[1]  In connection with this business, the Defendant owned a vacated, dilapidated, and frequently vandalized facility at the end of Tidewater Street in Pawtucket, Rhode Island.  Located along the Seekonk River, the Tidewater facility consisted of several buildings and two unused natural gas storage tanks.

After forming NEGC, in or about June 2001, the Defendant started a mercury reclamation program at Tidewater known as the Mercury-Sealed Regulator Removal Program.  Prior to the 1960s, many homes in the NEGC service area used gas meters that operated with mercury-sealed regulators or MSRs.  Recognizing that mercury is a dangerous substance and hazardous to human health, the Defendant began a program by which workers went to customers' homes and replaced existing MSRs with non-mercury regulators.  The work crews would then transport the MSRs and any recovered liquid mercury to

---

[1] As of August 2006, NEGC no longer provides natural gas service in Rhode Island and operates only in Massachusetts.

2

the Tidewater facility.  At the Tidewater facility, the Defendant employed an environmental services company, International Environmental Trading Company, Inc. ("IETC"), to pour off the liquid mercury from inside the regulators into special containers. The liquid mercury containers were then shipped to a reclamation facility in Pennsylvania.  The MSR housings were decontaminated through a rinsing process and recycled.  IETC also ensured that all mercury contaminated rags, protective clothing, and cleaning agents were properly disposed.

In November 2001, the Defendant stopped removing MSRs from customer homes, but kept IETC at the Tidewater site to finish processing the remaining MSRs through the end of the year.  In the spring of 2002, after settling a brief labor dispute, the Defendant again began removing MSRs from customers' homes, however, the Defendant did not re-contract with IETC to ensure the proper reclamation of the liquid mercury.  Instead, the Defendant stored the MSRs removed from customers' homes in one of the vacant buildings at the Tidewater facility.  To prevent the spillage of liquid mercury into the environment, the Defendant double bagged each MSR in heavy duty plastic bags and then piled those bags in plastic "kiddie" swimming pools.  Liquid mercury that was spilt during the removal process was kept in assorted containers (i.e. paint cans, plastic jugs, glass bottles, etc.) and stored inside the building in a plywood cabinet secured by a hasp and padlock.

The Defendant accumulated MSRs and liquid mercury at the Tidewater facility over the course of 2002, 2003, and 2004. Despite drafting several requests for proposals to solicit bids from contractors to dispose of the liquid mercury, the Defendant did not restart the reclamation component to the MSR Removal Program.

Throughout this time period, the Tidewater facility (to include the mercury storage building) was in a state of utter disrepair and the Defendant was well aware of the shoddy security conditions. Although the Defendant periodically stationed a security guard at the facility, the evidence established that graffiti covered the buildings, doors and windows were broken, the perimeter security fencing contained numerous gaps, and the site was subject to repeated break-ins and had become the periodic home to several homeless people.

In September 2004, three youths broke into the mercury storage building. Once inside, they removed several containers of waste liquid mercury and proceeded to spill the mercury throughout the building and the outside grounds. The vandals also brought some of the liquid mercury to a nearby residential apartment complex where they littered it in and around parking lots and outdoor common areas.

The spilled liquid mercury lay undiscovered on the Tidewater property for approximately three weeks. On October 19, 2004, an

employee discovered the spill and a clean up was conducted.   The ensuing investigation then led to the discovery of the second spill at the apartment complex.

For its part, the Government charged the Defendant in a three count indictment with violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., and the Emergency Planning and Community Right-to-Know Act ("EPCRA").   42 U.S.C. § 11001 et seq.   After an almost four week trial, the jury returned a verdict of guilty on Count I, knowingly storing a hazardous waste (i.e. liquid mercury) without a permit at the Tidewater facility in Pawtucket, Rhode Island, in violation of RCRA; and not guilty on Counts II and III.[2]

## II.   Hazardous Waste Management Overview

### A.   Federal Enforcement of RCRA

Congress enacted RCRA to address the nation's problems with hazardous waste disposal.   See 42 U.S.C. § 6901.   The intent behind RCRA is to facilitate the safe management of hazardous waste from the time it is generated to its ultimate disposal, to protect human health and the environment from the dangers of hazardous waste, and

---

[2] Count II of the indictment charged that on October 19, 2004 up to and including October 20, 2004 the Defendant knowingly and willfully failed to immediately provide notice to the state emergency planning commission and to the local emergency planning committee of a release of mercury.  Count III charged that from on or about March 25, 2003 until on or about October 19, 2004, the Defendant was knowingly storing a hazardous waste, mercury containing gas regulators, without a permit.

to encourage the conservation and recovery of natural resources. See id. § 6902.

A key feature of RCRA is that the Federal Government, namely the U.S. Environmental Protection Agency (EPA), may authorize states to enact their own hazardous waste management programs. Once authorized, a state's program effectively supplants the federal regulations and operates "in lieu" of the federal program as long as the state's regulations are "equivalent to" and "consistent with" the federal hazardous waste management regulations. Id. § 6926(b).

In developing their own programs, states may add to the federally mandated requirements and may impose requirements that are "more stringent" than the federal counterpart, but not less. See 42 U.S.C. § 6929; 40 C.F.R. § 271.1(i) (2008). In effect, the federal regulatory scheme establishes a uniform baseline standard. The Federal Government retains authority to enforce an authorized state program and may criminally prosecute violations of state hazardous waste management regulations. United States v. MacDonald & Watson Waste Oil Co., 933 F.2d 35, 43-46 (1st Cir. 1991) (upholding federal criminal enforcement of state permit violation under 42 U.S.C. § 6928(d)(2)); United States v. Elias, 269 F.3d 1003, 1009 (9th Cir. 2001).

There is a caveat to the general rule that the Federal Government may enforce an authorized state RCRA program. See

United States v. Recticel Foam Corp., 858 F. Supp. 726, 740-43 (E.D. Tenn. 1993). The Federal Government is barred from enforcing state requirements that have a greater scope of coverage than the federal regulations. 40 C.F.R. § 271.1(i)(1). If a state chooses to operate a hazardous waste management program with a greater scope of coverage than required by federal law (as opposed to "more stringent"), "the additional coverage is not part of the Federally approved program," id. § 271.1(i)(2), and the Federal Government is without authority to enforce those state regulations. However, if a state chooses to make its regulations "more stringent" than the federal regulations, the Federal Government's enforcement authority is not restricted. 42 U.S.C. § 6929; 40 C.F.R. § 271.1(i)(1); see Recticel Foam, 858 F. Supp. at 742. Where the line of demarcation between "greater in scope" and "more stringent" lies is not always crystal clear and, as it is in this case, can be the source of substantial dispute.

B.    The Conditionally Exempt Small Quantity Generator Exemption

When Congress enacted RCRA, it recognized that it would be extremely onerous for small businesses that only generate small amounts of waste to comply with the Act. See H.R. Rep. No. 98-1133, at 103 (1984), as reprinted in 1984 U.S.C.C.A.N. 5649, 5674 ("It is recognized that many small quantity generators may be small businesses that may be adversely affected if the full set of Subtitle C regulations are required."). To deal with this concern,

7

the federal regulations create a conditional exemption for small quantity generators ("CESQG"), which exempts them from, among other things, obtaining a hazardous waste storage permit.  See 40 C.F.R. § 261.5(b) (2008).  As the name implies, however, the exemption is conditional, and in order to qualify for it a generator of hazardous waste must satisfy several requirements.  First, it may not generate more than 100 kilograms of hazardous waste per month. 40 C.F.R. § 261.5(a).  Second, it must follow a specified method prescribed by the regulations to ascertain whether the waste it generated is hazardous.  Id. § 261.5(g)(1); § 262.11.  Third, it must ensure that hazardous waste kept in storage never exceeds 1,000 kilograms.  Id. § 261.5(g)(2).  Lastly, it must follow specific guidelines as to where it may treat or dispose of its hazardous waste.  Id. § 261.5(g)(3).  If the hazardous waste stored by the CESQG is to be mixed with non-hazardous waste, the regulations prescribe further requirements, which must be met in order to maintain the exemption.  Id. §§ 261.5(h)-(j).

For the purposes of this case, the critical point is that 40 C.F.R. § 261.5 is a conditional exemption, not an unqualified exemption.  The regulations are clear that generators that fail to comply with the required conditions cannot claim the exemption.

C.    The Rhode Island Program

Rhode Island received final authorization from the EPA to implement its base hazardous waste management program on January 31, 1986.  See 51 Fed. Reg. 3780 (Jan. 30, 1986).  Over the years, Rhode Island has revised its hazardous waste management regulations to maintain compliance with federal requirements.  See 55 Fed. Reg. 9128 (Mar. 12, 1990); 57 Fed. Reg. 8089 (Mar. 6, 1992); 57 Fed. Reg. 45574 (Oct. 2, 1992); 67 Fed. Reg. 51765 (Aug. 9, 2002); 72 Fed. Reg. 70229 (Dec. 11, 2007).  In each instance, Rhode Island sought the required EPA authorization for the changes and the EPA preformed its mandated statutory function -- namely authorizing the changes and making required findings.  See 42 U.S.C. § 6926(b).

One of these authorized changes concerned Rhode Island's treatment of CESQGs.  See 67 Fed. Reg. 51765 (Aug. 9, 2002, effective on Oct. 8, 2002).  In this authorization, the EPA noted that:

> [t]he major difference in Rhode Island's regulatory program as compared to the federal program is that it is more stringent with regard to the regulation of . . . [CESQGs], i.e., generators of less than 100 kg/month.
>
> Rule 5.0 [Generators] specifies that certain federal provisions which allow reduced requirements for SQGs and CESQGs (40 CFR 261.5, 40 CFR 262.20(e), 40 CFR 262.42(b) and 40 CFR 262.44) do not apply in Rhode Island . . . .
>
>        . . . .

9

> The requirements referenced above are part of Rhode Island's authorized program and are <u>federally enforceable</u>.

<u>Id.</u> (emphasis added).[3]

Thus, in Rhode Island, CESQGs that would ordinarily be relieved of their obligation to obtain a hazardous waste storage permit under the federal CESQG exemption <u>must</u> obtain a permit to ensure their compliance with RCRA under the EPA approved Rhode Island program.


III. Motion for Judgment of Acquittal

The Defendant's Motion for Judgment of Acquittal poses a head-on challenge to the EPA's 2002 determination that Rhode Island's treatment of CESQGs is more stringent and argues instead that Rule 5.00 of the Rhode Island Hazardous Waste Management Program is broader-in-scope, and therefore unenforceable by the EPA. Defendant argues that because the Federal Government essentially exceeded its prosecutorial authority, the conviction must be vacated.

---

[3] Rhode Island Hazardous Waste Regulations state:

> Rhode Island does not recognize federal exemptions for small quantity generators and the small quantity generator provisions of 40 C.F.R. 261.5 . . . do not apply in Rhode Island.

Rule 5.00, Rules and Regulations for Hazardous Waste Management, (amended February 9, 2007) available at http://www.dem.ri.gov/pubs/regs/regs/waste/hwregs07.pdf (last visited June 25, 2009).

Defendant's motion is brought pursuant to Fed. R. Crim. P. 29. Therefore, the Court reviews the evidence in the light most favorable to the Government and draws all reasonable inferences in its favor to determine if a rational fact finder could find, beyond a reasonable doubt, that sufficient evidence exists to sustain the conviction. United States v. Hernandez, 218 F.3d 58, 64 (1st Cir. 2000); United States v. Marrero-Ortiz, 160 F.3d 768, 772 (1st Cir. 1998).

The Rule 29 standard is an awkward fit in this case, however, because the Defendant's motion does not actually challenge the sufficiency of the evidence; rather, it challenges the Federal Government's authority to prosecute it in the first place.   The Defendant raised this issue several times prior to (and during) trial.[4]  The Court indulged counsel by dedicating significant time to the issue, but deferred ruling until just before the jury charge.  With the trial complete and the Defendant still pressing its challenge now under Rule 29, the Court will take the opportunity to more thoroughly set forth its reasons for denying Defendant's motion.

---

[4] See Def.'s Mot. to Exclude Federal Enforcement of Rhode Island State Regulations Concerning Conditionally Exempt Small Quantity Generators (Doc. 79 filed 9/11/2008); Mot. to Quash Tr. at pages 48-67 (Doc. 104 held 9/18/2008); Daubert Hr'g Test. of Ms. Marcia Williams Tr. at pages 55-93 (Doc. 121 held 10/7/2008); Def.'s Mot. for J. of Acquittal (Doc. 125 filed 12/01/2008).

Defendant's attack on the enforceability of the Rhode Island program, regardless of how it is styled in this proceeding, is in substance identical to an Administrative Procedures Act ("APA") challenge: the Defendant is effectively seeking to have declared unenforceable the 2002 decision of the EPA that categorizes Rhode Island's treatment of CESQGs as more stringent. As such, there is a serious question as to whether this Court may entertain the issue in this proceeding. In RCRA, Congress specifically prescribed that challenges to state program authorizations must be brought in the Circuit Court of Appeals through the APA and that the decisions of the EPA concerning the authorization of a state's hazardous waste management program "shall not be subject to judicial review in civil or criminal proceedings for enforcement." 42 U.S.C. § 6976(b). If the plain language were not enough (which it clearly is), the legislative history to the amendment that added this language drives home the point: "[a]ddition of this language . . . clarif[ies] that defendants in Federal enforcement proceedings cannot challenge permit terms and conditions or State program provisions if such provisions could have been challenged in the courts of appeals at the time the permit was issued." H.R. Rep. No. 98-198, at 55 (1983), as reprinted in 1984 U.S.C.C.A.N. 5576, 5614. Through this restriction, Congress sought to insulate the EPA's decisions on permitting and state authorization issues from collateral attack in district court by making it "quite difficult"

12

for those decisions to be reversed in court.  Greenpeace, Inc. v.

Waste Techs. Indus., 9 F.3d 1174, 1180 (6th Cir. 1993).

Defendant argues that 42 U.S.C. § 6976(b) only applies to

actions that seek to challenge the authorization of a state's

entire program; it claims it is challenging the impact of the

authorization and not the authorization itself.  This is a

distinction without a difference.  The underpinnings of the

Defendant's argument rest entirely upon the "broader-in-scope"

versus "more stringent" distinction.  Defendant's contention is

that extending regulation to CESQGs that would otherwise enjoy the

conditional exemption from regulatory requirements (or put another

way, removing these entities from the coverage of the exemption)

broadens the scope of the Rhode Island regulatory program.  Had an

APA challenge been mounted in 2002 it would have presented the

exact same argument.  No such challenge was brought and Defendant

now seeks to press it in the context of its challenge to the

Federal Government's authority to enforce criminally the adopted

program.  This is precisely what Congress forbade in § 6976(b).

See id.; Chem. Weapons Working Group, Inc. v. United States Dep't

of the Army, 111 F.3d 1485, 1492 (10th Cir. 1997); Palumbo v. Waste

Techs. Indus., 989 F.2d 156, 161-62 (4th Cir. 1993); see also Safe

Food & Fertilizer v. EPA, 350 F.3d 1263, 1267 (D.C. Cir. 2003)

(deciding that petitioner's challenge was an impermissible "back-

door" challenge to a 1988 rulemaking and barred under § 6976(a)).

Therefore, by not mounting an APA challenge at the appropriate time the Defendant has effectively waived the argument. Having said this, there is some support for Defendant's position that in a criminal enforcement action it may challenge the impact of an EPA decision. See United States v. White, 766 F. Supp. 873, 878 (E.D. Wash. 1991) (concluding that § 6976 did not strip the court of jurisdiction when considering the effect of the government's action as applied to the defendant). Furthermore, a full discussion of this issue is critical to understanding Defendant's argument on its motion for new trial. For these reasons, the Court will address the merits of Defendant's argument, which for the reasons set forth below must fail.

The Defendant's central contention is that the EPA erred in its determination that Rule 5.00 of Rhode Island's program is more stringent (as opposed to broader-in-scope). The analysis of this argument begins and ends with the plain language of 40 C.F.R. § 271.1(i).[5] The Court agrees with the Defendant that resort to EPA

---

[5] Section 271.1(i) states:

Except as provided in § 271.4, nothing in this subpart precludes a State from:

(1) Adopting or enforcing requirements which are more stringent or more extensive than those required under this subpart;
(2) Operating a program with a greater scope of coverage than that required under this subpart. Where an approved State program has a greater scope of coverage than required by Federal law, the additional coverage is not

14

guidance documents that purportedly interpret this regulation is unnecessary. See Def.'s Mem. of Law 12 (Doc. 125) ("there is no need to consider secondary materials").[6]

Applying 40 C.F.R. § 271.1(i) to Rule 5.00 of the Rhode Island program, it is clear that Rhode Island's decision not to recognize the CESQG exemption does not create a greater scope of coverage than the federal program; rather, it simply layers on additional requirements that CESQGs might not otherwise be subject to under the federal program.   The practical effect of these additional requirements is that Rhode Island's treatment of CESQGs is clearly more stringent than the federal program.

As the name implies, the federal exemption is conditional and an exemption (not an exception).   A CESQG starts out as a covered or regulated entity.   A CESQG can claim an exemption from the federal permitting requirement, but before it is exempted, it must

part of the Federally approved program.

(Emphasis added.)

[6] To be clear, the Court reaches its conclusion without turning to the EPA's 1982 Enforcement Memo and a 1984 Program Implementation Guidance Memorandum (or PIG), which address the meaning of § 271.1(i).   This is so because "a court should be guided by an administrative construction of a regulation only 'if the meaning of the words used is in doubt.' Deference to agency interpretations is not in order if the rule's meaning is clear on its face." Pfizer Inc. v. Heckler, 735 F.2d 1502, 1509 (D.C. Cir. 1984) (citing Udall v. Tallman, 380 U.S. 1, 16 (1965) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945))). The Court does not believe that 40 C.F.R. § 271.1(i) is so cryptic as to not mean what it says.

meet certain specified conditions.   See 40 C.F.R. § 261.5(b).

Without satisfying these requirements, a generator is not entitled

to the CESQG exemption, and remains a fully regulated entity

because CESQGs are at all times within the federal scope of

coverage and Rhode Island's increased demands of them do not

increase the overall scope of the federal program.   Moreover, as a

practical matter, this means that under the federal scheme a

generator could at various times be non-exempt (because, for

example, it has exceeded the quantity thresholds for a particular

month) or exempt, depending on the ebb and flow of its business.

Removing the exemption as Rhode Island has done simply keeps the

generator at all times within the sphere of coverage, regardless of

the quantities with which it deals.

This result is also independently commanded by the EPA's own

final rulemaking on the matter.   The Defendant argues in effect

that the unequivocal language of the EPA that the Rhode Island

permit requirement for CESQGs is "more stringent" and "federally

enforceable" is without legal effect.   See 67 Fed. Reg. 51765 (Aug.

9, 2002).   Defendant attempts to write-off this language as a kind

of regulatory dicta, with no binding effect.

It is well settled that regulations, substantive rules, and

legislative rules create law.   Am. Hosp. Ass'n v. Bowen, 834 F.2d

1037, 1045 (D.C. Cir. 1987).   Rules promulgated by an agency

through its legislative rule making authority carry with them the

force and effect of law. Warder v. Shalala, 149 F.3d 73, 79-80 (1st Cir. 1998); Levesque v. Block, 723 F.2d 175, 181-82 (1st Cir. 1983); see also Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs, 464 F.3d 1306, 1317 (Fed. Cir. 2006) (stating a substantive rule has the force and effect of law); Nat'l Ass'n of Home Builders v. United States Army Corps of Eng'rs, 417 F.3d 1272, 1285 (D.C. Cir. 2005) ("'legislative rules' have the force and effect of law"); Appalachian Power Co. v. EPA, 208 F.3d 1015, 1020 (D.C. Cir. 2000). These so-called legislative (or substantive) rules are binding and a court must follow them unless it finds them arbitrary. Levesque, 723 F.2d at 182 (discussing when legislative rules bind the courts); Vietnam Veterans of Am. v. Sec'y of the Navy, 843 F.2d 528, 537 (D.C. Cir. 1988).

A rule is legislative in nature if it is issued pursuant to statutory authority and creates rights, assigns duties, or imposes new standards or other affirmative obligations not already outlined in the law. Warder, 149 F.3d at 80 (citing La Casa Del Convaleciente v. Sullivan, 965 F.2d 1175, 1178 (1st Cir. 1992)). Important to this analysis is also whether the agency intends for the rule to have legislative effect. Levesque, 723 F.2d at 182-83.

Legislative or substantive rules must be distinguished from those interpretive decisions of an agency that are accorded deference but may be disregarded in favor of some other position after giving the decision the appropriate weight. See Warder, 149

F.3d at 79-80 (stating the line for determining whether a rule is legislative or interpretive is far from clear); Vietnam Veterans, 843 F.2d at 537 (interpretive rules or policy statements do not bind a court, regardless of their validity); Smith v. Miller, 665 F.2d 172, 179 n.7 (7th Cir. 1981) (indicating that legislative rules bind while interpretive rules are given deference); see also Charles Alan Wright & Charles H. Koch, Jr., 33 Federal Practice & Procedure § 8330 (2006).    Courts frequently use the term "deference" in a way that creates confusion is this regard; but the use of that term does not alter the fundamental analysis: if an agency's decision is a valid exercise of the agency's legislative rulemaking authority, then it is controlling. See, e.g., Levesque, 723 F.2d at 179-80 (rules promulgated pursuant to an agency's legislative authority are entitled to greater deference by the courts than are interpretative rules or policy statements)(emphasis added).

A review of the EPA's 2002 authorization of the Rhode Island program makes clear that the EPA intended to use its legislative rulemaking authority in authorizing the changes to Rhode Island's program.  First, the EPA subjected the authorization to notice and comment.  See 5 U.S.C. § 553(b)(A); Lincoln v. Vigil, 508 U.S. 182, 196 (1993) (indicating that notice and comment requirements apply only to so-called legislative or substantive rules).  The EPA provided the public with a one month notice and comment period

during which the public could oppose any part of the authorization. 67 Fed. Reg. 51765 (Aug. 9, 2002).  In providing this comment period, the EPA stated that if it received comments that opposed the authorization it would withdraw the challenged part of the authorization by publishing a document in the Federal Register prior to the rule's effective date.  <u>Id.</u>  The EPA specifically warned that the public "may not have another opportunity to comment." <u>Id.</u>

Second, the EPA approved the Rhode Island program in fulfillment of its statutory function.  <u>See</u> 42 U.S.C. § 6926(b) (directing the EPA to make findings as to whether the state program is equivalent to and consistent with the federal program).  The legal advertisement announcing the changes stated as much by informing the public that in granting final authorization to Rhode Island the EPA was exercising its "authority . . . in accordance with [statutory authority]."  Legal Notices (4 of 5), The Providence Journal-Bulletin, July 29, 2002, at E-4.

Third, the authorization imposed new standards and other affirmative obligations on hazardous waste generators in Rhode Island not already outlined in the law.  <u>See</u> <u>Warder</u>, 149 F.3d at 80.  The EPA clearly stated that "[t]he effect of [its] decision [was] that a facility in Rhode Island subject to RCRA will have to comply with the <u>newly authorized State requirements</u> instead of the Federal requirements in order to comply with RCRA."  67 Fed. Reg.

51765 (Aug. 9, 2002) (emphasis added).  All this inexorably leads to the conclusion that the decision was an exercise of the EPA's legislative authority, and not merely an interpretive or policy statement.

The Defendant argues that the Court should disregard the EPA's rulemaking here because it was made without proper authority, and is inconsistent with similar decisions concerning other states' programs and with earlier informal guidance documents authored by the agency on the broader-in-scope/more stringent distinction.[7]

_____

[7] The informal guidance documents Defendant cites include purported examples of what the EPA considers to be broader-in-scope.  One such broader-in-scope example is: "a lesser amount of waste exempted from regulation under the small quantity generation exemption."  Lee M. Thomas, Asst. Administrator for Solid Waste, Determining Whether State Hazardous Waste Management Requirements are Broader in Scope or More Stringent than the Federal RCRA Program, EPA Memorandum PIG-84-1 (May 21, 1984) (Doc. 125-4).  The Defendant has seized on this statement along with others like it to support its position that Rhode Island's treatment of CESQGs is in fact broader-in-scope.  See, e.g., EPA State Authorization Manual, page 1-2 (9540.00-9A, October 1990) (Doc. 125-5) ("Two simple examples of the 'broader in scope' principle are when a State lists additional wastes as hazardous which are not in the Federal universe of wastes or when the State does not provide for the small quantity generator exemption"); EPA State Authorization Training Manual, page I-9-10 (Doc. 125-7); EPA Codification Workbook, chapter IV, page 17-18 (Doc. 125-8) ("Examples of the first type of broader-in-scope statutory provision include: . . . provisions that have fewer waste or facility exemptions or exclusions in [sic] the Federal regulations").  These materials, however, are more perplexing than helpful because they are not all consistent with each other.  See William A. Sullivan, Jr., Enforcement Counsel, EPA Enforcement of RCRA-Authorized State Hazardous Waste Laws and Regulations, March 15, 1982 (Doc. 125-3) ("Examples of more stringent state provisions would include: . . . a lesser amount of waste exempted from regulation under the small quantity generator exemption (40 CFR § 261.5) . . . Provisions in state program which are more stringent than their federal counterparts are,

But nothing mined from these bureaucratic troves can undo the legal effect of EPA's rulemaking.

First, the EPA's decision that Rhode Island's regulation of CESQGs is more stringent was a proper exercise of its statutory authority.   See 42 U.S.C. §§ 6912(a), 6926, 6947, 6974(b). Congress specifically authorized the EPA to ensure that state programs are "equivalent" and "consistent" with the federal program. 42 U.S.C. § 6926(b). EPA has the inherent authority -- subject of course to the APA -- to make determinations as to whether a state program submitted to the EPA for approval is more stringent, or seeks to regulate in areas that are beyond the federal program's scope of coverage.

Second, in spite of some apparent inconsistency by the EPA in the treatment of CESQGs (at least superficially) concerning state programs, the EPA's decision is not so arbitrary as to require invalidation. See 5 U.S.C. § 706. Defendant argues that because the EPA has previously determined the programs of California and the District of Columbia (which treat CESQGs similarly to Rhode Island) to be broader-in-scope, and because the EPA has issued several informal guidance documents (described in footnote 7 above) that suggest subjecting CESQGs to a permit requirement is broader-in-scope, the EPA's decision to consider Rhode Island's treatment

_____

nevertheless, a part of the approved state program, and are enforceable by EPA").

21

of CESQGs as more stringent is patently arbitrary. See 57 Fed. Reg. 32726 (July 23, 1992) (authorizing California); 66 Fed. Reg. 46961 (Sept. 10, 2001) (authorizing District of Columbia). The Defendant contends that the inconsistency in the EPA's decisionmaking on this issue is even starker when one considers that the EPA has also found Rhode Island-like programs covering CESQGs in Louisiana and Connecticut to be more stringent.[8] See 64 Fed. Reg. 48099 (Sept. 2, 1999) (authorizing Louisiana); 69 Fed. Reg. 57842 (Sept. 28, 2004) (authorizing Connecticut).

"Although patently inconsistent applications of agency standards to similar situations are by definition arbitrary, the law does not demand perfect consistency in administrative decisionmaking," S. Shore Hosp., Inc. v. Thompson, 308 F.3d 91, 103 (1st Cir. 2002) (citing Ill. Bell Tel. Co. v. FCC, 740 F.2d 465, 470-71 (7th Cir. 1984)), and the Court does not believe these decisions represent agency action that makes no sense. See Puerto

---

[8] The Court's earlier oral decision on this issue relied on the Government's less than accurate representation that the states of West Virginia, Florida, Maryland, Massachusetts, New Hampshire, and Missouri had also treated CESQGs similar to Rhode Island and that the EPA considers such treatment to be more stringent to support consistent application of the rule. Upon closer examination, the Court believes that the treatment of CESQGs in these states is not similar to Rhode Island. Missouri, for example, only requires CESQGs to meet the special requirements for ignitable or reactive waste set forth in 40 CFR 265.176 -- a far cry from Rhode Island's treatment. 71 Fed. Reg. 25079 (Apr. 28, 2006). Likewise, West Virginia only subjects CESQGs to two additional requirements, a notification requirement and a restriction on where hazardous waste may be delivered. 65 Fed. Reg. 29973 (May 10, 2000).

<u>Rico Sun Oil Co. v. United States EPA</u>, 8 F.3d 73, 77 (1st Cir. 1993).   When viewed in their totality, the EPA's more recent decisions on the subject evidence a consistent position that began nearly five years ago in 2004.   Going back even further to 1999, the Court notes only one agency decision (concerning CESQGs in the District of Columbia) where the program is substantially similar but its treatment is at odds with the other decisions the EPA issued since that time.   From this, the Court cannot conclude that the EPA has been as arbitrarily inconsistent as the Defendant suggests.   Rather, it appears that the EPA has over time changed its position on the issue albeit in a less than perfectly seamless fashion.

At the core of the Defendant's arguments is the suggestion that the EPA was not free to change its mind: that is, once the EPA concluded in its earlier guidance documents that extending coverage to CESQGs made state programs broader-in-scope, it is locked into its position and can never change its view.   That, however, has never been the law.   A federal agency is fully entitled to change its mind, so long as the proper procedures are followed.   <u>See</u> <u>Nat'l Ass'n of Home Builders v. Defenders of Wildlife</u>, 551 U.S. 644, --, 127 S. Ct. 2518, 2530 (2007); <u>Natural Res. Def. Council v. E.P.A.</u>, 489 F.3d 1250, 1265 (D.C. Cir. 2007) (stating an agency may change its mind or abandon its initial rule); <u>WorldCom, Inc. v. F.C.C.</u>, 238 F.3d 449, 460 (D.C. Cir. 2001) ("Everyone agrees that an

agency's change of mind does not itself render the agency's action arbitrary."). Of course, if an agency intends to take a position that is inconsistent with existing regulations, it must promulgate new rules under the notice and comment provisions of the APA. 5 U.S.C. § 553; <u>Shalala v. Guernsey Mem'l Hosp.</u>, 514 U.S. 87, 100 (1995); <u>Via Christi Reg'l Med. Center, Inc. v. Leavitt</u>, 509 F.3d 1259, 1273 (10th Cir. 2007); <u>U.S. Telecom Ass'n v. F.C.C.</u>, 400 F.3d 29, 35 (D.C. Cir. 2005); <u>Warder</u>, 149 F.3d at 81 (stating if a later rule is inconsistent with another rule having the force of law then notice and comment is necessary). While the EPA's collective change of mind was less than perfectly executed, the flip-flop that apparently occurred between Louisiana (1999 - more stringent) and D.C. (2001 - broader-in-scope) and Connecticut (2004 - more stringent) is not enough to make the EPA's overall change in position an arbitrary one, particularly as it applies to the approval of Rhode Island's program in 2007. There are at least two reasons for this. First, each program authorization was effectuated by rulemaking notice and comment. No objections were received. Thus, by the time the Rhode Island authorization was noticed in the Federal Register, the EPA had clearly staked its position in the more stringent camp. And second, as noted above, no objections were filed to the Rhode Island program on this ground or any other. It is simply too easy (and too late in the day) to reach back over time and find one bureaucratic hiccup in the EPA's

approach to this issue and claim that it evidences arbitrariness on its part.   The notice of authorization for the Rhode Island rule may be short on explanation, but proper procedures were followed. The fact is that the regulated community (including the Defendant) was given an opportunity to comment and oppose the rule and did not.   If the regulated community had a beef with EPA's change in position it could and should have expressed it.

The Defendant also points to several conclusory statements contained in EPA informal guidance documents for support.   See EPA Materials, supra, note 7.   According to the Defendant, these documents should be considered as the EPA's "official" position on the issue (as opposed to the Federal Register notice of rulemaking) because they represent the EPA's official national guidance.   Such informal guidance materials, however, are not substantive rulings and have little if any persuasive value when they are not a product of notice-and-comment rulemaking, nor published in Federal Register.   See Christensen v. Harris County, 529 U.S. 576, 587 (2000) ("[i]nterpretations such as those in opinion letters-like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law-do not warrant Chevron-style deference"); Doe v. Leavitt, 552 F.3d 75, 80 (1st Cir. 2009); W. Radio Servs. Co. v. Espy, 79 F.3d 896, 901 (9th Cir. 1996); see also Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1551 (Fed. Cir. 1992) (holding that an agency

handbook was a general guide that did not have the force and effect of law); Sierra Club v. Wagner, 581 F. Supp. 2d 246, 265 (D.N.H. 2008).

The Court is mindful that the EPA materials may be entitled to Skidmore deference. Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) (nonbinding administrative interpretations may carry some weight depending upon the thoroughness of the agency's reasoning, their consistency with earlier and later pronouncements, and persuasive power); see Doe, 552 F.3d at 81. However, such deference must give way to the EPA's decision that Rhode Island's treatment of CESQGs is more stringent and therefore federally enforceable because the later is a legislative rule that carries the force and effect of law. Accordingly, the Defendant's argument that the Court should rely on the informal guidance material over the EPA's Federal Register decision fails.[9]

---

[9] Even if the EPA's decision to classify Rhode Island's treatment of CESQGs as more stringent could be considered an interpretive rule, the Court's decision in all likelihood would not change. It is well settled that an agency's interpretation of its own regulations is entitled to broad deference from the courts. See United States v. Mead Corp., 533 U.S. 218, 227 (2001); Auer v. Robbins, 519 U.S. 452, 461 (1997); Puerto Rico Aqueduct & Sewer Auth. v. United States EPA, 35 F.3d 600, 604 (1st Cir. 1994). "[D]eference increases when the agency interprets its own regulations." Adams v. United States EPA, 38 F.3d 43, 49 (1st Cir. 1994); see also Barnhart v. Walton, 535 U.S. 212, 217 (2002) ("Courts grant an agency's interpretation of its own regulations considerable legal leeway"). Such deference would arguably be in order here and trump earlier interpretive decisions based on the fact that the agency subjected the rule to public comment and received no objection. Mead, 533 U.S. at 229-30.

All of this is not to say that the EPA has acted flawlessly. Far from it. It is difficult to understand how the agency could engage in such a substantial change in position as to state program coverage of CESQGs while leaving untouched national guidance documents espousing an inconsistent position. This is clearly bad form, and maybe evidence of incompetence at some level, but it is not enough to change the outcome under prevailing law.[10]

Defendant's final salvo on this issue is that its prosecution on Count I violated the Due Process guarantees of the Fifth Amendment. Defendant contends that the Government violated its Due Process rights by failing to provide fair warning of the proscribed conduct with ascertainable certainty. While the above discussion shows that the Defendant has perhaps some basis to complain about the EPA's handling of its position change, it is not enough to support a claim of a Due Process deprivation. The EPA published the rule that declared Rhode Island's treatment of CESQGs was more stringent in the Federal Register and explained its impact shortly before the Defendant began committing the charged conduct. "It is

---

[10] Perhaps reading judicial tea leaves, after this issue arose at trial EPA added a caveat on its website. EPA now states on its website that the PIG memos are "[u]nder review in light of the determination made at 61 Fed. Reg. 34252, 34262 (July 1, 1996) that additional State requirements regarding CESQGs are "more stringent" and within the scope of the federal RCRA program." See RCRA Online website, Determining Whether State Hazardous Waste Req. Are Broader or More Stringent than Federal RCRA Program (RCRA Online Number 1 2 2 3 6 )  a v a i l a b l e  a t http://yosemite.epa.gov/osw/rcra.nsf/ea6e50dc6214725285256bf00063 269d/e9360d6bce9ad528852567ba00708b78!OpenDocument.

well settled that when regulations are published in the Federal Register they give legal notice of their contents to all who may be affected thereby." <u>Wolfson v. United States</u>, 492 F.2d 1386, 1392 (Ct. Cl. 1974) (citing <u>Fed. Crop Ins. Corp. v. Merrill</u>, 332 U.S. 380 (1947)); <u>see also</u> <u>United States v. Caseer</u>, 399 F.3d 828, 838 (6th Cir. 2005) ("Publication in the Federal Register of regulations which have the force of law does furnish constructive notice of the content of those regulations to those subject to them."); <u>Higashi v. United States</u>, 225 F.3d 1343, 1349 (Fed. Cir. 2000) (stating that publication of rules and regulations in the Federal Register gives legal notice of their contents to those subject to, or affected by, them); <u>Perales v. Reno</u>, 48 F.3d 1305, 1316 (2d Cir. 1995) ("Due process cases have long recognized that publication in the Federal Register constitutes an adequate means of informing the public of agency action.").

The Defendant's further quibble that the rule was never published in the Code of Federal Regulations ("CFR") is grasping at straws. The CFR is "the permanent publication of rules but publication there does not affect the validity of the rule so long as the rule was originally contained in the Federal Register." Charles Alan Wright & Charles H. Koch, Jr., 32 <u>Federal Practice & Procdure</u> § 8185 (2006); <u>see</u> 44 U.S.C. §§ 1501-1511; <u>see generally</u> <u>Manufactured Hous. Inst. v. United States EPA</u>, 467 F.3d 391, 399 (4th Cir. 2006) ("the agency's issuance of the new policy in the

Federal Register - though not a codification [in the CFR] - indicates a more formal agency action than anything that preceded it, and thus an equally binding one"); Bessemer & Lake Erie R.R. Co. v. ICC, 691 F.2d 1104, 1111 (3d Cir. 1982) (stating that codification of a standard adopted by the Interstate Commerce Commission in the Code of Federal Regulations might have been appropriate, but was certainly not essential to the legality of the standard). Indeed, each volume of the CFR contains an explanation of how to use it, including a statement that CFR volumes and individual issues of the Federal Register "must be used together to determine the latest version of any given rule." 40 CFR § Explanation, page v. In light of all this, the Court concludes that the Defendant's Due Process rights were not infringed and that it received proper notice of the proscribed conduct.

For the reasons stated above, the Defendant's Motion for Judgment of Acquittal is denied.[11]

---

[11] One final observation before moving on. The Defendant incorrectly presumes that if the Court erred in deciding the broader-in-scope/more stringent issue it is entitled to an acquittal on Count I. But whether the Defendant can even be considered a CESQG (a point assumed for purposes of the above discussion) is ultimately a question of fact that must be decided by a jury. Therefore, in the Court's estimation, at best, the Defendant would only be entitled to a new trial.

IV.  Motion for New Trial

In the alternative to its Motion for Judgment of Acquittal, the Defendant submits that a new trial is necessary because (1) it was deprived of a critical defense under the applicable regulations; (2) the evidence weighed heavily against the verdict on the issues of whether the liquid mercury was a waste and whether the company knowingly stored it; and (3) the Court improperly allowed evidence about the conditions at Tidewater and Southern Union's failure to contact police following the spill.  Each of these arguments will be addressed in turn, though none warrants a new trial, or even extensive discussion.

A motion for a new trial is directed to the broad discretion of the trial judge, and appropriate only "if the interest of justice so requires."  Fed. R. Crim. P. 33; United States v. Indelicato, 611 F.2d 376, 387 (1st Cir. 1979).

First, the Defendant contends the Court deprived it of a critical defense by failing to instruct the jury on the affirmative defense applicable to CESQGs.  This is essentially the Defendant's CESQG argument dressed up in a different set of clothes.  As discussed above, the CESQG exemption does not exist in the Rhode Island Hazardous Waste Management Regulations, which are the regulations the Defendant was prosecuted for violating.  "[A] trial court is under no obligation to accept a request for an instruction if the proffered instruction is incorrect in any way."  Wilson v.

30

Maritime Overseas Corp., 150 F.3d 1, 9 (1st Cir. 1998); see United States v. De La Cruz, 514 F.3d 121, 139 (1st Cir. 2008).   A proposed instruction must be lawful and "substantively correct." De La Cruz, 514 F.3d at 139.   The Court did not instruct the jury on the CESQG exemption because such a defense did not exist under the Rhode Island regulations.   Therefore, the Defendant was not entitled to the instruction and its argument to the contrary is without merit.

Second, the Defendant attacks the weight of the evidence used to convict it of Count I (storing liquid mercury without a permit). Its argument for a new trial on this point has two themes: first, that the Government failed to prove that the liquid mercury the Defendant stored was a waste; and second, that the weight of the evidence does not support finding it knowingly stored a waste. "Where a new trial motion is based upon the weight of the evidence, the court may not order a new trial 'unless it is quite clear that the jury has reached a seriously erroneous result.'" United States v. Ruiz, 105 F.3d 1492, 1501 (1st Cir. 1997) (quoting United States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986)).   This is by no means a low hurdle, and Defendant comes nowhere near clearing it.

A key question at trial was whether the liquid mercury at Tidewater was a waste (so said the Government) or a "commercial chemical product" (so said the Defendant).   At the heart of this dispute is what, if anything, the Defendant intended to do with the

31

mercury (nothing said the Government; recycle it said the Defendant). The Defendant claims the jury could not have found the mercury was a waste because the evidence "clearly" showed it could be poured and was at least 99% pure mercury -- a valuable commercial product. And, it argues, employee testimony, contemporaneous documents, and company actions all demonstrate an intent to recycle.

The evidence presented to the jury was such that reasonable minds could differ. As to whether the mercury was "pure," the Government showed some degree of contamination and established that re-processing would have been necessary to make this mercury truly a pure commercial grade. The more important point is the Defendant's intent. Here, the jury sided with the Government as to what the evidence showed: that the company did not intend to recycle and stored mercury at Tidewater in lieu of disposal. The Court need not rehash the entire record, which is voluminous. Suffice it to say, there was more than ample evidence to support the jury's conclusion; for example, the storage and security conditions at Tidewater, employee testimony that items were stored at Tidewater "instead of throwing [them] away," see Trial Tr. Vol 1, p. 78 (Doc. 105), and numerous references in company documents to the mercury as "waste" and to Tidewater as a "disposal area."

The Defendant next argues that the record did not support a finding that it knowingly stored a waste. In essence, this is but

32

a slightly different flavor of the weight of the evidence argument discussed above regarding the company's intent -- that it "considered" the mercury a product (because it planned to recycle it) and thus could not have knowingly stored it as a waste. For the reasons already discussed, this argument is unpersuasive. All in all, what the mercury was and what the company intended to do with it were hot button issues at trial. Given the evidence presented on both sides of the issue, there was nothing clearly erroneous about the jury's decision. See United States v. Wilkerson, 251 F.3d 273, 278 (1st Cir. 2001) (court weighs and evaluates credibility of the evidence in determining whether a new trial is appropriate).

Finally, the Defendant challenges the Court's decision to admit evidence of the conditions at Tidewater (graffiti, lack of security, plastic jugs, broken windows and fences, etc.) as well as the company's failure to call the police or 911 after learning of the mercury spill. Little need be said about either issue because both these points were briefed and argued extensively before and during trial. The Defendant moved for and was denied a mistrial after admission of the "police" evidence. It was and remains this Court's view that both categories of evidence are relevant. The manner in which the mercury was stored and the overall conditions at Tidewater are directly relevant to the Defendant's intent and the jury's ultimate determination of whether the mercury was a

33

waste or product (and thus whether a permit was required). The company's failure to call the police sheds light on consciousness of guilt as to the EPCRA charge, especially given the Government's high burden on that Count to establish beyond a reasonable doubt knowing and willful conduct.[12]

The Court disagrees that this evidence played as large a role at trial as the Defendant describes. In any event, there is no indication that it inflamed or incited the jury anymore than any piece of inculpatory evidence. The Court in fact took extraordinary measures to protect the Defendant against unfair prejudice or confusion. At the motion in limine stage, the Court cautioned the Government against making too much of the security issue. At trial, it excluded a considerable amount of proffered evidence on security and Tidewater conditions as cumulative and duplicative. It did not allow police to testify to their public safety concerns about the lack of notification. The jury simply heard that they were not called. Moreover, in closing argument the Defendant specifically urged the jury to give minimal weight to this evidence, emphasizing that no charge in the case required it

---

[12] There is also some merit to the Government's argument that the failure to call the police was "inextricably intertwined" with the rest of the evidence involving the events of October 19-20, 2004, and that the jury was entitled to the complete "story of the crime on trial" regarding what happened when Southern Union learned of the spill. United States v. Ladd, 885 F.2d 954, 959 (1st Cir. 1989) (quoting United States v. D'Alora, 585 F.2d 16, 20 (1st Cir. 1978)).

to call the police and that "regrettable" conditions at Tidewater did not make this a "negligent security case." Finally, the Court included the following instruction in the "Summary of Charges" section of its Jury Instructions:

> Additionally, I am instructing you that this is not a case about negligent security. The level of security and the conditions at Tidewater are not elements of any of the charges against Southern Union. Later in these instructions, I will instruct you as to the purposes for which you may consider the level of security and the conditions at Tidewater.

See Trial Tr. Vol 13, pp. 147-148 (Doc. 119).

It also instructed:

> There is no obligation under EPCRA, the only statute charged in Count II, for the Defendant to notify the local police department or any other police department, or to call 9-1-1 about the break-in at the Tidewater facility. By the same token, notification to the Rhode Island Dept. Of Environmental Management, DEM, or the National Response Center, NRC, does not satisfy the EPCRA requirement for immediate notification. However, having said this, lack of notification to certain agencies and/or notification to other agencies may be considered by you in assessing the question of whether the Defendant's conduct in this case was a knowing and willful violation of its obligation under EPCRA.

Id. at pp. 171-172.

Perhaps the best indication that this evidence did not taint the jury and that the jury scrupulously followed the Court's instructions is that the Defendant was found not-guilty on Counts II and III. If the security and police evidence was as poisonous as the Defendant suggests, surely the jury would have convicted across the board. Instead, by acquitting on the EPCRA charge, the

35

jury effectively said the failure to notify the police was not a substitute for the legal requirements of that statute; by acquitting on Count III (the storage of MSRs) the jury demonstrated its ability to distinguish the facts of these counts, and its ability to comply with instructions and weigh the evidence as to each Count.   In sum, there is simply no basis for concluding that the verdict was unjust and allowing a do-over, especially when the remedy of a new trial "is sparingly used, and then only where there would be a 'miscarriage of justice . . . and where the evidence preponderates heavily against the verdict.'"  Indelicato, 611 F.2d at 387 (quoting United States v. Leach, 427 F.2d 1107, 1111 (1st Cir. 1970); Rothrock, 806 F.2d at 322 (trial judge "is not a thirteenth juror who may set aside a verdict merely because he would have reached different result").

V.   Conclusion

For the foregoing reasons, the Defendant's Motion for Judgment of Acquittal and, in the alternative, its Motion for New Trial are DENIED.

IT IS SO ORDERED.

_____
William E. Smith
United States District Judge
Date: 7/22/09