# United States Court of Appeals
## For the First Circuit

———————————

No. 09-2403

UNITED STATES OF AMERICA,

Appellee,

v.

SOUTHERN UNION COMPANY,

Defendant, Appellant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

———————————

Before

Lynch, Chief Judge,
Selya and Thompson, Circuit Judges.

———————————

Gerald J. Petros, with whom Hinckley, Allen & Snyder LLP, John
A. Tarantino, Patricia K. Rocha, Adler, Pollock & Sheehan, David E.
Ross, Seth B. Davis, and Kasowitz, Benson, Torres & Friedman LLP
were on brief, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Peter F. Neronha, United States Attorney, Terrence P.
Donnelly, Assistant United States Attorney, Dianne G. Chabot,
Attorney, U.S. Environmental Protection Agency, and Kevin M.
Cassidy, Attorney, Environment & Natural Resources Division, U.S.
Department of Justice, were on brief for appellee.

———————————

December 22, 2010

———————————

**LYNCH, Chief Judge**.  This appeal by Southern Union, a natural gas company convicted by a jury of storing hazardous waste without a permit, raises two issues of initial impression.  First, the case tests whether federal criminal enforcement may be used under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6928(d), where certain federally approved state regulations as to hazardous waste storage have been violated.  Second, the case also raises the important question of whether a criminal fine must be vacated under Apprendi v. New Jersey, 530 U.S. 466 (2000), where a judge, and not a jury, determined the facts as to the number of days of violation under a schedule of fines.

The hazardous waste at issue in this case is mercury, which can poison and kill those exposed to it.  See 40 C.F.R. § 261.33(f) tbl. (listing mercury as hazardous waste due to toxicity).  Here, 140 pounds of mercury became the play toy of young vandals who spread it about, including at their homes in a local apartment complex, after they spilled it around Southern Union's largely abandoned and ill-guarded Tidewater site in Pawtucket, Rhode Island.

We affirm the district court's rulings on Southern Union's conviction, as set forth in United States v. Southern Union, 643 F. Supp. 2d 201 (D.R.I. 2009) (Southern Union I).  We conclude that:

(1) Southern Union is precluded by 42 U.S.C. § 6976(b) from challenging the EPA's 2002 Immediate Final Rule authorizing Rhode Island's RCRA regulations. Having failed to use the statutory procedure for judicial review, Southern Union may not raise the issue by collateral attack;

(2) the 2002 Rule, in any event, is valid and was within the EPA's authority to adopt; and

(3) the conviction does not violate Southern Union's right to fair notice under the Due Process Clause.

We also affirm the fine imposed. The Apprendi issue is close but the Supreme Court's recent decision in Oregon v. Ice, 129 S. Ct. 711 (2009), leads us to hold that the Apprendi rule does not apply to the imposition of statutorily prescribed fines. If, however, we were wrong in our assessment of the Apprendi issue, we would find that any error under Apprendi was not harmless and that the issue of the fine would need to be remanded. Finally, we also hold that the financial penalties imposed did not constitute an abuse of the district court's discretion.

I. SOUTHERN UNION'S MERCURY STORAGE AND RELEASE

Southern Union, a Texas-based natural gas distributor, began supplying natural gas to Rhode Island and Massachusetts customers in 2000 through a subsidiary, New England Gas Company, that it formed after acquiring several local gas companies. It stopped serving Rhode Island customers in 2006.

-3-

As part of the transactions in 2000, Southern Union acquired a twelve-acre complex, once used as a gas manufacturing plant, on Tidewater Street in Pawtucket, Rhode Island.  Most of the complex sat unused, but Southern Union used a few buildings for automated monitoring and used outdoor spaces to store construction supplies and waste.

The Tidewater property was not maintained and had fallen into disrepair.  The perimeter fence was rusted, with gaps that were left unrepaired.  There were no security cameras, and Southern Union had removed the single part-time security guard from the site by September 2004.  Southern Union was aware that homeless people were staying in a tin shed on the property, and that the property was frequently vandalized.

In June 2001, Southern Union began removing outdated mercury-sealed gas regulators (MSRs) from customers' homes and replacing them with updated regulators.  The old MSRs were taken to a brick building at the Tidewater facility.  There, for about five months, an environmental firm removed the mercury from the regulators and shipped it to a recycling facility, leaving the regulators to be cleaned and scrapped.  Southern Union stopped removing MSRs as a matter of course in November 2001, and its arrangement with the environmental firm ended in December 2001.  However, Southern Union continued to remove MSRs whenever they malfunctioned, bringing them to Tidewater, where they were "stored"

-4-

in doubled plastic bags placed in plastic kiddie pools on the floor of the brick building.

Employees were also encouraged to bring any loose mercury they found in their departments to Tidewater, where it was placed in the same building as the gas regulators. The loose mercury was stored in the various containers in which it arrived, including a milk jug, a paint can, glass jars, and plastic containers. Southern Union kept the containers in a locked wooden cabinet that was not designed for mercury storage. The brick building was in poor condition and had suffered break-in attempts and vandalism. It had many broken windows and its walls were covered in graffiti. Neither the cabinet nor the building itself contained any warning notice that hazardous substances were inside.

Southern Union had no use for any of the mercury it accumulated. By July 2004, when a Southern Union employee catalogued the contents of the brick building, it held 165 MSRs and approximately 1.25 gallons, or more than 140 pounds, of loose mercury (two tablespoons of mercury weigh just under one pound). That cataloguing did not lead the company to arrange for recycling, to secure the building, or to secure a storage permit from the state.

Southern Union was well aware that the mercury was piling up and that it was kept in unsafe conditions. The Environmental Services Manager for its New England Gas Company division, who

-5-

testified that he was concerned about the safety risk the mercury posed to the company's employees, drafted proposed Requests for Proposals (RFPs) in 2002, 2003, and 2004 to solicit bids to remove and dispose of or recycle the regulators "and associated wastes."

The 2002 draft was sent to Southern Union's Texas corporate headquarters for review by the Director of Environmental Services, where it died. Not only was the RFP not issued, but the New England Gas Company engineer who oversaw the environmental department became angry when he was repeatedly asked about it. The 2003 proposed RFP met the same fate, even though it specified the contents of a number of different containers of mercury. The draft, titled "Request for Proposals for Waste Segregation, Packaging, Transportation, and Disposal," sought a bid to "[r]emove liquid mercury from several small containers" and "[t]ransport and dispose (or recycle) of all waste generated" by this work (emphasis added). Nor did anything come of the 2004 proposed RFP, even though the environmental manager went outside his chain of command trying to get the RFP issued to vendors.

The safety risk posed by the conditions under which the mercury was stored was discussed at joint employee-management safety committee meetings in May, June, and September 2004. Indeed, the employee who brought a regulator in on September 20, 2004 was so concerned about the accumulating mercury that he raised the issue with his supervisor. No action was taken.

-6-

In late September 2004, youths from a nearby apartment complex broke into the brick building, broke open the wooden cabinet, found the mercury, and, playing with it, spilled some of it in and around the building. They also took some of the mercury back to their apartment complex, where they spilled more on the ground, dipped cigarettes in it, and tossed some in the air. Mercury was tracked into the residences when people walked through it and was found in several homes.

Southern Union discovered the break-in and spills on October 19, roughly three weeks later, when a worker found pancake-sized puddles of mercury around the brick building. Southern Union immediately called in a contractor to begin cleaning up the spills at Tidewater and the apartment complex.

A Southern Union employee also left a voicemail message that day for Jim Ball, the Emergency Response Coordinator at the state Department of Environmental Management. However, Southern Union did not contact the Pawtucket Fire Department or the state Fire Marshal, the designated points of contact for a release of more than a pound of mercury. The Fire Department did not arrive at Tidewater until the next day, after having found out about the spill from the Department of Environmental Management. By that time, the contractor had already removed the remaining mercury from the building and begun to ship it offsite.

-7-

Altogether, the company spent more than $6 million remediating the two spill sites. All five buildings in the apartment complex were evacuated. Residents, 150 of them, were displaced for two months. Most were tested for mercury levels in their blood. While some had elevated levels, none met current standards for hazardous exposure.

## II. CHALLENGES TO THE CONVICTION

In 2007, a federal grand jury returned a three-count indictment against Southern Union. The indictment charged Southern Union with two counts of storing hazardous waste without a permit in violation of RCRA. See 42 U.S.C. § 6928(d)(2)(A). Count One of the indictment covered the loose liquid mercury, and Count Three covered the mercury-embedded gas regulators. Count Two of the indictment charged Southern Union with failing to properly report a mercury release of more than one pound, a violation of the Emergency Planning and Community Right-to-Know Act.[1] See 42 U.S.C. §§ 11004, 11045(b)(4).

Southern Union's prime defense at trial was that the mercury was not a waste, but rather was a commercial chemical product that the company intended to recycle. Even if the mercury was not a commercial chemical product, the Company argued, it had not "knowingly stored a hazardous waste" because it believed the mercury was recyclable. After a nearly four-week trial, a jury

---

[1]     Fifty-five plaintiffs filed related civil litigation.

-8-

convicted Southern Union on Count One only.  Southern Union I, 643
F. Supp. 2d at 207.

Just before trial, Southern Union filed a motion arguing
that the federal government lacked authority to enforce Rhode
Island's regulations governing small quantity generators, under
which Southern Union was prosecuted, because they were "broader in
scope" than the federal RCRA program and therefore not part of the
federally approved and federally enforceable state program.  The
district court denied the motion, and Southern Union renewed it
after the jury verdict in a motion for a judgment of acquittal.[2]

The district court denied the motion for acquittal in a
published opinion issued July 22, 2009, finding Southern Union's
challenge untimely under 42 U.S.C. § 6976(b), which governs
judicial review of the EPA's authorization of state hazardous waste
programs.  Southern Union I, 643 F. Supp. 2d at 209-10.  The court
highlighted the statute's specific prohibition against judicial
review of such authorizations in "criminal proceedings for
enforcement."  Id. (quoting 42 U.S.C. § 6976(b)).  The court in the
alternative rejected Southern Union's challenge on the merits,
finding that the authorization was a valid, binding legislative
rule that authorized federal enforcement.  Id. at 210-13.

---

[2]     Southern Union also filed a Rule 33 motion for a new
trial.  The district court denied the motion, United States v.
Southern Union Co., 643 F. Supp. 2d 201, 217 (D.R.I. 2009)
(Southern Union I), and Southern Union does not appeal the denial.

Southern Union challenges the district court's application of RCRA and the 2002 Rule and claims that the prosecution violated due process. We review legal and constitutional questions de novo. United States v. Sampson, 486 F.3d 13, 19 (1st Cir. 2007). Southern Union does not challenge the district court's factual determinations pertinent to the issue. Both of Southern Union's claims of error fail.

A.      Legal Structure

RCRA, 42 U.S.C. § 6901 et seq., regulates the "treatment, storage, and disposal of solid and hazardous waste" in order to minimize the waste generated and the harm done by that waste. Meghrig v. KFC W., Inc., 516 U.S. 479, 483 (1996). It is a federal crime to knowingly store hazardous waste, such as mercury waste, "without a permit under this subchapter," that is, under 42 U.S.C. §§ 6921-6939f, inclusive. 42 U.S.C. § 6928(d)(2)(A); 40 C.F.R. § 261.33(f) tbl (listing mercury as hazardous waste). Within that subchapter, § 6926 directs the EPA to authorize states to enforce their own hazardous waste programs "in lieu of" the federal program, if the state programs are "equivalent to" and "consistent with" the baseline federal program. 42 U.S.C. § 6926(b).

The effect of the statute is that there is federal enforcement, including federal criminal enforcement, of state rules that are part of federally authorized state plans under RCRA. This

-10-

court so held in United States v. MacDonald & Watson Waste Oil Co., 933 F.2d 35, 44 (1st Cir. 1991). Southern Union does not contest this proposition. Rather, it argues that the Rhode Island regulations enforced here are not part of a federally authorized state plan.

Under § 6926, the EPA has promulgated regulations governing federal approval of state programs, which provide that states may adopt and enforce requirements that are "more stringent" or have a "greater scope of coverage" than the federal baseline program. 40 C.F.R. § 271.1(i). However, for state programs with "a greater scope of coverage," the "additional coverage" does not become part of the federally approved program. 40 C.F.R. § 271.1(i)(2). Southern Union argues that the Rhode Island regulations applicable here provide additional coverage.

Rhode Island has administered its own federally authorized hazardous waste program since 1986, and has secured federal approval of amendments from time to time. See 67 Fed. Reg. 51,765, 51,766 (Aug. 9, 2002). Pertinent here is the EPA's authorization of further amendments to the state program on August 9, 2002. Id. at 51,765. On that date, the EPA published an "Immediate final rule" (the "2002 Rule") in the Federal Register under which the authorization would automatically go into effect on October 8, 2002, unless the EPA received a comment in opposition to the authorization within thirty days. Id. at 51,765, 51,766.

-11-

The 2002 Rule explained that the major difference between the new Rhode Island program and the federal baseline program was that Rhode Island now regulated conditionally exempt small quantity generators (CESQGs) more stringently than did the federal regulations.[3] Under the federal baseline program, CESQGs are exempt from many requirements--including the permit requirement-- that are imposed on generators of higher quantities of hazardous waste. 40 C.F.R. §§ 261.5(a)(2) (outlining limited regulation of CESQGs), 270.1(c) (generally requiring permits to store hazardous waste).

Relying on the federal conditional exemption, Southern Union says it was a CESQG and therefore not required to have a permit. But the 2002 Rule made two things clear. One was that under Rhode Island law, Southern Union needed a permit. The second, tellingly, was that this tighter regulation was going to be federally enforced.[4]

---

[3] The federal program categorizes hazardous waste generators by the amount of hazardous waste they produce monthly. A hazardous waste generator qualifies as a conditionally exempt small quantity generator (CESQG) for a given month if it produces less than 100 kilograms of hazardous waste in that month and has accumulated no more than 1000 kilograms on-site. 40 C.F.R. § 261.5(a), (g)(2). In addition to complying with these limits, CESQGs must comply with regulations governing the categorization, treatment, and disposal of hazardous wastes. See 40 C.F.R. §§ 261.5(g)(1), (3); 262.11.

[4] The Rule also made it clear that a different part of the regulation, not at issue here, would not be federally enforced, indicating EPA did not simply assume all additional state requirements were federally enforceable.

Southern Union did not comment; in fact, the EPA received no comments from the public.  Nor did Southern Union take any action to seek judicial review of the EPA's final determination.

B.        Southern Union's Challenge

Southern Union argues that Rhode Island's regulation of CESQGs, under which it was prosecuted for storing loose mercury without a permit, cannot, merely by virtue of the 2002 Rule, be the basis for federal criminal prosecution.  From this it argues that the district court erred in refusing to put the question of whether it was a CESQG under federal law to the jury.  It argues that only the part of a state's hazardous waste program that is "required by federal law" becomes part of the state's federally authorized--and therefore federally enforceable--program.  Southern Union has put the cart before the horse.

1. Southern Union Is Precluded By 42 U.S.C. § 6976(b) from Attacking Federal Criminal Enforcement of the Federally Authorized State Rule

In enacting RCRA, Congress clearly channeled and limited the mechanism for judicial review of EPA authorizations:

Review of the Administrator's action (1) in issuing, denying, modifying, or revoking any permit under section 6925 of this title . . . or (2) in granting, denying, or withdrawing authorization or interim authorization under section 6926 of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person.  Any such application shall be made within ninety days from the date of such issuance, denial, modification, revocation, grant, or withdrawal, or after such date only if such application

-13-

is based solely on grounds which arose after such
ninetieth day.  Action of the Administrator with respect
to which review could have been obtained under this
subsection shall not be subject to judicial review in
civil or criminal proceedings for enforcement.  Such
review shall be in accordance with sections 701 through
706 of Title 5.

42 U.S.C. § 6976(b) (emphasis added).

Two of the statute's mechanisms are involved here.
First, under § 6976(b), judicial review of the EPA Administrator's
actions in granting authorization (or interim authorization) to
state programs under RCRA may be had in the pertinent federal court
of appeals within ninety days of issuance of the authorization.
Such review is to be in accordance with the Administrative
Procedure Act, 5 U.S.C. §§ 701-706.  It is undisputed that Southern
Union failed to challenge the 2002 Rule in this manner.  Second,
when review of the Administrator's actions could have been obtained
under § 6976, the statute denies judicial review of the
Administrator's action in "civil or criminal proceedings for
enforcement."[5]

This congressional channeling of the forum, method, and
timing of judicial review and exclusion of collateral attacks is
not unusual.  The Comprehensive Environmental Response,
Compensation, and Liability Act (CERCLA) has a similar provision,
see 42 U.S.C. § 9613(a), as do several other environmental

---

[5] The extension of time for challenging actions of the
Administrator on grounds that arise after the ninetieth day is not
applicable here.

-14-

statutes, see 33 U.S.C. §§ 1369(b), 2717(a); 42 U.S.C. §§ 300j-7, 4915(a), 7607(b).  Courts have upheld such channeling.  See, e.g., United States v. Walsh, 8 F.3d 659, 664 (9th Cir. 1993) ("[T]here is nothing to prevent Congress from providing a single national forum for the litigation of [asbestos removal] standards [under 42 U.S.C. § 7607(b)]."); Chrysler Corp. v. EPA, 600 F.2d 904, 912-14 (D.C. Cir. 1979) (applying 42 U.S.C. § 4915).  The CERCLA provision, to take one example, was enforced in a cost-recovery action to preclude the corporate defendant's collateral attack on a Superfund site listing.  See United States v. Asarco, Inc., 214 F.3d 1104, 1107 (9th Cir. 2000).[6]  Southern Union has not argued that § 6976(b) is itself unconstitutional.

The federal circuit courts construing § 6976(b) and the similar review provision in § 6976(a) have unanimously rejected later collateral attacks on the Administrator's decisions.  See Safe Food & Fertilizer v. EPA, 350 F.3d 1263, 1267 (D.C. Cir. 2003) (rejecting, under § 6976(a), an "impermissible 'back-door' challenge" to rulemaking); Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army, 111 F.3d 1485, 1491-93 (9th Cir. 1997); Greenpeace, Inc. v. Waste Techs. Indus., 9 F.3d 1174, 1180-82 (6th

---

[6]     Southern Union's argument about § 6976(b) is presented in its reply brief.  Arguments initially made in a reply brief are usually deemed waived.  See United States v. Hall, 557 F.3d 15, 20 n.3 (1st Cir. 2009).  But we bypass any issue of waiver and resolve the preclusion issue on the merits.

Cir. 1993); Palumbo v. Waste Techs. Indus., 989 F.2d 156, 159-62 (4th Cir. 1993).

In its reply brief, Southern Union argues that there is a distinction between a challenge to an authorization and "a challenge to the [federal] [g]overnment's authority to enforce Rhode Island's CESQG permit requirement."   There is no such distinction.   It is the Administrator's authorization in the 2002 Rule that is under attack.   Once that authorization is given through the Administrator's findings under 40 C.F.R. Part 271, which provides the requirements for federal authorization of state programs, federal enforcement follows automatically as a matter of law.   MacDonald, 933 F.2d at 44.   As Judge Wilkinson noted in Palumbo, the defendant's position "[a]t bottom . . . is nothing more than a collateral attack on the prior . . . decisions of the federal EPA.   The RCRA judicial review provision plainly forbids such an attack, in place of a direct appeal."   Palumbo, 989 F.2d at 159.

We wish to be clear: whether or not Southern Union had filed an action within ninety days of October 8, 2002 challenging the 2002 Rule, we may not under § 6976 review a defense in a criminal proceeding that the EPA's action was legally in error.[7]

---

[7]   In its reply brief Southern Union attempts to argue that it could not have challenged the 2002 Rule within ninety days because there was no final agency action to challenge.   That, it argues, is because the operative language was a mere "preamble." It then merges this into an attack on the merits of the regulation,

-16-

Nonetheless, in an abundance of caution we go on to examine the legality of the EPA's actions and conclude in an alternate holding that those actions withstand challenge.

### 2. Southern Union's Attack on the Legality of the Federal Authorization of Rhode Island's Regulation of CESQGs Fails

Southern Union's arguments fall into several general categories. It argues (1) that the 2002 Rule is not a binding legislative rule on its face for several reasons; (2) that the agency erred in its interpretation of the requirements in 40 C.F.R. § 271.1(i), because the state rule provides a "greater scope of coverage" and so cannot be within federal enforcement authority; and (3) that the 2002 Rule is invalid because it is inconsistent with prior EPA practice and that inconsistency has not been adequately explained or justified.

First, Southern Union challenges the authority under which the 2002 Rule was promulgated and the legal force of the Rule's statement that Rhode Island's regulation of CESQGs is federally enforceable. Southern Union claims, without citing authority, that the "EPA delegated to the Regions only the responsibility to authorize state RCRA programs under Section 6926(b)," not "to determine or expand the breadth of federal enforcement authority." But the EPA has a statutory duty to

---

arguing that it is not a "binding" or "enforceable" determination by the Administrator. We address this argument below.

-17-

approve state programs to the extent they meet the statutory and regulatory criteria.  Southern Union does not explain how the EPA-- including the regional administrators exercising their delegated authorization responsibilities--can fulfill that duty without specifying which parts of a state's program fulfill the criteria, thereby becoming federally approved and enforceable.

Still pursuing its attack on the legal force of the 2002 Rule, Southern Union argues that the portion of the Rule that discusses federal enforceability is a mere unenforceable preamble. Cf. Florida Power & Light Co. v. EPA, 145 F.3d 1414, 1418-20 (D.C. Cir. 1998) (describing preamble to a proposed rule as not a final action for purposes of 42 U.S.C. § 6976(a)).  It argues that the 2002 Rule neither purports to be a binding rule nor can be one, since it was not simultaneously codified in the Code of Federal Regulations.  Cf. Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 538-39 (D.C. Cir. 1986) (characterizing publication in Federal Register as minimum threshold requirement for status as regulation, id. at 538, but stating "[t]he real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations," id. at 539).

As a threshold matter, Southern Union's preamble argument is factually wrong.  Unlike the Federal Register notices in the cases Southern Union cites, the 2002 Rule was not divided into separate preamble and rule sections and did not portray any part of

the notice as "preamble."[8]  Southern Union mischaracterizes other
salient features of the 2002 Rule as well.  The EPA authorization
expressly stated that the action the EPA was taking was an
"[i]mmediate final rule," 67 Fed. Reg. at 51,765; that it was a
"final authorization" under 42 U.S.C. § 6926, 67 Fed. Reg. at
51,765, 51,768; and that the rule would later be codified in the
Code of Federal Regulations, id. at 51,768.  Moreover, the EPA
clearly treated the 2002 authorization as having binding legal
force, promulgating it through formal notice-and-comment
rulemaking, and stating in the rule itself that the rule
represented final agency action.[9]

     Second, Southern Union presents an argument construing
the relevant federal regulation.  It argues that since the baseline
federal program does not require CESQGs to obtain hazardous waste

---

     [8]     Compare Natural Res. Def. Council v. EPA, 559 F.3d 561,
565 (D.C. Cir. 2009) with 72 Fed. Reg. 13,560, 13,560, 13,580 (Mar.
2, 2007) (Federal Register notice at issue in Natural Res. Def.
Council); compare Florida Power & Light Co. v. EPA, 145 F.3d 1414,
1414-18 (D.C. Cir. 1998), with 59 Fed. Reg. 55,778, 55,778, 55,792
(Nov. 4, 1994) (Federal Register notice at issue in Florida Power
& Light).

     [9]     In applying the similar review provision in § 6976(a),
the D.C. Circuit examines three factors to determine whether the
EPA has issued a "final regulation" under RCRA: (1) EPA's
characterization of the action, (2) whether the action was
published in the Federal Register or the Code of Federal
Regulations, and (3) most importantly, whether the action has a
binding effect on either private parties or the EPA.  E.g., Cement
Kiln Recycling Coal. v. EPA, 493 F.3d 207, 226-27 (D.C. Cir. 2007);
Gen. Motors Corp. v. EPA, 363 F.3d 442, 448 (D.C. Cir. 2004)
(stating third factor most important).  We need not address whether
this circuit would take a similar view.

storage permits, the United States cannot enforce state rules that do.   We reject this strained interpretation of 40 C.F.R. § 271.1(i), which governs federal authorization of state hazardous waste programs.   The provision reads as follows:

> (i) Except as provided in § 271.4, nothing in this subpart[10] precludes a State from:
>
> (1) Adopting or enforcing requirements which are more stringent or more extensive than those required under this subpart;
>
> (2) Operating a program with a greater scope of coverage than that required under this subpart. Where an approved State program has a greater scope of coverage than required by Federal law, the additional coverage is not part of the Federally approved program.

On Southern Union's interpretation of the regulation, any state rule that is not "required" by the federal baseline program necessarily imposes "a greater scope of coverage," and so the district court erred when it held that "more stringent" requirements are federally approved while only greater-in-scope requirements are not.   We reject Southern Union's interpretation because it vitiates the clear distinction between "more stringent" and "greater in scope," collapsing the two terms into one.

Beyond that, if there were any ambiguity, we would "afford[] 'considerable deference' to the agency's interpretation of regulations promulgated under [its statutory] authority." Rhode

---

[10]   This subpart includes 40 C.F.R. §§ 271.1-271.27 inclusive, all of which sections specify requirements for federal authorization of state programs.

Island Hosp. v. Leavitt, 548 F.3d 29, 34 (1st Cir. 2008); see also Martex Farms, S.E. v. EPA, 559 F.3d 29, 32 (1st Cir. 2009). Here, where the agency has expressed that interpretation in a legislative rule promulgated through notice-and-comment rulemaking, the agency's interpretation is binding unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(a)(2), or otherwise defective under the APA. See Levesque v. Block, 723 F.2d 175, 182 (1st Cir. 1983); see also Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs, 464 F.3d 1306, 1317 (Fed. Cir. 2006) (stating that a substantive rule has the force and effect of law).

Southern Union offers no argument that the EPA's interpretation is arbitrary or capricious, or that the agency somehow exceeded its statutory authority. It argues only that its own reading is better on the plain language of the regulation. We do not agree about the reading and in any event this is not enough. The EPA's interpretation of 40 C.F.R. § 271.1(i) to permit federal enforcement of "more stringent" state regulations is a reasonable one based on the text and structure of the regulation.[11]

Southern Union argues in the alternative that even if "more stringent" requirements are federally authorized, a state's regulation of CESQGs is "additional coverage" rather than merely a

---

[11]    Southern Union does not challenge the validity of 40 C.F.R. § 271.1(i) itself (nor could it, since such a challenge would be untimely under 42 U.S.C. § 6976(a)).

-21-

"more stringent" requirement because it expands the universe of regulated entities to include entities that would not otherwise be covered by RCRA.

Southern Union's argument is based on its misreading of 40 C.F.R. § 261.5. This federal regulation clearly regulates CESQGs, governing how they categorize their waste, where they may store it, and how they may dispose of it. 40 C.F.R. § 261.5(c), (g). This is in addition to the eligibility requirements for categorization as a CESQG in a given month. 40 C.F.R. § 261.5(a), (g)(2). Further, because the eligibility requirements are based on the amount of hazardous waste generated or stored in a particular month, CESQG status is transient, so that some generators will be CESQGs only some of the time. It does not expand the universe of regulated entities to subject already-regulated entities to fuller regulation in Rhode Island.

Third, and finally, Southern Union strongly urges that the 2002 Rule is invalid because it is irrationally inconsistent with prior pronouncements of the EPA's position on the regulation of CESQGs and on which state regulations will receive federal authorization. Southern Union's argument relies primarily on various nonbinding EPA guidance documents stemming from the agency's interpretations, in the 1980s, that state regulation of CESQGs was not federally enforceable. However, these internal guidance documents have not been put forth as legally binding and

were not promulgated through notice-and-comment rulemaking, and therefore cannot trump the agency's formal regulatory promulgations. Cf. Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000).

Southern Union also points in passing to prior formal EPA authorizations of state programs--in 1992 as to California and in 2001 as to the District of Columbia--determining that state regulation of CESQGs was not then, in the EPA's view, federally enforceable. See 66 Fed. Reg. 46,961, 46,965 (Sept. 10, 2001) (District of Columbia); 57 Fed. Reg. 32,726, 32,729 (July 23, 1992) (California). Southern Union argues the 2002 EPA Rule authorizing Rhode Island's program cannot be binding on the regulated community because it is inconsistent with these prior determinations.

We briefly explain why the 2002 Rule is not subject to attack on grounds of irrational inconsistency with other EPA authorizations of state programs. The facts show that Southern Union overstates the supposed conflict. Since 1999, with the sole exception of the District of Columbia in 2001, EPA has consistently characterized state regulation of CESQGs as federally enforceable. See 72 Fed. Reg. 12,568, 12,570 (Mar. 16, 2007) (Vermont); 71 Fed. Reg. 9727, 9732, 9733 (Feb. 27, 2006) (New Hampshire); 69 Fed. Reg. 57,842, 57,856 (Sept. 28, 2004) (Connecticut); 64 Fed. Reg. 48,099, 48,101 (Sept. 2, 1999) (Louisiana). The District of Columbia decision in 2001 demonstrates, at worst, an aberration, and the

-23-

agency has maintained a consistent position ever since. In this vein, EPA has issued a proposed rule making California's CESQG regulations federally enforceable. 75 Fed. Reg. 60,398, 60,401-02 (Sept. 20, 2010).

Policy change over time is not irrational inconsistency. Agencies may change their policies provided substantive changes in an agency's position are accomplished by notice-and-comment rulemaking, see Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 100 (1995); U.S. Telecom Ass'n v. FCC, 400 F.3d 29, 34-35 (D.C. Cir. 2005), and accompanied by "some indication that the shift is rational," Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n, 59 F.3d 284, 291 (1st Cir. 1995) (citing Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973) (stating agency's rationale must be clear "so that the reviewing court may understand the basis of the agency's action.")). These conditions are met here. Each state program authorization has been promulgated through notice-and-comment rulemaking. And the change was clearly rational; the EPA's "reasoned basis" for deciding state CESQG regulations are federally enforceable is clearly discernible from the very text and structure of the regulation. See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974).

C.      Southern Union's Due Process Claim

There was no lack of due notice to Southern Union that
its behavior could lead to criminal prosecution.

The law embodies two commonsense notions in the face of
protestations of innocence by reason of ignorance.  One is that
those who keep dangerous materials on hand know their activity is
regulated.  United States v. Int'l Minerals & Chem. Corp., 402 U.S.
558, 565 (1971) ("[W]here . . . obnoxious waste materials are
involved, the probability of regulation is so great that anyone who
is aware that he is in possession of them or dealing with them must
be presumed to be aware of the regulation.").  The other is that
those who manage highly regulated industries are not
unsophisticated.  Southern Union is in the natural gas industry,
which is highly regulated both federally and locally.  It is part
of its business to keep abreast of government regulation.  See
United States v. Lachman, 387 F.3d 42, 56-57 (1st Cir. 2004)
(stating that companies in highly regulated industries are presumed
to be on notice of applicable regulatory regime).

Further, the company's activities put it in violation of
state law.  R.I. Gen. Laws § 23-19.1-18 (making violation of state
hazardous waste rules a felony punishable by imprisonment, $25,000
fine for each day's violation, and remediation costs).  Southern
Union does not argue it lacked notice of that.  Rather, it argues
it lacked notice that it could be federally prosecuted for activity
it acknowledges was a state crime.  We have held in a parallel

-25-

situation that notice that conduct violates state law constitutes fair notice of a counterpart federal violation. United States v. Gagnon, 621 F.3d 30, 33 (1st Cir. 2010).

In any event, the Environmental Services Manager for Southern Union's New England Gas Company subsidiary received a letter in July 2002 explaining that the EPA would soon authorize revisions to Rhode Island's hazardous waste program and inviting the company to comment. The company had actual notice of the publication of a Final Rule. The ensuing federal 2002 Rule was crystal clear on its face that the state standards would be federally enforced. It became effective twenty-three months before the event which led to the prosecution of Southern Union. There was no trap for the unwitting here. Obliviousness is not a defense.

### III. CHALLENGES TO THE FINE

The statutory fine for knowing storage of hazardous waste without a permit is "not more than $50,000 for each day of violation." 42 U.S.C. § 6928(d). The district court imposed a $6 million fine and a $12 million "community service obligation." Southern Union adequately preserved an objection to these penalties on the grounds that the $38.1 million maximum fine calculated in

the pre-sentence report violated Apprendi v. New Jersey, 530 U.S. 466 (2000).[12]

Apprendi requires that "any fact" other than that of a prior conviction "that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Id. at 490.  Southern Union argued at sentencing that the court could not impose a fine greater than $50,000, the maximum fine for a one-day violation.  That was because Southern Union presented evidence at trial from which the jury could have found that for at least some of the period of the indictment, it had treated the loose mercury as a recyclable resource rather than as waste.  The jury, it notes, was not asked to determine the number of days of violation, but only "to determine whether . . . at some point in time the liquid mercury was discarded by being abandoned" (emphasis added).

The prosecution argued that the Apprendi rule against judicial factfinding does not apply in the context of criminal

---

[12]    The district court found Southern Union had waived the Apprendi argument by failing to raise the issue during discussions about the structure of the jury verdict form, and raising the issue for the first time in objecting to the presentence report.  United States v. Southern Union Co., No. 07-134, 2009 WL 2032097, at *2 (D.R.I. July 9, 2009) (Southern Union II).  Southern Union disagrees that there was waiver, given that in United States v. Pérez-Ruiz, 353 F.3d 1, 14 (1st Cir. 2003), we found that "[i]n order to preserve a claim of Apprendi error for appeal, it is enough that a defendant offer a timely objection at sentencing."  Id.  The prosecution did not seek the district court's waiver ruling and does not press it on appeal.

fines.  The district court held that Apprendi does apply, but found it implicit in the jury verdict and the indictment on which the verdict form was based that Southern Union had violated RCRA for the full 762 days charged in the indictment.  United States v. Southern Union Co., No. 07-134, 2009 WL 2032097, at *3-4 (D.R.I. July 9, 2009) (Southern Union II).  It then used that information to calculate the maximum fine of $38.1 million.  Id. at *4.  The indictment charged conduct "[f]rom on or about September 19, 2002 until on or about October 19, 2004," and the verdict form encompassed Southern Union's conduct "[a]s to Count 1 of the Indictment, on or about September 19, 2002 to October 19, 2004." From these, the court concluded that the jury had found beyond a reasonable doubt that Southern Union violated RCRA during the entire period from approximately September 19, 2002 until October 19, 2004.  Southern Union II, 2009 WL 2032097, at *3.

On appeal, Southern Union makes two arguments challenging the fine.  First, it argues that where the statute of conviction sets a maximum fine of $50,000 "for each day of violation," 42 U.S.C. § 6928(d), then the issue of the number of days of violation must be submitted to the jury under Apprendi.  Second, it argues that the penalties imposed constituted an abuse of discretion. While we disagree with the district court on the Apprendi issue, we also reject Southern Union's arguments.

A.        Apprendi Does Not Apply to Criminal Fines

-28-

We start with the Apprendi argument, which presents a
pure issue of law, reviewed de novo.  United States v. González-
Vélez, 466 F.3d 27, 40 (1st Cir. 2006).  It is an open question in
this circuit whether Apprendi applies to criminal fines, though we
have assumed that criminal fines are subject to the rule of United
States v. Booker, 543 U.S. 220 (2005), a post-Apprendi case on the
Federal Sentencing Guidelines.  United States v. Bevilacqua, 447
F.3d 124, 127 (1st Cir. 2006); see also United States v. Uribe-
Londoño, 409 F.3d 1, 5 n.5 (1st Cir. 2005).

Southern Union argues that the question of whether
Apprendi applies is resolved by the plain language of the Supreme
Court's opinion in that case, which states that the rule covers
"any fact that increases the penalty for a crime" beyond the
statutory maximum.  Apprendi, 530 U.S. at 490 (emphasis added).  If
Apprendi applies only to facts increasing terms of incarceration,
and not to criminal fines, Southern Union argues, the Court's use
of the broad word "penalty" becomes superfluous, and corporations,
which cannot be incarcerated, are left outside Apprendi's
protection.

The Supreme Court extended the Apprendi rule to new
contexts in several post-Apprendi decisions.  See Ring v. Arizona,
536 U.S. 584 (2002) (applying rule to statute authorizing death
penalty upon judge's finding of aggravating factor); Blakely v.
Washington, 542 U.S. 296 (2004) (applying rule to statute

-29-

authorizing "exceptional sentence" upon judge's finding of aggravating factor); United States v. Booker, 543 U.S. 220 (2005) (applying rule to mandatory Federal Sentencing Guidelines enhancements); Cunningham v. California, 549 U.S. 270 (2007) (applying rule to scheme authorizing schedule of longer prison terms if judge finds aggravating circumstance). Under these decisions, a judge may not mete out any "punishment" for which the jury has not found all the necessary "facts." Blakely, 542 U.S. at 304. This has been called a "bright-line rule." Cunningham, 549 U.S. at 288. These cases do not distinguish among types of "penalties" or "punishment," leaving the broad language unglossed. From this one might conclude that a fine is like all other penalties, or one could reach a different conclusion. What is clear is that none of these cases deals with the question of whether the imposition of a fine falls under the Apprendi rule.

The prosecution argues that both the reasoning and the express language in Oregon v. Ice, 129 S. Ct. 711 (2010), mean that Apprendi does not apply to criminal fines, which have historically been within the discretion of judges, and not assigned to juries for determination. In Ice, the Court upheld a state sentencing regime that allowed judges to find facts justifying the imposition of consecutive, rather than concurrent, sentences of incarceration. Id. at 720. The Court characterized its decisions under Apprendi as curtailing any "legislative attempt to 'remove from the

-30-

[province of the] jury' the determination of facts that warrant punishment for a specific statutory offense." Id. at 718 (quoting Apprendi, 530 U.S. at 490) (alteration in original). The Court, reasoning from historical practice, cautioned that "preservation of the jury's historic role as a bulwark between the State and the accused at the trial for an alleged offense" is the "animating principle" in which the Apprendi rule must remain rooted. Id. at 717. The Court expressly considered the history at common law of the practice Ice challenged. Finding that at the time of the Founding, it was judges who chose whether to impose sentences concurrently or consecutively, and that therefore no traditional jury function had been curtailed by Oregon's scheme, the Court declined to extend the Apprendi rule to this determination.[13] Id. at 717-18. The logic and method of Ice alter any previous broad understanding of Apprendi.

The prosecution argues that we should follow not only the method of historical analysis endorsed by Ice but also the opinion's express language about criminal fines. The Court made an

---

[13]  The Court explained that its decision was also justified by states' sovereign interest in maintaining authority over their criminal justice systems and by the administrative difficulties the contrary rule, which could necessitate bifurcated or trifurcated trials, would place on state court systems. Ice, 129 S. Ct. at 718-19. The prosecution has provided a long list of state statutes that impose fines per day of violation, urging this court to consider the impact on state sovereignty that the application of Apprendi to fines could have on these statutes. Because we find ample reason not to extend the rule here, we need not decide the merits of this argument.

express statement in Ice, albeit in dicta, that it is inappropriate to extend Apprendi to criminal fines.  Observing that many states permit judicial factfinding on matters "other than the length of incarceration," the Court explained that "[t]rial judges often find facts about the nature of the offense or the character of the defendant in determining, for example, the length of supervised release following service of a prison sentence; required attendance at drug rehabilitation programs or terms of community service; and the imposition of statutorily prescribed fines and orders of restitution."[14]   Id. at 719.   The Court warned that applying Apprendi to these types of determinations "surely would cut the rule loose from its moorings."  Id.

We agree that we must give this language great weight. We do not discount the Supreme Court's language merely because it was used in dicta.  We "are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when . . . a dictum is of recent vintage and not

---

[14]    We have previously held that orders of restitution are not subject to the Apprendi rule.  See United States v. Milkiewicz, 470 F.3d 390 (1st Cir. 2006).  There, we explained that the statutory scheme for restitution, under which the court determines the victim's losses by a preponderance of the evidence, id. at 403, does not trigger the principles underlying Apprendi because the jury's verdict of guilt automatically authorizes restitution in the full amount of the victim's losses, id. at 404.  We reached this result despite noting that a "literal application of the Supreme Court's language might suggest" that the Apprendi rule does apply, id. at 403, indicating that even before Ice the Supreme Court's Apprendi line of cases tolerated nuanced application despite the cases' broad language.

enfeebled by any subsequent statement." Rossiter v. Potter, 357
F.3d 26, 31 n.3 (1st Cir. 2004) (alteration in original) (quoting
McCoy v. MIT, 950 F.2d 13, 19 (1st Cir. 1991)) (internal quotation
mark omitted).

        Turning again to the method of reasoning the Court used
in Ice, we agree with the prosecution that we must follow the logic
of Ice's reasoning, which further supports the conclusion that
Apprendi does not apply to criminal fines.  As the Supreme Court
recently stated, "[a] holding . . . can extend through its logic
beyond the specific facts of the particular case."  Los Angeles
County v. Humphries, No. 09-350, slip op. at 8 (U.S. Nov. 30,
2010).

        Applying Ice's reasoning and logic to the issue in this
case, it is now highly relevant that, historically, judges assessed
fines without input from the jury.[15]  Judges had discretion to
determine the amount of any fine imposed, and "[t]he range was
apparently without limit except insofar as it was within the
expectation on the part of the court that it would be paid."
Kathryn Preyer, Penal Measures in the American Colonies: An
Overview, 26 Am. J. Legal Hist. 326, 350 (1982).  This is in direct

---

        [15]    Before incarceration became widely used, "the two main
forms of noncapital punishment were whippings and fines, and in
both cases, the judge could set the amount or even elect between
the two, depending on the nature of the defendant and the crime."
Erik Lillquist, The Puzzling Return of Jury Sentencing: Misgivings
about Apprendi, 82 N.C. L. Rev. 621, 641 (2004).

contrast with the Supreme Court's reasoning in the Apprendi context that the "English trial judge of the later eighteenth century had very little explicit discretion in sentencing." Apprendi, 530 U.S. at 479 (quoting John H. Langbein, The English Criminal Trial Jury on the Eve of the French Revolution, in The Trial Jury in England, France, Germany 1700-1900, at 13, 36-37 (A. Schiappa ed., 1987)). Judicial discretion was limited in this context because the jury decided what level of crime the defendant had committed, which in turn largely determined the sentence.  Id. at 479-80.

Southern Union's main rejoinder is that historical practices do not speak to the specific issue here, the determination of the duration of an offense on which a fine is determined.[16]  Even assuming fines are similar to sentences of incarceration, this argument misses the point of the analogy and the flow of the logic used by the Ice majority.  The historical record presented in Ice showed that at common law, judges chose within their unfettered discretion whether to impose consecutive or concurrent sentences, and consecutive sentences were the default rule.  Ice, 129 S. Ct. at 717.  The prosecution here presents

---

[16]    Southern Union also argues that there is evidence that ten states allowed juries to determine fines at the turn of the twentieth century.  Such evidence, however, is of little utility where the inquiry concerns the role of the jury at common law.  See Ice, 129 S. Ct. at 717 ("Our application of Apprendi's rule must honor the 'longstanding common-law practice' in which the rule is rooted.") (quoting Cunningham v. California, 549 U.S. 270, 281 (2007)).

strong evidence of historic practice that at common law, judges'
discretion in imposing fines was largely unfettered.  The Court in
Ice specifically cautioned that it would be senseless to use
Apprendi to nullify sentencing schemes in which legislatures have
curtailed the discretion judges had at common law.  Id. at 719.

        Our view that Ice has effected a change in the
application of the Apprendi rule to the issue in this case is
directly supported by the dissent in Ice.  The four dissenting
Justices stated that the majority opinion had altered the method of
analysis underlying Apprendi in at least five different ways.  Id.
at 721-22 (Scalia, J., dissenting).  They protested that the
majority had constructed formal limits narrowing the broad,
"nonformalistic rule" originally set forth in Apprendi.  Id. at
720.  The dissent stated that the Ice majority had accepted
arguments the Court had previously rejected under Apprendi about
the relevance of common-law sentencing practices to the
constitutionality of modern legislative sentencing schemes.  Id. at
720-22.  The dissent, colorfully accusing the majority of giving
life to arguments previously "dead and buried," insisted that the
Court's opinion in Ice "gives cause to doubt whether the Court is
willing to stand by" the Apprendi rule.  Id. at 723.

        Our holding is based on the Supreme Court's language in
Ice that "[i]ntruding Apprendi's rule into" decisions such as "the
imposition of statutorily prescribed fines . . . surely would cut

-35-

the rule loose from its moorings."  Id. at 719 (majority opinion).
To the extent that excluding criminal fines from Apprendi requires
a more restrained view of the rule's scope than did the Court's
previous Apprendi-line decisions, it is the Supreme Court in Ice
that has imposed the restraint.  See id. ("Members of this Court
have warned against 'wooden, unyielding insistence on expanding the
Apprendi doctrine far beyond its necessary boundaries.'") (quoting
Cunningham, 549 U.S. at 295 (Kennedy, J., dissenting)).[17]

        In the interest of judicial economy and efficiency we
reach an additional issue.  We hold that if we are wrong and if
Apprendi does apply to criminal fines, it would be necessary to
remand for resentencing.  The district court erred in holding,
despite the absence of a special interrogatory, that the jury
necessarily found beyond a reasonable doubt that Southern Union had
violated RCRA during all or nearly all of the date range in the
indictment.  Southern Union II, 2009 WL 2032097, at *3.  The court
reasoned that the indictment's description of the date range--from

_____

        [17]    We recognize that two circuits, which could not or did
not discuss Ice, have applied Apprendi to criminal fines.  See
United States v. Pfaff, Nos. 09-1702, 09-1707, 09-1790, 2010 WL
3365923 (2d Cir. Aug. 27, 2010); United States v. LaGrou
Distribution Sys., Inc., 466 F.3d 585 (7th Cir. 2006).  In LaGrou,
which was decided before the Supreme Court's decision in Ice, the
Seventh Circuit simply quoted the rule in Apprendi and held that
the fine imposed in that case violated the rule.  LaGrou, 466 F.3d
at 594.  In Pfaff, the Second Circuit cited to LaGrou without
adding analysis of its own, other than to distinguish criminal
fines from restitution on the stated grounds that only criminal
fines are subject to statutory maximums.  Pfaff, 2010 WL 3365923,
at *2.

"on or about September 19, 2002 to October 19, 2004"--was "listed on the verdict form and found by the jury beyond a reasonable doubt." Id. From this date range the court calculated a period of violation of 762 days, resulting in a statutory maximum fine of $38.1 million, reduced a bit at the margin due to the "on or about" language in the verdict form. Id.

The prosecution essentially concedes and we agree that if Apprendi did apply to criminal fines, the jury did not necessarily determine the number of days of violation. The jury did not need to find that Southern Union began to violate RCRA "on or about" September 19, 2002 in order to convict Southern Union on Count 1. As the court instructed the jury, the jury needed only to "determine . . . whether at some point in time the liquid mercury was discarded by being abandoned" and therefore ceased to be legally held for future recycling and began to be stored as waste (emphasis added). Southern Union produced evidence that at several points throughout the indictment period, and as late as the summer of 2004, Southern Union employees discussed a potential mercury recycling project. The district court could not conclude from the verdict form the number of days of violation the jury had necessarily found.

Where an error is constitutional in nature, "the government has the burden of proving beyond a reasonable doubt that the error did not affect the defendant's substantial rights."

-37-

United States v. Sepúlveda-Contreras, 466 F.3d 166, 171 (1st Cir. 2006). Apprendi error is harmless "where the evidence overwhelmingly establishes" the facts necessary "to justify the statutory maximum under which the defendants were sentenced." United States v. Soto-Beníquez, 356 F.3d 1, 46 (1st Cir. 2004). That is not this case. We reject the prosecution's suggestion that the evidence was so overwhelming that no reasonable jury could conclude other than that the mercury was treated as waste throughout the period in the indictment.

If, then, we are wrong about whether the Apprendi rule applies to criminal fines, the case would need to be remanded to the district court for resentencing. The district court would need to address several issues that we mention but do not resolve here.

First, it would need to address the prosecution's argument at sentencing that even if Apprendi applied, Southern Union could be assessed a $500,000 fine under the alternative fine statute. See 18 U.S.C. § 3571(c).

Second, it may need to clarify the nature of the financial penalties it imposed. At sentencing, after determining that the statute "yields a maximum fine . . . of $38.1 million," the district court characterized the $18 million in financial penalties it imposed as two separate pools of funds, including a "fine" of $6 million and a "community service obligation," listed

-38-

in the court's judgment as a special condition of probation, of $12 million.[18]  In describing the community service obligation, the court did not use the term "restitution," but neither did the court specify that it was part of a total fine.

The prosecution argues that the district court should be "permitted to clarify the status of the $12 million" it assessed in community service obligations as "restitution."  Restitution is exempt from Apprendi under our circuit law.  United States v. Milkiewicz, 470 F.3d 390, 402-04 (1st Cir. 2006).

Southern Union, in its opening brief, ignored the district court's treatment of the financial penalties as having two separate components, and described its obligations as a single $18 million penalty.  In its reply brief, it argues that the district court cannot recharacterize the community service obligations as restitution because it did not invoke the statutory restitution procedure before sentencing.  See 18 U.S.C. § 3664.  If a remand were necessary, the district court may need to address these issues

---

[18]     $1 million of the $12 million obligation is designated for the following recipients: $200,000 each for the Rhode Island Chapter of the American Red Cross, the Rhode Island Environmental Response Fund, the Hasbro Children's Hospital in Providence, the state Distressed Communities Recreation and Acquisition Fund, and the Pawtucket Fire Department.  The remaining $11 million is designated to endow a grantmaking fund, to be managed by the Rhode Island Foundation, in order to fund grants in environmental education, remediation, conservation, and children's health issues related to toxic waste.

in the first instance and determine which arguments Southern Union
has preserved.

B.          The Fine Imposed Was Reasonable

We review the reasonableness of the sentence imposed,
upholding the sentence unless the district court abused its
discretion.  United States v. Carrasco-De-Jesús, 589 F.3d 22, 26
(1st Cir. 2009); United States v. Thurston, 544 F.3d 22, 24-25 (1st
Cir. 2008).  First, we determine whether the district court
considered the relevant statutory sentencing factors and adequately
explained the sentence it chose.[19] See United States v. Martin, 520
F.3d 87, 92 (1st Cir. 2008) (quoting Gall v. United States, 552
U.S. 38, 51 (2007)).  Second, we consider whether the sentence is
substantively reasonable under the totality of the circumstances,
giving due deference to the district court's experience and
familiarity with the facts of the case.  Id.

The Sentencing Guidelines on fines do not apply here, and
so in addition to the relevant RCRA provision, 42 U.S.C. § 6928(d),
the district court was obliged to consider only the sentencing
factors in 18 U.S.C. §§ 3553 and 3572.  U.S.S.G. §§ 8C2.1 cmt.
background, 8C2.10 (2009); see also United States v. Ionia Mgmt.
S.A., 555 F.3d 303, 310-11 (2d Cir. 2009) (explaining review of
fine imposed when Sentencing Guidelines do not apply).  Even

---

[19]    Southern Union does not challenge the district court's
pertinent findings of fact.

Case 1:07-cr-00134-S-DLM Document 156   Filed 12/23/10   Page 41 of 43 PageID #: 4517

assuming arguendo that the $12 million community service obligation was a fine, the financial penalties imposed were within the discretion of the district court.

Southern Union argues that the district court misapplied the statutory sentencing factors, placing too much emphasis on factors likely to increase the fine, such as the company's profitability, and too little on mitigating factors, such as its prior history as a clean, responsible corporate citizen and its outlays in remediating the damage from the mercury distribution. The prosecution urges us to review these claims only for plain error, because Southern Union failed to present them to the district court despite clear opportunity to do so after the court announced the sentence. See United States v. Almenas, 553 F.3d 27, 36 (1st Cir. 2009) (applying plain error review); United States v. Mangual-Garcia, 505 F.3d 1, 15 (1st Cir. 2007) (same). In any event we hold there was no procedural error, let alone plain error, in the district court's methodical, detailed consideration of each sentencing factor.

Southern Union also claims the $18 million penalty was substantively unreasonable, arguing that it was grossly excessive in comparison to the penalties of $75,000-$250,000 imposed in what it describes as cases of more egregious RCRA violations. See 18 U.S.C. § 3553(a)(6) (requiring courts to "avoid unwarranted sentence disparities among defendants with similar records who have

-41-

been found guilty of similar conduct").  But the district court
made "an individualized assessment based on the facts presented,"
and "adequately explain[ed] the chosen sentence."  Gall, 552 U.S.
at 50.

The district court explained why the statutory factors
justified the penalties, noting that Congress measured the
seriousness of long-term RCRA violations by imposing a high, per-
day statutory maximum fine; that Southern Union's willingness to
put a densely-populated residential community, local public safety
employees, and its own employees at risk by storing hazardous waste
under deplorable conditions in their midst indicated great
culpability; and that there was a need for a penalty substantial
enough to attract the attention of large corporations, thereby
achieving not only specific, but also general, deterrence.
Further, the district court specifically acknowledged the need to
avoid creating unwarranted disparities, but explained that it had
concluded that "sentencing in criminal environmental matters is a
very individualistic task" in which case-to-case comparisons are
difficult to make.[20]  Reviewing the totality of the circumstances,

---

[20]     Based on the five cases Southern Union encourages us to
consider, the court's conclusion was warranted.  Four were resolved
by plea agreements.  The fifth, United States v. Kelley Technical
Coatings, Inc., 157 F.3d 432 (6th Cir. 1998), upheld an RCRA
conviction for which a $225,000 fine was imposed.  Id. at 444.
Kelley's sentence was not at issue on appeal, and the opinion lacks
information necessary to any reasoned comparison--for instance,
whether Kelley's manufacturing plants were in a populated area, or
how large or profitable Kelley was.  See id. at 435-36.  Further,

we find no abuse of discretion in the sentence imposed by the district court.

                                    IV.

       In this case each side has been well represented by able counsel.

       For the reasons stated above, we affirm Southern Union's conviction as well as the sentence and financial penalties imposed.

       So ordered.

---

the Sixth Circuit affirmed the conviction of Kelley's vice president and his sentence to a fine and imprisonment, id. at 443-44--a substantial penalty imposing individual responsibility that is completely absent in Southern Union's case since, as the district court noted, there is no evidence of any individual shouldering any responsibility for the company's RCRA violation.